**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF**
**OHIO EASTERN DIVISION**

| | |
|---|---|
| JOHN DOE, et al., | Case No. 2:08 CV 575 |
| Plaintiffs, | Judge Frost |
| v. | Magistrate Judge King |
| MOUNT VERNON CITY SCHOOL DISTRICT BOARD OF EDUCATION, et al., | |
| Defendants. | |

## PLAINTIFFS STEPHEN AND JENIFER DENNIS'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Fed. Rule of Civ. Proc. 56, the Court's Scheduling Order, and applicable law, Plaintiffs Stephen and Jenifer Dennis, individually and as the natural parents and next friends of their minor child, Zachary Dennis, hereby move the Court to enter an Order granting summary judgment on Defendant John Freshwater's counterclaims for defamation and intentional infliction of emotional distress. Plaintiffs also move for summary judgment on their battery and Establishment Clause claims. Points and authorities in support of this Motion are set forth in Plaintiffs' Memorandum in Support.

Respectfully submitted,

/s/Douglas M. Mansfield
Douglas M. Mansfield (0063443)
(Trial Attorney)
dmansfield@jonesday.com
JONES DAY
325 John H. McConnell Blvd. Ste. 600
Columbus, OH  43215

(614) 469-3939 (telephone)
 (614) 461-4198 (fax)

Mailing Address:
JONES DAY
P.O. Box 165017
Columbus, OH  43215-2673

Attorney for Plaintiffs

# TABLE OF CONTENTS

**Page**

SUMMARY OF ARGUMENT ......................................................................... vi

I.   INTRODUCTION ........................................................................................ 1

II.  FACTUAL BACKGROUND ....................................................................... 4

III. ARGUMENT ............................................................................................. 10

   A.   Freshwater's Defamation Counterclaim Fails For Multiple Reasons ................. 11

      1.   The Statements That Freshwater Claims Are Defamatory All Are Contained In Plaintiffs' First Amended Complaint, And Therefore Are Absolutely Privileged......................................................................... 12

      2.   Freshwater Fails To Adequately Identify Any Defamatory Statements Outside Of Those Contained In The First Amended Complaint, Which Also Requires Dismissal Of His Defamation Counterclaim ........................................................................................ 13

      3.   The Dennises' Statements Are Protected By A Qualified Privilege ........ 14

      4.   Freshwater Is A Limited Purpose-Public Figure Who Cannot Establish That The Dennises Acted With Actual Malice ........................ 17

   B.   Freshwater's Counterclaim For Intentional Infliction Of Emotional Distress Likewise Should Be Dismissed On Multiple Grounds. ........................ 20

      1.   Freshwater Has Failed To Show That The Dennises Intended To Cause Him Emotional Distress Or That They Should Have Known That Their Conduct Would Cause Him Emotional Distress.................... 21

      2.   Freshwater Has Failed To Show That The Dennises' Conduct Was Outrageous and Extreme........................................................................ 22

      3.   Freshwater Has Failed To Show That He Suffered From A Severe And Debilitating Injury.......................................................................... 24

   C.   Freshwater Has Failed To Plead, Let Alone Make Out, A Prima Facie Case For Negligent Infliction Of Emotional Distress......................................... 25

   D.   The Dennises Are Entitled To Summary Judgment On Their Battery Claim............................................................................................................. 26

      1.   The Dennises Have Established A Prima Facie Case For Battery........... 26

      2.   Zach Dennis Did Not Consent To Being Harmed By The Tesla Coil......................................................................................................... 27

   E.   Freshwater Violated the Establishment Clause By Endorsing Religious Beliefs in His Classroom ............................................................................... 29

      1.   Freshwater Fails the "Purpose" Prong of the Lemon Test...................... 30

**TABLE OF CONTENTS**
(continued)

**Page**

  2. Freshwater Fails the "Endorsement" and "Entanglement" Prongs of the Lemon Test ........................................................................ 33

IV. CONCLUSION ............................................................................................. 35

## TABLE OF AUTHORITIES

**Page**

CASES

UNITED STATES SUPREME COURT

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)............................................................................................11

*Edwards v. Aguillard*,
482 U.S. 578 (1987)............................................................................................30

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974)............................................................................................18

*Lemon v. Kurtzman*,
403 U.S. 602 (1971)........................................................................................ passim

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)............................................................................................11

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964)............................................................................................17

*Santa Fe Indep. Sch. Dist. v. Doe*,
530 U.S. 290 (2000)............................................................................................34

*Stone v. Graham*,
449 U.S. 39 (1980)................................................................................30, 31, 32

*Zelman v. Simmons-Harris*,
536 U.S. 639 (2002)............................................................................................34

FEDERAL CIRCUIT COURTS

*Adland v. Russ*,
307 F.3d 471 (6th Cir. 2002) ........................................................................29, 30

*Am. Civil Liberties Union of Ky. v. McCreary County*,
354 F.3d 438 (6th Cir. 2003) ........................................................................ passim

*Baker v. Adams County/Ohio Valley Sch. Bd.*,
310 F.3d 927 (6th Cir. 2002) ............................................................................34

*Coles ex rel. Coles v. Cleveland Bd. of Educ.*,
171 F.3d 369 (6th Cir. 1999) ............................................................................30

*Harris v. United States*,
    422 F.3d 322 (6th Cir. 2005) ....................................................................26

*Roberts v. Madigan*,
    921 F.2d 1047 (10th Cir. 1990) ........................................................33, 35

*Talley v. Family Dollar Stores of Ohio, Inc.*,
    542 F.3d 1099 (6th Cir. 2008) ...........................................................21, 24

## FEDERAL DISTRICT COURTS

*Katter v. Ohio Employment Relations Bd.*,
    492 F. Supp. 2d 851 (S.D. Ohio 2007) ......................................................34

*Martin v. JBS Technologies, LLC*,
    443 F. Supp. 2d 962 (S.D. Ohio 2006) ......................................................22

## OHIO SUPREME COURT

*A&B-Abell Elevator Co., Inc. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*,
    651 N.E.2d 1283 (Ohio 1995) .........................................................14, 15, 17, 20

*Hahn v. Kotten*,
    331 N.E.2d 713 (Ohio 1975) ....................................................................14

*Harasyn v. Normandy Metals, Inc.*,
    551 N.E.2d 962 (Ohio 1990) ....................................................................26

*Jacobs v. Frank*,
    573 N.E.2d 609 (Ohio 1991) ....................................................................19

*Love v. City of Port Clinton*,
    524 N.E.2d 166 (Ohio 1988) ....................................................................26

*Nickell v. Gonzalez*,
    477 N.E.2d 1145 (Ohio 1985) ...................................................................28

*Surace v. Wuliger*,
    495 N.E.2d 939 (Ohio 1986) ....................................................................12

*Vail v. The Plain Dealer Publ'g Co.*,
    649 N.E.2d 182 (Ohio 1995) ....................................................................20

*Yeager v. Local Union 20*,
    453 N.E.2d 666 (Ohio 1983) ...............................................................22, 23

## OHIO COURTS OF APPEALS

*Bales v. Hack*,
   509 N.E.2d 95 (Ohio Ct. App. 1986) ...................................................................12

*Belcher v. Carter*,
   234 N.E.2d 311 (Ohio Ct. App. 1967) .................................................................28

*Brown v. Lawson*,
   863 N.E.2d 215 (Ohio Ct. App. 2006) .................................................................19

*Burkes v. Stidham*,
   668 N.E.2d 982 (Ohio Ct. App. 1995) ............................................................24, 25

*Criswell v. Brentwood Hosp.*,
   551 N.E.2d 1315 (Ohio Ct. App. 1989) ...............................................................25

*Daubenmire v. Sommers*,
   805 N.E.2d 571 (Ohio Ct. App. 2004) ............................................................18, 19

*Ekstrom v. Cuyahoga Cty. Comty. Coll.*,
   779 N.E.2d 1067 (Ohio Ct. App. 2002) ...............................................................22

*Ekunsumi v. Cincinnati Restoration, Inc.*,
   698 N.E.2d 503 (Ohio Ct. App. 1997) .................................................................21

*Featherstone v. CM Media, Inc.*,
   No. 02AP-65, 2002 WL 31750286 (Ohio Ct. App. Dec. 10, 2002) .......................18

*Feeney v. Eshack*,
   718 N.E.2d 462 (Ohio Ct. App. 1998) .................................................................27

*Fuchs v. Scripps Howard Broad. Co.*,
   868 N.E.2d 1024 (Ohio Ct. App. 2006) ...............................................................18

*Giglio v. Doherty*,
   562 N.E.2d 513 (Ohio Ct. App. 1988) .................................................................24

*Kassouf v. Cleveland Magazine City Magazines, Inc.*,
   755 N.E.2d 976 (Ohio Ct. App. 2001) ......................................................17, 18, 19

*Kovacic v. Eastlake*,
   No. 2005-L-205, 2006 WL 3833872 (Ohio Ct. App. Dec. 29, 2006) ....................23

*Lakota Local Sch. Dist. Bd. of Educ. v. Brickner*,
   671 N.E.2d 578 (Ohio Ct. App. 1996) .................................................................15

*Lang v. Trimble-Weber*,
   No. 75692, 2000 WL 337619 (Ohio Ct. App. Mar. 30, 2000) ..............................12

*Martinez v. WTVG*,
    No. L-07-1269, 2008 WL 1700443 (Ohio Ct. App. Apr. 11, 2008).........................................20

*McCartney v. Oblates of St. Francis deSales*,
    609 N.E.2d 216 (Ohio Ct. App. 1992)....................................................................................15

*McPeek v. Leetonia Italian-Am. Club*,
    882 N.E.2d 450 (Ohio Ct. App. 2007)....................................................................................17

*Morrow v. Reminger & Reminger Co. L.P.A.*,
    915 N.E.2d 696 (Ohio Ct. App. 2009)....................................................................................23

*Muehrcke v. Housel*,
    909 N.E.2d 135 (Ohio Ct. App. 2008)....................................................................................25

*Sears Roebuck & Co. v. Swaykus*,
    No. 02JE8, 2002 WL 31859516 (Ohio Ct. App. Dec. 11, 2002)...........................................23

