101

1   read, correct?

2          A.   Yes.

3          Q.   In the first paragraph in that letter you

4   talk about the fact that you have removed the Ten

5   Commandments, those book covers or posters that were

6   in your classroom, correct?

7          A.   Is that what it says there?

8          Q.   Yeah, I'm asking you --

9          A.   Yes.

10         Q.   Okay.  And in there you actually state

11  that you understand that the courts have ruled that

12  you're not allowed to put those kinds of things in

13  your classroom.  Do you see that?

14         A.   Yes, sir.

15         Q.   And about the middle, halfway down that

16  statement there's the paragraph that begins "In

17  addition."  Do you see that?

18         A.   Yes, I do.

19         Q.   And that's where you talk about the

20  superiors having ordered you to remove the Bible from

21  your desk.  Do you see that?

22         A.   Yes, sir.

23         Q.   Okay.  And you go on in that paragraph to

24  say that it's not your intention to remove the Bible

102

1   from your desk.

2           A.    Where is that at, sir?

3           Q.    In that same paragraph.

4           A.    Oh, okay.

5                 Okay.  Can you repeat that question, sir?

6                 MR. MANSFIELD:  Could you read that back,

7   please.

8                 (Record read.)

9           A.    What was the question on that?

10          Q.    "Is that correct?"

11          A.    Is that what it says here?

12          Q.    Well, let me ask you -- I know it says

13   that here, right?

14          A.    I'm sorry.  I apologize.  I want to hear

15   what she says again.

16          Q.    Let me ask it a different way.  In this

17   middle paragraph you're stating that you don't agree

18   that you should have to remove the Bible from your

19   desk, correct?

20          A.    Yeah.  Like I said, I didn't write this

21   up, so --

22          Q.    Well, let me ask you, did you agree with

23   that, that you -- was that your belief at the time,

24   that you should not have to remove your Bible from

103

1    your desk?

2         A.   Yes.

3         Q.   So you agreed with this paragraph, that

4    you should not have to remove your Bible from the

5    desk.

6         A.   Yeah.   From what the paragraph is saying,

7    yes.

8         Q.   But that was your belief at the time,

9    correct?

10        A.   To not remove the Bible from the desk.

11        Q.   Correct.

12        A.   Yes.

13        Q.   And that's your belief today I assume.

14        A.   Yes.

15        Q.   Through today you still maintain that you

16   should be allowed to have your personal Bible on your

17   desk in the public school classroom.

18        A.   That would be correct.

19        Q.   Okay.   And you believe that removing the

20   Bible, your personal Bible from your desk in your

21   classroom would be an infringement on your own deeply

22   held personal religious beliefs granted by God and

23   guaranteed under the free exercise clause of the

24   First Amendment to the United States Constitution; is

1    that correct?

2         A.   Yes.

3         Q.   And that's a right that you believe you

4    have under the Constitution, correct?

5         A.   Yes.

6         Q.   And the students in your classroom have

7    rights too, don't they?

8         A.   Absolutely.

9         Q.   And they have the right that a public

10   school teacher shouldn't be teaching religion to

11   them, correct?

12        A.   That's correct.

13        Q.   And as a teacher you have an obligation

14   to those students through your teaching not to

15   infringe on their rights, correct?

16        A.   Yes.

17        Q.   Okay.  Do you think, I don't know whether

18   you have any -- are there any Muslim teachers in the

19   Mount Vernon City School District?

20        A.   I don't know, sir.

21        Q.   If there were a Muslim teacher, do you

22   think that teacher should be able to place the Koran

23   on their desk?

24        A.   You would have to ask that Muslim

105

1   teacher, sir.

2        Q.   I'm asking you, what's your personal

3   opinion about that?

4             MR. HAMILTON:   Objection as to whether or

5   not it calls for any legal speculation, but answer if

6   you can.

7        A.   Can you repeat the question?

8        Q.   Tell me your personal belief, do you

9   believe a Muslim teacher should be able to have a

10  Koran on their desk in the public school classroom?

11            THE WITNESS:   I'm confused here.   That

12  means I can answer it?

13       Q.   Yes.

14            MR. HAMILTON:   Yes, sir.

15       A.   Yeah, I'll say --

16            THE REPORTER:   I'm sorry.   I didn't hear

17  your answer.

18            THE WITNESS:   Do me a favor, repeat that

19  one more time, will you, because I just want to make

20  sure.   I wasn't quite sure if I could . . .

21            (Record read.)

22       A.   Yes.

23       Q.   Now, there was another meeting on April

24  21st.   Do you recall that meeting?

106

1          A.    You'll have to refresh me on that one,

2    sir.

3          Q.    Following the rally in the Square do you

4    recall there being another meeting with school

5    administrators about removing the Bible from your

6    desk?

7          A.    I do not remember that meeting.

8          Q.    You don't remember an April 21st

9    meeting?

10         A.    No.  I just -- you're going to have to

11   give me some more info on that, sir.

12         Q.    All right.  We'll get back to that.

13   During the remainder of the school year following

14   April 16th, remainder of that 2007-2008 school

15   year, did you always keep your Bible on your desk?

16         A.    After April 16th?

17         Q.    Yes.

18         A.    To the end of the year?

19         Q.    Yes.

20         A.    Yes.

21         Q.    So you never complied with Mr. White's

22   order to remove the Bible from your desk.

23         A.    That is correct.

24         Q.    Okay.  But I think you already told me

107

1    this, that you did comply with the order to remove

2    the FCA Bibles, correct?

3        A.   Yes.

4        Q.   And you removed -- you complied with the

5    orders to remove the religious displays that were in

6    the classroom; is that correct?

7        A.   You just put another word in there;

8    "displays."  I didn't display anything, sir.

9        Q.   Okay.  The religious -- or, the Ten

10   Commandments book covers.  You complied with the

11   order to remove the Ten Commandments book covers from

12   your room.

