301

1    the family that had filed or had raised a complaint

2    about you with the school district?

3         A.    You asked me when I learned the name?

4         Q.    Yeah, when you learned the name.  How did

5    you find out it was the Does?

6         A.    Had to be after April 22nd.

7         Q.    Okay.

8         A.    Sometime in there.  Sometime after that.

9         Q.    What were the circumstances of you

10   learning that?  How did you learn?

11        A.    That was from Mr. White.

12        Q.    And what did he do?  What did he tell

13   you?

14        A.    I asked about who was making the

15   complaint and he told me.

16        Q.    He didn't come to tell you.  You asked

17   him and then he told you.

18        A.    I think that's how it went, yes.

19        Q.    How did you feel when you heard that

20   James Doe's parents were the ones that had come to

21   the school to talk about what had happened to their

22   kid?

23        A.    How did I feel?

24        Q.    In other words, were you upset?  Were you

302

1    mad?

2         A.   Oh, upset about the whole thing, the

3    whole situation.  It could have been a different

4    name, it wouldn't have -- I was upset about the whole

5    situation.  Didn't make any difference who John Doe

6    was.

7         Q.   Okay.  Were you upset with the Does?

8         A.   No.

9         Q.   Okay.

10        A.   I mean, I'm upset the whole thing was

11   taking place.  The whole . . .

12        Q.   Were you disappointed in any way that

13   James Doe and his family were the ones who had made

14   the complaint?

15        A.   Disappointed with them?

16        Q.   Yes.

17        A.   Disappointed with the situation.

18        Q.   I asked you some of this before, we'll go

19   through it kind of quickly, but what's your religion,

20   Mr. Freshwater?

21        A.   Christian.

22        Q.   What denomination?

23        A.   Presently attending Assemblies of God.

24        Q.   I'm sorry.  What was that?

303

1          A.    I'm presently attending Assemblies of

2    God.

3          Q.    Assemblies of God?

4          A.    Yes.

5          Q.    Assemblies of God is a -- there's a

6    national affiliation of churches?

7          A.    Yes.

8          Q.    Is that right?

9          A.    Yes.

10         Q.    Okay.  And is there more than one

11   Assemblies of God church in Mount Vernon?

12         A.    There might be two.  I'm not sure if it's

13   considered in town or not.  It might be on the

14   outskirts.

15         Q.    Okay.

16         A.    So there could be two.  I'm not sure of

17   the location.

18         Q.    How often do you go to church?

19         A.    One, two times a week.

20         Q.    Do you have any positions of leadership

21   in your church?

22         A.    Yes, I do.

23         Q.    I assume you participate in a number of

24   different church related activities.

304

1        A.    Yes.

2        Q.    Is your religion very important to you?

3        A.    Certainly.

4        Q.    It's an integral part of your life?

5        A.    Certainly.  Yes.

6        Q.    Now, the complaints that the Does made

7   had nothing to do with you losing your job with the

8   Mount Vernon City School district, correct?

9        A.    Repeat that.

10       Q.    The complaints, the actual complaints,

11   that the Does lodged with the school district, that

12   did not cause you to lose your job with the Mount

13   Vernon city schools, correct?

14       A.    I was -- yes.

15       Q.    Well, it was actually the school

16   district's decision to terminate you, correct?

17       A.    From the information from the Does, yes.

18       Q.    It was information that the school board

19   had learned from a variety of different sources,

20   correct?

21       A.    I only believe one source.

22       Q.    Well, the school board had this entity

23   called HR on Call do an investigation.  Do you recall

24   that?

305

1          A.   That's correct.

2          Q.   And those HR on Call investigators

3    interviewed a whole lot of people in the community.

4    Do you recall that?

5          A.   Yes.

6          Q.   And they talked to you.

7          A.   Yes.

8          Q.   And they talked to a number of people

9    within the school system.

10         A.   Yes.

11         Q.   Okay.  And then based on that report the

12   school board decided to proceed with termination of

13   your teaching position, correct?

14         A.   Yeah, that's what -- the report from HR

15   is what they used to make that decision.  Yes.

16         Q.   Right.  And the Does had no role in that

17   decision, correct?

18         A.   They had a lot of role to do with that.

19         Q.   The Does don't sit on the school board,

20   do they?

