

in the distant past. He believed that the differences among modern species arose primarily through natural selection, or survival of the fittest, and he described the whole process as "descent with modification."

No one doubts, of course, that a certain amount of descent with modification occurs within species. But Darwin's theory claims to account for the origin of new species – in fact, for every species since the first cells emerged from the primordial ooze.

This theory does have the virtue of making a prediction: If all living things are gradually modified descendants of one or a few original forms, then the history of life should resemble a branching tree. Unfortunately, despite official pronouncements, this prediction has in some important respects turned out to be wrong.

The fossil record shows the major groups of animals appearing fully formed at about the same time in a "Cambrian explosion," rather than diverging from a common ancestor. Darwin knew this, and considered it a serious objection to his theory. But he attributed it to the imperfection of the fossil record, and he thought that future research would supply the missing ancestors.

But a century and a half of continued fossil collecting has only aggravated the problem. Instead of slight differences appearing first, then greater differences emerging later, the greatest differences appear right at the start. Some fossil experts describe this as "top-down evolution," and note that it contradicts the "bottom-up" pattern predicted by Darwin's theory. Yet most current biology textbooks don't even mention the Cambrian explosion, much less point out the challenge it poses for Darwinian evolution.

Then came the evidence from molecular biology. Biologists in the 1970's began testing Darwin's branching-tree pattern by comparing molecules in various species. The more similar the molecules in two different species are, the more closely related they are presumed to be. At first this approach seemed to confirm Darwin's tree of life. But as scientists compared more and more molecules, they found that different molecules yield conflicting results. The branching-tree pattern inferred from one molecule often contradicts the pattern obtained from another.

Canadian molecular biologist W. Ford Doolittle doesn't think the problem will go away. Maybe scientists "have failed to find the 'true tree'," he wrote in 1999, "not because their methods are inadequate or because they have chosen the wrong genes, but because the history of life cannot properly be represented as a tree." Nevertheless, biology textbooks continue to assure students that Darwin's Tree of Life is a scientific fact overwhelmingly confirmed by evidence. Judging from the real fossil and molecular

evidence, however, it is an unsubstantiated hypothesis masquerading as a fact.

# They All Look Alike: Homology in Vertebrate Limbs

Most introductory biology textbooks carry drawings of vertebrate limbs showing similarities in their bone structures. Biologists before Darwin had noticed this sort of similarity and called it "homology," and they attributed it to construction on a common archetype or design. In *The Origin of Species*, however, Darwin argued that the best explanation for homology is descent with modification, and he considered it evidence for his theory.

Darwin's followers rely on homologies to arrange fossils in branching trees that supposedly show ancestor-descendant relationships. In his 1990 book, *Evolution and the Myth of Creationism*, biologist Tim Berra compared the fossil record to a series of Corvette models: "If you compare a 1953 and a 1954 Corvette, side by side, then a 1954 and a 1955 model, and so on, the descent with modification is overwhelmingly obvious."





*Darwin's "homology" arguments (top) are a classic case of circular reasoning. Blatant distortion (below): Human embryos never have gills – not even rudimentary ones. From Biology, 5th Edition, by Raven & Johnson, McGraw-Hill.*

Article originally appeared in *The American Spectator - December 2000 / January 2001*

But Berra forgot to consider a crucial, and obvious, point: Corvettes, so far as anyone has yet been able to determine, don't give birth to little Corvettes. They, like all automobiles, are designed by people working for auto companies. In other words, an outside intelligence. So although Berra believed he was supporting Darwinian evolution rather than the pre-Darwinian explanation, he unwittingly showed that the fossil evidence is compatible with either. Law professor (and critic of Darwinism) Phillip E. Johnson dubbed this: "Berra's Blunder."

The lesson of Berra's Blunder is that we need to specify a natural mechanism before we can scientifically exclude designed construction as the cause of homology. Darwinian biologists have proposed two mechanisms: developmental pathways and genetic programs. According to the first, homologous features arise from similar cells and processes in the embryo; according to the second, homologous features are programmed by similar genes.

But biologists have known for a hundred years that homologous structures are often not produced by similar developmental pathways. And they have known for thirty years that they are often not produced by similar genes, either. So there is no empirically demonstrated mechanism to establish that homologies are due to common ancestry rather than common design.

Without a mechanism, modern Darwinists have simply defined homology to mean similarity due to common ancestry. According to Ernst Mayr, one of the principal architects of modern neo-Darwinism: "After 1859 there has been only one definition of homologous that makes biological sense: Attributes of two organisms are homologous when they are derived from an equivalent characteristic of the common ancestor."

This is a classic case of circular reasoning. Darwin saw evolution as a theory, and homology as its evidence. Darwin's followers assume evolution is independently established, and homology is its result. But you can't then use homology as evidence for evolution except by reasoning in a circle: Similarity due to common ancestry demonstrates common ancestry.

Philosophers of biology have been criticizing this approach for decades. As Ronald Brady wrote in 1985: "By making our explanation into the definition of the condition to be explained, we express not scientific hypothesis but belief. We are so convinced that our explanation is true that we no longer see any need to distinguish it from the situation we were trying to explain. Dogmatic endeavors of this kind must eventually leave the realm of science."

So how do the textbooks treat this controversy? Once again, they ignore it. In fact, they give students the



Fabricated evidence. Since peppered moths don't naturally rest on tree trunks, researchers simply glued them in place. (From Biology, by Burton S. Guttman, published by McGraw-Hill.)

impression that it makes sense to define homology in terms of common ancestry and then turn around and use it as evidence for common ancestry. And they call this "science."