*Shariff v. Rahman*,
    787 N.E.2d 72 (Ohio Ct. App. 2003)......................................................................................24

*Simmons v. Climaco*,
    507 N.E.2d 465 (Ohio Ct. App. 1986)....................................................................................12

*Sovchik v. Roberts*,
    No. 3090-M, 2001 WL 490015 (Ohio Ct. App. May 9, 2001)...............................................19

*Stafford v. Columbus Bonding Ctr.*,
    896 N.E.2d 191 (Ohio Ct. App. 2008)....................................................................................26

*Stiles v. Chrysler Motors Corp.*,
    624 N.E.2d 238 (Ohio Ct. App. 1993)....................................................................................12

*Thompson v. Webb*,
    735 N.E.2d 975 (Ohio Ct. App. 1999)..............................................................................14, 17

*Tubbs v. Cuyahoga Metro. Hous. Auth.*,
    No. 62710, 1993 WL 204598 (Ohio Ct. App. June 10, 1993)...............................................13

*Wall v. Ohio Permanente Med. Group, Inc.*,
    695 N.E.2d 1233 (Ohio Ct. App. 1997)..................................................................................13

## OHIO COURT OF CLAIMS

*Saffell v. Dept. of Rehab. and Corr.*,
    696 N.E.2d 1126 (Ohio Ct. Cl. 1997).....................................................................................23

**CONSTITUTIONAL PROVISIONS**

U.S. Constitution Amendment I ................................................................1, 29

U.S. Constitution Amendment IV .................................................................29

**RULES**

Fed. R. Civ. P. 56 .........................................................................................10

**OTHER AUTHORITIES**

Point of View, On-Air Line Up for Friday, August 1, 2008
    http://www.pointofview.net/site/News2?page=NewsArticle&id=6517 ..................................10

Pam Schehl, *Crowd Shows Support for MV Science Teacher*, Mt. Vernon News, April 17,
    2008 at A1 ...........................................................................................9

## SUMMARY OF ARGUMENT

Plaintiffs are entitled to summary judgment on Defendant's defamation counterclaim, because the allegedly defamatory statements in question are protected by either an absolute or qualified privilege, or both, and because even if the statements at issue are not privileged, they were not published with actual malice.  Defendant also has failed to present a viable counterclaim for intentional infliction of emotional distress.  He has not shown that Plaintiffs intended to cause him emotional distress, that Plaintiffs' conduct was outrageous or extreme, or that he has sustained a severe or debilitating injury.  Additionally, Plaintiffs should be granted summary judgment on their battery claim, which stems from Defendant's use of a high-voltage electrical device to burn a cross on the arm of Plaintiffs' son, because they have satisfied all of the elements of this tort under Ohio law and Defendant has no viable defense to his actions.  Summary judgment is also proper on Plaintiffs' Establishment Clause claim because Defendant, while denying some conduct, has nonetheless admitted to engaging in certain conduct, including the display of several Bibles and the Ten Commandments in his public school classroom, that violates the Establishment Clause.

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| JOHN DOE, et al., | Case No. 2:08 CV 575 |
| Plaintiffs, | Judge Frost |
| v. | Magistrate Judge King |
| MOUNT VERNON CITY SCHOOL DISTRICT BOARD OF EDUCATION, et al., | |
| Defendants. | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
PARTIAL SUMMARY JUDGMENT**

**I.      INTRODUCTION**

This case is about an eighth grade science teacher, Defendant John Freshwater

("Freshwater"), who violated federal and state law by burning one of his students, Zachary

("Zach") Dennis, with an electrostatic device known as a Tesla coil during a classroom

demonstration and by bringing religion into his public school classroom at the Mount Vernon

Middle School.  Zach Dennis's parents, Stephen and Jenifer Dennis ("The Dennises")[1] filed the

instant civil-rights lawsuit on their son's behalf, alleging, among other things, that Freshwater

committed battery when he applied the Tesla coil to Zach Dennis's arm, and that Freshwater

violated the Establishment Clause of the First Amendment by, among many other things,

displaying multiple copies of the Ten Commandments and several Bibles in his classroom.

Freshwater, in turn, filed counterclaims against the Dennises for defamation and intentional

---

[1] During prior proceedings in this case, a protective order required that Stephen, Jenifer, and Zach Dennis be referred to as John, Jane, and James Doe, respectively.  (*See* Doc. No. 4.)  The Court granted a motion to lift the protective order on November 16, 2009, so this Memorandum and future pleadings will refer to the Dennises by their real names.  (*See* Doc. No. 59.)

inflection of emotional distress.  The Dennises now move for summary judgment on Freshwater's counterclaims, as Freshwater has failed to establish that the Dennises defamed him or that they caused him severe emotional distress.  Because the Dennises have satisfied all of the elements of battery under Ohio law, and because Freshwater has admitted to actions that constitute clear violations of the Establishment Clause, the Dennises also move for summary judgment on their battery and Establishment Clause claims.[2]

Summary judgment is proper on Freshwater's counterclaims for defamation and intentional infliction of emotional distress.  Freshwater's defamation counterclaim fails for three reasons.  First, the only publication of the allegedly defamatory statements that Freshwater identifies with any specificity is the publication of these statements in the First Amended Complaint.  In arguing that statements contained in a complaint can serve as a basis for a defamation counterclaim, Freshwater appears to overlook the fact that, under Ohio law, statements contained in pleadings are absolutely privileged.  And even if Freshwater claims that the Dennises made defamatory statements outside of those contained in the First Amended Complaint, he does not identify any such statements, let alone which member of the Dennis family made such statements, when they made them, or to whom.  Third, even assuming the judicial privilege does not apply, the statements in question nonetheless are protected by a qualified privilege.  Finally, even if no privilege applies, Freshwater's defamation counterclaim still fails because he is a limited-purpose public figure who cannot prove that the Dennises acted with actual malice in publishing the allegedly defamatory statements.

_____

[2] Plaintiffs' claim for an Establishment Clause violation contains numerous other allegations aside from the Ten Commandments posters and the Bibles in Freshwater's classroom.  (First Am. Compl. ¶¶ 10-69, 74-81 (Doc. No. 11).)  Freshwater disputes these other allegations in some measure, but does not dispute the facts that form the basis of this motion.  Plaintiffs, therefore, are moving for partial summary judgment as to liability on their Establishment Clause claim.

Freshwater's counterclaim for intentional infliction of emotional distress similarly must be dismissed because he cannot satisfy the elements of the claim.  Freshwater has offered no evidence that the Dennises intended to cause him emotional injury, he cannot demonstrate that the Dennises' conduct was outrageous or extreme, and he is unable to show that the emotional harm from which he allegedly suffers is severe or debilitating.  Because Freshwater's counterclaims for defamation and intentional infliction of emotional distress are utterly unsubstantiated, lacking any foundation in fact or law, the Dennises respectfully request that the Court dismiss both counterclaims.

The Dennises likewise should be granted summary judgment on their battery claim against Freshwater because they have established a prima facie case for this tort.  Freshwater admitted to applying the Tesla coil to Zach Dennis's arm, and the application of this device fairly can be classified as harmful or offensive contact.  At the time he used the Tesla coil on Zach Dennis, Freshwater knew the device could cause burns, leave a red mark, or cause pain when applied.  He therefore acted with the requisite intent for committing battery.

As to the Dennises' Establishment Clause claim, Freshwater admitted in sworn testimony to displaying four separate copies of the Ten Commandments in his classroom.   The Sixth Circuit has held that posting the Ten Commandments in a public school classroom under these circumstances is a violation of the Establishment Clause.  Freshwater also acknowledged that he kept a Bible on his desk throughout his tenure at the Mount Vernon Middle School, and that he stored additional Bibles in the back of his classroom.  Freshwater's decision to display the Ten Commandments and the Bibles violated not just one, but all three prongs of the *Lemon* test.  *See Lemon v. Kurtzman*, 403 U.S. 602 (1971).  The Ten Commandments and the Bibles in Freshwater's classroom served no secular purpose, had the primary effect of advancing religion,

and fostered an excessive entanglement of religion with public school education.  The Dennises should be granted summary judgment on this portion of their Establishment Clause claim as well.

## II.    FACTUAL BACKGROUND

This case involves a teacher, a student, and the student's parents.  Defendant John Freshwater taught eighth grade science at the Mount Vernon Middle School during the 2007-2008 school year.  (Def. Freshwater's Dep. at 8-9, Oct. 14, 2009 (hereinafter "Freshwater Dep.") (attached as Ex. A); First Am. Compl. ¶ 11.)  Plaintiff Zach Dennis was a student in Freshwater's science class that school year.  (Freshwater Dep. at 144; First Am. Compl. ¶¶ 10-12; Zachary Dennis Decl. ¶ 1 (attached as Ex. B).)  Plaintiffs Stephen ("Steve") and Jenifer Dennis are Zach Dennis' parents.  (First Am. Compl. ¶ 3; Jenifer Dennis Decl. ¶ 1 (attached as Ex. C); Stephen Dennis Decl. ¶ 1 (attached as Ex. D).)

On December 6, 2007—during the eighth grade science class that Zach Dennis attended—defendant John Freshwater used an electrostatic device commonly known as a Tesla coil to conduct various experiments.  (Freshwater Dep. at 144, 163-64; Zachary Dennis Decl. ¶ 2.)  Zach's science class was the eighth period of the day—the last of the school day.  (Freshwater Dep. at 144.)  Freshwater had used the Tesla coil in his classroom for years to conduct experiments.  (*Id.* at 154-55, 183-84.)  The Tesla coil is a device that creates an electrical charge between 20,000 and 45,000 volts, depending on how high or low the device is set.  (*Id.* at 145-46, 153.)  The device has a metal tip, and when placed near an object, the electrical charge that the Tesla coil generates will arc from its tip to that object.  (*Id.* at 153-54.)  In Zach Dennis' science class on December 6, 2007, Freshwater used the Tesla coil to apply electrical charges to sealed tubes of gas and, depending on the color the tube glowed when

electrically charged, the students could identify what type of gas the tube contained.  (*Id.* at 154, 162, 171, 195-96; Zachary Dennis Decl. ¶ 2.)