13       A.   Yes.

14       Q.   Okay.  Was there another Bible that you

15   had in your classroom on the lab table at some point

16   during the '07-'08 school year?

17       A.   Yes.

18       Q.   What was that Bible?

19       A.   That was the school's Bible.

20       Q.   And that's a Bible that you had checked

21   out from the school library?

22       A.   That would be correct.

23       Q.   And you checked that out after these

24   meetings you had with Mr. Short about -- or Mr. White

108

1    about removing your personal Bible, correct?

2         A.   So you're saying after April 16th?

3         Q.   Correct.

4         A.   Yes.

5         Q.   And you put that Bible on your lab table

6    to make a statement, didn't you?

7         A.   No.  No, I did not.

8         Q.   Why did you put that -- why did you check

9    that Bible out of the school library and put it on

10   your lab table?

11        A.   Well, it was real simple, I figure

12   they're going to take this one off, and I was going

13   to put that one on, because I figured they would not

14   take the school Bible off.

15             MR. MANSFIELD:  Mark that as wherever we

16   are.  No. 4.

17             (EXHIBIT MARKED FOR IDENTIFICATION.)

18        Q.   Mr. Freshwater, I'm handing you what's

19   been marked as Deposition Exhibit No. 4, it's

20   actually two pages there.  Exhibit 4 are some

21   pictures of what appear to be materials in your

22   classroom; is that right?

23        A.   The top one.  Can you -- repeat that one,

24   please.

109

1    Q.    Tell me what the top one is.  Is that a

2  picture in your classroom?

3    A.    That is correct.

4    Q.    And that's the Bible there, that book we

5  see right on the top.

6    A.    That's correct.

7    Q.    That, in fact, is the same Bible you have

8  here today it looks like.

9    A.    That's right.

10    Q.    And there are several books underneath

11  that Bible.  Do you know what those books are?

12    A.    I don't remember what those books are,

13  sir.

14    Q.    You say you don't remember?

15    A.    I don't remember, sir.

16    Q.    Okay.  Where is this picture taken?  Is

17  this the corner of your desk?

18    A.    Yes, that would be correct.

19    Q.    Do you know who took these pictures?

20    A.    I have no idea, sir.

21    Q.    Is this where, this position where your

22  Bible is here on this first page of Exhibit 4, is

23  that where you always kept your Bible on your desk?

24    A.    Always?  You used the word "always"

110

1    there.  Can you repeat that again?

2         Q.   Yes, I used the word "always."

3         A.   That's what I thought you said.  I can't

4    go with that statement, always, no.

5         Q.   Where we see this Bible in the picture on

6    Exhibit 4, that's the location where you typically

7    kept the Bible on your desk?

8         A.   I would accept "typical," yes.

9         Q.   As we're looking at this picture we see

10   the back of what looks to be a VCR.  Is that what

11   that is?

12        A.   That is correct.

13        Q.   And as we're looking in that direction

14   from the front of the Bible towards the VCR, what

15   direction is that in the classroom?

16        A.   That would be north.

17        Q.   Is that towards the students?

18        A.   No, that would be at about a 95-degree

19   angle away from the students.

20        Q.   Looking at Exhibit 4, where are the

21   students?  Are they to the right?

22        A.   They would be to the right, yes.

23        Q.   Okay.  And your desk chair I assume is to

24   the bottom on this picture.

111

1          A.    It would be to the left.

2          Q.    To the left?

3          A.    Yes.

4          Q.    Okay.  So as we see the desk here in

5    front of the VCR, the desk extends perpendicular to

6    the VCR and away from the VCR; is that right?

7          A.    That would be correct.

8          Q.    Okay.

9          A.    Well, it extends this way.

10         Q.    This way, correct?

11         A.    Yes.

12         Q.    Perpendicular to the VCR.

13         A.    Yes.

14         Q.    And the students are out here to the

15   right.

16         A.    Yes.

17         Q.    And so the Bible here is right at the

18   front of your desk in terms of its orientation

19   towards the students.

20         A.    In this picture, yes.

21         Q.    Right.  If you look at page 2 of Exhibit

22   4, that appears to be another picture of your Bible;

23   is that correct?  I know it's hard to see.

24         A.    It's black and white there.  It could be

112

1    a different book there.  I'm not sure, sir.  It could

2    be the one underneath, I don't know.

3            Q.   Did you also have a couple of the Chicken

4    Soup for the Teenage Soul books in your classroom?

5            A.   I don't remember.  I don't remember, sir.

6            Q.   Do you recall having those books at one

7    point in time?

8            A.   I don't remember, sir.

9            Q.   Do you recall reading passages from those

10   books, from the Chicken Soup for the Teenage Soul, to

11   your students?

12           A.   To my students?

13           Q.   Yeah.

14           A.   I don't remember, sir.

15           Q.   If a student would testify that you had

16   done that in the past, do you have any reason to

17   dispute that?

18              MR. DESCHLER:  Can you identify the past,

19   the timing on that?

20           Q.   If a student had testified, any student

21   had testified that you had read excerpts from Chicken

22   Soup for the Teenage Soul to them, to the class, do

23   you have any reason to dispute that?

24           A.   I guess not.  I wouldn't have reason to

113

1    dispute that.

2              (EXHIBIT MARKED FOR IDENTIFICATION.)

3         Q.   Mr. Freshwater, let me hand you what

4    we've marked as Deposition Exhibit 5 which also

5    contains two pages.  The top page of Exhibit 5, are

6    these the Ten Commandments book covers that you were

7    referring to before?

8         A.   I'm sorry, I just got distracted by that.

9    Go ahead, sir.

10             THE WITNESS:  Can you repeat, please?

11             (Record read.)

12        A.   Yes, these would be the book covers, the

13   security -- blocking the security window, yes, the

14   window.