21         A.   No, they did not.

22         Q.   And they didn't participate in any of the

23   school board deliberations, correct?

24         A.   To my knowledge, I don't know.

306

1      Q.   Okay.  And the Does aren't within the

2   school administration, are they?

3      A.   No.

4      Q.   So the actual decision by the school to

5   suspend you as a teacher and to pursue termination,

6   that decision, the actual decision, was a school

7   district decision alone, correct?

8      A.   Yes.

9      Q.   Okay.  And because of that school

10  district decision, you were suspended without pay,

11  correct?

12     A.   Yes.

13     Q.   And the school board is pursuing

14  termination of your teaching position, correct?

15     A.   In a state hearing, yes.

16     Q.   Right.  Okay.  Do you think the Does were

17  wrong to come to the school to make a complaint when

18  James came home and had a burn mark on his arm?

19     A.   Were they wrong?

20     Q.   Right.

21     A.   Were they wrong going to -- yes.

22     Q.   If your daughter came home from school

23  let's say with a wound on her arm, wouldn't you think

24  it would be reasonable to go to the school and try to

307

1   determine what happened to your daughter during the

2   school day?

3           A.    Absolutely.

4           Q.    Okay.  So when the Does went to the

5   school to try to figure out what had happened to

6   their son James, that was a reasonable thing to do as

7   a parent, right?

8           A.    I would disagree with that.

9           Q.    Why?

10          A.    Should have came to me.  This could have

11  been resolved way back yonder.

12          Q.    Well --

13          A.    I would have went to a doctor, sir.  I

14  would have went to a doctor and came to me.  If my

15  child's hurt, I'm to a doctor.  That's a no-brainer

16  to me.

17          Q.    The Does could have come talk to you,

18  right?

19          A.    Yes.

20          Q.    And likewise they could have gone and

21  talked to school administrators, which is what they

22  did, right?

23          A.    That's what they chose, but I believe

24  they chose the wrong route.

308

1       Q.   Okay.  But it's not unreasonable for them

2  to go talk to school administrators, correct?

3       A.   Not unreasonable?

4       Q.   That's not an unreasonable decision for

5  them to choose to talk to --

6       A.   Myself personally, I would say that would

7  be unreasonable.

8       Q.   If you're --

9       A.   You go to the source.  You don't jump two

10  commands.  You don't jump ahead from the teacher to

11  the principal and go right to the superintendent.  To

12  me that doesn't make any sense.

13       Q.   Okay.  If your daughter came home from

14  school one day and was complaining that a teacher had

15  sexual abused her, would you go talk to the teacher?

16       A.   You better believe I would.

17       Q.   And you wouldn't skip over the teacher

18  and go talk to the administrator?

19       A.   That would be next, yes.

20       Q.   You'd talk to both is what you're telling

21  me.

22       A.   Yes, I would.  And I would be to a doctor

23  very quickly.  My wife would be going one way, I'd be

24  going the other direction.

309

1    Q.   Okay.   And in that instance if you

2  decided not to go talk to the teacher, that wouldn't

3  be unreasonable, would it?

4    A.   Repeat that again.

5    Q.   In that situation I just described it

6  would be perfectly reasonable for you to skip talking

7  to the teacher that had the allegations made against

8  them and go talk to somebody else.

9    A.   In that situation if you believe your

10  child's hurt, you go deal with it with the teacher

11  and you go to a doctor.   You get your person who's

12  injured to the doctor.

13    Q.   You made a complaint in your counterclaim

14  for intentional infliction of emotional distress,

15  right?

16    A.   Let me just wind down here a second,

17  okay, because that -- that aspect just quite

18  honestly, that burns me, and I'm using that . . .

19    Q.   I understand, sir, you're upset that the

20  Does --

21    A.   Right.   That does upset me.   That is the

22  crux.   We wouldn't be here today if that didn't

23  happen, sir.

24    Q.   Well, we don't know that, unfortunately.

310

1          A.    I believe we wouldn't be here today.

2          Q.    Okay.  You filed a second counterclaim,

3    right, one for intentional infliction of emotional

4    distress?

5          A.    Yes.

6          Q.    How have you been caused emotional

7    distress?