## Nothing a Little Glue Can't Fix: The Peppered Moths

Darwin was convinced that in the course of evolution, "Natural Selection has been the most important, but not the exclusive means of modification," but he had no direct evidence of this. The best he could do in *The Origin of Species* was give "one or two imaginary illustrations."

In the 1950's, however, British physician Bernard Kettlewell provided what seemed to be conclusive evidence of natural selection. During the previous century, peppered moths in England had gone from being predominantly light-colored to being predominantly dark-colored. It was thought that the change occurred because dark moths are better camouflaged on pollution-darkened tree trunks, and thus less likely to be eaten by predatory birds.

To test this hypothesis experimentally, Kettlewell released light and dark moths onto nearby tree trunks in polluted and unpolluted woodlands, then watched as birds ate the more conspicuous moths. As expected, birds ate more light moths in the polluted woodland, and more dark moths in the unpolluted one. In an article written for *Scientific American*, Kettlewell called this "Darwin's missing evidence." Peppered moths soon became the classic example

D000509



*The sort of distortion that would land a stock promoter in jail. (From Biology, 5th Edition, by Raven & Johnson, published by McGraw-Hill.)*

of natural selection in action, and the story is still retold in most introductory biology textbooks, accompanied by photographs of the moths on tree trunks.

In the 1980's, however, researchers discovered evidence that the official story was flawed – including the pertinent fact that peppered moths don't normally rest on tree trunks. Instead, they fly by night and apparently hide under upper branches during the day. By releasing moths onto nearby tree trunks in daylight, Kettlewell had created an artificial situation that does not exist in nature. Many biologists now consider his results invalid, and some even question whether natural selection was responsible for the observed changes.

So where did all those textbook photos of peppered moths on tree trunks come from? They were all staged. To expedite things, some photographers even glued dead moths to trees. Of course, the people who staged them before the 1980's thought they were accurately representing the true situation, but we now know they were mistaken. Yet a glance at almost any current biology textbook reveals that they are all still being used as evidence for natural selection.

In 1999, a Canadian textbook-writer justified the practice: "You have to look at the audience. How convoluted do you want to make it for a first time learner?" Bob Ritter was quoted as saying in the April 1999 *Alberta Report Newsmagazine.* High school students "are still very concrete in the way they learn," continued Ritter. "We want to get across the idea of selective adaptation. Later on, they can look at the work critically."

Apparently, the "later" can be much later. When University of Chicago Professor Jerry Coyne learned the truth in 1998, he was well into his career as an evolutionary biologist. His experience illustrates how insidious the icons of evolution really are, since they mislead experts as well as novices.

## Beaks and Birds: Darwin's Finches

A quarter of a century before Darwin published *The Origin of Species,* he was formulating his ideas as a naturalist aboard the British survey ship H.M.S. Beagle . When the Beagle visited the Galapagos Islands in 1835, Darwin collected specimens of the local wildlife, including some finches.

Though the finches had little in fact to do with Darwin's development of evolutionary theory, they have attracted considerable attention from modern evolutionary biologists as further evidence of natural selection. In the 1970's, Peter and Rosemary Grant and their colleagues noted a 5 percent increase in beak size after a severe drought, because the finches were left with only hard-to-crack seeds. The change, though significant, was small; yet some Darwinists claim it explains how finch species originated in the first place.

A 1999 booklet published by the U.S. National Academy of Sciences describes Darwin's finches as "a particularly compelling example" of the origin of species. The booklet cites the Grants' work, and explains how "a single year of drought on the islands can drive evolutionary changes in the finches." The booklet also calculates that "if droughts occur about once every 10 years on the islands, a new species of finch might arise in only about 200 years."

But the booklet fails to point out that the finches' beaks returned to normal after the rains returned. No net evolution occurred. In fact, several finch species now appear to be merging through hybridization, rather than diverging through natural selection as Darwin's theory requires.

Withholding evidence in order to give the impression that Darwin's finches confirm evolutionary theory borders on scientific misconduct. According to Harvard biologist Louis Guenin (writing in *Nature* in 1999), U.S. securities laws provide "our richest source of experiential guidance" in defining what constitutes scientific misconduct. But a stock promoter who tells his clients that a particular stock can be expected to double in value in twenty years because it went up 5 percent in 1998, while concealing the fact that the same stock declined 5 percent in 1999,

Article originally appeared in *The American Spectator - December 2000 / January 2001*

D000510



might well be charged with fraud. As Berkeley law professor Phillip E. Johnson wrote in *The Wall Street Journal* in 1999: "When our leading scientists have to resort to the sort of distortion that would land a stock promoter in jail, you know they are in trouble."

## From Apes to Humans

Darwin's theory really comes into its own when it is applied to human origins. While he scarcely mentioned the topic in *The Origin of Species*, Darwin later wrote extensively about it in *The Descent of Man*. "My object," he explained, "is to show that there is no fundamental difference between man and the higher animals in their mental faculties" - even morality and religion. According to Darwin, a dog's tendency to imagine hidden agency in things moved by the wind "would easily pass into the belief in the existence of one or more gods."

Of course, the awareness that the human body is part of nature was around long before Darwin. But Darwin was claiming much more. Like materialistic philosophers since ancient Greece, Darwin believed that human beings are nothing more than animals.

Darwin, however, needed evidence to confirm his conjecture. Although Neanderthals had already been found, they were not then considered ancestral to humans, so Darwin had no fossil evidence for his view. It wasn't until 1912 that amateur paleontologist Charles Dawson announced that he had found what Darwinists were looking for, in a gravel pit at Piltdown, England.