At the end of the class period on December 6, 2007, Freshwater showed the students how he could shock himself with the Tesla coil by running the charge across his arm.  (Freshwater Dep. at 176; Zachary Dennis Decl. ¶ 3.)  Freshwater then asked the students in his class whether any of them wanted to see what the charge from the Tesla coil felt like if applied to them.  (Freshwater Dep. at 172; Zachary Dennis Decl. ¶ 3.)  Several students, including Zach Dennis, volunteered.  (Freshwater Dep. at 173-77; Zachary Dennis Decl. ¶ 3.)  Freshwater did not ask any of the students who volunteered if they had any medical complications or run any other safety considerations by them (Freshwater Dep. at 192-93), but merely commented before applying the electrical shock to the students that it would result in a temporary tattoo in the shape of a cross that would remain for a while (*In the Matter of the Termination of Employment of John Freshwater* (hereinafter "Freshwater Termination Hearing Tr."), Zachary Dennis Test., 10/28/08, at 338-39 (attached as Ex. E); Zachary Dennis Decl. ¶ 4.)  Freshwater did not give the students further warnings that day (Freshwater Dep. at 192-93), despite the fact that he knew the electrical shock from the coil "hurts," "may leave a red mark," and that upon contact with the coil, most students "pull away"  (Freshwater Termination Hearing Tr., John Freshwater Test., 10/28/08, at 399-401 (attached as Ex. E).)

Although Freshwater disputes holding Zach Dennis' arm down when he applied the electrical charge from the Tesla coil to Zach's arm (a fact to which Zach testified and other students confirmed), he does not dispute using the Tesla coil on Zach.  (Freshwater Dep. at 181; Freshwater Termination Hearing Tr., John Freshwater Test., 10/28/08, at 399.)  Zach Dennis testified that Freshwater ran the coil up and down his arm twice, and across his arm twice, in the

shape of a cross.  (Freshwater Termination Hearing Tr., Zachary Dennis Test., 10/28/08, at 337-39; *see also* Zachary Dennis Decl. ¶ 5.)  Freshwater does not dispute this general pattern, but claims it was in the shape of an "X" and not a cross.  (Freshwater Termination Hearing Tr., John Freshwater Test., 10/28/08, at 403.)  The attached photos of the mark left by Freshwater's use of the Tesla coil on Zach's arm shows the pattern Freshwater followed.  (Jenifer Dennis Decl. ¶ 5-6 (photographs attached as Ex. 1 and 2 to Decl.); Stephen Dennis Decl. ¶ 6-7 (photograph attached as Ex. 1 to Decl.); Freshwater Termination Hearing Tr., Jenifer Dennis Test., 10/28/08, at 366-67 (attached as Ex. E) (introducing some of the photographs of Zach's arm).)

Very shortly after Freshwater used the Tesla coil on Zach—and even before the end of the class period that day—Zach began to see the effects of the electrical burn.  (Freshwater Termination Hearing Tr., Zachary Dennis Test., 10/28/08, at 340; Zachary Dennis Decl. ¶ 6.)  Zach saw redness that he describes as "red blotches" and "little welts" on his arm.  (Freshwater Termination Hearing Tr., Zachary Dennis Test., 10/28/08, at 340; Zachary Dennis Decl. ¶ 6.)  When Zach returned home after school that day (and after spending some time at a neighbor friend's house), he showed the mark to his mom, Jenifer Dennis, who was understandably concerned.  (Freshwater Termination Hearing Tr., Zachary Dennis Test., 10/28/08, at 340-41; *Id.*, Jenifer Dennis Test., 10/28/08, at 363-64; Zachary Dennis Decl. ¶  7; Jenifer Dennis Decl. ¶¶ 3-4.)  The burn was painful at that time, but not unbearably so.  (Zachary Dennis Decl. ¶ 7.)  Both Jenifer Dennis and Zach were in a rush, however, to get Zach out the door so that Steve could drive Zach to Cleveland for his hockey practice.  (Freshwater Termination Hearing Tr., Zachary Dennis Test., 10/28/08, at 340-41; *Id.*, Jenifer Dennis Test., 10/28/08, at 363-64; Jenifer Dennis Decl. ¶¶ 3-4.)  Zach did not mention the burn to his dad during the drive north, but later that evening when Zach came off the ice and pulled his goalie pads off of his arms, the burn had

become increasingly painful and he showed the burn to his dad.  (Freshwater Termination Hearing Tr., Zachary Dennis Test., 10/28/08, at 341-42; Zachary Dennis Decl. ¶ 8; Stephen Dennis Decl. ¶¶ 3-5.)  Steve Dennis was outraged by what he saw and took pictures of the mark on Zach's arm with his cell-phone camera.  (Stephen Dennis Decl. ¶ 6-7 (photograph attached as Ex. 1 to Decl.).)  Steve and Zach then drove home from Cleveland to Mt. Vernon.  (Freshwater Termination Hearing Tr., Zachary Dennis Test., 10/28/08, at 342; Stephen Dennis Decl. ¶ 9; Zachary Dennis Decl. ¶ 9.)

After Steve and Zach returned home, Jenifer Dennis treated Zach's arm with cold compresses and put him in bed.  (Zachary Dennis Decl. ¶ 9; Jenifer Dennis Decl. ¶ 5; Stephen Dennis Decl. ¶ 9.)  Zach awoke a short time later crying from the pain of the burn, and Jenifer gave him Tylenol or some other pain killer to help him sleep.  (Freshwater Termination Hearing Tr., Zachary Dennis Test., 10/28/08, at 342-43; *Id.*, Jenifer Dennis Test., 10/28/08, 365-67; Zachary Dennis Decl. ¶ 9; Jenifer Dennis Decl. ¶ 5; Stephen Dennis Decl. ¶ 9.)  The pain from the electrical burn subsided over the next several days, and the mark of the cross on Zach's arm disappeared altogether after several weeks.  (Zachary Dennis Decl. ¶ 10; Jenifer Dennis Decl. ¶ 7.)  Again, Freshwater does not dispute using the Tesla coil on Zach Dennis' arm and cannot dispute that the electrical charge from the device burned Zach's arm and left a clear mark.

Steve and Jenifer Dennis were, of course, upset about what had happened to their son and the very next morning—December 7—went to the school to talk to the administrators about what had happened to their son and to find out from the school what the device was that Freshwater had used to make the mark on their son's arm.  (Freshwater Termination Hearing Tr., Stephen Short Test., 10/02/08, at 55-57 (attached as Ex. F); Freshwater Termination Hearing Tr., Jenifer Dennis Test., 10/28/08, at 368-69; Jenifer Dennis Decl. ¶ 8; Stephen Dennis Decl. ¶ 10.)   Steve

and Jenifer Dennis met with Stephen Short, the Superintendent of the Mount Vernon City School District.  (Freshwater Termination Hearing Tr., Stephen Short Test., 10/02/08, at 55; *Id.*, Jenifer Dennis Test., 10/28/08, at 69; Jenifer Dennis Decl. ¶ 8; Stephen Dennis Decl. ¶ 10.)  At that meeting, Steve and Jenifer asked Steve Short to investigate the incident and to make sure the same thing did not happen to their child or any other child again.  (Freshwater Termination Hearing Tr., Stephen Short Test., 10/02/08, at 56; *Id.*, Jenifer Dennis Test., 10/28/08, at 369; Jenifer Dennis Decl. ¶¶ 8-10 ; Stephen Dennis Decl. ¶¶ 10-12.)  Steve and Jenifer did not report the incident to the police, but stressed to Steve Short that they preferred to remain anonymous throughout the investigation in order to protect their son.  (Freshwater Termination Hearing Tr., Stephen Short Test., 10/02/08, at 56-57; Jenifer Dennis Decl. ¶ 10; Stephen Dennis Decl. ¶ 12.).

Over the next few months, the Dennises learned that, aside from branding their son with a cross on his arm, Freshwater had also been improperly teaching religion in his public school classroom.  The Dennises likewise raised these concerns with the school administration, but, again, asked that school officials keep their names quiet in order to protect Zach, who had to remain in school and in Freshwater's classroom.  (Jenifer Dennis Decl. ¶ 11; Stephen Dennis Decl. ¶ 13.)  These allegations about Establishment Clause violations are set forth in the complaint filed in this action (*see* First Am. Compl. ¶¶ 10-69, 74-81), some of which Freshwater disputes.  Those disputed allegations do not form the basis of this motion.  Rather, there are a number of things Freshwater did in his classroom during the 2007-08 school year that he does not dispute that, standing alone, are sufficient to show an Establishment Clause violation.  In particular, Freshwater admits to hanging four different copies of the Ten Commandments in his classroom during the 2007-2008 school year.  (Freshwater Dep. at 71-75 (admitting to hanging three copies in the windows and one on the bulletin board), Ex. 5-6.; *see also* Zachary Dennis

Decl. ¶ 12.)  Further, he displayed his personal Bible on the corner of his desk (Freshwater Dep. at 71, Ex. 3 ) and a collection of Bibles in the back corner of his room (Freshwater Dep. at 82-88).  (*See also* Zachary Dennis Decl. ¶ 13 (stating that a collection of Bibles remained in the classroom until May 2008).)  In April 2008, school authorities ordered Freshwater to remove these and other *religious* items—objects that had been displayed for the 2007-2008 school year—from his classroom.  (Freshwater Dep. at 66-70, 89-93.)  Freshwater admits to removing most of these religious materials from his classroom by April 16, 2008.  (*Id.* at 92 (stating that he removed most religious materials on school orders).)  He refused, however, despite his school Principal's express directive, to remove the personal Bible from his desk.  (*Id.* at 106.)  The Bible remained on Freshwater's desk through the end of the 2007-2008 school year (*Id.*), and, during that time, Zach Dennis continued to attend class in that very room (Zachary Dennis Decl. ¶ 1, 13; Jenifer Dennis Decl. ¶ 11; Stephen Dennis Decl. ¶ 13).