15        Q.   All right.  There's a "215" there in the

16   middle, that middle book cover; do you see that?

17        A.   Yes.

18        Q.   Do you know what that is?

19        A.   That would be my room number.

20        Q.   Okay.  So that room number appears on the

21   glass?

22        A.   That is correct.

23        Q.   So these pictures are actually posted on

24   the outside, or let me ask, is this picture taken

114

1    from the inside or outside of your classroom?

2         A.   Unless the pictures have been inverted

3    this would be, yeah, if it's transposed -- yes, this

4    would be outside.

5         Q.   Outside your classroom.

6         A.   Yes.

7         Q.   And so these posters would have been

8    visible out into the hallway; is that what you're

9    telling me?

10        A.   Yeah, they would be visible outside,

11   yeah, out in the hallway.  Yes.

12        Q.   And they were also, the Ten Commandments

13   language also appeared on the reverse side of these

14   book covers, correct?

15        A.   No, that's not correct.

16        Q.   Okay.  Was there anything visible on the

17   opposite side of these Ten Commandments book covers

18   inside your classroom?

19        A.   I'm just trying to read it here because

20   it's been awhile since -- what's it say?  "Good

21   Thinking" I think it says there, sir.

22        Q.   I'm talking about on the flip side.

23        A.   That would be the reverse side, "Good

24   Thinking."

115

1          Q.    I see.  So on the reverse side of this

2     center one that says "Good Thinking" we would see the

3     Ten Commandments language inside your classroom.

4          A.    Yeah.  I could say yes to that.  Yes.

5          Q.    And so the flip side of these other two,

6     the top and the bottom Ten Commandments book covers,

7     what we would see if they weren't covered with

8     something else inside your classroom would be the

9     "Good Thinking" side.

10         A.    Yes.

11         Q.    Okay.  If you look at page 2 of Exhibit

12    5, this is another list of the Ten Commandments,

13    correct, among other things that appear in this

14    picture?

15         A.    Yes.

16         Q.    And is this the Ten Commandments poster

17    that we talked about before that was on your bulletin

18    board?

19         A.    This one?

20         Q.    Yes.

21         A.    No.

22         Q.    Is it?

23         A.    I'm sorry, I thought you heard me.  No.

24         Q.    No?  Okay.  Where was this one located in

116

1     your classroom?

2          A.   This looks like on my chalkboard.

3          Q.   And this Ten Commandments, I'll call it a

4     poster, I know it's not that big, but that was there

5     during the 2007-2008 school year?

6          A.   When was this picture taken?

7          Q.   Well, we're going to get testimony about

8     that I think from somebody at the school district,

9     but I'm assuming it was taken April 2008.

10         A.   Okay.

11         Q.   You don't have any reason -- to the best

12    of your recollection, this poster was up in your

13    classroom during the 2007-2008 school year.

14         A.   My best recollection, yes.

15         Q.   Okay.  So there actually were three Ten

16    Commandments book covers/posters in your classroom,

17    correct, the ones on the windows near your door, this

18    one on your chalkboard, and then the one we talked

19    about on the bulletin board, correct?

20         A.   Yes.

21              (EXHIBIT MARKED FOR IDENTIFICATION.)

22         Q.   Mr. Freshwater, let me hand you what we

23    marked as Exhibit 6.  Can you identify this picture

24    for me?  I mean, what it's a picture of?

117

1      A.   This would be a picture in my room behind

2   my desk.

3      Q.   Okay.  This is the bulletin board we

4   talked about before?

5      A.   Yes, it is.

6      Q.   And then at the bottom of this picture we

7   see that Ten Commandments book cover we talked about

8   before, correct?

9      A.   That is correct, sir.

10     Q.   Okay.  And then above that is the

11  patriotic poster that you referred to?

12     A.   That would be correct.

13     Q.   And that patriotic poster is a picture

14  of, it looks like Colin Powell and President Bush and

15  some others, his cabinet members.

16     A.   Yeah, I would assume.  I don't know them

17  all, but I would assume, sir.

18     Q.   Okay.  And there's a religious

19  inscription or saying there at the top of that

20  poster; is that correct?

21     A.   Is there a religious saying up -- yes.

22     Q.   Do you recall what that said?  Part of

23  it's blocked out.

24     A.   No, I do not.

118

1          Q.    There's a reference there, a biblical

2     reference on the right-hand top side of the poster;

3     do you see that?  I mean, it's referring to a part of

4     the Bible there up in the top right-hand corner.

5          A.    Yeah, I see something there, but from the

6     picture I cannot tell, sir.

7          Q.    You don't know what that's referring to,

8     what biblical verse --

9          A.    No.

10         Q.    -- that's referring to?

11         A.    No, I don't.

12         Q.    Okay.  If you look at the top of this

13    picture, there's a Will Graham Celebration poster; do

14    you see that?

15         A.    Yes.

16         Q.    And you understand Will Graham is Billy

17    Graham's son?

18         A.    Yes.

19         Q.    And tell me what this poster was about,

20    this Will Graham poster.

21         A.    The Celebration of Will Graham 2007.

22         Q.    This was a tour that Will Graham was

23    doing around the country; is that right?

24         A.    I don't know if it was a -- I don't know

119

1    if you would consider it a tour.

2         Q.   A series of speaking engagements, better

3    to characterize it that way?

4         A.   Celebration, more of a -- how can you

5    describe it?  Music.  A lot of music.  It was a lot

6    of music.

7         Q.   It was an evangelical event; is that fair

8    to say?

9         A.   No, I don't think that would be fair to

10   say.

11        Q.   He appeared at Kenyon College.

12        A.   That would be correct.

13        Q.   And you recall that being in late-2007?

14        A.   What is "late"?

15        Q.   Well, during the school year in 2007 --

16   in the latter part of 2007, so the first half of the

17   '07-'08 school year, sometime between September and

18   December.

19        A.   I'm not sure, sir.  I'd have to -- I

20   don't remember exactly.