8          A.    Where to begin.  Diet.  Eating, not

9    eating, that type of thing.  Loss of weight.

10   Anxiety.  Lack of sleep.  Not sleeping.  Like my

11   wife, all the above I just said, brought on some

12   other physical ailments.

13         Q.    What are those physical ailments?

14         A.    It's Epstein-Barr.

15         Q.    Was that something you had before?

16         A.    No.  She's had it now for four or five

17   months now.

18         Q.    Your wife is suffering from Epstein-Barr.

19         A.    Yes.

20         Q.    Okay.

21         A.    So yes, it's caused a huge amount of

22   problems, believe me.

23         Q.    I'm specifically asking about you,

24   emotionally, just you, sir.  Have you had any

311

1   physical ailments as a result of your emotional

2   distress?

3         A.   Anxiety.

4         Q.   Any physical ailments?

5         A.   Give me some examples.

6         Q.   Well, Epstein-Barr or --

7         A.   Oh.

8         Q.   -- something, any physical ailment that

9   you suffered as a result of your emotional distress.

10        A.   I would say depression.  I would say

11  depression.

12        Q.   Have you gone to see a doctor for any of

13  these emotional distresses you've suffered?

14        A.   No.

15        Q.   Have you gone to see a psychiatrist for

16  any of these problems?

17        A.   No, I have not.

18        Q.   You've seen no medical professional

19  whatsoever.

20        A.   I have seen no medical professional.

21        Q.   Okay.  What damage, actual economic

22  damages have you suffered as a result of the

23  emotional distress?

24        A.   I don't own a whole lot right now.  I own

312

1    very little.

2            Q.    Why is that?

3            A.    All my biggest assets are not mine.

4            Q.    What do you mean by that?

5            A.    My property would be my largest asset.

6            Q.    And what happened to your property?

7            A.    Someone next to me owns it.

8            Q.    Did you sell it to them?

9            A.    No.

10           Q.    How did they happen to come to own it?

11           A.    I guess "own" is not -- he has a deed.

12           Q.    Why does he have the deed?

13           A.    Because I owe him.

14           Q.    Because you owe him?

15           A.    Yes.

16           Q.    You borrowed money from him.

17           A.    No.

18           Q.    What do you owe him for, then?

19           A.    For his accountable hours.

20           Q.    His what?

21           A.    His accountable hours with me.

22           Q.    Who lives next to you?  Who is this

23   person that lives next to you that owns your

24   property?

313

1          A.   I'm sorry.  Mr. Hamilton.

2          Q.   Okay.  He actually -- his property is

3     next to your property?

4          A.   No.  He's adjacent to me.  I apologize on

5     that.  Thank you for clarifying that.

6          Q.   So you've given the deed to your property

7     to Mr. Hamilton.

8          A.   That is correct.

9          Q.   And that's security for payment --

10          A.   Yes.

11          Q.   -- for his attorney's fees.

12          A.   Yes.

13          Q.   Okay.  Did you give Mr. Hamilton a

14     mortgage for your property?

15          A.   I'm not sure what you mean by that, sir.

16          Q.   Did you create a mortgage document that

17     you signed giving Mr. Hamilton a security interest in

18     your property?

19          A.   My wife dealt with a lot of that.  Like I

20     say, she deals with my finances, she deals with that,

21     but I just, yeah, she deals with that.

22          Q.   Did you actually sign the deed over to

23     Mr. Hamilton?

24          A.   Mr. Hamilton has the deed.

314

1          Q.    That's not my question.  Did you actually

2     sign it over to him?

3          A.    Yes.

4          Q.    And so he has the deed and it's been

5     signed over into his name.

6          A.    Yes.

7          Q.    Okay.  What other damages have you

8     suffered as a result of this emotional distress?

9          A.    I can't get a job so, obviously, that

10    hurts financially.  Repeat your question.

11         Q.    What other damages have you suffered as a

12    result of your emotional distress.

13         A.    I'm sorry.  I'm repeating it all in my

14    head.

15         Q.    Well, I think you testified before that

16    your wife has suffered from Epstein-Barr syndrome,

17    that physical ailment, correct?

18         A.    Yes.

19         Q.    And I think you told me you've suffered

20    no actual physical ailments from your emotional

21    distress.