Dawson had found part of a human skull and part of an apelike lower jaw with two teeth. It wasn't until forty years later that a team of scientists proved that the Piltdown skull, though perhaps thousands of years old, belonged to a modern human, while the jaw fragment was more recent, and belonged to a modern orangutan. The jaw had been chemically treated to make it look like a fossil, and its teeth had been deliberately filed down to make them look human. Piltdown Man was a forgery.

Most modern biology textbooks do not even mention Piltdown. When critics of Darwinism bring it up, they are usually told that the incident merely proves that science is self-correcting. And so it was, in this case - though the correction took over forty years. But the more interesting lesson to be learned from Piltdown is that scientists, like everyone else, can be fooled into seeing what they want to see.

The same subjectivity that prepared the way for Piltdown continues to plague human-origins research. According to paleoanthropologist Misia Landau, theories of human origins "far exceed what can be inferred from the study of fossils alone and in fact place a heavy burden of interpretation on the fossil record – a burden which is relieved by placing fossils into pre-existing narrative structures." In 1996, American Museum of Natural History Curator Ian Tattersall acknowledged that "in paleoanthropology, the patterns we perceive are as likely to result from our unconscious mindsets as from the evidence itself." Arizona State University anthropologist Geoffrey Clark echoed this view in 1997 when he wrote: "We select among alternative sets of research conclusions in accordance with our biases and preconceptions." Clark suggested that "paleoanthropology has the form but not the substance of science."

Biology students and the general public are rarely informed of the deep-seated uncertainty about human origins that is reflected in these statements by scientific experts. Instead, they are simply fed the latest speculation as though it were a fact. And the speculation is typically illustrated with fanciful drawings of cave men, or pictures of human actors wearing heavy make-up.

## What's Going on Here?

Most of us assume that what we hear from scientists is comparatively trustworthy. Politicians might distort or shave the truth to support a preconceived agenda, but scientists, we are told, deal with facts. Sure they might sometimes get it wrong, but the beauty of science is that it's empirically testable. If a theory is wrong, this will be discovered by other scientists performing independent experiments either to replicate or disprove their results. In this way the data are constantly reviewed and hypotheses become widely accepted theories. So how do we explain such a pervasive and long-standing distortion of the specific facts used to support evolutionary theory?

Perhaps Darwinian evolution has taken on a significance in our culture that has little to do with its scientific value, whatever that may be. An indication of this was seen in the nearly universal and censorious reaction to the Kansas School Board's decision to allow room for dissent in the standard teaching of evolution (much of which, as we have just seen, is plain wrong).

According to the news media, only religious fundamentalists question Darwinian evolution. People who criticize Darwinism, we are told, want to bomb science back to the Stone Age and replace it with the Bible. The growing body of scientific evidence contradicting Darwinian claims is steadfastly ignored. When biochemist Michael Behe pointed out in *The New York Times* last year that the embryo "evidence" for evolution was faked, Harvard Dar-




Article originally appeared in *The American Spectator - December 2000 / January 2001*

D000511

winist Stephen Jay Gould admitted that he had known this for decades (as noted above) – but accused Behe of being a "creationist" for pointing it out.

Now, although Behe supports the idea that some features of living things are best explained by intelligent design, he is not a "creationist" as that word is normally used. Behe is a molecular biologist whose scientific work has convinced him that Darwinian theory doesn't conform to observation and experimental evidence. Why does Gould, who knows Haeckel's drawings were faked, dismiss Behe as a creationist for criticizing them?

I suspect that there's an agenda other than pure science at work here. My evidence is the more or less explicit materialist message woven into many textbook accounts. Futuyma's *Evolutionary Biology* is characteristic of this, informing students that "it was Darwin's theory of evolution," together with Marx's theory of history and Freud's theory of human nature, "that provided a crucial plank to the platform of mechanism and materialism" that has since been "the stage of most Western thought." One textbook quotes Gould, who openly declares that humans are not created, but are merely fortuitous twigs on a "contingent" (i.e. accidental) tree of life. Oxford Darwinist Richard Dawkins,

though not writing in a textbook, puts it even more bluntly: "Darwin made it possible to be an intellectually fulfilled atheist."

These are obviously philosophical rather than scientific views. Futuyma, Gould, and Dawkins have a right to their philosophy. But they do not have the right to teach it as though it were science. In science, all theories – including Darwinian evolution – must be tested against the evidence.

Since Gould knows that the real embryological evidence contradicts the faked drawings in biology textbooks, why doesn't he take a more active role in cleaning up science education? The misrepresentations and omissions I've examined here are just a small sampling. There are many more. For too long the debate about evolution has assumed "facts" that aren't true. It's time to clear away the lies that obstruct popular discussion of evolution, and insist that theories conform to the evidence. In other words, it's time to do science as it's supposed to be done.

*Permission is granted to copy this article for non-commercial purposes provided credit is given to Discovery Institute*

## Are Your Children Using These Textbooks?

Jonathan Wells analyzed ten popular high school biology textbooks. The texts were evaluated on how well they dealt with the evolutionary "evidence" of the Miller-Urey experiment, Haeckel's embryos, Darwin's Tree of Life, vertebrate limb homology, peppered moths, and Darwin's finches.

An "A" grade signifies the book had full disclosure of the truth, discussion of relevant scientific controversies, and a recognition that Darwin's theory—like all scientific theories—might have to be revised or discarded if it doesn't fit the facts. An "F" indicates that the textbook uncritically relies on logical fallacy, dogmatically treat a theory as an unquestionable fact, or blatantly misrepresent published scientific evidence. The overall grades are below.