Despite the Dennises' efforts to keep their son's name from being disclosed, Freshwater learned the Dennises' identity on April 7, 2008, when his school principal asked him to remove the religious materials from his classroom and disclosed the Dennises' identities.  (Jenifer Dennis Decl.  ¶ 12; Stephen Dennis Decl. ¶ 14.)  Unlike the Dennises, however, who simply raised their concerns with school officials and tried to keep things quiet, Freshwater chose to broadcast his perspective to the world.  Immediately following the school's ultimatum that he remove religious materials from his classroom, Freshwater addressed an April 16, 2008 rally of supporters at Mount Vernon's Public Square, stating, among other things, that he "respectfully reject[ed] the request to remove the Bible."  (Freshwater Dep. at 51-53, Ex. 3; *see also* Pam Schehl, *Crowd Shows Support for MV Science Teacher*, Mt. Vernon News, April 17, 2008, at A1 (attached as Ex. G) (describing the rally).)  What began with the rally turned into a full-fledged media

campaign, not limited to the following:  On April 28, 2008, Freshwater was interviewed on Bob Burney Live, an AM radio talk show, regarding the school's actions and the religious displays in his classroom.  (Ex. H, filed manually by leave of Court (Doc. No. 57).)  With his attorney, R. Kelly Hamilton, Freshwater also appeared on the Fox News television program, Showdown, on July 5, 2008.  (Ex. I, filed manually by leave of Court.)  In that nationally broadcasted interview, Freshwater expressed his opinions on several issues, including the Tesla coil incident. Freshwater again made himself available for interview on August 1, 2008, appearing on Point of View, a radio talk show.  (Exhibit J, filed manually by leave of Court; *see also* Point of View, On-Air Line Up for Friday, August 1, 2008 http://www.pointofview.net/site/News2?page= NewsArticle&id=6517 (last visited Nov. 12, 2009)).

The Dennises filed their complaint against the Mount Vernon City School District Board of Education, Stephen Short, William White, and Freshwater on June 13, 2008, first making their allegations against Freshwater public.  (*See* Compl. (Doc. No. 2).)  Freshwater filed counterclaims of defamation and intentional infliction of emotional distress on September 2, 2008, shortly after the start of administrative proceedings to terminate him from his Mount Vernon teaching position.  (*See* Freshwater Counterclaim (Doc. No. 19).)  This Court dismissed the claims against the School Board and its employees other than Freshwater on October 1, 2009, after those parties settled their differences.  (Doc. No. 52.)  The controversies between Freshwater and the Dennises remain, and this Court has ordered all dispositive motions to be filed on or before November 16, 2009.  (Doc. No. 36.)  As is set forth below, the undisputed facts squarely contradict Freshwater's counterclaims, necessitating that they be dismissed, and also require summary judgment on Plaintiff's battery and Establishment Clause claims.

III.    **ARGUMENT**

Under Civil Rule 56, summary judgment shall be entered if "there is no genuine issue as to any material fact" and the moving party "is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In an era of increasing litigation, the United States Supreme Court has repeatedly underscored the importance of using summary judgment to resolve claims that should not proceed to trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).  In *Anderson v. Liberty Lobby, Inc.*, the Supreme Court emphasized that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to survive summary judgment.  477 U.S. 242, 252 (1986).  Rather, "there must be evidence on which the jury could reasonably find for the plaintiff" to withstand summary judgment.  *Id.*  And, if a plaintiff fails to support an essential element of a claim, summary judgment must issue because a failure of proof regarding an essential element renders all other facts immaterial.  *Celotex Corp.*, 477 U.S. at 322-23.  Because the undisputed facts reject them, Freshwater's claims should be dismissed and, likewise, because the undisputed facts support them, summary judgment should be granted on Plaintiffs' battery and Establishment Clause claims.

A.    **Freshwater's Defamation Counterclaim Fails For Multiple Reasons.**

Even construing all evidence in favor of Freshwater, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986), Freshwater's defamation counterclaim cannot withstand summary judgment.  First, the only allegedly defamatory statements that Freshwater has identified are statements contained in the complaint filed in the instant case.  These statements are protected by the judicial privilege and therefore cannot serve as the basis for a defamation claim.  Second, assuming the judicial privilege does not apply (which it should), the Dennises nonetheless had a qualified privilege to publish the statements in question.  Third, even if no privilege applies, Freshwater's defamation counterclaim still cannot succeed, because

11

Freshwater is a limited-purpose public figure who must show that the Dennises acted with actual malice in publishing the allegedly defamatory statements. He has not made this showing. For any of these reasons, Freshwater's defamation counterclaim should be dismissed.

> **1.    The Statements That Freshwater Claims Are Defamatory All Are Contained In Plaintiffs' First Amended Complaint, And Therefore Are Absolutely Privileged.**

In alleging that the Dennises "published and stated defamatory and false statements of fact" about him (Countercl. ¶ 3), Freshwater cites only one instance in which the allegedly defamatory statements were published—in the First Amended Complaint. (*See id.* ¶¶ 1-2.) Freshwater fails to recognize that statements contained in a civil complaint are privileged, as long as they are reasonably related to the legal proceeding in which they were published. *See Surace v. Wuliger*, 495 N.E.2d 939, 942-43 (Ohio 1986) ("[A] claim alleging that a defamatory statement was made in a written pleading does not state a cause of action where the allegedly defamatory statement bears some reasonable relation to the judicial proceeding in which it appears."); *see also Lang v. Trimble-Weber*, No. 75692, 2000 WL 337619, at *4 (Ohio Ct. App. Mar. 30, 2000) (holding that statements in a draft complaint were privileged and noting that "Ohio Courts have long recognized the doctrine of absolute privilege in judicial proceedings acts to bar defamation claims").

To argue that allegations contained in the First Amended Complaint do not reasonably relate to the very judicial proceedings in which they were filed seems disingenuous at best, if not utterly absurd. Indeed, Ohio courts have applied the judicial privilege to statements bearing a more attenuated relationship to the judicial proceedings in which they were published than are the statements at issue here. *See, e.g.*, *Stiles v. Chrysler Motors Corp.*, 624 N.E.2d 238, 242-43 (Ohio Ct. App. 1993) (applying judicial privilege to statements made during grievance process in connection with collective bargaining agreement); *Bales v. Hack*, 509 N.E.2d 95, 98 (Ohio Ct.

App. 1986) (holding allegation of homosexuality in counterclaim in divorce proceedings, "regardless of whether the allegation . . . was true," bore "a reasonable relationship to the divorce action" and therefore was privileged); *Simmons v. Climaco*, 507 N.E.2d 465, 466 (Ohio Ct. App. 1986) (holding that "absolute privilege extends to preindictment statements and writings made by an attorney on behalf of his client relevant to an ongoing grand jury investigation" of that client).  Freshwater cannot prevail on his counterclaim by alleging solely that statements contained in the First Amended Complaint are defamatory.

### 2. Freshwater Fails To Adequately Identify Any Defamatory Statements Outside Of Those Contained In The First Amended Complaint, Which Also Requires Dismissal Of His Defamation Counterclaim.

Although Freshwater's counterclaim states that "Plaintiffs' [sic] have made numerous factual statements to other persons" (Countercl. ¶ 1), Freshwater not only fails to identify who these "other persons" are, but he also does not indicate which member of the Dennis family made any particular allegedly defamatory statement to these so-called "other persons," or when they were made.  What is more, Freshwater admitted that he knows of no defamatory statements that the Dennises made outside of those he alleges were contained in the First Amended Complaint.  (*See* Freshwater Dep. at 300:17-20 (stating that he is "not aware" of any statements "the Dennises have made" against him other than statements in the complaint)).  Because Freshwater cannot identify any defamatory extra-judicial statements the Dennises made, or for that matter to whom or when they made such statements, Plaintiffs should be granted summary judgment on Freshwater's defamation counterclaim for this reason, as well.  *See Wall v. Ohio Permanente Med. Group, Inc.*, 695 N.E.2d 1233, 1244 (Ohio Ct. App. 1997) (noting that party alleging he was defamed by insurance entity "never identified who allegedly defamed him or what the unidentified person stated, and concluding that "[w]ithout identifying who made the allegedly defamatory statement," the party "failed to support his claim"); *Tubbs v. Cuyahoga*

13

*Metro. Hous. Auth.*, No. 62710, 1993 WL 204598, at *8 (Ohio Ct. App. June 10, 1993) (noting that plaintiff "failed to present specific evidence as to either who made any statement or when the defamatory statements were made public," and determining that "bare allegations without specificity are not enough to withstand [opposing parties'] motion" for summary judgment).

### 3.    The Dennises' Statements Are Protected By A Qualified Privilege.

Even if the Dennises' allegedly defamatory statements are not protected by the judicial privilege (which they are), the statements are still covered by a qualified privilege.  To establish a qualified privilege under Ohio law, a party must show that "(1) the publication was made in good faith, (2) there was an interest to be upheld, (3) the publication was limited in scope to that interest, (4) the publication was made on a proper occasion, and (5) the publication was done in a proper manner and to the proper parties." *Thompson v. Webb*, 735 N.E.2d 975, 979 (Ohio Ct. App. 1999); *see also Hahn v. Kotten*, 331 N.E.2d 713, 718 (Ohio 1975) (noting that a "publication is privileged when it is fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned") (internal quotation marks omitted).  The Ohio Supreme Court has noted that the "defense of qualified privilege is deeply rooted in public policy." *A&B-Abell Elevator Co., Inc. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 651 N.E.2d 1283, 1290 (Ohio 1995).  Where, as here, the circumstances giving rise to the allegedly defamatory statements are not disputed, the determination of whether a qualified privilege exists is a question of law for the Court.  *Id.*

The Dennises have met all five requirements for earning a qualified privilege.   In filing the First Amended Complaint, the Dennises clearly acted in good faith.  Upon seeing the burn on their child's arm and learning of the circumstances surrounding the infliction of that injury, they, like any other concerned parents, contacted Mount Vernon school officials.  (Freshwater

Termination Hearing Tr., Stephen Short Test., 10/02/08, at 55-57; *Id.*, Jenifer Dennis Test., 10/28/08, at 369; Jenifer Dennis Decl. ¶¶ 8-10; Stephen Dennis Decl. ¶¶ 10-12.)  Over the course of the next few months, the Dennises came to learn that Freshwater engaged in unconstitutional activities involving, among other things, the teaching of religion and posting of religious displays in his classroom, which the Dennises also brought to the school district's attention. (Jenifer Dennis Decl. ¶¶ 11; Stephen Dennis Decl. ¶¶ 13.)  Following repeated and unsuccessful requests for school officials to take appropriate action, the Dennises filed the instant lawsuit in an effort to protect their child.  (*See* Compl.; Jenifer Dennis Decl. ¶¶ 13-15; Stephen Dennis Decl. 15-17.)