21        Q.   Did you attend the event?

22        A.   Did I attend it?  Yes.

23        Q.   Okay.  And just tell me briefly what

24   happened at the event.

120

1        A.    A lot of music that -- some of it didn't

2   suit my style so I was not in there, okay?  It was

3   loud, so I was in and out.

4        Q.    And Will Graham spoke?

5        A.    Yes, he spoke.

6        Q.    Did you hear him speak?

7        A.    Bits and pieces, yeah.  Like I said, I

8   was in and out.

9        Q.    When he spoke, though, there wasn't loud

10  music going on, was there?

11       A.    No.  No.

12       Q.    Okay.  Do you know how long he spoke?

13       A.    I don't know, sir.

14       Q.    Are you telling me you didn't listen to

15  his entire speech?  You left?  You came and went?

16       A.    I was in and out, yeah.

17       Q.    So you didn't hear his entire speech.

18       A.    No, I did not.

19       Q.    Was he delivering a sermon?

20       A.    He was speaking, sir.

21       Q.    And obviously you put this Will Graham

22  Celebration poster on your bulletin board in your

23  classroom.

24       A.    I didn't put it there, sir.

121

1          Q.    Okay.  Who put it there?

2          A.    I would have to guess on that.  I don't

3     know, sir.

4          Q.    Well, what's your guess?

5          A.    Student from FCA or my daughter.  I don't

6     know.

7          Q.    Did you take your daughter to the Will

8     Graham event?

9          A.    Yeah, she went.

10         Q.    And it's your testimony that you did not

11    put this Will Graham poster on your bulletin board.

12         A.    I don't remember, sir.

13         Q.    Okay.  So you don't remember whether you

14    did it or whether somebody else did it, you just

15    don't recall as you sit here today.

16         A.    I don't remember, sir.

17         Q.    So it might have been you, correct?

18         A.    No, it wasn't me.

19         Q.    Okay.  Well, you just told me you didn't

20    recall whether you did it or not, so --

21         A.    I didn't put it up there.

22         Q.    Okay.  Nonetheless, you allowed it to

23    remain on your bulletin board in your classroom

24    during the 2007-2008 school year, correct?

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

122

1          A.    It was the FCA room also, sir.

2          Q.    Okay.  So the answer to my question is

3    "correct."

4          A.    You'll have to repeat that question, sir.

5                MR. MANSFIELD:  Could you read the

6    question back.

7                (Record read.)

8          A.    Yes.

9                (EXHIBIT MARKED FOR IDENTIFICATION.)

10         Q.    Handing you what we've marked as Exhibit

11   7.

12               (Discussion off the record.)

13         Q.    Mr. Freshwater, we've just handed you

14   what's been marked as Deposition Exhibit 7 and this

15   is also a picture in your classroom; is that correct?

16         A.    Yes, it is.

17         Q.    And these are some cabinets above a

18   counter in your classroom.

19         A.    That would be correct.

20         Q.    And on four of those doors there are

21   little posters, correct?

22         A.    You called these posters, sir?

23         Q.    Well, I don't know.  You tell me what

24   they are.

123

1          A.    Motivational.

2          Q.    Motivational what?

3          A.    Writings.  Posters.

4          Q.    Is it okay if I refer to them as little

5    posters?

6          A.    Yes.  Yes.

7          Q.    Okay.  And each of those is a religious

8    saying, correct?

9          A.    No.

10         Q.    What are they?

11         A.    Motivational sayings.

12         Q.    Are there biblical references contained

13   in those?

14         A.    I can't tell, sir.

15         Q.    Yeah, we can't read them here.  We'll

16   figure out what they say later, but do you recall

17   what those were?

18         A.    I don't recall, sir.

19         Q.    There's writing that appears in a little

20   larger type in the top half of each of these small

21   posters, correct?

22         A.    Yes.

23         Q.    And that's what you're telling me is a

24   motivational statement?

124

1          A.   The whole thing, sir.

2          Q.   At the bottom there's some additional

3    language on each one, correct?

4          A.   That would be -- it appears that way,

5    yes.

6          Q.   And those were actual biblical verses at

7    the bottom, correct?

8          A.   I do not know, sir.

9          Q.   You don't recall?

10         A.   I don't remember, sir.

11         Q.   Do you know what happened to those four

12   posters?

13         A.   I can only assume that they were --

14              MR. HAMILTON:  Don't assume.

15         A.   Okay.  They were removed from my room

16   when the stuff out of my room was removed.

17         Q.   You removed these four as a result of

18   your conversations with Mr. White about removing

19   religious displays, correct?

20         A.   Yes.

21         Q.   And so these were four of the items that

22   you had to remove at that time.

23         A.   Yes, Mr. White said to.  Yes.

24         Q.   Right.  Okay.  So based on that fact that

125

1    these were items you had to remove, it's fair to

2    assume that there were religious references or

3    citations at the bottom of each of these four

4    posters; wouldn't you agree with me?

5         A.    No.

6         Q.    When you removed them from these

7    cabinets, where did you put them?

8         A.    I don't remember, sir.

9         Q.    Did you keep them in your classroom or

10   take them home?

11        A.    I don't remember, sir.

12        Q.    Do you know whether you have them today?

13        A.    I don't know where they're at, sir.

14        Q.    Do you recall destroying them?

15        A.    Did I destroy them?  No.  When they -- I

16   can't used the word "assume."  When they went through

17   my room, that's when I -- they were probably removed

18   from the -- however they cleaned my room out, sir.

19        Q.    Well, you told us that you actually

20   removed these things in response to Mr. White's

21   request, and what I'm trying to find out is did you

22   put them in the cabinets, or did you take them home,

23   or did you throw them away?  Do you recall what you

24   did with them?