22         A.    Depression.

23         Q.    That's not a physical ailment.  That's a

24    mental state, right?

315

1      A.   Okay.  But it does affect your

2  physical . . .

3      Q.   But you have no physical manifestations

4  of this emotional distress, correct?

5      A.   Lack of diet, my diet, not eating

6  properly, losing weight, anxiety.

7      Q.   What statements or what conduct have the

8  Does done that have caused you emotional distress?

9  What is it that they did that caused you emotional

10  distress?

11      A.   The whole situation.

12      Q.   Is it the filing of the lawsuit?

13      A.   I'm not quite -- I'm not -- I guess I'm

14  on a different track right now so I'm not quite sure.

15  Can you explain that to me?

16      Q.   What did the Does do that caused your

17  emotional distress?  What did they do?

18      A.   All the allegations that were listed in

19  the countersuit.

20      Q.   All the allegations that were included in

21  their complaint that they filed against you.  Right?

22      A.   I see what you're saying.  Yes.

23      Q.   Okay.  And there's nothing else, just

24  those allegations that are in the complaint.  I know

316

1    there are a lot of them, but --

2         A.   Yes.

3         Q.   -- those are the allegations that caused

4    your emotional distress.

5         A.   Yes.

6         Q.   Do you think the statements that are in

7    the complaint are atrocious?

8         A.   I'd say yes to that.

9         Q.   Why do you say that?

10        A.   Because there's -- they're out-and-out --

11   there's lies in there.

12        Q.   Okay.  What's a lie that's included in

13   the complaint?

14        A.   That I burned and branded James.

15        Q.   Okay.  The complaint doesn't use the word

16   "branded," does it?

17        A.   Okay.  That term came up in the HR I

18   believe, sir, that's why I would like to have that

19   document, so I can be accurate.

20        Q.   Okay.  The complaint actually talks about

21   you using the Tesla coil on James's arm, correct?

22        A.   Yes.

23        Q.   Okay.  And the complaint alleges that by

24   use of the Tesla coil an James's arm that you burned

317

1   a mark on James's arm, correct?

2           A.   That's what it says.

3           Q.   I'm asking you your understanding.

4           A.   I wish I could have the complaint with

5   me.  I'm speculating on the complaint without having

6   it in front of me.

7           Q.   Okay.  Well, it is true, we've already

8   established this today, that you did use the Tesla

9   coil an James Doe, right?

10              MR. HAMILTON:  Objection.

11              MR. MANSFIELD:  Well, he's already

12  testified to it.  To the extent he's going to --

13              MR. HAMILTON:  No, he's testified to that

14  particular testimony.

15              MR. MANSFIELD:  He's waived the privilege

16  in that regard.

17              MR. HAMILTON:  We're still raising it.

18              THE WITNESS:  Do I need to read this?

19              MR. HAMILTON:  No.

20          Q.   (By Mr. Mansfield) It's not a lie, is it,

21  that you did apply the Tesla coil to James Doe?

22  That's not a lie, is it?

23          A.   Can you repeat it for me?

24          Q.   It's not a lie that you used the Tesla

318

1    coil or applied the Tesla coil to James Doe.   That is

2    not a lie.

3           A.    That I applied it?

4           Q.    Right.

5           A.    That's not a lie.

6           Q.    And if James Doe was burned, I'm not

7    saying you meant to burn him or that you even know he

8    got burned, but if he actually was burned by the use

9    of that Tesla coil, the fact that he got burned is

10   not a lie, is it?

11          A.    It's his word against my word, and he

12   didn't get burnt.

13          Q.    Well, you don't know if he got burned or

14   not, right, because you never saw it?

15          A.    Never saw the arm.

16          Q.    So you have no basis to know whether

17   that's true or not, right?

18          A.    Right.

19          Q.    So if James Doe says and his parents say

20   and there are pictures that show a burn on his arm,

21   that's not a lie, is it?

22          A.    To me that's a lie.

23          Q.    How?

24          A.    Because I know what took place.

319

1      Q.    Okay.  Is there anything else in the

2    complaint that's a lie?

3      A.    Sir, I'd have to see the complaint.

4      Q.    No, you tell me what you believe to be a

5    lie in the complaint.  All these allegations that are

6    in the complaint, you tell me as you sit here today

7    what you believe, if there's nothing else that you

8    consider to be a lie, tell me that.