D– *Biology: The Dynamics of Life* by Alton Biggs, Chris Kapicka & Linda Lundgren (Glencoe/McGraw-Hill, 1998)

D+ *Biology (Fifth Edition)* by Neil A. Campbell, Jane B. Reece & Lawrence G. Mitchell (Benjamin/Cummings Publishing Co, 1999)

D– *Evolutionary Biology (Third Edition)* by Douglas J. Futuyma (Sinauer Associates, 1998)

F *Biology: The Unity and Diversity of Life (Eighth Edition)* by Cecie Starr & Ralph Taggart (Wadsworth Publishing Co, 1998)

F *Biology (Sixth Edition)* by Sylvia Mader (WBC/McGraw-Hill, 1998)

F *Biology (Fifth Edition)* by Peter H. Raven & George B. Johnson (WBC/McGraw-Hill, 1999)

F *Biology* by Burton S. Guttman (WBC/McGraw-Hill, 1999)

F *Biology: Visualizing Life, Annotated Teacher's Edition* by George B. Johnson (Holt, Rinehart & Winston, 1998)

F *Biology (Fifth Edition)* by Kenneth R. Miller & Joseph Levine (Prentice Hall, 2000)

F *Biology: The Study of Life (Seventh Edition)* by William D. Schraer & Herbert J. Stoltze (Prentice Hall, 1999)





Article originally appeared in *The American Spectator - December 2000 / January 2001*

PLANTIFF'S
EXHIBIT
#23
Freshwater

4|18

EXTRA CREDIT
Watch and exam the film "Expelled- Ben Stein" and explain why it is important to
examine this film objectively and not let bias affect your observations.
(Websites- http://www.expelledthemovie.com/) To view movie trailer's)

**ATTACHMENT 7**

PLAINTIFF'S
EXHIBIT
#24
Freshwater

FILE COPY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

JOHN DOE AND JANE DOE,                    Case No. 02:08 CV 575
AS THE NATURAL PARENTS
AND NEXT FRIENDS OF THEIR
MINOR CHILD, JAMES DOE

     Plaintiffs,                              JUDGE GREGORY L. FROST

     v.                                       Magistrate Judge NORAH MCCANN KING

MOUNT VERNON CITY SCHOOL
DISTRICT BOARD OF EDUCATION,
et al.,
     Defendants.

### COUNTERCLAIM OF DEFENDANT JOHN FRESHWATER TO PLAINTIFFS'
### FIRST AMENDED COMPLAINT
### (JURY DEMAND ENDORSED HEREON)

Now comes Defendant John Freshwater, by and through his Trial Counsel,

R. Kelly Hamilton, who represents Defendant in his personal capacity and makes the

following counterclaims.

**Counterclaim One - Defamation**

1.    Plaintiffs' have made numerous factual statements to other persons, some of

which have been filed as factual statements in the instant First Amended Complaint,

alleging numerous actions allegedly undertaken or conducted by Defendant John

Freshwater.

2.    Among the factual statements alleged by Plaintiffs' were that Defendant John

Freshwater committed violations against the policies of the Defendant Mount Vernon

City School board, taught his own religious beliefs in a public school classroom, made

inappropriate statements to students in a public school classroom, taught intelligent

design in a public school classroom, burned a cross onto James Doe's arm, conducted and led prayer during a Fellowship of Christian Athletes meeting among other violations of Fellowship of Christian Athletes standards, and committed constitutional violations after a supervisory monitor was placed into his public school classroom.

3.   Not more than one year prior to the date hereof, Plaintiffs' published and stated defamatory and false statements of fact injuring Defendant John Freshwater with the required degree of fault.

4.   Plaintiffs' statements of allegations are false.

5.   Plaintiffs' statements and assertions are slanderous as a matter of law in that the statements and assertions were intended to and did (1) cause injury to Defendant John Freshwater's reputation, (2) expose him to public hatred, contempt, ridicule, shame or disgrace, and/or (3) affect him adversely in his trade or business.

6.   Plaintiffs' published these statements to others.

**Counterclaim Two – Intentional Infliction of Emotional Distress**

7.   Plaintiffs' have has intentionally and/or negligently caused Defendant John Freshwater emotional distress to include loss of appetite, lost time from work, anxiety, and loss of sleep.

**Damages**

8.   As a direct and proximate result of Plaintiffs' conduct, Defendant John Freshwater has suffered damage and injury including, but not limited to, economic, physical and emotional forms.

**Request for Relief**

9.   WHEREFORE Defendant John Freshwater requests that this Court:

A.    Award him compensatory damages;

B.    Award him punitive damages;

C.    Award him attorney's fees; and

D.    Award him such other relief as this Court deems appropriate and just.

Respectfully submitted,

s/ R. Kelly Hamilton
The Law Office of R. Kelly Hamilton (0066403)
**Office:** 3800 Broadway, Grove City, Ohio 43123
**Mail to:** P.O. Box 824, Grove City, Ohio 43123
Phone 614-875-4174  Fax    614-875-4188
Email: hamiltonlaw@sbcglobal.net
Attorney for Defendant John Freshwater

## JURY DEMAND

Defendant hereby demands a trial by jury on all matters triable to a jury.

s/ R. Kelly Hamilton
The Law Office of R. Kelly Hamilton (0066403)

## CERTIFICATE OF SERVICE

### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

I hereby certify that on September 2, 2008, I electronically filed the foregoing
*Counterclaim* with the Clerk of Court using the CM/ECF system which will send
notification of such filing to the following:

s/ R. Kelly Hamilton
The Law Office of R. Kelly Hamilton (0066403)

# AFFIDAVIT

State of Ohio      )
)  ss
County of _Knox_   )

Before me, the undersigned notary, personally appeared John Freshwater, who having first been duly sworn, deposes and says:

1.  Affiant has personal knowledge of all matters set forth in this affidavit;

2.  Affiant had the following verbatim exchange with investigators from HR on Call during an interview that occurred on May 15, 2009.