Whether the Dennises may have been upset with Freshwater—which any parent whose child was burned by his or her science teacher likely would be—is of no moment in deciding whether they acted in good faith.  *A&B-Abell Elevator Co., Inc.*, 651 N.E.2d at 1292 (explaining that in "determining whether an occasion is privileged, . . . [courts] are not concerned with the motive of" the person who made the allegedly defamatory statements, and cautioning that "[t]he issue of 'good faith' necessary to establish the privilege should not be confused with the issue of 'state of mind' necessary to defeat it.")  The Dennises therefore have satisfied the first qualified-privilege requirement.

The Dennises have met the second requirement with similar ease, as they voiced their concerns to school officials and filed this lawsuit to prevent their child from suffering additional injuries.  (Jenifer Dennis Decl. ¶¶ 8-11, 13-15; Stephen Dennis Decl. ¶¶ 10-13, 15-17.)  Ohio courts recognize that parents have an interest in keeping school children properly educated and safe.  *See, e.g.*, *McCartney v. Oblates of St. Francis deSales*, 609 N.E.2d 216, 224 (Ohio Ct. App. 1992) (applying qualified privilege to defamatory statements school officials made about former teacher and noting that "[a]s a matter of public policy, educators and parents share a

common interest in the training, morality and well-being of the children in their care."); *cf.*
*Lakota Local Sch. Dist. Bd. of Educ. v. Brickner*, 671 N.E.2d 578, 585 (Ohio Ct. App. 1996)
(applying qualified privilege to school superintendent's comments about former school board
treasurer making $500,000 error in school district's budget, and determining his "remarks were
made pursuant to his duty to provide a good education to the children in" his school district).

And the Dennises have satisfied the final three qualified-privilege requirements as well.
In terms of the scope and occasion of publication, the Dennises only discussed the events at issue
in this case with Mount Vernon school officials, and explicitly asked them to keep the matter
private.  (Jenifer Dennis Decl. ¶¶ 8-14, 16; Stephen Dennis Decl. ¶¶ 10-15, 18.)    The Dennises
refrained from speaking publicly about the information contained in the First Amended
Complaint, outside of their compelled testimony at the Mount Vernon School Board's
administrative proceedings to terminate Freshwater, their depositions in the instant federal
lawsuit, and limited responses to press inquiries.  (Jenifer Dennis Decl. ¶ 16; Stephen Dennis
Decl. ¶ 18.)

The Dennises' efforts to handle this matter discretely stand in stark contrast to
Freshwater's repeated attempts to gain publicity and support by granting numerous interviews to
television, radio, and print reporters, and by participating in a "rally on the square" in downtown
Mount Vernon where he spoke to the crowd gathered about the facts leading up to the instant
lawsuit.  (Freshwater Dep. at 50, Ex. 3; *see also* Ex. G, H, I, J.)  In fact, Freshwater admits that
no one other than him, the Dennises, and Mount Vernon school officials knew about the facts of
this case until he made them public during the rally on the square.  (Freshwater Dep. at 142-44.)
Given Freshwater's own conduct, it strains credulity to classify the Dennises' publication of the

allegedly defamatory statements as improper as to manner or as to the parties to whom the statements were published.

Although Freshwater can overcome the qualified privilege if he demonstrates that the Dennises acted with actual malice—that is, "with knowledge that the statements [in question were] false or . . . with reckless disregard as to their truth or falsity,"—he is unable to do so. *A&B-Abell Elevator Co., Inc.*, 651 N.E.2d at 1292 (internal quotation marks omitted); *see also Thompson*, 735 N.E.2d at 980 ("Reckless disregard may be established by evidence showing that the alleged defamer had serious doubts about the truth of the statements."). The Dennises firmly believe that the statements in question are true. (Jenifer Dennis Decl. ¶¶ 14-15; Stephen Dennis Decl. ¶¶ 16-17), and Freshwater has supplied no evidence that calls the Dennises' intent into question. Because the Dennises have satisfied the requirements for earning a qualified privilege, and because Freshwater has not shown that the Dennises acted with the requisite intent to defeat that privilege, Freshwater's defamation counterclaim should not survive summary judgment.

### 4.   Freshwater Is A Limited Purpose-Public Figure Who Cannot Establish That The Dennises Acted With Actual Malice.

The implications of Freshwater's inability to prove the Dennises acted with actual malice reach well beyond the context of qualified privilege. This is so because, by his own doing, Freshwater has become a limited-purpose public figure, and with this classification once again comes the Ohio courts' mandate that he show the defamatory statements were published with actual malice. *See Kassouf v. Cleveland Magazine City Magazines, Inc.*, 755 N.E.2d 976, 983-84 (Ohio Ct. App. 2001); *see also New York Times Co. v. Sullivan*, 376 U.S. 254, 279-280 (1964). And, once again, this is something he cannot do.

In Ohio, there are four classifications for a party alleging defamation: (1) a private person, (2) a public official, (3) a public figure, or (4) a limited-purpose public figure. *McPeek v.*

*Leetonia Italian-Am. Club*, 882 N.E.2d 450, 453 (Ohio Ct. App. 2007).  The party's

"classification . . . which determines his burden of proof, is a question of law."  *Id.*  In deciding

whether to classify a party as a limited-purpose public figure, Ohio courts examine two factors:

"(1) the [party's] participation in the controversy from which the alleged defamation arose and

(2) whether that [party] has attained a general notoriety in the community as a result of that

participation."  *Kassouf*, 755 N.E.2d at 982.  *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351

(1974) (explaining that when "an individual voluntarily injects himself or is drawn into a

particular public controversy" he "becomes a public figure for a limited range of issues"); *see

also Fuchs v. Scripps Howard Broad. Co.*, 868 N.E.2d 1024, 1034 (Ohio Ct. App. 2006) ("A

private person may become a limited-purpose public figure if he voluntarily injects himself or is

drawn into a particular public controversy.") (internal quotation marks omitted); *Daubenmire v.

Sommers*, 805 N.E.2d 571, 586 (Ohio Ct. App. 2004) ("Public-figure status does not depend on

the desires of the individual.").

      By thrusting himself into the public spotlight, Freshwater has earned his designation as a

limited-purpose public figure.  As already addressed in connection with qualified privilege,

Freshwater spoke at the Mount Vernon rally held on his behalf and gave several interviews to

various media about the facts surrounding this case.  Ohio courts do not hesitate to deem

educators limited-purpose public figures under the appropriate circumstances, like those present

here.  *See Daubenmire*, 805 N.E.2d at 587 (affirming summary judgment, including trial court's

determination that former high school football coach was a limited-purpose public figure, which

was based in part on the fact the coach "engage[ed] in religious conduct with football players

throughout his tenure," the coach's appearances on radio and television programs and in print

media, and the coach's appearance at a community meeting to "defend himself"); *see also*

*Featherstone v. CM Media, Inc.*, No. 02AP-65, 2002 WL 31750286, at *5 (Ohio Ct. App. Dec. 10, 2002) (affirming trial court's conclusion that retired teacher was a limited-purpose public figure regarding issues related to the school board and his former school district, noting that the teacher regularly spoke at school board meetings, attended 90% of board meetings, and had a talk show where he "regularly discussed matters relating to the Board"); *Sovchik v. Roberts*, No. 3090-M, 2001 WL 490015, at *6 (Ohio Ct. App. May 9, 2001) (affirming trial court's determination that former assistant principal who "actively interacted with the . . . community and the media during the controversy over his departure" was a limited-purpose public figure).

Unlike a private figure, who need only show that a party negligently published a defamatory statement, *Brown v. Lawson*, 863 N.E.2d 215, 220 (Ohio Ct. App. 2006), Freshwater, as a limited-purpose public figure, must demonstrate by clear and convincing evidence that the Dennises acted with actual malice in publishing the statements at issue here, *Daubenmire*, 805 N.E.2d at 587. In other words, Freshwater must prove that "the statements were made with knowledge that the statements were false or with reckless disregard of whether they were false." *Brown*, 863 N.E.2d at 220; *see also Jacobs v. Frank*, 573 N.E.2d 609, 613 (Ohio 1991) ("[A]ctual malice requires more than evidence of ill will, spite, or ulterior motive; the libeled [party] must prove with convincing clarity that the defendant had a high degree of awareness of the probable falsity of the published statements."). As already discussed, Freshwater cannot point to one scintilla of evidence that the Dennises acted maliciously. And his conclusory assertion that the Dennises "published and statement defamatory and false statements . . . with the required degree of fault" (Countercl. ¶ 3), hardly proves sufficient to establish actual malice. *See Kassouf*, 755 N.E.2d at 984 (affirming summary judgment because plaintiff "failed to list specific facts to support the notion" that defendants acted with actual malice in publishing the

statements at issue).  Freshwater has fallen woefully short in his efforts to recover for

defamation, and as a result, the Dennises should be granted summary judgment on Freshwater's

defamation counterclaim for this reason, too.