126

1          A.    I do not remember, sir.

2          Q.    How about the Ten Commandments book

3    covers and those other things that we talked about

4    today, do you recall what you did with them?   In

5    other words, did you put them inside the cabinets?

6    Did you throw them away?  Did you take them home?

7    What do you recall doing with them?

8          A.    I don't remember, sir.

9          Q.    Do you recall giving them to your

10   attorneys for purposes of production in the lawsuit?

11         A.    You'll have to ask him.

12         Q.    All right.  Were you involved in a school

13   activity or an activity called Cross Club?

14         A.    I'm sorry.  Could you repeat that?

15         Q.    Were you involved in an activity at

16   school, I assume it's at school, but an activity or a

17   group called Cross Club?

18         A.    Define "involved."  I'm not sure what you

19   mean by that word.

20         Q.    What is Cross Club?

21         A.    It was FCA.

22         Q.    It's the same thing as FCA.

23         A.    Yes.

24         Q.    Did you have Cross Club posters in your

127

1    classroom as well?

2         A.   I don't remember, sir.

3         Q.   There was some testimony from the hearing

4    when you testified in your termination hearing that

5    you had these old Cross Club posters in your

6    classroom.  Do you recall that testimony?

7         A.   You would have to show that to me, sir.

8         Q.   As you sit here today, you can't recall

9    today whether you had these Cross Club posters on

10   your wall or not.

11        A.   Yes, that's correct.

12        Q.   We talked about you removing these items

13   from your classroom in response to Mr. White's

14   direction and I think you told us before you did not

15   remove your personal Bible on your desk, correct?

16        A.   That is correct, sir.

17        Q.   And you also actually did not remove this

18   patriotic poster; is that correct?

19        A.   Yeah, that is correct, because I was

20   never asked to remove that.

21        Q.   And after being told to remove the

22   religious items from your classroom, we talked about

23   you checked out this other Bible from the library,

24   correct?

128

1        A.   Yes.

2        Q.   And you also checked out a book called

3   Jesus of Nazareth.

4        A.   I don't remember the name of it, sir.

5        Q.   Do you recall checking out two books from

6   the library?

7        A.   Yes.

8        Q.   One was the Oxford Bible.

9        A.   Yes.

10       Q.   And you don't remember the other book

11  being a book called Jesus of Nazareth.

12       A.   I don't remember, sir.

13       Q.   That second book was also a religious

14  book, though, you do recall that.

15       A.   I'm not -- religious book?  I don't know,

16  sir.

17       Q.   When you checked the book out of the

18  library, you had to fill out a library card just like

19  every kid would have to do.

20       A.   That would be correct.

21       Q.   Okay.  Do you recall telling anybody that

22  you checked those two books out to make a point with

23  the school?

24       A.   Make a point.  I think I've already

129

1    mentioned what the point is.

2         Q.    Right.  By checking these two books out

3    you were making the point that, I'll characterize it

4    this way and you correct me if I'm wrong, but that

5    you thought it was ridiculous that they were

6    requiring you to remove your personal Bible when you

7    could actually go get these religious books from the

8    library and check them out and keep them in your

9    classroom; is that fair?

10        A.    No, that's not fair, sir.

11        Q.    You tell me, then, what was the point of

12   checking those two books out from the library?

13        A.    I thought I already -- do you want me to

14   repeat what I said, sir?

15        Q.    You told me the first book you checked

16   out because you thought your personal Bible was going

17   to be taken away; that was your point with that one.

18        A.    Yes.

19        Q.    And what was your point with the second

20   book?

21        A.    I happened to notice it with that one and

22   I wanted to look at it.

23        Q.    So it's your testimony you had no point

24   or motive or intention in checking those books out.

130

1        A.    No, I didn't have no -- no.  Like I say,

2   in case my personal Bible was removed.  My daughter,

3   every time she came in, we looked to see if the Bible

4   was removed or not till the end of the year.

5        Q.    Was your daughter in your class that

6   year?

7        A.    No, sir.

8        Q.    But I take it your daughter would come

9   visit you in your classroom at different points

10  during the day.

11       A.    Before school, after school.

12       Q.    Okay.  So when you came to school every

13  day, you would bring your daughter with you.

14       A.    That is correct.

15       Q.    And so she would come to your classroom

16  first.

17       A.    Majority of the time, yes.

18       Q.    And then she would go to her homeroom and

19  go about her day?

20       A.    That would be correct, yeah.

21            MR. MANSFIELD:  Go off the record here

22  for a second.

23            (Discussion off the record.)

24            (EXHIBIT MARKED FOR IDENTIFICATION.)

131

1          Q.    Mr. Freshwater, let me hand you what we

2     marked as Exhibit 8.  I apologize, I should have

3     marked this before.  This is another photograph of

4     your classroom; is that correct?

5          A.    That would be correct, sir.

6          Q.    And that's the same bulletin board we

7     were looking at before.

8          A.    That would be correct, sir.

9          Q.    And here there are these posters, the

10    Cross Club News; do you see that?

11         A.    Yes.

12         Q.    Or banners, whatever you want to call

13    them.

14         A.    Yes.

15         Q.    What are those?  You tell me what they

16    are.

17         A.    Students made these prior to -- before we

18    became FCA.

19         Q.    And so you just kept these tacked onto

20    your bulletin board.

21         A.    Yeah.  It's the FCA room.

22         Q.    Okay.

23         A.    It's --

24         Q.    I'm sorry.

132

1      A.    That's okay.  Go ahead.

2      Q.    When did Cross Club become FCA?

3      A.    I don't remember, sir.

4      Q.    Before 2005?  After 2005?

5      A.    I don't remember, sir.

6      Q.    Do you recall how long you had these

7    Cross Club News banners up on your bulletin board?

8      A.    I don't remember, sir.

9      Q.    Okay.  They were there during the

10   2007-2008 school year in any event.