9      A.    There's other things.  I would have to

10   see the complaint, sir.

11     Q.    Okay.

12           MR. MANSFIELD:  Why don't we take a short

13   break.

14           THE WITNESS:  Okay.

15           (Recess taken, 6:16 to 6:26 p.m.)

16           MR. MANSFIELD:  We'll go back on the

17   record.

18     Q.    Mr. Freshwater, you've been handed a copy

19   of the first amended complaint that's been filed in

20   this case and you've had a few minutes to look over

21   it; is that right?

22     A.    Just a few minutes, yes.

23     Q.    Are there any particular statements in

24   there that you consider to be a lie?

320

1           A.   Yes.

2           Q.   What are those?  Why don't you tell me

3    where you are.

4           A.   Four of 14, sir.

5           Q.   I'm sorry, 4?

6           A.   Four of 14.

7           Q.   What page are you on?  Oh, 4 of 14.

8           A.   Four of 14.  I'm sorry.

9           Q.   Which paragraph number?

10          A.   I'm reading 17 again here.  I'm at the

11   top.

12               Eighteen.

13          Q.   So is 17 a lie or not?

14          A.   No.

15          Q.   Seventeen's not, but 18 is?

16          A.   Let me just start with 18, sir.

17          Q.   Okay.

18          A.   "Mr. Freshwater taught students in his

19   eighth grade science class his own religious

20   beliefs."  Not.  No.

21          Q.   Okay.

22          A.   "Nineteen.  Mr. Freshwater taught the

23   meaning of Easter and Good Friday in his science

24   class."

321

1          Q.    You raised the issue about Easter and

2    Good Friday in your science class with James Doe,

3    correct?

4          A.    I did not raise it, sir.

5          Q.    Okay.  Who raised it?

6          A.    I don't remember who raised it.

7          Q.    The topic of Easter and Good Friday did

8    come up in your science class with James Doe,

9    correct?

10         A.    From my recall, remember, yes.

11         Q.    Okay.  And you asked the students if they

12   understood what the meaning of Easter was and what

13   the meaning of Good Friday was.

14         A.    No, sir.

15         Q.    You didn't?

16         A.    No.

17               Twenty is wrong.  That's a lie.

18               Twenty-one is wrong.

19               Twenty-three is wrong.

20               Twenty-four's a lie.

21               Twenty-five's a lie.

22         Q.    So there are a number of different

23   statements in this complaint that you consider to be

24   a lie; is that fair?

322

1       A.    "Forty-four.  At one FCA meeting

2   Mr. Freshwater conducted a 'healing session' in which

3   he held his hands above the non-school speaker's

4   head."  Sir, I couldn't hold my hands up.

5       Q.    Why not?

6       A.    I was going through therapy for my

7   shoulder at that time.  It was absolutely impossible.

8       Q.    Did you go see a doctor at that time?

9       A.    Yes, I did.

10      Q.    Okay.  When Steve Short and others within

11  the administration were coming to you in April 2008

12  about the Bible on your desk and these other things

13  we talked about earlier, did you ever file a

14  grievance over that process?

15      A.    No, I did not, sir.

16      Q.    Was there a reason why you decided not to

17  file a grievance?

18      A.    I didn't belong to the union.  I didn't

19  know the process.

20      Q.    Even though you aren't a union member you

21  can still file a grievance through that process,

22  can't you?

23      A.    I understand that now.

24      Q.    Did you ever tell your students that you

323

1    thought Good Friday should be called the greatest

2    Friday or the best Friday?

3         A.   No, sir.

4         Q.   Do you think over the years some of the

5    students in your class have been non-Christian?

6         A.   I'm sorry, sir, what?

7         Q.   Have there been students over the years,

8    you may not know, but I would take it it's fair to

9    say that over the years there have been students in

10   your class who were not Christians, correct?

11        A.   I don't -- I don't know who is and isn't,

12   sir.

13        Q.   Just as a general proposition, in just

14   the normal course of things --

15        A.   No opinion on that.

16        Q.   Have you ever had any Asian students in

17   your class?