3.  Affiant states he made an audio recording and has transcribed in part the following exchange as it relates to his response to the investigators when asked why he took a book on loan from the school library. "FI" stands for female investigator and "MI" stands for male investigator. "JF" stands for John Freshwater.

FI-you said you had, a, a, a Bible from the school library at the lab table in your room?

JF-yes

FI-what's the purpose for that if you, if you have one at your desk? What's the purpose for this one?

JF-why, because when they told me to remove my inspiration this one, I was curious and I went down to the library and noticed that they had a library Bible down there and I checked it out

FI-okay

FI-it should be over due by now right?

JF-welll, laughter, they're lenient, the librarians are lenient with me, I'm teaching

FI-so it, was just it's a statement is what your saying?

JF-yea, because when I opened it up I recognized it was bought with government money, and its been there, I obviously looked at the dates when it was stamped and actually I looked at some of the names on there it's like oh I remember that kid, remember that kid, I actually kind a enjoyed looking at it, ah it dates back a long ways

Page 1 of 2      *Emp. Exh. 4*

D000685

FURTHER AFFIANT SAYETH NAUGHT.

_(signature)_

John Freshwater

The foregoing affidavit was sworn to and acknowledged before me this _8 16 7 2009_,
by John Freshwater, who is personally known by me or who provided satisfactory
identification and who did swear to the truthfulness of the above.

_(signature)_

Notary Public

R. KELLY HAMILTON, ATTORNEY AT LAW
Notary Public
In and for the State of Ohio
My Commission Has No Expiration Date
Section 147.03 R.C.

D000686

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

JOHN DOE, et al.,

        Plaintiffs,

    v.

MOUNT VERNON CITY SCHOOL
DISTRICT BOARD OF EDUCATION, et al.,

        Defendants.

Case No. 2:08 CV 575

Judge Frost

Magistrate Judge King

### AMENDED NOTICE OF DEPOSITION FOR JOHN FRESHWATER

PLEASE TAKE NOTICE that, pursuant to Rule 30 of the Federal Rules of Civil Procedure and applicable law, Plaintiffs shall take the oral deposition of John Freshwater on Wednesday, October 14, 2009 at 9:30 a.m.  The deposition will take place at the offices of Jones Day, 325 John H. McConnell Boulevard, Columbus, Ohio 43235.  The deposition shall take place before a notary public or other officer authorized by law to administer oaths, shall be stenographically recorded, and shall continue from day to day until completed or adjourned.

Respectfully submitted,

_____

Douglas M. Mansfield  (0063443)
JONES DAY
325 John H. McConnell Boulevard, Suite 600
Columbus, Ohio  43215-2673
(614) 469-3939 (telephone)
(614) 461-4198 (facsimile)

Mailing Address:
JONES DAY
P.O. Box 165017
Columbus, Ohio  43216-5017

Attorney for Plaintiffs

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and accurate copy of the foregoing Notice of Deposition has been served upon the following, by regular U.S. Mail, this ___ day of September, 2009:

David K. Smith
Krista Keim
Sarah J. Moore
Elise C. Keating
BRITTON, SMITH, PETERS & KALAIL CO., L.P.A.
3 Summit Park Drive, Suite 400
Cleveland, OH 44131

*Counsel for Defendants Mount Vernon City School
District Board of Education, Stephen Short, and
William White*

Robert H. Stoffers
Jason R. Deschler
MAZANEC, RASKIN, RYDER & KELLER, CO., LPA
250 Civic Center Drive, Suite 400
Columbus, OH 43215

*Counsel for Defendant John Freshwater*

R. Kelly Hamilton
4030 Broadway
P. O. Box 824
Grove City, OH 43123

*Counsel for Counterclaimant John Freshwater*

_____
One of the Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**FILE COPY**

| | | |
|---|---|---|
| **JOHN DOE** and **JANE DOE**, individually and as the Natural Parents and Next Friends of Their Minor Child, **JAMES DOE**, | : | |
| | : | **CASE NO. 08-CV-575** |
| | : | |
| Plaintiffs, | : | **JUDGE FROST** |
| | : | **MAGISTRATE JUDGE KING** |
| v. | : | |
| | : | JURY DEMAND ENDORSED HEREON |
| **MOUNT VERNON CITY SCHOOL DISTRICT BOARD OF EDUCATION, ET AL.** | : | |
| | : | |
| | : | |
| Defendants. | : | |

## FIRST AMENDED COMPLAINT

Plaintiffs, John Doe and Jane Doe, individually and as natural parents and next friends of

their minor child, James Doe, respectfully represent as follows:

**I.   SUMMARY OF ACTION**

1.     This is a civil rights action seeking declaratory and injunctive relief and monetary

damages, including punitive damages for constitutional violations within the Mount Vernon City

School District involving violations of the Establishment Clause of the First Amendment of the

United States Constitution, pursuant to 42 U.S.C. § 1983.  Plaintiffs ask that these actions be

declared unconstitutional and that the Defendants be enjoined from continuing the activity.

Plaintiffs seek compensatory damages and punitive damages for the egregious actions alleged herein.

## II.   JURISDICTION

2.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343(3) and (4) for causes of action arising under the First and Fourth Amendments to the Constitution of the United States of America and 42 U.S.C. § 1983.

## III.   PARTIES

3.      The Plaintiffs herein are John Doe and Jane Doe, both individuals of the full age of majority and who reside in Knox County, Ohio, and who are the natural parents and next friends of the minor child, James Doe.