**B.      Freshwater's Counterclaim For Intentional Infliction Of Emotional Distress Likewise Should Be Dismissed On Multiple Grounds.**

As an initial matter, if Freshwater's defamation counterclaim fails, then so, too, should

his counterclaim for intentional infliction of emotional distress, as the allegedly "slanderous"

statements (Countercl. ¶ 5) that comprise the defamation counterclaim were the purported cause

of Freshwater's emotional distress.  *See, e.g.*, *Vail v. The Plain Dealer Publ'g Co.*, 649 N.E.2d

182, 186 (Ohio 1995) ("Since we have concluded that the [allegedly defamatory] statements at

issue are constitutionally protected speech, [appellant's] claims for intentional infliction of

emotional distress must also fail."); *Martinez v. WTVG*, No. L-07-1269, 2008 WL 1700443, at *8

(Ohio Ct. App. Apr. 11, 2008) (holding that, because news report on which appellant's claim for

intentional infliction of emotional distress was privileged, "appellant's intentional infliction of

emotional distress claim must fail"); *see also A & B-Abell Elevator Co.*, 651 N.E.2d at 1295

("[W]here claims . . . are based on statements that are qualifiedly privileged under defamation

law, the protection afforded those statements . . . must also apply in the derivative claims.").

But even if this Court finds that Freshwater's emotional-distress counterclaim is not

inextricably linked to his unsuccessful defamation counterclaim, his claim for intentional

infliction of emotional distress is meritless because he cannot satisfy the elements of this tort.

To withstand summary judgment on his intentional infliction of emotional distress counterclaim,

Freshwater must show that "(1) [party allegedly at fault] intended to cause emotional distress or

knew or should have known that [their] conduct would result in serious emotional distress to the

[claimant]; (2) [opposing party's] conduct was outrageous and extreme and beyond all possible

bounds of decency and was such that it can be considered as utterly intolerable in a civilized community; (3) [opposing party's] conduct was the proximate cause" of claimant's injury; and (4) claimant's "emotional distress was serious and of such a nature that no reasonable person could be expected to endure it." *Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 1110 (6th Cir. 2008) (internal quotation marks omitted); *see also Ekunsumi v. Cincinnati Restoration, Inc.*, 698 N.E.2d 503, 506 (Ohio Ct. App. 1997).  Freshwater cannot show that the Dennises intended to cause him emotional distress or that they should have known that they would cause him emotional distress, nor can he point to any outrageous conduct by any member of the Dennis family.  Freshwater also cannot demonstrate an adequate level of emotional distress to sustain this counterclaim.  The Dennises therefore should be granted summary judgment on Freshwater's counterclaim for intentional infliction of emotional distress.

> **1.      Freshwater Has Failed To Show That The Dennises Intended To Cause Him Emotional Distress Or That They Should Have Known That Their Conduct Would Cause Him Emotional Distress.**

Freshwater has produced no evidence that the Dennises acted with the requisite malice for establishing an intentional-infliction-of-emotional-distress claim.  Indeed, the only mention Freshwater makes of the intent requirement for his emotional-distress counterclaim is the aforementioned conclusory statement that the Dennises "published and stated defamatory and false statements . . . with the required degree of fault."  (Countercl. ¶ 3.)  By filing the instant lawsuit, the Dennises did not seek to injure Freshwater; their sole focus was to protect their child from additional harm.  (Jenifer Dennis Decl. ¶ 14; Stephen Dennis Decl. ¶ 16.)  Indeed, as discussed *supra*, it was the Dennises, not Freshwater, who sought to keep this matter private. (Jenifer Dennis Decl. ¶¶ 10-12, 16; Stephen Dennis Decl. ¶¶ 12-14, 18.)  Unlike Freshwater, the

Dennises did not repeatedly speak to reporters about this case,[3] nor did they hold any public

events to rally support.  (Jenifer Dennis Decl. ¶ 16; Stephen Dennis Decl. ¶ 18.)  Because

Freshwater has supplied no evidence whatsoever that the Dennises intended to cause him—or

should have known that they would cause him—emotional distress, he has failed to satisfy the

first element for establishing a viable claim for intentional infliction of emotional distress.  *See,

e.g.*, *Ekstrom v. Cuyahoga Cty. Comty. Coll.*, 779 N.E.2d 1067, 1077 (Ohio Ct. App. 2002)

(affirming summary judgment on claim for intentional infliction of emotional distress in part

because claimant "failed to present any evidence to indicate that [opposing party] intended to

cause her emotional distress, or knew or should have known that anyone's actions would result

in serious emotional distress").

### 2. Freshwater Has Failed To Show That The Dennises' Conduct Was Outrageous and Extreme.

Freshwater fares no better in his attempt to satisfy the second element of an intentional-

infliction-of-emotional-distress claim.  Assuming that the Dennises made defamatory statements

(which they did not), the publication of those statements in a civil complaint hardly can be

classified as the "outrageous and extreme" conduct that Ohio courts demand in the intentional-

infliction-of-emotional-distress context.  Liability for intentional infliction of emotional distress

attaches "only where the conduct has been so outrageous in character, and so extreme in degree,

as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly

intolerable in a civilized community."  *Yeager v. Local Union 20*, 453 N.E.2d 666, 671 (Ohio

1983), *rev'd on other grounds by Welling v. Weinfeld*, 866 N.E.2d 1051 (Ohio 2007) (internal

quotation marks omitted); *see also Martin v. JBS Technologies, LLC*, 443 F. Supp. 2d 962, 969-

---

[3] As this case captured more media attention, and long after the allegations involved became public, reporters continued to ask questions of and seek comments from the Dennises.  On occasion, the Dennises responded to press inquiries, but did not grant any television or radio interviews.

70 (S.D. Ohio 2006) (reviewing Ohio courts' standard for "outrageous and extreme conduct").

The statements in the First Amended Complaint hardly constitute the extreme and outrageous

conduct needed to maintain a claim for intentional infliction of emotional distress. *See Yeager*,

453 N.E.2d at 671 (noting that "liability clearly does not extend to mere insults, indignities,

threats, annoyances, petty oppressions, or other trivialities") (internal quotation marks omitted);

*see also Sears Roebuck & Co. v. Swaykus*, No. 02JE8, 2002 WL 31859516, at *2-3 (Ohio Ct.

App. Dec. 11, 2002) (holding that filing a false complaint, without more, was insufficiently

extreme and outrageous to support intentional infliction of emotional distress claim).

     Moreover, Ohio courts have rejected as insufficiently outrageous conduct more extreme

than the statements at issue here.  *See, e.g.*, *Kovacic v. Eastlake*, No. 2005-L-205, 2006 WL

3833872, at *17 (Ohio Ct. App. Dec. 29, 2006) (determining that paramedic's comment, "Let's

watch her die," in response to plaintiff who had called 911 because she had trouble breathing,

and other paramedics' "alleged enjoyment" of watching plaintiff suffer "while unacceptable,

[did] not rise to the level of extreme and outrageous conduct necessary to sustain a claim for

emotional distress"); *Saffell v. Dept. of Rehab. and Corr.*, 696 N.E.2d 1126, 1127 (Ohio Ct. Cl.

1997) (deeming insufficiently outrageous prison officials' refusal to allow plaintiff's marriage to

an inmate to go forward because they questioned her gender).  What is more, "[p]arties cannot

generally be held liable for intentional infliction of emotional distress for having performed an

act they were legally entitled to perform."  *Morrow v. Reminger & Reminger Co. L.P.A.*, 915

N.E.2d 696, 714 (Ohio Ct. App. 2009).  And that is what the Dennises did here—they went to

their child's school with complaints about the physical harm their child suffered and with

questions about the subjects their child's teacher was teaching in science class.     Freshwater

therefore has not established the second element of his prima facie case for intentional infliction of emotional distress.

### 3.    Freshwater Has Failed To Show That He Suffered From A Severe And Debilitating Injury.

Likewise, Freshwater cannot satisfy the fourth element of his emotional distress counterclaim, because he did not suffer severe emotional distress.  Under Ohio law, "emotional distress requires an emotional injury which is both severe and debilitating."  *Burkes v. Stidham*, 668 N.E.2d 982, 989 (Ohio Ct. App. 1995); *see also Giglio v. Doherty*, 562 N.E.2d 513, 515 (Ohio Ct. App. 1988) (reversing a damages award for intentional infliction of emotional distress, and concluding that claimant was not "emotionally debilitated").

Instead of providing evidentiary support for a "severe and debilitating" injury, Freshwater merely claims that the Dennises' conduct has caused him to suffer "loss of appetite, lost time from work, anxiety, and loss of sleep."  (Countercl. ¶ 7.)  He admits that he never sought medical or psychiatric care for any of these alleged conditions, and he supplies no documentation or evidence beyond his own statement that he suffers from these ailments.  (Freshwater Dep. at 311 (admitting that he has "seen no medical professional").)  Freshwater's self-serving assertions, without more, do not establish the severe and debilitating emotional injury required to succeed on his counterclaim.  *See Talley*, 542 F.3d at 1111 (noting that "while Ohio does not require expert medical testimony to support an intentional infliction of emotional distress claim, a [party] must at least provide some evidence beyond his or her own testimony" and concluding that claimant's "assertion that she finds it difficult to get out of bed each day and her sister's affidavit stating that [she] 'cries frequently and otherwise appears to be depressed'" was insufficient to sustain a claim for intentional infliction of emotional distress); *Shariff v. Rahman*, 787 N.E.2d 72, 76 (Ohio Ct. App. 2003) ("While [claimants] assert that it is possible to prove a serious

emotional injury without resort to expert evidence, such evidence is necessary in all but the most extraordinary cases."); *see also Burkes*, 668 N.E.2d at 990 (deeming "trauma and shock to [claimant's] nervous system, chronic depression and phobia" insufficiently "severe and debilitating" to reverse summary judgment on claim for intentional infliction of emotional distress).   Because he has not proven a severe or debilitating injury (or the required intent or outrageous conduct), no reasonable jury could find that Freshwater has established a claim for intentional infliction of emotional distress.  As a result, Freshwater's intentional-infliction-of-emotional-distress counterclaim must be dismissed.

### C.   Freshwater Has Failed To Plead, Let Alone Make Out, A Prima Facie Case For Negligent Infliction Of Emotional Distress.