11     A.    Yes.

12     Q.    The top one here says "Cross Club News."

13   Do you know what the ones behind it said?

14     A.    No, sir.

15     Q.    But they were also Cross Club related

16   banners?

17     A.    I don't know, sir.

18           MR. MANSFIELD:  Okay.  Why don't we go

19   ahead and break now.

20           (At 12:27 p.m. a lunch recess was taken

21   until 1:35 p.m.)

22                        - - -

23

24

133

1           Wednesday Afternoon Session,

2           October 14, 2009.

3                    - - -

4           CROSS-EXAMINATION (continued)

5   By Mr. Mansfield:

6           Q.   Mr. Freshwater, this morning we talked a

7   little bit about the rally on the Square and, as I

8   understand it, that same day there was an abortion

9   van that was in Mount Vernon.  Were you aware of

10  that?

11          A.   (Witness shakes head.)

12          Q.   Have you come to learn that there was an

13  abortion van in Mount Vernon that day that drove by

14  the middle school?

15          A.   Yeah, I became aware of it.  Yes.

16          Q.   Who told you that?

17          A.   I think it was the Does.

18          Q.   The Does told you.

19          A.   Yeah, in a newspaper article.

20          Q.   So they didn't tell you.

21          A.   *The Columbus Dispatch*, Mount Vernon --

22          Q.   Okay.

23          A.   Through the Does.

24          Q.   Did you see that abortion van near the

134

1   Square when the rally on the Square was going on?

2          A.   No.

3          Q.   Did you happen to see that abortion van

4   that day, on April 16th, 2008?

5          A.   No.

6          Q.   Did Mr. Daubenmire talk to you about the

7   fact that that abortion van was going to show up that

8   day?

9          A.   No.

10         Q.   Now, you're aware that at some point in

11  time the Does came to the school, actually in

12  December 2007, to talk to administrators about what

13  had happened to James in your science class, right?

14  You're aware of that.

15         A.   It was a -- I'm aware of it now, yes.

16         Q.   Right.  You didn't know it at the time --

17         A.   Right.

18         Q.   -- but you're aware of it now.

19         A.   Yes.

20         Q.   And I assume you're aware now that the

21  Does had met with school administrators a few times

22  in between December '07 and April '08 let's say.

23         A.   Yes.

24         Q.   When the school district, when Mr. White

135

1    and others had conversations with you about the

2    religious displays in the classroom and the Bible on

3    your desk, you didn't know that the Does had talked

4    to anybody at the school at that point in time, did

5    you?

6         A.   Again, you continue to say "religious

7    display."  It was not a religious display, sir.

8         Q.   Okay.  The book covers and the Bibles in

9    your classroom, when the school administrators were

10   talking to you about those in April 2008, at that

11   point in time did you know that the Does had

12   complained about you and your teaching?

13        A.   I learned -- you're saying the name Does?

14   Are you --

15        Q.   Yes.

16        A.   Are you asking me when I learned about

17   the Does?

18        Q.   Yes.

19        A.   Is that what you asked?

20        Q.   Yeah.

21        A.   I'm just trying to -- that would have

22   took place after April 22nd after I had a meeting

23   with Mr. White and they were going to put a monitor

24   in my class.

ARMSTRONG & OKEY, INC., Columbus, Ohio (614) 224-9481

136

1        Q.   Okay.

2        A.   So that would be, I'll put it at April

3   22nd or later.

4        Q.   So when all these allegations that were

5   being made against you were -- strike that.

6             When this issue about a Bible on your

7   desk became public, you had no understanding that the

8   Does had somehow complained to the school district

9   about anything.

10        A.   That would be correct, yes.

11        Q.   Everything becoming public about the

12   Bible on the desk and the troubles you were having

13   with the school district, that really had nothing to

14   do with the Does, correct?

15        A.   Repeat that one.  I'm not quite sure what

16   your question is on that.

17        Q.   This whole issue about you having the

18   Bible on the desk and this coming into public light

19   and the fact that there was a rally on the Square

20   and, you know, your name appearing in the paper

21   complaining about the fact that the school district

22   was admonishing you for having a Bible on the desk,

23   all of that had nothing to do with the Does, correct?

24        A.   I'm not certain of your question on that,

137

1    sir.  I didn't know the Does till after April 22nd.

2           Q.    Right.   And all these issues about the

3    Bible on the desk and the rally on the Square and all

4    these things all happened before you knew about the

5    Does, correct?

6           A.    Yes.

7           Q.    Okay.

8           A.    I didn't have a name Doe.

9           Q.    Right.   So the fact that your name was

10   made public, the fact that this whole issue about the

11   Bible on the desk became a public issue, that had

12   nothing to do with the Does making a public statement

13   about that, correct?

14          A.    I guess I'm confused on the question

15   here.  I didn't know the name -- I didn't know it was

16   the Does.

17          Q.    Right.

18          A.    So I don't know how to answer that one.

19          Q.    Let me ask it this way, in April of 2008

20   the Does never made any public statement regarding

21   anything related to you having Bibles in the

22   classroom or you burning a cross on James's arm,

23   correct?

24          A.    You just added something new in there.  I

138

1    didn't burn a cross.  So you just added a whole

2    nother thing into that.

3          Q.    I'll split it out.

4          A.    Okay.

5          Q.    Before, well, before you -- in April 2008

6    or any time up to that point the Does had never made

7    a public allegation about you having a Bible on your

8    desk in the classroom, correct?

9          MR. HAMILTON:  What are you defining as

10   "public," Doug?

11         MR. MANSFIELD:  Defining as what?

12         MR. HAMILTON:  What are you defining as

13   "public"?

14         Q.    Do you understand what a public statement

15   is?  A statement made to the public.  A statement

16   made to a newspaper.  A statement made to anybody in

17   the public.

18         MR. HAMILTON:  Or a statement made to a

19   school administrator.