18        A.   I'm sure I have, sir.

19        Q.   Okay.  There are a number of Korean kids

20   in the Mount Vernon area; is that right?

21        A.   What do you mean by "a number," sir?

22        Q.   Well, there are Korean kids in the Mount

23   Vernon community, in the schools.

24        A.   Yes.

324

1       Q.    You taught Korean kids in your class.

2       A.    I've taught Korean kids in my class?

3       Q.    Yes.

4       A.    I'm trying to think of one right now.  I

5  can't even think of one right now, sir.

6       Q.    Okay.  It's fair to say, though, that

7  there have been kids in your class that may have been

8  Buddhists or Islamic or something other than

9  Christian.

10      A.    Sir, I don't know.  I don't know.

11      Q.    Okay.  But would you be surprised if you

12  found out that there were kids in your class over the

13  years that weren't Christians?

14      A.    Would I be surprised.

15      Q.    Right.

16      A.    I don't have an -- I don't have an

17  opinion on that, sir.  I'm getting the impression --

18  you're trying to rip off a bunch of stuff.  Can you

19  slow down, please?  You're riffling stuff very

20  quickly, and you told me at the beginning of this

21  session that you would be clear and concise when you

22  talk with me, so if you please could slow down, I

23  appreciate it.

24      Q.    I'm riffling through my pages.

325

1      A.   I know that.  I realize that.  And what

2  you're trying to do is trying to incriminate me very

3  quickly, sir.  That's the impression I'm getting.

4      Q.   Sir, I apologize.  I'm just trying to get

5  through my notes quickly so we can get this done.

6      A.   I see that.  And you have a reason to do

7  that, right?

8      Q.   Do you recall ever telling any of your

9  students that the permission slip policy for FCA was

10  stupid?

11      A.   No, sir.

12      Q.   Do you think the policy is stupid?

13      A.   No, sir.

14      MR. MANSFIELD:  Those are all the

15  questions I have today.

16      THE WITNESS:  Does that mean we're done?

17      MR. MANSFIELD:  Yes, it does.

18      THE WITNESS:  Thank you, sir.

19      MR. HAMILTON:  He'll sign.

20      (The deposition concluded at 6:35 p.m.)

21      - - -

22

23

24

326

1    State of Ohio                    :
                                      :   SS:
2    County of _____   :

3          I, John Freshwater, do hereby certify that I
     have read the foregoing transcript of my deposition
4    given on Wednesday, October 14, 2009; that together
     with the correction page attached hereto noting
5    changes in form or substance, if any, it is true and
     correct.

6

7                         _____
                          John Freshwater
8

9          I do hereby certify that the foregoing
     transcript of the deposition of John Freshwater was
10   submitted to the witness for reading and signing;
     that after he had stated to the undersigned Notary
11   Public that he had read and examined his deposition,
     he signed the same in my presence on the _____ day
12   of _____, 2009.

13

14                        _____
                          Notary Public

15

16   My commission expires _____, _____.

17                         - - -

18

19

20

21

22

23

24

327

1                         CERTIFICATE

2    State of Ohio           :
                             :   SS:
3    County of Franklin      :

4         I, Maria DiPaolo Jones, Notary Public in and
     for the State of Ohio, duly commissioned and
5    qualified, certify that the within named John
     Freshwater was by me duly sworn to testify to the
6    whole truth in the cause aforesaid; that the
     testimony was taken down by me in stenotypy in the
7    presence of said witness, afterwards transcribed upon
     a computer; that the foregoing is a true and correct
8    transcript of the testimony given by said witness
     taken at the time and place in the foregoing caption
9    specified and completed without adjournment.

10        I certify that I am not a relative, employee,
     or attorney of any of the parties hereto, or of any
11   attorney or counsel employed by the parties, or
     financially interested in the action.

12

13        IN WITNESS WHEREOF, I have hereunto set my
     hand and affixed my seal of office at Columbus, Ohio,
     on this 23rd day of October, 2009.

14

15        *Maria DiPaolo Jones*
          Maria DiPaolo Jones, Registered
16        Diplomate Reporter, CRR and
          Notary Public in and for the
17        State of Ohio.

18   My commission expires June 19, 2011.

19   (MDJ-3458)

20                          -  -  -

21

22

23

24