4.      Defendants are:

a.      Mount Vernon City School District Board of Education

b.      Stephen Short, who is the Superintendent of the Mount Vernon City School District.

c.      William White, who is the Principal of Mount Vernon Middle School.

d.      John Freshwater, an eighth grade science teacher at Mount Vernon Middle School.

5.      Mount Vernon City School District is located within Knox County, Ohio. Defendants Stephen Short and John Freshwater are of the age of majority and reside and work in Knox County, Ohio. Defendant William White is of the age of majority, works in Knox County, Ohio and resides in Licking County, Ohio.

## IV. STANDING

6.      Plaintiffs John and Jane Doe have standing to pursue this matter.

7.      Plaintiffs John and Jane Doe's son, James Doe, attended Mount Vernon Middle School, located within Knox County, Ohio, as an eighth grade student during the 2007-2008 school year. Plaintiffs John and Jane Doe have other children whom will also be entering Mount Vernon Middle School, located within Knox County, Ohio, in the near future.

8.      John and Jane Doe and their son, James Doe, suffered actual injury as James Doe was present to and witnessed the Defendants' illegal actions alleged in this Complaint.

9.      Complaints were made by John and Jane Doe to Defendants Stephen Short and William White during the 2007-2008 school year. Even then, the unconstitutional activity did not stop.

## V. FACTUAL ALLEGATIONS

10.     James Doe is an eighth grade student at Mount Vernon Middle School.

11.     Mr. John Freshwater is an eighth grade science teacher at Mount Vernon Middle School and has, at all times, been employed by the Mount Vernon City School District and under the supervision of Superintendent Stephen Short and Principal William White.

12.     James Doe is enrolled in Mr. Freshwater's eighth grade science class at Mount Vernon Middle School.

13.     During the 2007-2008 school year, Mr. Freshwater violated policy of the Mount Vernon City School District.

14.     During the 2007-2008 school year, Mr. Freshwater violated the United States Constitution.

15.     Mr. Freshwater has not been disciplined in the 2007-2008 school year for his violations of Mount Vernon City School District policy.

Doc:347485.1                                          3

16.    Mr. Freshwater has not been disciplined in the 2007-2008 school year for his violations of the United States Constitution.

17.    Previous to April 2008, Mr. Freshwater displayed the Ten Commandments, religious posters and Bible passages within his classroom and kept several Bibles in his classroom which were not for his personal use.

18.    Mr. Freshwater taught students in his eighth grade science class his own religious beliefs.

19.    Mr. Freshwater taught the meaning of Easter and Good Friday in his science class.

20.    In the course of his teaching, Mr. Freshwater advised his students that, although he is forced to teach from the textbooks, the teachings are wrong or not proven according to the Bible.

21.    Mr. Freshwater uses code words in his classroom to inform his students when he disagrees with the classroom teachings based upon his own religious beliefs.

22.    During the 2007-2008 school year, Mr. Freshwater used the code word "here" in his classroom.

23.    Mr. Freshwater taught intelligent design in his classroom at least as early as 2003 and continued to teach intelligent design as recent as April 2008.

24.    In 2003, Mr. Freshwater petitioned the Mount Vernon City Schools School Board to allow him to teach intelligent design in the classroom.

25.    Although Mr. Freshwater was advised that he could not teach intelligent design in the classroom in 2003, he continued to teach the same to his eighth grade science class.

26.     Defendants Stephen Short and William White were aware that Mr. Freshwater disregarded their instructions not to teach religion in the classroom, but allowed Mr. Freshwater to continue teaching without discipline.

27.     Defendants Stephen Short and William White were aware that the posters and religious information displayed in Mr. Freshwater's classroom for more than a decade was in direct violation of Mount Vernon City School District policy and the United States Constitution.

28.     Defendants allowed Mr. Freshwater to display this information in his classroom despite the fact that doing so was unconstitutional and in violation of the school's own policy.

29.     On December 6, 2007, Mr. Freshwater burned a cross into James Doe's arm using an electric device manufactured by Electro-Technic Products, Inc., Model BD-10A.

30.     The manufacturer of Model BD-10A warns that the electric device has a high voltage output that should never be used to touch human skin.

31.     Mr. Freshwater applied the electric device of Model BD-10A to the arm of James Doe on December 6, 2007.

32.     Mr. Freshwater applied the electric device to the arm of at least one other eighth grade student on December 6, 2007.

33.     The area burned with Model BD-10A resulted in an easily identifiable cross consisting of red welts with swelling and blanching in the surrounding area.

34.     On December 7, 2007, John and Jane Doe notified Defendant Superintendent Short regarding Mr. Freshwater's inappropriate activity in his eighth grade science class.

35.     Mr. Freshwater was not disciplined for his actions of December 6, 2007 with regard to the misuse of Model BD-10A.

36.     Defendant Principal William D. White wrote a letter to Mr. Freshwater in January 2008, stating that Mr. Freshwater was not to shock children with the device.

37.     Defendant Principal White's letter noted that it would not be placed in Mr. Freshwater's personnel file unless he shocked his students again.

38.     Mr. Freshwater knew that the electric device, model BD-10A, could cause harm if placed in contact with human skin.

39.     As the eighth grade science teacher, it is Mr. Freshwater's duty to understand and follow the manufacturer's advice regarding proper use of science instruments.

40.     During most of the 2007-2008 school year, Mr. Freshwater was the teaching advisor to the Fellowship of Christian Athletes.