To the extent that Freshwater seeks to recover for negligent infliction of emotional distress—a claim that he mentions once but fails to properly plead (*see* Countercl. ¶ 7 (alleging Plaintiffs "intentionally and/or negligently caused Defendant . . . emotional distress"))—this counterclaim should suffer the same fate as his counterclaim for intentional infliction of emotional distress.  Ohio courts limit "recovery for negligent infliction of emotional distress . . . to such instances as where one was a bystander to an accident or was in fear of physical consequences to his or her own person."  *Muehrcke v. Housel*, 909 N.E.2d 135, 142 (Ohio Ct. App. 2008); *see also Criswell v. Brentwood Hosp.*, 551 N.E.2d 1315, 1318 (Ohio Ct. App. 1989) (noting that "Ohio case law has recognized negligent infliction of emotional distress only where there is a cognizance of a real danger, not mere fear of nonexistent peril").  Freshwater does not allege—nor can he—that the allegedly defamatory statements placed him in peril of physical harm.  He therefore cannot recover under a theory of negligent infliction of emotional distress.  *See Muehrcke*, 909 N.E.2d at 142 (rejecting claim for negligent infliction of emotional distress when claimed injuries were "depression, emotional stress, anxiety, and

discomfort as a result of [opposing party's] actions and the pending litigation" because claimants "fail[ed] to demonstrate that they were subject to actual physical peril and suffered severe and debilitating emotional injuries as a result").

### D. The Dennises Are Entitled To Summary Judgment On Their Battery Claim.

When Freshwater applied a high-voltage electrical charge from the Tesla coil to Zach Dennis's arm on December 6, 2007 during his eighth grade science class, he committed battery. Freshwater admitted in sworn testimony to applying the device to Zach Dennis's arm (*see* Termination Hearing Tr., John Freshwater Test., 10/28/08, at 399), and he has mounted no viable defense to the Dennises' claim that he is liable for battery. (*See also* Freshwater Dep. at 181 (Freshwater responding, "Yes," when asked whether he testified during the termination hearing that he used the Tesla coil on Zach Dennis's arm).) The Dennises therefore should be granted summary judgment on their battery claim.

### 1. The Dennises Have Established A Prima Facie Case For Battery.

Under Ohio law, a "person is subject to liability for battery when he acts intending to cause a harmful or offensive contact, and when a harmful contact results." *Love v. City of Port Clinton*, 524 N.E.2d 166, 167 (Ohio 1988); *Stafford v. Columbus Bonding Ctr.*, 896 N.E.2d 191, 200 (Ohio Ct. App. 2008); *Harris v. United States*, 422 F.3d 322, 330 (6th Cir. 2005) (noting that the definition of battery in Ohio is "an intentional uninvited contact with another."). An individual possesses the requisite level of intent to commit battery when he "desires to cause consequences of his act, or he believes that the consequences are substantially certain to result from it." *Harasyn v. Normandy Metals, Inc.*, 551 N.E.2d 962, 964 (Ohio 1990) (internal quotation marks and ellipses omitted).

Freshwater's application of the Tesla coil to Zach Dennis's arm constituted the harmful or offensive contact required to state a battery claim. The device produced raised, red welts in

the shape of a cross on Zach Dennis's arm, which caused Zach Dennis significant discomfort. (*See* Zachary Dennis Decl. ¶¶ 5-9; Jenifer Dennis Decl. ¶¶ 4-6, Ex. 1 and 2; Stephen Dennis Decl. ¶¶ 3-9, Ex. 1.)  Freshwater cannot dispute that Zach Dennis suffered a visible injury, because he did not see Zach Dennis's arm after applying the Tesla coil.  (*See* Freshwater Dep. at 188 (admitting he never saw "the mark on Zach Dennis's arm").)

Freshwater also possessed the requisite intent for battery when he applied the Tesla coil to Zach Dennis.  He undoubtedly should have known that his actions were substantially certain to cause harm.  During the termination proceedings, Freshwater admitted that he was aware that the Tesla coil "put out a lot of volts," that it created an electric charge, and that the device could cause subcutaneous burns.  (Freshwater Termination Hearing Tr., John Freshwater Test., 10/28/08, at 382, 384; s*ee also* Freshwater Dep. at 156 (responding "Sure" when asked whether he understood that "electrical shocks [could] cause burns").)  Freshwater, who had used the device in his eighth grade science class for twenty-one years (Freshwater Dep. at 154), also testified that the Tesla coil had left a slight red mark on students' arms in the past, and that students often pulled their arms away when he applied the device to them because "it hurts" (Freshwater Termination Hearing Tr., John Freshwater Test., 10/28/08, at 399, 401.)  That Freshwater did not intend to harm Zach Dennis does not release him from liability for the battery he committed.  *See Feeney v. Eshack*, 718 N.E.2d 462, 464 (Ohio Ct. App. 1998) ("[I]t is not necessary to intend the harmful result; it is sufficient to intend the offensive contact that causes the injury.").  Having established all elements of their battery claim, the Dennises should be granted summary judgment.

### 2.    Zach Dennis Did Not Consent To Being Harmed By The Tesla Coil.

In the event Freshwater attempts to argue that Zach Dennis consented to the Tesla coil's application by volunteering to participate in the classroom demonstration, Freshwater's argument

misses the mark.  When Zach Dennis volunteered for the demonstration, he had no idea that Freshwater's application of the Tesla coil would result in a cross-shaped injury to his arm.  (*see* Freshwater Dep. at 192-93 (Freshwater stating that he gave no warning); *see also* Zachary Dennis Decl. ¶ 4.)  If he had known that the Tesla coil was capable of injuring him, Zach Dennis never would have agreed to participate in Freshwater's demonstration.  ( Freshwater Termination Hearing Tr., Zachary Dennis Test., 10/28/08, at 343; Zachary Dennis Decl. ¶ 11.)   His consent therefore was uninformed and, as a result, invalid.

Although Ohio courts have not been confronted with a set of facts akin to the ones that gave rise to the battery claim in this case, they have addressed the issue of informed consent in the medical context, and that treatment proves instructive here.  *See, e.g.*, *Nickell v. Gonzalez*, 477 N.E.2d 1145, 1148 (Ohio 1985)  (discussing elements of the tort of lack of informed consent available to medical patients and holding that the tort is "established when . . . a reasonable person in the position of the patient would have decided against the therapy had the material risks and dangers inherent and incidental to treatment been disclosed to him or her prior to the therapy"); *Belcher v. Carter*, 234 N.E.2d 311, 312 (Ohio Ct. App. 1967) ("If a patient's consent to a touching is given without sufficient knowledge and understanding of the nature of the touching contemplated by the doctor, there may be no legal defense to battery based upon consent.").

Like a patient who never would have consented to an operation if the doctor had fully disclosed the risks, Zach Dennis never would have raised his hand when Freshwater called for volunteers if Freshwater had warned students about the risks associated with applying the Tesla coil to human skin.  Freshwater should not be permitted to avoid liability for battery based on the fact that Zach Dennis, lacking full knowledge of the potential dangers of the Tesla coil, offered

to help his science teacher, whom he trusted and admired, with a classroom demonstration.  (*See* Zachary Dennis Decl. ¶ 14.)  With the consent defense entirely foreclosed, Freshwater cannot defeat the Dennises' battery claim.  Accordingly, summary judgment should be granted on this claim.

> **E.      Freshwater Violated the Establishment Clause By Endorsing Religious Beliefs in His Classroom.**

Under basic standards of First Amendment jurisprudence, Freshwater unconstitutionally endorsed religion in his classroom.  The Establishment Clause of the First Amendment states that "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. This Clause, applied against the States through the Fourth Amendment, "at the very least, prohibits government from appearing to take a position on questions of religious beliefs or from 'making adherence to a religion relevant in any way to a person's standing in the political community.'" *Am. Civil Liberties Union of Ky. v. McCreary County*, 354 F.3d 438 (6th Cir. 2003), *cert. granted*, 543 U.S. 924 (2004), *aff'd*, 545 U.S. 844 (2005).  Individuals subjected to government endorsement of religion have Article III standing to challenge such activities in federal court when those individuals experience "direct and unwelcome contact" with the religious display.  *Adland v. Russ*, 307 F.3d 471, 478 (6th Cir. 2002).

The test first outlined in *Lemon v. Kurtzman*, 403 U.S. 602 (1971) continues to determine the boundaries of government action under the Establishment Clause.  *Adland*, 307 F.3d at 479. Under *Lemon*, courts must consider whether "(1) the government activity in question has a secular purpose; (2) whether the activity's primary effect advances or inhibits religion; and (3) whether the government activity fosters an excessive entanglement with religion." *McCreary County*, 354 F.3d at 445-46 (citing *Lemon*, 403 U.S. at 612-13).  While a handful of  Supreme Court Justices have expressed some reservations regarding the *Lemon* test, the Sixth Circuit

remains "*bound to follow this test* until the Supreme Court explicitly overrules or abandons it." *Adland*, 307 F.3d at 479 (emphasis added).

Governments engage in unconstitutional activity where plaintiffs establish a violation of *any* prong of the three-part *Lemon* test. *See, e.g.*, *Edwards v. Aguillard*, 482 U.S. 578, 583, (1987) ("State action violates the Establishment Clause if it fails to satisfy any of these prongs."). Freshwater, a government actor, violated not one, but *all three prongs*, by unconstitutionally promoting religion in his classroom.

### 1.    Freshwater Fails the "Purpose" Prong of the *Lemon* Test.

Freshwater can prove no secular purpose for his religious activities because they are inherently religious in nature.  To satisfy the "purpose" prong of the *Lemon* test, Plaintiffs must show that the Defendant's "predominate purpose for the displays was religious."  *McCreary County*, 354 F.3d at 446.  In determining this religious purpose, courts look for a "purposeful or surreptitious effort to express some kind of subtle governmental advocacy of a particular religious message." *Id.* (quoting *Lynch v. Donnelly*, 465 U.S. 668, 680 (1984)).  A purported secular purpose may permit some supposed religious displays, but "the secular purpose requirement is not satisfied . . . by the mere existence of some secular purpose, however dominated by religious purposes."  *Adland*, 307 F.3d at 480 (internal quotations and citations omitted).  Additionally, any stated secular purpose "must be sincere and not a mere sham." *Coles ex rel. Coles v. Cleveland Bd. of Educ.*, 171 F.3d 369, 384 (6th Cir. 1999).