20         A.    They made a statement -- I don't know.

21   I'm very confused on that, sir.

22         Q.    Okay.

23         A.    I'm not . . .

24         Q.    The first time the issue of a Bible being

139

1    on your desk or you being admonished by the school

2    district for a Bible on your desk or for the other

3    things we talked about, the first time that was made

4    public, in fact, was when there was the rally on the

5    Square, right?

6         A.   Again, you're back to that "public"

7    again.  I'm not -- you're going to have to --

8         Q.   Okay.  Were people in the community aware

9    about the allegation -- strike that.

10             Were people in the community aware that

11    the school district had been talking to you about

12    removing the Bible from your desk at any time before

13    the rally on the Square?

14        A.   The people, no.

15        Q.   Okay.  And so the first time that issue

16    became public was at the rally on the Square.

17        A.   About the Bible on the desk.

18        Q.   Yes.

19        A.   Becoming public.

20        Q.   About that issue becoming public.  The

21    fact that there was some issue with you and a Bible

22    on the desk with your employer, the school district,

23    the first time that became public was at the rally on

24    the Square.

140

1      A.   Maybe something else -- maybe Mr. White

2  talked about it.  I don't know.  I mean, he . . .

3      Q.   Okay.

4           MR. DESCHLER:  Doug, I'm going to object

5  to the -- hold on a second, John -- the word you used

6  is "public."  Okay, the April 14th letter sent by

7  Plaintiff's former attorney was deemed to be a public

8  record, so I don't know -- that was contained in

9  there.  So I want to make sure we understand.  You

10 mean speech to the public?  I'm confused on that

11 issue.

12          MR. MANSFIELD:  We'll get to that.

13          MR. DESCHLER:  Okay.

14          MR. MANSFIELD:  You know, I'm going to

15 object again.  I can't have both of you guys

16 objecting.  There's only one counsel permitted to

17 represent him and, Jason, I want the record to

18 reflect while you were objecting Mr. Hamilton was

19 whispering into Mr. Freshwater's ear.  That's not a

20 proper way to do things.  There are questions

21 pending.  You can't talk to a witness when there's a

22 question pending.

23          So one of you has to decide who's

24 representing him at this deposition.  We're not going

141

1    to have objections from both of you.  We can get the

2    magistrate on the line if you'd like, you know, she's

3    going to tell you you both can't object.

4              MR. DESCHLER:  We're both representing

5    him in different capacities.

6              MR. MANSFIELD:  It's one party.

7              MR. HAMILTON:  Let's not mince words.

8    Let's just get the magistrate on the line then.  I

9    mean, let's -- I don't want to argue with you over

10   these things.  We're taking up valuable time.  If it

11   would make you feel better to talk to the magistrate

12   about it, let's do that.

13             MR. MANSFIELD:  Well, if it happens

14   again, we'll get the magistrate on the line.

15             Q.   (By Mr. Mansfield) Mr. Freshwater, the

16   first time you were made aware of any issue about the

17   Bible on your desk was in April 2008, correct?

18             A.   Well, April --

19             Q.   April 17th.

20             MR. DESCHLER:  I'm sorry.  Can we go off

21   the record for a second.

22             (Discussion off the record.)

23             MR. MANSFIELD:  Can you read my last

24   question back, please.

142

1          (Record read.)

2     A.    April 7th.

3     Q.    Right.

4     A.    Yes.

5     Q.    April 7th, 2008.

6     A.    Yes.

7     Q.    And up to that point, up to April 7th,

8  2008, obviously nobody in the public in Mount Vernon

9  or anywhere else knew about the Bible on the desk

10 issue, correct?

11    A.    It was never a problem before April

12 7th.

13    Q.    Right.  So the answer to my question is

14 "yes"?

15         MR. HAMILTON:  Can you -- I object.  He

16 can't possibly know whether or not anybody in Mount

17 Vernon, what knowledge they had.  He only has his

18 knowledge.

19    Q.    Based on your knowledge, were you aware

20 of anybody in Mount Vernon being aware of that issue

21 up to or prior to April 7th, 2008?

22    A.    I was not aware of any.

23    Q.    Okay.  The first time that you are aware

24 that the issue about the school board asking you to

143

1    remove religious displays from your classroom and the

2    school board asking you to remove the Bibles from

3    your classroom was the rally on the Square on April

4    16th, 2008, correct?

5         A.   You'll have to reword that because I

6    stopped -- you said "religious displays," again.

7         Q.   Listen to my question.

8         A.   You're saying "religious displays."  I

9    just kind of shut you down because it wasn't

10   religious displays.

11        Q.   You may disagree with the religious

12   displays.  The school is making allegations against

13   you that they were religious displays; would you

14   agree with me on that?

15        A.   That is an allegation in this case.

16        Q.   So the first time the allegation that you

17   had religious displays in the classroom and the

18   school board had asked you to remove them, and the

19   first time that the school board had asked you to

20   remove Bibles from your classroom, the first time

21   that either of those two issues became public was at

22   the rally on the Square on April 16th, 2008,

23   correct?

24        A.   We're back with that word "public."

144

1        Q.   I'm just asking for your understanding.

2   Whatever you --

3        A.   From my understanding.

4        Q.   Yeah.

5        A.   Yes.

6        Q.   Okay.  Let's go back to December 6th,

7   2007.  James Doe is a student in your class, correct?

8        A.   Yes, he is.

9        Q.   He's in your, it's eighth period science

10  class?

11       A.   Yes.

12       Q.   And that's the last period of the school

13  day; is that correct?  Or am I wrong about that?

14       A.   Was it the last period or the period

15  before?  It's towards the end of the day, sir.

16       Q.   Okay.  And in that class, in your

17  classroom where James Doe was there on December

18  6th, 2007, you did an experiment with a Tesla coil,

19  correct?