41.     Mr. Freshwater conducted and led prayer in Fellowship of Christian Athletes (FCA) meetings.

42.     Mr. Freshwater personally invited guest speakers from outside the school to present to the FCA.

43.     Mr. Freshwater has asked students to lead prayer in FCA meetings.

44.     At one FCA meeting, Mr. Freshwater conducted a "healing session" in which he held his hands above a non-school speaker's head, and had students in attendance hold hands around the speaker while Mr. Freshwater "removed Satan" from the man.

45.     At other meetings, Mr. Freshwater made statements in violation of Mount Vernon's permission slip policy by saying that permission slips are "stupid" and that he is breaking God's law if he turns away children that do not have a permission slip.

46.     On January 15, 2008, permission slips were not collected at the FCA event, a violation of school policy.

47.     John Doe notified Superintendent Short about this, and Superintendent Short indicated that he would go to the school board with that information.

48.     On January 22, 2008, permission slips were again not required or distributed for another FCA event.

49.     Mr. Freshwater was present where a guest speaker at an FCA meeting told students present that they are saved, whereas the other students playing on the playground are going to Hell.

50.     At FCA meetings, Mr. Freshwater distributed Bibles for the students present to give to other students at the school who were not present.

51.     Students in FCA meetings were told by an invited speaker that they should disobey the law to further their own religion, even if it means going to jail.

52.     From December 7, 2007, when Defendants were placed on notice of Mr. Freshwater having burned a cross into James Doe's arm, and through to the date of the filing of this Complaint, Defendants have failed to discipline Mr. Freshwater.

53.     After four months of Defendants' ignoring Plaintiffs' concerns, Plaintiffs again notified Defendants, in writing, of the policy violations and unconstitutional activities taking place at Mount Vernon Middle School.

54.     On April 14, 2008, Plaintiffs notified Superintendent Short and Principal White in writing of the events taking place at Mount Vernon Middle School.

55.     Mr. Freshwater was not disciplined as a result of the concerns raised in Plaintiffs' correspondence of April 14, 2008.

56.     Mr. Freshwater was permitted to continue teaching at Mount Vernon Middle School even after Plaintiffs' correspondence of April 14, 2008.

57.     Mr. Freshwater continued to teach religion, violate school policy, and violate the U.S. Constitution after Plaintiffs' concerns which were raised April 14, 2008.

58.   After April 14, 2008, Mr. Freshwater assigned "extra credit" to his students for homework related to intelligent design.

59.   Mr. Freshwater also refused to teach the school's required curriculum, including failing to teach evolution to his 2007-2008 eighth grade science class.

60.   On April 21, 2008, Superintendent Short and Principal White were again notified in writing of the fact that Mr. Freshwater was continuing his religious teachings.

61.   Defendants still did not remove Mr. Freshwater from the eighth grade classroom.

62.   At some time in April 2008, Defendants placed a human "monitor" in Mr. Freshwater's classroom to advise Defendants of any concerns in Mr. Freshwater's classroom.

63.   After April 21, 2008, and despite a monitor in the classroom, Mr. Freshwater continued to violate school policy and the U.S. Constitution in his teachings.

64.   Plaintiffs put Defendants on notice of their concern that their son would be retaliated against for their right to complain of the constitutional violations occurring at Mount Vernon Middle School.

65.   Superintendent Short promised Plaintiffs that Mr. Freshwater would not be told the identity of the complaining parents.

66.   Even after Superintendent Short's promise, Principal William White disclosed the identity of the Plaintiffs to Mr. Freshwater.

67.   After Plaintiffs raised concerns with the school, a field trip was scheduled in May 2008. Plaintiff James Doe was scheduled to attend the field trip with an individual serving as leader of James Doe's small group. Upon information and belief, Defendants then changed the schedule and knowingly placed James Doe in a small group with teacher John Freshwater.

68.     As a result, Plaintiffs John and Jane Doe were forced to prohibit their son from attending the school field trip so that he would not be forced to spend a day out of town in a group led by teacher John Freshwater.

69.     The Mount Vernon City School System knowingly continues to allow teachers to publish religious materials in classrooms, including, but not limited to, middle school teacher Lori Miller.

## VI.    POLICIES AND PROCEDURES

70.     The Defendants, through their customs, policies, patterns and practices have each acted negligently, intentionally, recklessly, and with deliberate indifference to the constitutional rights of the Plaintiffs.

71.     The action by the Defendants reflect an arbitrary use of governmental power.

72.     The policies, customs, patterns and practices of Defendants were the moving force behind the constitutional violations suffered by the Plaintiffs.

73.     The policy makers were on notice of the obvious need to prohibit teachers from imposing religious teachings and beliefs on students through lesson plans and teaching methods. The policy makers failed to develop and institute adequate regulations, policies and procedures to regulate teachers imposing religion on to students.  As such, Defendants were deliberately indifferent to the rights of their students, including Plaintiffs.

## VII.   FIRST CAUSE OF ACTION-(VIOLATION OF THE ESTABLISHMENT CLAUSE OF THE FIRST AMENDMENT)

74.     Plaintiffs hereby incorporate all of the allegations contained in the previous paragraphs.

75.     42 U.S.C. § 1983 prohibits Defendants from depriving Plaintiffs of "rights, privileges and immunities secured by the constitutional laws" in the United States.

76.     The language of the Establishment Clause of the First Amendment of the United States Constitution provides that a state "shall make no law respecting an establishment of religion."  Through the Fourteenth Amendment of the United States Constitution, the First Amendment is made applicable to local public schools.