Courts have consistently found, for example, that the Ten Commandments posted in a public school or classroom are for the purpose of advancing a particular religious belief.  *See, e.g.*, *Stone v. Graham*,  449 U.S. 39, 41 (1980) ("The pre-eminent purpose for posting the Ten Commandments on schoolroom walls is plainly religious in nature.").  The Supreme Court has made clear that the Ten Commandments are not confined to "arguably secular matters" because

they "are undeniably a sacred text in the Jewish and Christian faiths, and no . . . supposed secular purpose can blind us to that fact."  *Stone*, 449 U.S. at 41.  Admittedly, the Ten Commandments can be utilized in the classroom for the limited purpose of studying "history, civilization, ethics, comparative religion, or the like," *Stone*, 449 U.S. at 42, but any display "must present the Ten Commandments objectively and integrate them with a secular message," *McCreary County*, 354 F.3d at 448.

The Sixth Circuit utilizes three factors to determine whether a Ten Commandments display has been objectively integrated for a secular purpose:  (1) the content of the displays; (2) the context or physical setting in which the Commandments are displayed; and (3) evolution of the displays over time.  *Id.* at 449.  In *American Civil Liberties Union of Kentucky v. McCreary County*, the Sixth Circuit scrutinized the content of a display that combined the Ten Commandments with the Star Spangled Banner, the Declaration of Independence, the Mayflower Compact, the Bill of Rights, the Magna Carta, the National Motto, the Preamble to the Kentucky Constitution, and an accompanying School Board Resolution that attempted to explain the collage of documents' "historical significance in the development of this country."  *Id.* at 449-50.  Despite the School Board's extensive effort to put a secular bent on its collage, the Sixth Circuit found that the "message [was] patently religious and in no way resembles an objective study of the role that the Ten Commandments, or even the Bible generally, played in the foundation of the American government."  *Id.* at 451.  Looking to "intended physical context" as well, the Court found that, although defendants attempted to make them a "passive symbol" among many secular documents, the school failed to "present the Ten Commandments objectively and as an integral part of a non-religious message."  *Id.* at 455.  Looking to the third consideration, the

Court similarly found that historical government "involvement with the displays" indicated a primarily religious purpose. *Id.* at 458.

Without even a purported secular purpose for his posting of the Ten Commandments, Freshwater's actions cannot withstand the scrutiny of *Lemon's* "purpose" test.  He posted three copies of the Ten Commandments on the window next to his classroom door and at least one on his bulletin board, making them visible to students inside and outside his classroom.  (Freshwater Dep. at 71-74; Zachary Dennis Decl. ¶ 12.)  Under the Sixth Circuit's "purpose" considerations, these postings were not displayed with other secular content or in a non-religious collage, were not contextually independent, and were not historical displays that had been adopted or changed by Freshwater over time.  *See McCreary County*, 354 F.3d. at 449 (stating the "purpose" considerations).  Additionally, Freshwater taught only science (Freshwater Dep. at 42) and cannot constitutionally relate his posting of several copies of the Ten Commandments to his required curriculum.  These were stand-alone copies of the Ten Commandments, and as such, served no "permissible state objective under the Establishment Clause."  *Stone*, 449 U.S. at 42.

Similarly, Freshwater violated *Lemon's* "purpose" prong by placing Bibles in his classroom.  These Bibles included the personal copy on his desk—a book he refused to remove for the entire 2007-2008 school year—and the other Bibles that remained in his classroom until May 2008.  (Freshwater Dep. at 71, 82-88, 106; *see also* Zachary Dennis Decl. ¶ 13 (stating that a collection of Bibles remained in the classroom until May 2008).)  While the Sixth Circuit has not directly considered facts where a teacher displayed Bibles in a classroom, such biblical displays clearly serve a religious purpose under the content, context, and historical considerations.  *See McCreary County*, 354 F.3d at 449 (stating the "purpose" considerations).  The Tenth Circuit's analysis of this very issue provides insight on the religious purpose of

Freshwater's actions. *See Roberts v. Madigan*, 921 F.2d 1047 (10th Cir. 1990), *cert. denied*, 505

U.S. 1218 (1992). In *Madigan*, a teacher, Mr. Roberts, kept a Bible on his desk, had some other

religious books in his classroom library, and sometimes read his Bible to himself during class

time. 921 F.2d at 1049. Upholding the school's efforts to prevent Mr. Roberts' religious activity,

the Tenth Circuit applied the *Lemon* "purpose" prong to find an "improper religious purpose" in

the "use of the Bible and the presence of the religious books in his classroom library."

*Id.* at 1057. Upholding the District Court's decision in the case, the Tenth Circuit emphasized

that Mr. Roberts "offered nothing to suggest that his actions were non-religious." Similar to the

facts in *Madigan*, Freshwater can offer nothing here to suggest that his actions were for a non-

religious purpose. Bibles are inherently religious texts, and their placement in a science

classroom does nothing but promote a religious purpose. Freshwater's Bibles, in addition to the

Ten Commandment postings and the other religious objects that Freshwater removed

(Freshwater Dep. at 71-74, 82-88, 92, 106; Zachary Dennis Decl. ¶¶ 12-13.), clearly illuminate

Freshwater's religious purpose. Therefore, Freshwater's actions violate the *Lemon* "purpose"

prong and are unconstitutional under the Establishment Clause.

       **2.**      **Freshwater Fails the "Endorsement" and "Entanglement" Prongs of the *Lemon* Test.**

      While Freshwater's religious purpose is alone sufficient to establish a constitutional

violation, he also violated the other *Lemon* prongs by advancing and endorsing religion to the

extent that it excessively entangled government and religion. When applying *Lemon*, the Sixth

Circuit now recognizes that *Lemon* effectively includes an "endorsement" test, "which looks to

whether a reasonable observer would believe that a particular action constitutes an endorsement

of religion by the government." *McCreary County*, 354 F.3d at 446. This "endorsement"

consideration does not replace any of the *Lemon* factors, but merely "should be treated as a

refinement of the second *Lemon* [advancement] prong." *Baker v. Adams County/Ohio Valley Sch. Bd.*, 310 F.3d 927, 929 (6th Cir. 2002) (internal quotation marks omitted).  Additionally, the Supreme Court "no longer separately applies the 'excessive entanglement' prong," for it "has been subsumed with significantly less weight" into the other *Lemon* criteria.  *Katter v. Ohio Employment Relations Bd.*, 492 F. Supp. 2d 851, 860 (S.D. Ohio 2007) (Frost, J.) (citing *Mitchell v. Helms*, 530 U.S. 793, 808 (2000)); *see also Zelman v. Simmons-Harris*, 536 U.S. 639, 668-669 (2002) (O'Connor, J., concurring) (discussing the Supreme Court's "fold[ing of] the entanglement inquiry into the primary effect inquiry" because "both inquiries rely on the same evidence").  Therefore, the advancement, endorsement, and entanglement considerations may be addressed under a similar endorsement prong.

Applying the endorsement prong, courts must determine "whether an objective observer, acquainted with the text, legislative history, and implementation of the displays would view them as state endorsement" of religion.  *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 308 (2000) (internal quotation marks omitted).  Considerations also include the "totality of the circumstances surrounding the display" and "the specific content of the display and the context of its presentation."  *McCreary County,* 354 F.3d at 458 (internal citations and quotations omitted).

In *McCreary County*, for example, the Defendants effectively endorsed religion because they could not tie the posted Ten Commandments to a "unifying historical or cultural theme that is also secular."  *Id.* at 460.  The *McCreary* Court concluded that a "reasonable person will think religion, not history" when viewing the Commandments despite the many efforts to contextually place the Commandments otherwise.  *Id.* (internal quotation marks omitted).  Displays of the Ten Commandments are generally considered to endorse religion because they are "several thousands

of years old, were not a product of European or American culture and, many believe, are the word of God." *Id.*  Similar to the Sixth Circuit, the Tenth Circuit in *Madigan* found the teacher's placement of religious displays in his classroom, including his personal Bible, to unconstitutionally endorse religion: "[the teacher's] actions, when viewed in their entirety, had the primary effect of communicating a message of endorsement of a religion to the impressionable ten-, eleven-, and twelve-year-old children in his class." *Madigan*, 921 F.2d at 1057.

So, too, did Freshwater's actions amount to effective religious endorsement to his impressionable young eighth graders.  Any reasonable observer, including Freshwater's students, would undoubtedly find his actions to "constitute[] an endorsement of religion by the government." *See McCreary County*, 354 F.3d at 446.  Viewed alone or in their entirety—the Bibles, the several Ten Commandments postings, and the other religious items that Freshwater admits to removing (Freshwater Dep. at 71-74, 82-88, 92, 106; Zachary Dennis Decl. ¶¶ 12-13.)—these objects unconstitutionally violate the endorsement and entanglement prongs of the *Lemon* test.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant them summary judgment on Defendant Freshwater's counterclaims for defamation and intentional infliction of emotional distress and on their battery and Establishment Clause claims.

Respectfully submitted,


/s/Douglas M. Mansfield_____
Douglas M. Mansfield (0063443)
(Trial Attorney)
dmansfield@jonesday.com
JONES DAY
325 John H. McConnell Blvd. Ste. 600
Columbus, OH  43215

(614) 469-3939 (telephone)
 (614) 461-4198 (fax)

Mailing Address:
JONES DAY
P.O. Box 165017
Columbus, OH  43215-2673

Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on November 16, 2009, I electronically filed the foregoing Motion for Partial Summary Judgment and Memorandum in Support, with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following at their e-mail address on file with the Court:

Robert H. Stoffers
Jason R. Deschler
MAZANEC, RASKIN, RYDER & KELLER, CO., LPA
250 Civic Center Drive, Suite 400
Columbus, OH 43215

*Counsel for Defendant John Freshwater*

R. Kelly Hamilton
4030 Broadway
P. O. Box 824
Grove City, OH 43123

*Counsel for Counterclaimant John Freshwater*

/s/Douglas M. Mansfield
Douglas M. Mansfield