20       A.   That is correct.

21       Q.   Tell me what a Tesla coil is.

22       A.   It's a device that's used for

23  experiments.

24       Q.   What kind of device is it?

145

1    A.   It's high voltage and -- I'm not sure.  I

2    guess I'm not quite sure what you're after on that.

3        Q.   Well, I want to know what your

4    understanding is of what the Tesla coil is.

5        A.   But you didn't ask me when.  Now my

6    understanding of it, or then?

7        Q.   Okay.

8        A.   That's -- I'm -- I need some clarity on

9    that, sir.

10       Q.   Okay.  When I ask these questions about

11   the Tesla coil, let's just make the time frame

12   December 2007, okay?

13       A.   So my knowledge of 2007.

14       Q.   What your knowledge was in December 2007.

15       A.   Okay.

16       Q.   What was your knowledge in December 2007

17   about what a Tesla coil is?

18       A.   Everything that I had from -- on training

19   from another teacher from, his name is Jeff -- I'm

20   sorry, probably too fast.

21       Q.   Jeff?

22       A.   The on-training from another colleague,

23   Jeff George.

24       Q.   My question is what was your

146

1    understanding of what a Tesla coil was back in

2    December 2007?

3         A.    A device that I used for doing

4    experiments with.

5         Q.    You understood it was a device that put

6    out an electrical output, correct?

7         A.    Yes.

8         Q.    And you understood, you testified just a

9    minute ago that it put out high voltage, correct?

10         A.    That -- I understand that now, yes.

11         Q.    You didn't understand that in December

12    2007.

13         A.    I did not know how high it was.

14         Q.    But you understood in December 2007 it

15    put out high voltage, correct?

16         A.    When I was trained by Jeff George, he

17    might have said something then.

18         Q.    Okay.  What training did Jeff George give

19    you about the use of the Tesla coil?

20         A.    Twenty-one years ago.  I have to say I

21    don't remember all of the training.  What I used in

22    my room -- what he had showed me then is what I used

23    in my room.

24         Q.    What did he show you, then, 21 years ago?

147

1          A.    The vacuum tubes is what I'm trying to
2    pull up out of my brain here, the vacuum tubes with
3    gases in them, charging those up.
4          Q.    So he showed you how to apply the Tesla
5    coil to those vacuum tubes to charge those tubes?
6          A.    Yes.
7          Q.    And he showed you how to operate the
8    Tesla coil?
9          A.    Yeah.
10         Q.    He showed you how to turn it on?
11         A.    Twenty-one years ago.  I would expect so,
12   yes.
13         Q.    And he showed you that it had a rheostat
14   on the side of it?
15         A.    Yeah.
16         Q.    And that rheostat would increase or
17   decrease the power output of the Tesla coil, correct?
18         A.    That would be correct, yeah.
19         Q.    Okay.  And did he give you any training
20   about what you were not supposed to do with the Tesla
21   coil?
22         A.    No.  I have a hard time remembering that.
23   I mean, I'm . . .
24         Q.    Where is Jeff George today?

148

1        A.   I couldn't tell you.

2        Q.   Do you know how long ago he left teaching

3   in Mount Vernon schools?

4        A.   Ten years ago.

5        Q.   Is he still in Mount Vernon, do you know?

6        A.   I don't know.

7        Q.   Okay.  Did Mr. George actually physically

8   hand you and give you the Tesla coil for your

9   classroom?

10       A.   I don't know, sir.

11       Q.   Do you remember where it came from?

12       A.   School equipment.

13       Q.   How did you get the Tesla coil that

14   you've had in your classroom?

15       A.   School -- school equipment.

16       Q.   Tell me how you got it.  Who gave it to

17   you?  Where did you get it?

18       A.   They're kept in the lab room or kept in

19   the classroom.

20       Q.   Was it in your --

21       A.   It's a part of the science equipment.

22   It's with all the other experiments that are used.

23       Q.   When you started 21 years ago, was the

24   Tesla coil already into your science classroom?

149

1      A.    There was a couple.  I don't recall if
2   there was a couple then or not so I don't know.  I
3   don't know if there was just one then or two or three
4   then.  I don't know back 21 years ago how many there
5   was.
6      Q.    But you remember there being at least one
7   Tesla coil in your science classroom on the very
8   first day you started teaching in Mount Vernon City
9   Schools.
10      A.    Oh, no.  No, I don't remember one being
11   in the classroom.
12      Q.    Okay.
13      A.    It could have been in the lab.  Could
14   have been in Mr. George's room.  I'm not sure.
15      Q.    So at some point in time you got at least
16   one, maybe more Tesla coils, into your science
17   classroom.
18      A.    I didn't do the purchasing and orders.
19      Q.    That wasn't my question, sir.  You need
20   to listen to my question.
21      A.    Okay.
22      Q.    At some point in time you got a Tesla
23   coil into your classroom.
24      A.    Did I use one?  Are you asking did I use

150

1    a Tesla coil in my classroom?  Yeah.

2         Q.    Okay.  And did you over the 21 years you

3    taught there, did you keep the Tesla coil in your

4    classroom at all times?

5         A.    If there was only one, it just moved

6    around.

7         Q.    Okay.  That's my question.

8         A.    Yeah.

9         Q.    The Tesla coil, was that just for your

10   classroom or was that part of the general equipment

11   that you could go and get and bring back?

12        A.    There you go.  General equipment.

13        Q.    So when you wanted to use the Tesla coil

14   in your classroom for science experiments, you would

15   have to go to the lab or wherever the Tesla coil was

16   stored and pick it up and bring it back to your

17   classroom.

18        A.    Yeah.  Or like I say, another teacher

19   could be using it.

20        Q.    Right.

21        A.    Maybe to another classroom, to the lab.

22        Q.    But you did not maintain a Tesla coil in

23   your classroom every day.

24        A.    No.