77.     The Establishment Clause of the First Amendment of the United States Constitution forbids the enactment of any law or practice "respecting an establishment of religion."  The United States Supreme Court in *The People of Illinois, ex rel. v. McCollum v. Board of Education of School District No. 71,* 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948), stated that because of the Establishment Clause, "neither a state, nor the federal government can, openly or secretly, participate in the affairs of any religious organizations or groups, and vice versa." 333 U.S. at 210-211, 68 S.Ct. 461.

78.     The Establishment Clause requires "government neutrality with respect to religion." *See Feishefressor v. Directors of School District 200,* 15 F.3d 680, 608 (7th Cir. 1994).

79.     The Defendants' actions alleged above have the purpose and effect of endorsing religion over non-religion and Christianity over other religious beliefs.

80.     The Defendants' actions of endorsing Christianity are in violation of the Establishment Clause of the First and Fourteenth Amendments of the United States Constitution.

81.     The Defendants' policies and classroom teachings defeat the rights of Plaintiffs to teach their children their own religious Christian beliefs.

## VIII.   SECOND CAUSE OF ACTION-(RETALIATION)

82.     Plaintiffs hereby incorporate all of the allegations contained in the previous paragraphs.

83.     Plaintiffs were engaging in the activity of free speech as protected under the First Amendment of the United States Constitution when showing their concern with regard to the unconstitutional actions of Mr. Freshwater teaching his religious views in his science class.

84.     The Defendants' actions caused the Plaintiffs to suffer injury by depriving James Doe of a valuable educational experience

85.     The injury to the Plaintiffs has discouraged them from continuing to exercise their right to free speech as evidenced from their desire to file pseudonymously.

86.     The Defendants' actions were motivated in part as a response to the Plaintiffs' engagement of their free speech right.

## IX.   THIRD CAUSE OF ACTION – (BATTERY)

87.     Plaintiffs hereby incorporate all of the allegations contained in the previous paragraphs.

88.     Defendant John Freshwater applied an electric device manufactured by Electro-Technic Products to the arm of his eighth grade student, James Doe.

89.     The electric device caused a burn mark on the skin of James Doe.

90.     The contact by Defendant Freshwater in using the electric device was offensive to Plaintiffs and their reasonable sense of personal dignity.

91.     Defendant Freshwater knew or had reason to know that the electric device was substantially certain to cause burn marks on human skin.

## X.   FOURTH CAUSE OF ACTION – (NEGLIGENT SUPERVISION, NEGLIGENT RETENTION)

92.     Plaintiffs hereby incorporate all of the allegations contained in the previous paragraphs.

93.     Defendant Mount Vernon City School District Board of Education, with knowledge of Defendant Freshwater's conduct, facilitated said conduct by failing to suspend

and/or terminate Defendant Freshwater's employment for the approximately twenty years of unlawful conduct described above.

94.     Defendant Mount Vernon City School District Board of Education was negligent in its supervision and retention of Mr. Freshwater by retaining Mr. Freshwater despite the above allegations and failing to discipline Mr. Freshwater despite knowledge of the same.

95.     Plaintiffs were damaged by Defendant Mount Vernon City School District Board of Education's negligent supervision and retention of Defendant Freshwater for which Defendant is liable.

## XI.     FIFTH CAUSE OF ACTION – (NOMINAL DAMAGES)

96.     Plaintiffs hereby incorporate all of the allegations contained in the previous paragraphs.

97.     Plaintiffs have suffered damages as a result of the allegations herein, for which Plaintiffs are entitled to nominal damages.

## XII.    DECLARATORY JUDGMENT

98.     Plaintiffs hereby incorporate all of the allegations contained in the previous paragraphs.

99.     Plaintiffs are entitled to declaratory judgment pursuant to 28 U.S.C. § 2201 and in accordance with the Federal Rules of Civil Procedure 57 that the Defendants' actions are in violation of the Establishment Clause of the First and Fourteenth Amendments of the United States Constitution.

## XI.     INJUNCTIVE RELIEF

100.    Plaintiffs have suffered, and will continue to suffer immediate harm if the Defendants are allowed to continue their actions of teaching religious views within the Mount Vernon City School District.

101.   Plaintiffs seek a preliminary and, in due course, a permanent injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure, which enjoins all Defendants from allowing and participating in the teaching of religious views in class, burning religious emblems on students, conducting prayer meetings, conducting healing sessions, and displaying religious materials in the classroom.

## XII.   DAMAGES

102.   As a direct and proximate result of Defendants' conduct, Plaintiff James Doe has suffered significant injuries and damages including, but not limited to, physical and emotional pain and suffering, anxiety and distress.

## XIII.   ATTORNEY'S FEES

103.   Plaintiffs request and are entitled to an award of attorney's fees and litigation related costs pursuant to 42 U.S.C. § 1988.

## XIV.   REQUEST FOR RELIEF

104.   WHEREFORE, Plaintiffs request that this Court:

    A.   Award Plaintiffs compensatory damages;

    B.   Award Plaintiffs punitive damages;

    C.   Award Plaintiffs reasonable attorneys fees pursuant to 42 U.S.C. § 1988 and other applicable law;

    D.   Award Plaintiffs prejudgment interest and post judgment costs;

    E.   Award Plaintiffs such other and further relief the Court deems appropriate.

Respectfully submitted,


*/s/ Jessica K. Philemond*
**Jessica K. Philemond**      **(0076761)**
Email:  jkp@isaacbrant.com
Isaac, Brant, Ledman & Teetor, LLP
250 East Broad Street
Columbus, Ohio  43215
Tele:  (614) 221-2121; Fax (614) 365-9516
*Attorney for Plaintiffs*


## JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable herein.


*/s/ Jessica K. Philemond*
**Jessica K. Philemond**      **(0076761)**