Page 328

IN THE MATTER OF

THE TERMINATION OF EMPLOYMENT
OF JOHN FRESHWATER

VOLUME III

TRANSCRIPT OF PROCEEDINGS

held at Knox County Office Building,
Mount Vernon, Ohio,
on October 28, 2008,
before Mr. R. Lee Shepherd, Referee

O'DONNELL & McGHEE, LLC
Registered Professional Reporters
13 Park Avenue West, Suite 502
Mansfield, OH 44902
(419)522-9700

Page 329

APPEARANCES:

FOR THE BOARD OF EDUCATION

Mr. David J. Millstone
SQUIRE SANDERS
4900 Key Tower
127 Public Square
Cleveland, OH 44114-1304
(216)479-8500

FOR MR. FRESHWATER

Mr. R. Kelly Hamilton
P.O. Box 824
Grove City, OH 43123
(614)875-4174

ALSO PRESENT

Ms. Jessica Philemond
Mr. Jason Deschler
Ms. Elise Keating

EXHIBITS:

Board's

17 -- CD of "The Watchmaker"

18 -- copy of title page of "Abundant Life New
Testament" -- one page

19 -- CD of YouTube video

20 -- CD of Fox News interview

21-- Resource Speaker Request forms -- thirty-three
(33) pp.

22 -- e-mail from warrenrn@kenyon.edu to Freshwater,
John -- one (1) page

23 -- "About Answers in Genesis" -- one (1) page

24 -- "Survival of the Fakest" -- eight (8) pp.

Page 330

INDEX:

Witnesses

Page:Line

Zachary Dennis
Direct Examination by Mr. Millstone    332:12

Jennifer Dennis
Direct Examination by Mr. Millstone    363:4

John Freshwater
Cross-Examination by Mr. Millstone    373:19

Page 331

1        (9:22 a.m.)
2        HEARING OFFICER:  Attorney Millstone, I believe
3   you're calling your next witness.
4        MR. MILLSTONE:  Yes.  We call Zach Dennis.
5        HEARING OFFICER:  Mr. Dennis, have you ever
6   appeared in a court proceeding and provided testimony
7   before?
8        MR. DENNIS:  No.
9        HEARING OFFICER:  Have you ever studied about it in
10  civics class perhaps or in a class at school?
11       MR. DENNIS:  No.
12       HEARING OFFICER:  Have you ever seen it on TV?
13       MR. DENNIS:  Yeah.
14       HEARING OFFICER:  All right.  What I must do as the
15  Referee first is to have you take an oath that you will tell
16  the truth.  So if you would, please raise your right hand.
17       (Mr. Dennis was sworn by Mr. Shepherd.)
18       HEARING OFFICER:  Thank you very much.  Now, if you
19  could be seated in that chair, the attorneys will be given an
20  opportunity to ask you questions.  This is all being recorded
21  by this court reporter, so you must give verbal answers.  And
22  please speak loudly enough so that she can hear you and
23  record your answer.
24       If you don't understand the question that the
25  attorneys ask, just ask them to repeat it, and they will.  If

Page 332

1  you need a break, time for a drink of water or just to
2  stretch your legs, just ask, and we'll allow that.  All
3  right?
4        MR. DENNIS:  Okay.
5        HEARING OFFICER:  Do you have any questions?
6        MR. DENNIS:  No.
7        HEARING OFFICER:  Okay.  Attorney Millstone.
8        MR. MILLSTONE:  Thank you.
9                  **ZACHARY DENNIS**
10  called as a witness by the Board, being first duly sworn or
11  affirmed, was examined and testified as follows:
12                  **DIRECT EXAMINATION**
13  BY MR. MILLSTONE:
14  Q.  Zach, could you tell us your full name for the record,
15  please.
16  A.  Zachary Steven Dennis.
17  Q.  And where do you live, Zach?
18  A.  Mount Vernon, Ohio.
19  Q.  What's your address?
20  A.  1420 Club Drive.
21  Q.  How old are you, Zach?
22  A.  14 years old.
23  Q.  And when's your birthday?
24  A.  December 17th, 1993.
25  Q.  And what grade are you in school?

Page 333

1  A.  I'm a freshman at the Mt. Vernon High School.
2  Q.  And last year were you in ninth grade or eighth grade?
3  A.  Eighth grade, yeah.
4  Q.  And where were you in eighth grade?
5  A.  Mount Vernon Middle School.
6  Q.  And did you take science last year?
7  A.  Yes.
8  Q.  And who was your science teacher?
9  A.  Mr. Freshwater.
10  Q.  And what period did you have Mr. Freshwater?  Do you
11  recall?
12  A.  Eighth period.
13  Q.  Okay.  I'm going to show you a couple of things here, a
14  couple of devices.  Have you ever seen either of these
15  before --
16  A.  Yes.
17  Q.  -- or anything like them?
18  A.  Yes.
19  Q.  Do you know what they are?
20  A.  Tesla coil.
21  Q.  Do you know what the -- what a Tesla coil does?
22  A.  Yes.
23  Q.  Were they used in your classroom?
24  A.  Yes.
25  Q.  What does a Tesla coil do?

Page 334

1  A.  It's used to light up gases, I believe.
2  Q.  Okay.  And was it used for that purpose in your
3  classroom?
4  A.  Yes.
5  Q.  Do you remember about when that was?
6  A.  Around December, I believe.
7  Q.  Okay.  Of last year?
8  A.  Yes.
9  Q.  And when that was done, were the lights on or off in the
10  room?
11  A.  Off.
12  Q.  And what happened?  Tell us how the -- how they lit up
13  the gases and what did you with them.
14  A.  Mr. Freshwater put tubes of gases on the ground, and he
15  would take the coil and light the end up of it.  And it would
16  light up kind of like neon.  It would light up.  And then we
17  studied them and see what colors different gases were.
18  Q.  And did you go down and try to identify each gas by its
19  color?
20  A.  Yes.
21  Q.  Did he touch it with the tip of this Tesla coil or what
22  did he do?  How did he do it?
23  A.  He held it, like, above it.  And there was, like, an
24  electric that shoots out of it, and the electric hit it.
25  Q.  And then the gases would light up?

Page 335

1  A.  Yes.
2  Q.  And after he used it with the -- to light up the gases,
3  did he do anything else with the Tesla coil?
4  A.  Yes.
5  Q.  What did he do?
6  A.  A kid named [Student #7]        , he asked him to pick up a
7  tube of gas, and he shocked him in the back.
8  Q.  With the Tesla coil?
9  A.  Yes.
10  Q.  Did he ask [Student #7] if he wanted to be shocked?
11  A.  No.
12  Q.  Did . [Student #7] react?
13  A.  Yes.
14  Q.  What reaction did he have?
15  A.  He was -- it surprised him, and so he was kind of
16  jumping around and saying that that hurt.  And then he calmed
17  down.
18  Q.  Okay.  Was anything else done with the Tesla coil after
19  that?
20  A.  Yes.
21  Q.  Could you explain to the Referee what was done.
22  A.  Mr. Freshwater asked for volunteers, and then he marked
23  the students with it, a few students with it.
24       And, also, he -- the students got in a line and held
25  hands.  And he shocked one student, and we could see how far

1  the electrical would go through so many people.
2  Q. Now, you say that he asked -- did he ask whether
3  students want to have this used on them or did students ask
4  him?
5  A. Yes.
6  Q. Which was it?
7  A. He asked to see if -- from what I remember, he said if
8  anybody wants to see how this feels, you can come up here.
9  Q. And do you remember about how many students --
10 A. Maybe four or five.
11 Q. And were you one of those students?
12 A. Yes.
13 Q. How did he mark them?
14 A. In the shape of a cross.
15 Q. When he -- did he touch you with the tip of it or was it
16 like with the --
17 A. With the electric volt.
18 Q. With the electric volt. Now, let me get up for a second
19 and see -- can you demonstrate how your hand was held? And,
20 by the way, do you know which of these he used? Can you
21 tell? Do you recall?
22 A. I can't tell you which one it was.
23 Q. Okay. Let's say for a moment that I'm you.
24 A. Okay.
25 Q. Where do I put my hand? Just hold it out here?

1  A. It was on top of an overhead.
2  Q. Okay. So there was an overhead on the desk. And did
3  you lay your arm on the overhead?
4  A. Yes.
5  Q. We'll say this is the overhead. Was it like this?
6  A. Yes.
7  Q. Now, could you demonstrate what Mr. Freshwater did at
8  that point. Just take one of those. Don't plug it in,
9  please.
10 A. He went like this and then came up and down and then
11 across.
12 Q. You say he went like this. You were holding my hand
13 down with yours. So he held your -- he held your arm down
14 and he went up and down twice and across twice?
15 A. Yes.
16 Q. How did it feel?
17 A. Like it was kind of burning and tingling, like you got
18 shocked, like static electrical except more intense.
19 Q. Now, before he did that, did he give you any
20 instructions about what you should or shouldn't do while he
21 was doing that?
22 A. No.
23 Q. Did he -- did he talk about or warn about any dangers of
24 the use of the Tesla coil?
25 A. No.

1  Q. Did he ask you if you had any medical conditions?
2  A. No.
3  Q. Did he ask you if you had any implants?
4  A. No.
5  Q. Did he ask you if you had a pacemaker?
6  A. No.
7  Q. Did he ask you if you were pregnant?
8  A. No.
9  Q. Were you standing on the ground?
10 A. Yes.
11 Q. Did he warn you about being grounded or not being
12 grounded while this was done?
13 A. No.
14 Q. What about with the other students? Did he do any of
15 those things to any of them? Did he warn any of them that
16 you heard?
17 A. No.
18 Q. Did he ask -- were there any girls that he did it to?
19 Do you recall?
20 A. I don't remember. I think there might have been, but
21 I can't tell you.
22 Q. You don't recall him asking anybody if they were
23 pregnant, though?
24 A. No.
25 Q. Did he ask anybody if they had any health conditions of

1  any kind?
2  A. No.
3  Q. Did he ask anybody if they had a pacemaker or an
4  implant?
5  A. No.
6  Q. Now, after or before he put the mark on, did he make any
7  comment about what it was or what he was doing?
8  A. Not that I can say.
9  Q. Either before or after he used the Tesla coil on you,
10 did he make any comment about what the mark was?
11 A. Yes. He said that it was a temporary tattoo and that
12 those crosses are going to be there for a while.
13 Q. Are you saying that it was "those crosses" would be
14 there for a while or did he say that?
15 A. He said that.
16 Q. You indicated that after you were marked with the Tesla
17 coil or after -- were there any students after you or were
18 you the last one?
19 A. I was the last one from what I remember.
20 Q. And you said he lined the students up?
21 A. Yeah.
22 Q. Could you explain a little bit more about that?
23 Describe that a little bit more, please.
24 A. The students were in a line, and they were holding
25 hands. And the first person, he shocked their hand, and we

1 could see how far you could feel the electrical go through
2 how many people.
3 Q. And do you recall, did he do this with the whole class
4 hand in hand or did he ask for just a small group?
5 A. I think anyone who wanted to do it could come up.
6 Q. And, so, again, it was a volunteer to come up and do
7 it. If you wanted to come up, you could come up and do it?
8 A. Yeah.
9 Q. Now, after Mr. Freshwater used the device on your arm,
10 used the Tesla coil on your arm, could you see the mark on
11 there? Could you see any redness?
12 A. Yes.
13 Q. What did it look like?
14 A. It was kind of red blotches and, like, little welts
15 going up your arm and little dots.
16 Q. And did it look like the shape of anything to you?
17 A. Yes.
18 Q. What was the shape?
19 A. Looked like a cross to me.
20 Q. And was that still there when you left his room?
21 A. Yes.
22 Q. Was it there when you left school that day?
23 A. Yes.
24 Q. How about when you got home that evening?
25 A. Yes.

1 Q. Now, what happened after you left school and you went
2 home? Did you show this to your mother?
3 A. Yes.
4 Q. Tell us what happened.
5 A. I showed it to my mom, and she was concerned about it.
6 And then I had to go to ice hockey practice, and I had to
7 leave for ice hockey practice.
8 Q. And where was your ice hockey practice?
9 A. In Cleveland, Ohio.
10 Q. So you had a lengthy drive to go to your ice hockey
11 practice?
12 A. Yes.
13 Q. What position do you play?
14 A. Goalie.
15 Q. And so you were going for your goalie practice and ice
16 hockey practice?
17 A. Yeah.
18 Q. Was there anything that -- what time did your hockey
19 practice start? Do you recall?
20 A. It started at, I think, from 8:00 to 9:00.
21 Q. Okay. Do you recall anything during hockey practice?
22 Was the mark still there?
23 A. Yes.
24 Q. Could you feel it?
25 A. Yes.

1 Q. Could you describe how it felt during hockey practice?
2 A. It was a burning sensation, and it was irritated from my
3 equipment and sweat.
4 Q. And did you complain to anyone?
5 A. Yeah.
6 Q. Who did you complain to?
7 A. My dad and, later that night, my mom.
8 Q. Okay. So while you were at hockey practice, did you
9 complain to your dad?
10 A. Yes.
11 Q. After hockey practice, you drove home, I take it.
12 A. Yes.
13 Q. Or your dad drove home.
14 A. My dad drove home.
15 Q. You don't have a license yet. And you were -- at that
16 time, how old were you? 13?
17 A. Yes.
18 Q. Now, when you got home, is that when you complained to
19 your mother about it?
20 A. Yes.
21 Q. Okay. Could you tell us what happened.
22 A. It was still burning and it was irritated and it was
23 hard for me to fall asleep with it, and I just told her about
24 that.
25 Q. And did she do anything?

1 A. She took pictures of it.
2 Q. If you had to do it over again, would you volunteer to
3 have your arm marked --
4 A. No.
5 Q. -- with the Tesla coil?
6 A. No.
7 Q. I'd like to change subjects with you, if I could, a
8 little bit. And I want to talk about what went on in your
9 classroom. Did Mr. Freshwater ever bring up religion in your
10 classroom?
11 A. Yes.
12 Q. Do you have any specific examples that you can share
13 with us?
14 A. Yes.
15 Q. Would you please go ahead and share them.
16 A. There was a video that was played, and it was --
17 I believe it was something to do with the creator. It was
18 about the creation of earth and relating to a watchmaker
19 making a watch.
20     MR. MILLSTONE: Okay. I'm going to ...
21     (Board Exhibit 17 was played.)
22 Q. Is that the video he showed in class?
23 A. Yeah.
24     MR. HAMILTON: Is there more?
25     MR. MILLSTONE: No. I've marked it as Exhibit 17,

1  a CD that has the film on it.
2  BY MR. MILLSTONE:
3  Q.  So one example is the video that we just saw.  Are there
4  any other examples that you have of where he raised the issue
5  of religion in class?
6  A.  Yes.  He would relate to a higher being in class.
7  Q.  And in conjunction with what?
8  A.  We were like -- like, we were -- in astronomy, we would
9  talk about -- and we'd talk about the Big Bang Theory, and he
10  said that it's -- the earth started from the tip of a pen and
11  everything exploded and then came back together and made a
12  perfect universe.  And we talked about there wasn't very good
13  odds of that happening.  And a girl in my class would say,
14  well, it was magic or something.  And Mr. Freshwater --
15          MR. HAMILTON:  Objection as to hearsay from the
16  other student.
17          HEARING OFFICER:  Sustained.
18              If you could, Zach, just instead of telling us
19  what others might have said, just your own experience.
20          MR. MILLSTONE:  Or what you observed Mr. Freshwater
21  saying.
22          THE WITNESS:  Yes.  This has to do with what
23  Mr. Freshwater said.
24          HEARING OFFICER:  All right.  Then you can tell us.
25  A.  She said, Maybe this is magic, and he would say, Or

1  maybe it was a higher being.
2  Q.  Okay.  Do you have any other examples?
3  A.  We talked about Easter and Good Friday.
4  Q.  And when did that come up?
5  A.  I think -- it came up before Easter, that weekend, or
6  that Friday before the weekend of Easter.
7  Q.  Okay.  And what was -- had you been studying the
8  movement of the moon at the time?
9  A.  Yes.
10  Q.  And had Mr. Freshwater given you an assignment with
11  respect to the movement of the moon and understanding how the
12  tide changes?
13  A.  Yeah.  We had to find out when Easter would be due to
14  the moon and the calendar.
15  Q.  Okay.  And then what was the discussion about Easter
16  that happened after that?
17  A.  He asked us what Good Friday was.  And I believe I
18  answered that and --
19  Q.  What was your answer?
20  A.  That it was when Jesus died for our sins.  And
21  Mr. Freshwater said that it should be called the greatest
22  Friday or the best Friday ever.  And then he asked what
23  Easter was, and someone said when Jesus was resurrected.
24  Q.  Okay.  Do you have any other examples?
25  A.  Yes.

1  Q.  What?
2  A.  He gave us a packet about Mount Saint Helens that we had
3  to turn back in, and it was about carbon dating; and a
4  scientist got coal that formed ten years after Mount Saint
5  Helens erupted and he said that it was a couple years old and
6  so carbon dating must be wrong if that happened.
7  Q.  And how does that relate to religion?
8  A.  That coal can form fast and so the earth could have
9  formed fast and it wouldn't be a million years old or a
10  couple billion years old.
11  Q.  So it had to do with the age of the earth?
12  A.  Yes.
13  Q.  Did he ever refer to his Bible in conjunction with any
14  lessons that you had?
15  A.  Yes.
16  Q.  And could you give an example of that.
17  A.  It was about volcanos and, I believe, that the earth is
18  going to come to a fiery end.  And he said, I know this
19  because I read the book, and held up the Bible and then put
20  it back down.
21  Q.  Did he ever express anything else or is there any other
22  example that you can give us where he may have brought
23  religion into your science lessons?
24  A.  Yes.  When we talked about the moon and Lance
25  Armstrong -- I believe that's what his name is -- landed on

1  the moon, they thought that cosmic dust was going to be a few
2  feet high from the moon collecting dust over billions of
3  years.  And when they got there, it was only a couple inches,
4  so that means that the moon must be young because it hasn't
5  collected a lot of cosmic dust.
6  Q.  And do you have any other examples?
7  A.  Not that I can remember.
8  Q.  Okay.  Did Mr. Freshwater ever use the Internet in the
9  classroom with the students?
10  A.  Yes.
11  Q.  Did he ever go to a website called "Answers in Genesis"
12  in the classroom?
13  A.  Yes.
14  Q.  And did he ever make any assignments to students or to
15  you -- I guess you don't know about other students.  Did he
16  ever make any assignments directly to you?
17  A.  Yes.  He had me get on "Answers in Genesis" and research
18  something about dinosaurs.
19  Q.  Did he specifically tell you to go to "Answers in
20  Genesis"?
21  A.  Yes.
22  Q.  Did he ever teach you anything about something he called
23  the hydrosphere theory?
24  A.  Yes.
25  Q.  Could you explain what that was and what he thought.

Page 348

1   A.  It was how dinosaurs could live in areas like Alaska and
2   Antarctica, where they find greenhouse gases and fossils and
3   how fish fossils can be found on top of mountains.  And it
4   was, the earth was, surrounded by, like, a dome of water,
5   condensed water, and then it could make it humid for
6   dinosaurs to live anywhere.  And then one time it broke, it
7   flooded, so fish -- so it rose and then fish would be stuck
8   on top of mountains.  And then the water flowed back out
9   again, and that was what killed a lot of dinosaurs and the
10  species.
11  Q.  And was the implication of that that was the great flood
12  that Noah --
13  A.  He didn't say that, but I took it that way.
14  Q.  Did he indicate that that was evidence that the
15  dinosaurs lived at the same time as man as far as that?  Do
16  you recall?
17  A.  I don't remember.
18  Q.  Now, you indicated that Mr. Freshwater handed out a
19  packet on Mount Saint Helens that you had to turn back in.
20  A.  Yes.
21  Q.  Were there other occasions that he handed out packets
22  that had to be turned back in?
23  A.  Yes.
24  Q.  Do you have any other examples of that that you can
25  recall at this time?

Page 349

1   A.  There was one about Albert Einstein.  And we did other
2   ones on sound waves and different kind of electrical waves,
3   like microwaves and radio waves and other examples.  There
4   were a lot of other packets.
5   Q.  Was there ever any phrase, that special phrase that
6   Mr. Freshwater asked students to use in conjunction --
7   A.  Yes.
8   Q.  -- with their class?
9   A.  Yes.
10  Q.  What was that phrase?
11  A.  Here.
12  Q.  And could you explain how that was to be used?
13  A.  It was used -- in the textbook, when something was
14  stated as a fact that wasn't necessarily proven, we'd say
15  "here" after that.
16  Q.  Now, in your class, did you study the periodic table?
17  A.  Yes.
18  Q.  And about how long did you study that?
19  A.  A few weeks.  We memorized a certain number of them.
20  Q.  And did Mr. Freshwater ever give extra credit
21  assignments?
22  A.  Yes.
23  Q.  And is there any that he gave relating to intelligent
24  design?
25  A.  Yes.

Page 350

1   Q.  What was that extra credit assignment?
2   A.  It was to go see the movie *Expelled* and write a
3   nonbiased paragraph about it.
4   Q.  And did he talk about that movie to the Fellowship of
5   Christian Athletes as well?
6   A.  Yes.
7   Q.  And could you tell us what he did at Fellowship of
8   Christian Athletes with respect to that movie?
9   A.  He got the kids together one Friday, I believe, to go
10  see it.  And, also, he asked us to encourage the movie
11  theaters to play it there.
12  Q.  By the way, did you ever study magnetism in class?
13  A.  Yes.
14  Q.  And do you recall anything of the discussions by
15  Mr. Freshwater about magnets?
16  A.  About magnets, that opposites attract, and it should be
17  the same with humans.
18  Q.  Okay.  Let's change the subject again if we could.  Talk
19  about the Fellowship of Christian Athletes.  Do you know --
20  what's the Fellowship of Christian Athletes?
21  A.  A time for Christian athletes to meet and talk about
22  God.
23  Q.  And were you part of the Fellowship of Christian
24  Athletes --
25  A.  Yes.

Page 351

1   Q.  -- last year?
2   A.  Yes.
3   Q.  And how often did you meet?
4   A.  Every Monday and Tuesday.
5   Q.  Now, what were the different meetings?
6   A.  Monday was in Mr. Freshwater's room, and it was the
7   leadership meeting, which was when we would watch movies and
8   talk about different things going on at churches.
9   Q.  Okay.  And who showed movies?
10  A.  Mr. Freshwater.
11  Q.  Who picked the movies?
12  A.  I believe Mr. Freshwater did.
13  Q.  What are some of the movies that he showed you?
14  A.  One was on Islam, the Islam point of view for
15  terrorists.  It was *Obsession*.
16  Q.  Other kinds of movies that were shown?
17  A.  There was *Invisible Children*, which is about college
18  kids making a documentary in Africa.
19  Q.  Okay.
20  A.  And there was another movie that I remember, but I don't
21  remember what it was called.  It was just about different
22  points of views of people.
23  Q.  What else happened at the leadership meetings?
24  A.  Occasionally, we would call speakers.  We'd pray.  We'd
25  talk about different things going on in the churches, about

Page 352

1  missionary trips and abortion clinics and things like that.
2  Q.  Who ran the leadership meetings?
3  A.  Mr. Freshwater did.
4  Q.  When you say he ran them, what did he do to run them?
5  A.  He picked the stuff that we did.  He gave the phone
6  numbers of students to call.  And he brought in the videos.
7  He would often, like, direct it, bring up topics and things.
8  Q.  Okay.  Did he ever lead any prayers during that time?
9  A.  Yes.
10  Q.  Did he ever participate in the prayers that he didn't
11  lead?
12  A.  Yes.
13  Q.  Did he ever ask specific students to lead prayers?
14  A.  Yes.
15  Q.  Now, speakers.  Did you have speakers at these
16  leadership meetings or were those the Tuesday meetings or
17  both?
18  A.  Speakers sometimes would come into the Monday meetings,
19  and then every Tuesday a speaker would come in.
20  Q.  And how were those speakers arranged, if you know?
21  A.  I don't know.  Either a student would call or
22  Mr. Freshwater would call.  Most of the time, I didn't know
23  who would be speaking the Tuesday.
24  Q.  Okay.  Did you ever call any speakers to come in?
25  A.  Yes.  One time when I didn't have my permission slip,

Page 353

1  Mr. Freshwater had me call my mom and get permission, and
2  then he had me call two speakers.  One was a Mr. Bender, and
3  the other one, I don't remember him.
4  Q.  Okay.  Did he give you telephone numbers for them?
5  A.  Yes.
6  Q.  Did you ever call a Pastor Cline?
7  A.  No.
8  Q.  Tell us a little bit -- is there anything else about the
9  leadership meeting that I haven't asked you about that you
10  want to cover?
11  A.  I don't think so.
12  Q.  Okay.  Tell us about the Tuesday meetings.  Were those
13  the same length as the Monday meetings or were they longer?
14  A.  They were the same length.
15  Q.  During the lunch hour?
16  A.  Yes.
17  Q.  Okay.  And what happened at the Tuesday meeting?
18  A.  A speaker would come in and talk about the same things,
19  and then they would say a prayer and we would leave.
20  Q.  Okay.  And did you ever see Mr. Freshwater participate
21  in any prayers at the Tuesday meeting?
22  A.  Yes.
23  Q.  Did he ever lead any of the prayers on Tuesday?
24  A.  He didn't lead them, but he talked.
25  Q.  By "talking," you mean he participated in the prayers?

Page 354

1  Is that what you mean by participation?
2  A.  Yes.
3  Q.  And was there one particular meeting where there was a
4  pastor there who hadn't been well or who wasn't well?
5  A.  Yes.
6  Q.  Could you describe what happened at that meeting.
7  A.  He spoke, and then he said a prayer.
8  Q.  Who's "he"?
9  A.  Pastor Zirkle.  And then he spoke, and then he said a
10  prayer.  And then Mr. Freshwater said, He's not feeling well;
11  let's say another prayer for him.  And [Student #4]  started the
12  prayer, and then Mr. Freshwater came in.  And I opened up my
13  eyes, and I was looking.  He had his hands up, and he said
14  something.  He was talking to God, and he said something
15  like, Devil, you cannot take over this man, and, Lord, help
16  protect him.
17  Q.  Okay.  Did Mr. Freshwater ever hand out Bibles to
18  students?
19  A.  Yes.
20  Q.  And can you tell us when that happened or describe what
21  happened then.
22  A.  I don't know when it was, but he told us to take a Bible
23  and give it to someone who needs it.
24  Q.  And I only have one copy of this, but I'm going to show
25  you this book and ask you is this -- do you recognize this

Page 355

1  book?
2  A.  Yes.
3  Q.  What is it?
4  A.  It's a Bible that I had to give to someone who needed
5  it.
6  Q.  Okay.  Is that one of the Bibles that Mr. Freshwater
7  handed out --
8  A.  Yes.
9  Q.  -- to you as a student?
10  A.  Yes.
11       MR. MILLSTONE:  We only have one copy of that.  We
12  can mark it as an exhibit, but I don't have a copy for
13  Mr. Hamilton or for myself.
14       HEARING OFFICER:  Is it your intention to refer to
15  any of the contents?
16       MR. MILLSTONE:  No.  No, it's not.
17       HEARING OFFICER:  Maybe if we just make a copy of
18  the front for our records.
19       MR. MILLSTONE:  Okay.  We'll do that later, if we
20  can.
21       MR. HAMILTON:  For the record, though, I do want to
22  inspect that book.
23       HEARING OFFICER:  That's fine.
24       MR. MILLSTONE:  Sure.
25       HEARING OFFICER:  If you could, just take a moment

Page 356

1  to hold it up so that we can at least see.
2       MR. MILLSTONE:  The front cover says "Abundant Life
3  New Testament, Experience the Presence of God in everyday
4  life."  And on the side, it says -- on the side of the front
5  cover, it says, "Living translation."  And in the bottom
6  right-hand corner, it says "NLT."  We're going to mark the
7  cover as Exhibit 18, and we'll make a photocopy of the cover
8  for the record.
9  BY MR. MILLSTONE:
10 Q.  Now, you testified a little earlier that Mr. Freshwater
11 urged the students that participated in FCA to call the
12 theater and have them ask the theater or --
13 A.  Yes.
14 Q.  -- tell the theater that they'd like to have *Expelled*
15 played there.  Is that right?
16 A.  Yes.
17 Q.  Did he ever talk to students either in class or FCA
18 about any other movies that they should or shouldn't go to?
19 A.  FCA shouldn't go to the movie *The Golden Compass*.
20 Q.  Now, in your classroom, did Mr. Freshwater ever show any
21 movies about any missions that he had been on?
22 A.  Yeah.
23 Q.  Were these missions in conjunction with his church?  Do
24 you know?
25 A.  Yeah, I think so.

Page 357

1  Q.  And do you recall where the mission was to?
2  A.  It was to an orphanage in Romania.
3  Q.  Did he show -- did he relate that to science at all?
4  A.  No.
5  Q.  Did he show any movies or videos of him as a fire
6  jumper?
7  A.  Yes.
8  Q.  And I take it those did not have any religious content.
9  A.  No.  He showed us a scrapbook of his missionary trip to
10 China.
11 Q.  Okay.  Now, Zach, do you know what the word "bias" is?
12 A.  Yeah.
13 Q.  Do you have any bias against Mr. Freshwater?
14 A.  No.
15 Q.  Do you dislike Mr. Freshwater?
16 A.  No.
17 Q.  Did you feel that Mr. Freshwater disliked you?
18 A.  No.
19 Q.  Now, I skipped an area, and I want to go back to it, the
20 FCA again.
21 A.  Okay.
22 Q.  Do you recall anything concerning permission slips and
23 the need to have them to go to FCA meetings?
24 A.  Yes.
25 Q.  Did your parents ever sign a permission slip for you?

Page 358

1  A.  No.
2  Q.  Were you ever kept out of the FCA meetings because you
3  didn't have a permission slip?
4  A.  Eventually, yeah.
5  Q.  And when was eventually?
6  A.  After a few times I went without it, they kept saying
7  that I had to get a permission slip, but they still kept
8  letting us come.  And a few weeks later, he said I couldn't
9  come.
10      MR. MILLSTONE:  Okay.  That's all the questions
11 that I have right now for Zach.
12      HEARING OFFICER:  Thank you.
13           Zach, do you need a short break before we
14 continue?  It's going to be Attorney Hamilton's turn to ask
15 you questions now.
16      THE WITNESS:  I'm fine.
17      HEARING OFFICER:  All right.
18      MR. HAMILTON:  At this particular time, Your Honor,
19 I'm going to forego cross-examining Zachary Dennis at this
20 particular time.  He is under duty to appear pursuant to
21 subpoena.  We do expect to call him during our case in chief,
22 and I want to put that on the record.
23      HEARING OFFICER:  Thank you.
24           With that, Zach, I believe your testimony for
25 the time being is concluded.  As Attorney Hamilton has

Page 359

1  mentioned, he's calling you as a witness in his presentation,
2  which will take place after the School Board has completed
3  their presentation.  So you will come back at that point in
4  time and once again testify.  Do you understand?
5       THE WITNESS:  Yes.
6       HEARING OFFICER:  Okay.  You're excused.
7       MR. HAMILTON:  Your Honor, if I may, would you
8  remind the witness about the separation of witnesses and not
9  to speak to others about his particular testimony.
10      HEARING OFFICER:  Thank you.  That's a very good
11 point.
12           We've invoked a rule in this hearing, Zach, called
13 a separation of witnesses, the purpose being that the
14 witnesses will not hear what each other testifies to or
15 discuss the testimony with one another, so if you can just be
16 reminded of that and not discuss your testimony with anyone
17 until you're back in court for the very last time.  Any
18 questions about that?
19      THE WITNESS:  No.
20      HEARING OFFICER:  All right.  Thank you.
21      THE WITNESS:  Thank you.
22      MR. MILLSTONE:  Thank you, Zach.
23      HEARING OFFICER:  Attorney Millstone, your next
24 witness.
25      MR. MILLSTONE:  Can we take a short break?

1      HEARING OFFICER:  Certainly.  We'll stand adjourned
2 for ten minutes to prepare for the next witness.  Be back at
3 25 after, please.
4             (A recess was taken from 10:13 a.m.
5             to 10:28 a.m.)
6      HEARING OFFICER:  All right, ladies and gentlemen,
7 we're ready to reconvene the hearing.  Just a reminder to
8 everybody in the chamber if they could turn their cell phones
9 and all recording devices off while we're engaged in the
10 hearing, I'll appreciate that.
11      MR. MILLSTONE:  Before we call the next witness --
12 we're ready to proceed with the next witness.  If I heard
13 Mr. Hamilton correctly, he waived cross-examination of Zach
14 Dennis.  I believe he used those words, that I waive
15 cross-examination.
16      HEARING OFFICER:  Actually, he used the word
17 "forego," but I interpret that to mean the same as a waiver.
18      MR. MILLSTONE:  Having chosen not to cross-examine
19 Zach, he has the right to call him in his case in chief but
20 cannot inquire under the Rules of Evidence and under the
21 Civil Rules into any subjects that were already covered
22 during the course of his direct examination, and I just --
23 which is the position we plan to take at that point in time.
24 And in fairness to Mr. Hamilton, before he may choose to do
25 that again, I wanted to make that clear on the record.

1      HEARING OFFICER:  You have done so.
2      Do you have any comments, sir?
3      MR. HAMILTON:  Yes, sir.  We heard new information
4 today.  There's been new information that's actually come out
5 as recently as that that was in the paper today, information
6 that we hadn't been able to previously prepare for,
7 information that we had no idea even existed, specifically as
8 it relates to this particular witness.  Therefore, we do
9 anticipate -- and if it's going to be the Court's ruling that
10 somehow cross-examination was waived, then, by all means,
11 we'll go ahead on the record right now and make it very
12 clearly stated that we will intend to call him back during
13 the case in chief as if on cross-examination, in case I did
14 not properly explain that earlier.
15      But we are foregoing at this particular time the
16 opportunity to cross-examine based upon some of the new
17 information that was presented.  It's something that's
18 clearly done in cases in courtrooms all across the state of
19 Ohio, and that's what I intend to employ.  Now, just so it's
20 understood, I do intend to go into those topics.  If it's
21 going to be the Court's direction that those topics cannot be
22 gone into, then let's bring the young man back before we go
23 onto the next witness and we'll begin the cross-examination.
24      I think the Court's probably pretty aware that I'm
25 pretty meticulous and pretty thorough about every particular

1 issue.  What we're trying to do is give the School Board an
2 opportunity to go ahead and present your case, because the
3 nature of the allegations here are just based upon a
4 particular report, and, essentially, there's nothing else
5 that we have to rely upon.  We need to find out what some of
6 the sworn statements may be from these particular people,
7 because this document contains no sworn statements, just
8 assertions that are complete hearsay.
9      Therefore, I would request that if the Court is
10 somehow in the future going to somehow rule that we've given
11 up our opportunity to cross-examine, then I would ask that we
12 bring him back right now.  Unfortunately, I think it will
13 take longer than is necessary if I just simply have the time
14 to prepare for some of the information that we heard about
15 today.
16      HEARING OFFICER:  Thank you.  I'll take both of
17 your arguments under advisement at this point.  Let's proceed
18 with our next witness.
19      MR. MILLSTONE:  We call Jenny Dennis.
20      HEARING OFFICER:  Be seated.  State your name for
21 the record, please.
22      THE WITNESS:  Jennifer Dennis.
23      HEARING OFFICER:  Thank you.  Attorney Millstone.
24      MR. MILLSTONE:  Thank you.
25

1             <u>JENNIFER DENNIS</u>
2 called as a witness by the Board, being first duly sworn or
3 affirmed, was examined and testified as follows:
4             <u>DIRECT EXAMINATION</u>
5 BY MR. MILLSTONE:
6 Q.  Mrs. Dennis, where do you live?
7 A.  1420 Club Drive, Mount Vernon, Ohio.
8 Q.  And do you have any relationship to Zach Dennis?
9 A.  I'm his mother.
10 Q.  I want to ask you about events in December of last
11 year.  Do you recall Zach coming home from school one day
12 with something on his arm?
13 A.  Yes.
14 Q.  Could you describe what happened that afternoon when
15 Zach came home.
16 A.  After school, I believe he went to a friend's house.
17 And I believe it was around December 6th.  So I was home.  He
18 was going to Cleveland that night to work with his goalie
19 coach, so I was trying to get his hockey gear together,
20 making sure he had everything.  When I saw him, he came in,
21 and I believe a neighbor was there.  And he said, Look, Mom,
22 and showed me his arm.
23     I was like, What is that?
24     Shocked.  I didn't know what it was.  At that time, I
25 tried not to make a big deal of it because the neighbor was

Page 364

1  there.  I didn't know exactly what that was.  And we had to
2  leave, so we had just a quick discussion about it.
3       He said, Mr. Freshwater did that in science class.
4       And I just asked, you know, what it was.
5       And he said it was a machine and that he was told that
6  the cross would be there because it was like a temporary
7  tattoo; that it would be there for a while.
8       So at that time, I packed his hockey bags up, and his
9  father took him up to Cleveland to work with the goalie
10  coach.
11  Q.  Okay.  At that time, did he complain to you about any
12  kind of pain?
13  A.  I don't believe at that time we discussed that.  Or I
14  may have asked, That looks like it hurt.  Does that hurt?
15       And he said, you know, yeah, it hurt.
16       I didn't know what it was that had put it there, and
17  I was trying not to get in depth into that at that time.
18  Q.  Okay.  How far does Zach have to go for practice?  You
19  said to Cleveland?
20  A.  To Cleveland, to North Olmstead, about an hour and a
21  half, hour and 40 minutes.
22  Q.  Okay.  And did anything happen before he came home that
23  evening that you were involved with with respect to this
24  marking on his arm?
25  A.  When he came home from school or from Cleveland?

Page 365

1  Q.  No.  After he left for practice and before he came home
2  again.
3  A.  My husband called me when Zach was on the ice.  He said
4  he acted like something wasn't right, like he was
5  uncomfortable.  And later on, he kept shaking his
6  arm.  And when he got off the ice, Steve asked Zach what was
7  wrong, and he showed him his arm.  And he was like, Did you
8  see his arm?  What in the world is on his arm?  Where did he
9  get that?
10       And started going into that, and I told him we shouldn't
11  discuss it because he was at the ice rink.  There were other
12  people around.  And I believe that's all we said on the
13  phone.
14  Q.  And did Zach get home that evening eventually?
15  A.  Yes.
16  Q.  And what happened when he came home?
17  A.  I believe it was around 11:30 when he came home.  When
18  he goes to work with his goalie coach, he sleeps on the way
19  home.  When he comes home, we usually usher him up to the bed
20  because he's half asleep and put him to bed.  When I did
21  that, he could not go back asleep.  He was uncomfortable.
22  Called me to come in there, and we -- he was uncomfortable.
23  And we started discussing it a little more.  And I believe my
24  feeling was that the mark would be gone in the morning, so my
25  husband and I took pictures with my digital camera.

Page 366

1       And what I got from him was, Zach said it was a machine
2  they use in science class that you plug into a wall, push a
3  button, and it creates a lightning bolt.
4       To me, it looked like an oven burn, extreme sunburn,
5  something of that nature.  So I tried to keep it cool for
6  him.  I was thinking the blankets from the bed, because it
7  was December, the heat was causing more pain and irritating
8  it.
9       When my husband was in Cleveland, he took pictures with
10  his cell phone and he showed me those pictures, and it
11  appeared to me that this was more irritated, like perhaps
12  sweat may have irritated it, something like that.  So I was
13  comparing the two pictures.
14       And tried to put him back to bed.  He had difficulty
15  going to sleep.
16  Q.  You said you took pictures that evening?
17  A.  Yes.
18  Q.  Approximately what time?
19  A.  I imagine around midnight.
20  Q.  I'm going to hand you what's been marked for
21  identification as Board Exhibit No. 7.  Can you identify that
22  for the record, please.
23  A.  That's a picture I took of Zach's arm in his bedroom.
24  Q.  Okay.  That's a picture that you took around midnight?
25  A.  Yes.

Page 367

1  Q.  And that is one of the pictures you took.  Okay.  I'm
2  going to hand you what's been marked for identification
3  purposes as Board Exhibit No. 8 and ask if you can identify
4  that.
5  A.  This is the picture I took in my bathroom of Zach's arm.
6  Q.  And when did you take that?
7  A.  I believe I took this one first, so I would have taken
8  it after.
9  Q.  When you say "this one first," you're referring to Board
10  Exhibit 7?
11  A.  The one in the bathroom, Exhibit 8, was taken --
12  I believe we took that second.  We took Exhibit 7 first and
13  then Exhibit 8.
14  Q.  Okay.  And were they both taken in the same time frame?
15  A.  Within five, ten minutes of each other.
16  Q.  So they both were taken at home?
17  A.  Yes.
18  Q.  Okay.  Now, have you in any way doctored these pictures?
19  A.  No.
20  Q.  And are these pictures a true representation of what you
21  saw on your son's arm?
22  A.  That is how I believe his arm looked when he came home
23  from school when I saw it and that evening when I saw his
24  arm.
25  Q.  Now, if he was complaining, did you take him into the

Page 368

1 emergency room that evening?
2 A. No.
3 Q. What about the next day? Was the mark still on his arm
4 the next morning?
5 A. It was still on his arm the next morning. I did not
6 take him to the emergency room. I felt that if it would have
7 been a sunburn or a burn from the oven or something like
8 that, I would not have taken him to the emergency room for
9 that.
10 Q. Okay. Do you have any medical background?
11 A. Yes.
12 Q. What background do you have?
13 A. I've worked as surgical scrub tech in surgery here at
14 KCH and also in California and in Mansfield at a surgery
15 center.
16 Q. Okay. Now, did you have any follow-up over the marks
17 with anybody at the schools?
18 A. The next morning, I had difficulty sleeping and deciding
19 what to do about this. I was confused about the whole
20 thing. So as soon as I got the kids off to school, I ran out
21 and took the camera and printed the pictures out and went
22 straight into Mr. Short's office.
23 Q. Okay. And did you -- did your husband go with you or
24 did you meet him there?
25 A. He met me there.

Page 369

1 Q. So both of you met with Mr. Short?
2 A. Yes.
3 Q. And could you describe what happened at that meeting.
4 A. When I got there, I told him that I was very sorry to be
5 there but I had something I wanted to discuss with him.
6 I was confused about what had happened to my son in science
7 class. His teacher I always heard was a good man, and
8 I never expected anything like this. And I wanted his
9 confirmation that I was not overreacting on this and that was
10 something that was not typical in our schools. And I showed
11 him the pictures.
12 Q. And at that time, did you -- did you indicate to
13 Mr. Short that you didn't want to see anybody get fired over
14 this?
15 A. Yes. I was very emotional. Mr. Freshwater's daughter
16 had been at our house, I believe it was that week, sled
17 riding. She was at a friend's house, and they all went sled
18 riding together. I knew the kids were friends at school.
19 And I just felt this was not a good situation, and I was
20 concerned. And I said I really would hate to see anybody get
21 fired over this, I don't want to see anybody get fired over
22 this.
23 Q. And when you met with Mr. Short in December, did you
24 have any bias towards Mr. Freshwater?
25 A. No.

Page 370

1 Q. And what was your impression of him?
2 A. I had met him one time. That was before school started
3 when we got to meet the teachers. I did not get to talk to
4 him that long. Somebody else came in. [Student #401] and Zach went
5 to the same elementary school for a couple of years, so I
6 just knew him a bit, seeing him at the school, not really --
7 I don't think I ever spoke to him. And then I do know that
8 there's a teacher at the elementary school where my younger
9 son went whose husband passed away, and I know he was very
10 instrumental in helping her through that tough time.
11    MR. MILLSTONE: I don't have any further questions
12 of this witness.
13    HEARING OFFICER: Okay. Thank you.
14    Mr. Hamilton.
15    MR. HAMILTON: I'm going to say the same things I
16 did earlier. Whether I use the word "forego," whether I use
17 the words "I'll do it later," I intend to call Miss Dennis
18 during our case in chief as if on cross-examination. I'll
19 state again that there was new information presented in news
20 media last night that, quite frankly, I haven't had a chance
21 to prepare for, so if the Court wants to keep on moving and
22 let the School Board put on their case so we'll be able to
23 more properly prepare for some of these witnesses, then
24 that's what I would encourage.
25    MR. MILLSTONE: Mr. Referee, the time to

Page 371

1 cross-examine witnesses is when they testify. It isn't a
2 matter of waiting and preparing additionally and then
3 cross-examining them at some later date. That is not the
4 purpose of testimony. That is not the procedure that is
5 appropriate to follow.
6    Certainly, if there's new information and the
7 witness needs to be recalled to examine them over that new
8 information, that is a right that the other side has. They
9 do not have the right to cross-examine over matters that have
10 been testified to if they do not do so at the time the
11 witness testifies.
12    MR. HAMILTON: Your Honor, if we're playing this
13 game -- if we're going to conduct this hearing according to
14 the statute, then we well know the Civil Rules of Procedure
15 do not strictly apply in this particular forum. We've talked
16 about that before. We were going to use those as a guide.
17 We're trying to get to the truth of the matter. We're trying
18 to represent John Freshwater in the best manner possible.
19 And, quite frankly, we're going to need some more time to
20 evaluate this particular information.
21    HEARING OFFICER: All right. I understand.
22 Believe me, I understand both of your arguments. Label it
23 cross-exam, label it whatever you wish, the question here is
24 what latitude Mr. Hamilton will be permitted --
25    MR. MILLSTONE: Yes.

1 HEARING OFFICER: -- at the point that he examines
2 these witnesses. And I will research that and make a ruling
3 upon that at a later point in time. I definitely don't want
4 to take a timeout to do that now. I want to continue with as
5 much testimony as we can.
6 MR. MILLSTONE: Fine.
7 HEARING OFFICER: And, hopefully, I can get an
8 answer for you gentlemen over our lunchtime break. So having
9 noted your arguments, I would ask that you call your next
10 witness.
11 MR. MILLSTONE: Okay. We would call [Student #3]
12 Okay, we will not be calling [Student #3] at this time, as
13 apparently he was excused by Mr. Hamilton, so --
14 HEARING OFFICER: He is who?
15 MR. MILLSTONE: He's another student. He was here,
16 and since he was here, I was going to go ahead and call him,
17 because he had a test this afternoon, so I was going to call
18 him. But, apparently, he was excused by you. [Student #3]
19 MR. HAMILTON: [Student #3]
20 MR. MILLSTONE: Or [Student #3] I'm sorry.
21 MR. HAMILTON: My understanding, he said he was
22 here waiting on me, and I said, I'm not going to get to you
23 today.
24 MR. MILLSTONE: That's fine. His dad asked, and
25 since he was here, I was going to just go ahead and take him

1 since he had an exam this afternoon.
2 MR. HAMILTON: Please let the record reflect I'm
3 not trying to interfere with your order of --
4 MR. MILLSTONE: No, I wasn't planning to call him.
5 I was just going to go ahead, since he was here, and do it,
6 but since he's not, that's fine.
7 HEARING OFFICER: Is there another witness
8 available?
9 MR. MILLSTONE: Yes. We'd like to call
10 Mr. Freshwater on cross-examination.
11 HEARING OFFICER: All right. Have a seat and state
12 your name for the record.
13 THE WITNESS: John David Freshwater.
14 HEARING OFFICER: Thank you.
15 Attorney Millstone.
16 **JOHN D. FRESHWATER**
17 being first duly sworn or affirmed, was examined and
18 testified as follows:
19 **CROSS-EXAMINATION**
20 BY MR. MILLSTONE:
21 Q. Just briefly, where do you reside, Mr. Freshwater?
22 A. 7760 New Delaware Road, Mount Vernon.
23 Q. And you're currently employed, although on suspension,
24 from the Mount Vernon Schools?
25 A. That's correct.

1 Q. And what position did you hold there?
2 A. Science teacher, eighth grade.
3 Q. At middle school?
4 A. Middle school.
5 Q. Now, Mr. Freshwater, you've made a number of public
6 statements, have you not?
7 A. Yes.
8 Q. And you appeared before the Board, in fact, in August of
9 this year --
10 A. Yes.
11 Q. -- did you not?
12 A. Yes.
13 Q. And you made a public statement to the Board?
14 A. Yes.
15 Q. And that statement was recorded and put on YouTube, was
16 it not? You don't know?
17 A. No.
18 Q. Okay. In that statement, did you indicate that you had
19 never branded or burned any student?
20 A. In that statement at the School Board?
21 Q. Yes.
22 A. Yes.
23 Q. And you also indicated you never branded, burned, or
24 marked the alleged plaintiff. Is that correct?
25 A. Yes.

1 Q. And that was referring to Zach Dennis?
2 A. Yes.
3 Q. You also stated in that statement to the Board that you
4 never taught evolution or creationism. Is that correct?
5 A. That's not correct.
6 Q. Okay. Did you ever say to the Board during that
7 statement that you never had any training as a monitor of
8 FCA --
9 A. As monitor?
10 Q. -- until the 2007-2008 school year?
11 A. Could you repeat that one.
12 Q. Yes, I can. Did you also say to the Board that you did
13 not have any training as a monitor of FCA, the Fellowship of
14 Christian Athletes, prior to the 2007-2008 school year?
15 A. Yes.
16 Q. You did say that?
17 A. (The witness nodded.)
18 Q. And you also said to the Board you were pleased to learn
19 that you had always acted properly as a monitor of the FCA
20 when you got that --
21 A. Monitor, supervisor, facilitator.
22 Q. -- of the FCA when you got that training? Is that
23 correct?
24 MR. MILLSTONE: Sorry.
25 MR. HAMILTON: Are you going to show a video?

1    MR. MILLSTONE:  No.  I just wanted to put you in
2  the spotlight.
3        MR. HAMILTON:  Thank you, sir.
4            (Board Exhibit 19 was played.)
5  BY MR. MILLSTONE:
6  Q.  Mr. Freshwater, is that an accurate depiction of the
7  statements made?
8  A.  Yes.
9  Q.  Now, I understand that you said that you didn't say,
10  I don't teach evolution, I've never taught evolution and
11  creationism.  I take it that was a misstatement.
12  A.  Yes.
13  Q.  And what did you intend to say?
14  A.  I do not teach intelligent design.
15  Q.  I just want to give you a chance to correct it.
16  A.  I know that.  Thank you.
17  Q.  I assumed that's what you meant.
18  A.  Yes.
19        MR. MILLSTONE:  All right.  I've marked as
20  Exhibit 19 a copy of that short video.
21  Q.  That was from YouTube.
22  A.  Okay.
23  Q.  All right.
24  A.  I do not have YouTube at home.
25  Q.  Did you also have an interview on Fox News with Larry



1  Elder --
2  A.  Yes.
3  Q.  -- where you appeared on television?
4  A.  Yes.
5  Q.  And during that interview, I believe you said -- and
6  correct me if I'm wrong -- or let me ask you this question:
7  Did you say there are three categories, evolution, ID, and
8  creationism?
9  A.  I teach evolution.  I do not teach ID or creationism.
10  Q.  Did you say words to that effect?
11  A.  I don't recall.  I don't remember.  I take it you're
12  going to show the video.
13  Q.  Happy to do that.
14            (Board Exhibit 20 was played.)
15        MR. MILLSTONE:  I don't think we need to hear his
16  comments.
17        MR. HAMILTON:  Any further comments by John
18  Freshwater?
19        MR. MILLSTONE:  No, that was the last comment by
20  John.  I'm happy to play the rest of it if you like.
21        MR. HAMILTON:  Let's have it full and complete, if
22  you don't mind.
23        MR. MILLSTONE:  I don't mind.  Let's see if I'm
24  smart enough to make it go forward from there.
25        We've marked that video as Board Exhibit 20.

1  BY MR. MILLSTONE:
2  Q.  Now, Mr. Freshwater, again, in that video, you indicated
3  that there are three different areas, evolution, intelligent
4  design, and creationism, and you teach evolution, you don't
5  teach intelligent design or creationism.
6  A.  Yes.
7  Q.  And has that been true throughout your career?
8  A.  Yes.
9  Q.  You also said in there that you did not brand anybody
10  and that that is the truth.  Is that correct?
11  A.  Yes.
12  Q.  And it was said in there that you didn't brand, burn, or
13  put any religious symbol on anybody.  Is that correct?
14  A.  Yes.
15  Q.  And that this is an experiment you've done for 21 years,
16  whatever this experiment was that -- there was a reference in
17  there to an experiment you've done with students, talking
18  about the incident with the students last year that Zach
19  testified about, that you had done that for 21 years.  Is
20  that correct?
21  A.  Yes.
22  Q.  And that you've had your Bible on your desk and that it
23  is the source of your inspiration, I believe is the word you
24  used, is that it is your inspiration, the Bible.  Is that
25  correct?

1  A.  Yes.
2  Q.  Now, after the hearing days on Thursday and Friday
3  earlier this month, there was an interview that was done in
4  the -- in the *Columbus Dispatch*, I believe.  Did they
5  interview you or did they interview Mr. Hamilton?  Do you
6  know?  Do you recall?
7  A.  I don't remember.
8  Q.  In there, you're quoted as saying -- I know the
9  newspapers are not always accurate, so let me ask you,
10  because it's been my experience sometimes they are, sometimes
11  they're not.
12        It says, After yesterday's hearing, Freshwater said that
13  he had used the device, also known as a Tesla coil, on at
14  least 600 students in his 16 years with the district.  Is
15  that an accurate statement?  Did you make that statement?
16  A.  Yes, 500 or 600 students.
17  Q.  Okay.  So you said 500 or 600?
18  A.  That's my estimate.
19  Q.  Now, do you know what this is?
20  A.  Um-hum.  Yes, sir.
21  Q.  What is it?
22  A.  Tesla coil.
23  Q.  And do you know if either one of these are the ones you
24  used in your classroom last year?
25  A.  Either one of those?

Page 380

1  Q.  Yes.  Do you know?
2  A.  Yes, I know.
3  Q.  Which one did you use?
4  A.  Neither one.
5  Q.  Okay.  Which one -- you didn't use either one of those?
6  A.  No.
7  Q.  What did you use in your classroom?  Did you use one
8  like it?
9  A.  One like that, yes.
10  Q.  Okay.  And how do you know it wasn't one of those two?
11  A.  Because I know.
12  Q.  Well, how is it that you know?
13  A.  Because I have it.
14  Q.  So you have the Tesla coil?
15  A.  No -- do I have the Tesla coil?  Yes.
16  Q.  Is it your property?
17  A.  No.
18  Q.  Were you authorized to take it?
19  A.  I followed what the administration said to do.
20  Q.  Were you authorized to take it from the schools?
21  A.  I followed what the administration said to do.
22  Q.  That's not the question I've asked you.
23        HEARING OFFICER:  Please answer his question.
24  A.  Okay.  Can you repeat the question.
25  Q.  Were you authorized by anyone to take it from the

Page 381

1  schools?
2  A.  No.
3  Q.  Is it a device similar to either of these?
4  A.  Yes, sir.
5  Q.  What is a Tesla coil?
6  A.  An instrument used for demonstrations in a classroom.
7  Q.  What kind of demonstration?
8  A.  Electrical, obviously.  Reactions.  Muscle reaction, how
9  quickly you can move.
10  Q.  Okay.
11  A.  It could be used for studying electrons, the flow of
12  electrons.  It can be used for charging --
13  Q.  The description that Zach gave in terms of using it to
14  charge up gases in tubes to show the different colors, is
15  that -- was that an accurate description of what you did with
16  it in the classroom?
17  A.  Yes.
18  Q.  And so is that what you call ionizing the gas in a
19  vacuum to display the colors --
20  A.  Yes.
21  Q.  -- if we talk about it in little more technical terms?
22  A.  Yes, that's a good description.
23  Q.  Do you know what it's used for outside of the
24  classroom?  If you do --
25  A.  No.  I would have to guess at that.

Page 382

1  Q.  I'm not asking you to guess.  Now, isn't it true that
2  the Tesla coil puts out between approximately 20,000 and
3  45,000 volts, one of these devices?
4  A.  Does it put out a lot of volts?  Yes.
5  Q.  Do you know how many?
6  A.  Other than what I've seen in print, that's been in
7  print.
8  Q.  Um-hum.
9  A.  I believe that's accurate, what you're saying.
10  Q.  Okay.  And how long have you known how high the voltage
11  is on it?
12  A.  Good question.  I really can't answer that.
13  Q.  Okay.  Do you have any estimate as to when you first saw
14  that in terms of what the voltage is on it?
15  A.  I would bet that I had looked at it 21 years ago and
16  looked it over because it was new to me, yes.
17  Q.  Okay.  And where would you have looked?
18  A.  On the device itself.
19  Q.  Okay.  And that's considered high voltage at that
20  level?  20,000 to 45,000 volts, that would be high voltage,
21  wouldn't it?
22  A.  I can't answer you about that one.
23  Q.  Okay.  Does the device generate a form of electricity?
24  A.  Yes.  Yes.
25  Q.  And in addition to the voltage, are you aware that this

Page 383

1  device operates at a frequency of approximately 500
2  kilowatts?
3  A.  Am I aware of that?
4  Q.  Yes.
5  A.  Maybe at one time about 21 years ago, but not until I've
6  seen it in print.
7  Q.  So the answer is, you may have been aware of it, but you
8  were not until you saw it in print?  I'm trying to understand
9  the answer.
10  A.  Repeat that question, sir.
11  Q.  Is your answer that you may have been aware of it but
12  you're not certain?
13  A.  Yes.
14  Q.  And when you saw it in print, you became --
15  A.  Refamiliarized with it, yes.
16  Q.  Okay.  And you saw it in print where?
17  A.  *Columbus Dispatch*, I do believe.
18  Q.  Okay.  So you saw some article.  And was that recently?
19  A.  What's recently?  Six months.
20  Q.  That's recently.  So since the 1st of April of 2008
21  you've read it somewhere?
22  A.  Yes.
23  Q.  But prior to that, prior to April 1st, you don't know
24  whether you knew it before or not.
25  A.  Again, coming back probably 21 years ago when I first

Page 384

1  saw the Tesla coil.
2  Q.  Are you aware that because of the frequency and the high
3  voltage that the Tesla coil can cause subcutaneous burns?
4  A.  Am I aware of that?
5  Q.  Yes.
6  A.  If left on for a long duration, a long time period, yes.
7  Q.  Are you aware that the Tesla coil generates ozone gas?
8  A.  No.  But when you mention that, I could probably say yes
9  to that after you mentioned that, yes.  Am I aware of it
10  until you mentioned it?  No.
11  Q.  And are there any dangers of ozone gas?  That's a pretty
12  broad question.
13  A.  Talk to Al Gore about it.
14  Q.  I'll talk to Al Gore about it.  Is there any danger to
15  the immediate user if there's ozone gas present?  Do you
16  know?
17  A.  I do not know.
18  Q.  Now, in terms of how you use this in class from a
19  pedagogical standpoint, you use this to charge gases, or
20  ionize gases, in a vacuum tube to show the colors and have
21  students identify gases by the differences in colors.  Isn't
22  that correct?
23  A.  That is one way, yes.
24  Q.  Okay.  Now, in identifying gases by the colors, that's
25  related to chemistry, is it not, identifying gases?

Page 385

1  A.  That is one area, yes.  Yes, that would be one area that
2  you would use that demonstration, yes, um-hum.
3  Q.  And a Tesla coil can also be used to demonstrate the
4  conductivity of electricity, can it not?
5  A.  Sure, yes.
6  Q.  And there are even devices made pedagogically to use it
7  with where it would convert from the Tesla coil, the energy
8  from the Tesla coil, and operate a device that is
9  specifically designed to show that.  Are you aware of that?
10  A.  Can you give me an example of a device?  I'm not sure.
11  Q.  Yeah.  There's a -- I've seen it used with -- where
12  there's no line connecting with a little -- with a small
13  windmill to cycle it.
14  A.  A radio device.
15  Q.  Yeah.  And you apply the Tesla coil.  You charge it from
16  the outside of the --
17  A.  Of the vacuum tube, yes.
18  Q.  And it generates the electricity to turn it or --
19  A.  It probably would do that.  That would be more -- that
20  demonstration which I do, I would use it more dealing with
21  light waves.  We're getting into science there.
22  Q.  All right.  Now, you used to teach electricity, did you
23  not?
24  A.  Yes, I did.
25  Q.  That's no longer part of your standards in eighth grade,

Page 386

1  or is it?
2  A.  Electricity?
3  Q.  Electricity.
4  A.  Standards, no, that's not part of the standards.
5  Q.  And you used to use the Tesla coil to use it for that
6  purpose in prior years.  Is that correct?
7  A.  Yes.
8  Q.  Do you continue to -- do you still use it for that
9  purpose?
10  A.  For electricity?
11  Q.  Yeah.
12  A.  No.
13  Q.  Would you explain how you're using the Tesla coil for
14  what would have been the eighth grade science standard.
15  A.  Many different ways I can bring it in.  I'll bring it
16  one way.  Atoms.  Okay.  Anytime you're studying science,
17  atoms and cells are the basic units you have to talk about.
18  You have to have an understanding of atoms and cells.
19  Q.  Okay.
20  A.  Some of the topics that we get into talk about -- with
21  my standards, they have to have a pretty thorough
22  understanding of atoms.  Over the years, the makeup of an
23  atom, such as protons and neutrons.
24  Q.  So you use it for that purpose?
25  A.  And this -- it was to look at some elements, and atoms

Page 387

1  make up elements.  Okay?  So without going into great detail,
2  yes.
3  Q.  Now, prior to April of 2008, had you ever seen an
4  instruction manual or operational manual for the Tesla coils
5  at school?
6  A.  No.
7  Q.  Have you ever seen one for any Tesla coil?
8  A.  No.
9  Q.  Since April, have you seen --
10  A.  Oh, yeah, in the investigation.  The first time I've
11  seen it was in the investigation.
12  Q.  They attached a copy in the investigation?
13  A.  Yes.  That was the first time.
14       MR. MILLSTONE:  Could I get Board Exhibit 6,
15  please.
16  Q.  Could you turn to --
17       THE WITNESS:  Is it okay if I stand for a few
18  minutes?  Is that okay?
19       MR. MILLSTONE:  I don't have a problem with that.
20       HEARING OFFICER:  Certainly.
21  Q.  Could you turn to Attachment 17, please,
22  Mr. Freshwater.  Is Attachment 17 the instruction manual?
23  A.  Yes, it is.
24  Q.  Okay.  So you did see it attached to the report?
25  A.  Yes.

Page 388

1  Q.  Could you turn to the -- well, do you know where the
2  manual was located?
3  A.  This manual here?
4  Q.  Um-hum.
5  A.  I would speculate that probably the company.
6  Q.  Okay.  I think they indicate in their report that they
7  downloaded it from the company's Web site.
8  A.  Okay.
9  Q.  I believe if you look back through the report, you'll
10  see that they indicate that that's where they located it,
11  from the Web site.
12      MR. HAMILTON:  Are you testifying or are you asking
13  him a question?
14  Q.  Do you recall that?
15  A.  No.
16  Q.  Okay.  Well, let's see if we can find it.  Would you
17  take a look at the bottom of page 8, top of page 9.
18  A.  Page 8?  Excuse me.
19  Q.  Bottom of page 8.
20  A.  I was looking at the index.
21  Q.  Oh, oh, the attachments.  The body of the report
22  itself.
23  A.  Okay.
24  Q.  Take a moment to read through that to yourself.
25  A.  Where it says "Other Interviews and Findings"?

Page 389

1  Q.  That's right.  Did you read that paragraph?
2  A.  Yeah.
3  Q.  And in reading that paragraph, do you know where H. R.
4  On Call was able to locate the manual?
5  A.  Yeah.  What they're saying here is they -- it is model
6  BD-10A High Frequency Generator manufactured by
7  Electro-Technic Products located in Chicago, Illinois.  There
8  was no written instructions that could be located with the
9  device.  However, operating instructions were available and
10  could be downloaded from the company's Web site.  It was
11  confirmed that the device has been owned for a number of
12  years by the school.
13  Q.  Okay.  Thank you.  Did you ever try to go to the company
14  Web site to download instructions for your class?
15  A.  Have I?
16  Q.  Yes.
17  A.  No.
18  Q.  Have you ever tried to locate instructions for the
19  device?
20  A.  From my memory?
21  Q.  Yeah.
22  A.  You're talking 21 years now.
23  Q.  Um-hum.
24  A.  No, but I'm not positive of that.
25  Q.  Okay.  But to the best of your recollection, you don't

Page 390

1  recall ever trying to locate the instructions?
2  A.  I don't remember.
3  Q.  You don't remember whether you tried.  What about within
4  the last five years have you tried to locate the
5  instructions?  Can you remember that far back whether you've
6  made that effort?
7  A.  Again, I do not remember.
8  Q.  Okay.  Prior to using it last year, did you try to
9  locate the instructions?
10  A.  I did not.
11  Q.  I'd ask you to turn back to Attachment 17.  I'd like you
12  to turn to page 3 of the instructions.  Are you there?
13  A.  Yes.  Where it says No. 5 in the upper top?  Because
14  they're not numbered.
15  Q.  The pages aren't numbered.  It's the third page back,
16  and it has a number 5 up at the top.  And it has a picture of
17  a clip and something attached to it --
18  A.  Yeah.
19  Q.  -- in the middle of the page which is labeled voltage
20  calibrator.  But if you would take a look at the triangle
21  that talks about safety precautions and look down at the
22  third from the bottom paragraph on the page -- do you have
23  that?  Did you read that?
24  A.  Oh, there.  I see where you're saying.  "Never touch or
25  come in contact with the high voltage output of this device,

Page 391

1  nor with any device it is energizing."
2  Q.  Okay.  What do you understand that to mean?
3  A.  Just what it says here.
4  Q.  That you should not --
5  A.  "Never touch or come in contact with the high voltage
6  output of this device, nor any device that it is energizing."
7  Q.  And what is the high voltage output?
8  A.  I'm guessing referring back to BD-10A.
9  Q.  Which is a device similar to this.  Is that correct?
10  A.  Yes.
11  Q.  And what is the -- what is the high voltage output that
12  they refer to?  What is the high voltage output?  What
13  shouldn't you be coming into contact with or touching?  Do
14  you know?
15  A.  They're saying here it has an output of 20,000 to 45,000
16  volts, is what it's saying.
17  Q.  Yeah.  And how does it put that out?
18  A.  Through the Tesla coil.
19  Q.  And where does it come from?
20  A.  Where?  Locationwise?
21  Q.  Yeah, locationwise.
22  A.  Through the end of it.
23  Q.  At the tip?
24  A.  At the tip.
25  Q.  And what is it saying you shouldn't come in contact

Page 392

1 with?  With what comes out of the tip?  Is that what you
2 understand that to mean?
3 A.  Just whatever they said here.  I'm just reading what
4 they're saying, never touch or come in contact with the high
5 voltage output of the device.
6       MR. HAMILTON:  Your Honor, I object.  He's asked
7 and answered at least two or three different times.  He's
8 quoted the material exactly.  Mr. Millstone has asked him
9 to.  I don't know what else he's asking him.
10      HEARING OFFICER:  He has, but the latest series of
11 questions was trying to more particularize where the voltage
12 was coming from, so it was a slightly different question.
13      MR. HAMILTON:  Thank you.
14      MR. MILLSTONE:  And that has not been answered at
15 this point.
16      HEARING OFFICER:  I think he did answer where the
17 voltage came from when you asked him if it was the tip.
18      MR. MILLSTONE:  It was the tip.
19 Q.  So do you understand that instruction that you shouldn't
20 be touching the arc or tip, or either the arc or the tip when
21 you're using that?
22 A.  They're not talking about the arc here.  I'm just taking
23 it from what it reads here.  "Never touch or come in contact
24 with the high voltage output of this device" or a device this
25 is energizing.

Page 393

1 Q.  And do you understand what that means?
2 A.  Yes.
3 Q.  And can you tell us what it means?  Without reading it
4 again, can you tell us what it means?
5 A.  What does it mean to me?
6 Q.  Yes.
7 A.  Do not touch the end of the Tesla coil.
8 Q.  Okay.  Look at the next paragraph.
9 A.  "Since its output" ... ?
10 Q.  Right.  And go to the third sentence there.  Could you
11 read that where it starts with "if a user."
12 A.  "The same should be said for women who are pregnant."
13 Q.  No, the sentence that starts "if a user."  That's the
14 third sentence, I believe.
15 A.  Do you want me to read the whole paragraph?
16 Q.  No.  Starting with the third sentence where it starts
17 with "if a user," read that sentence, please.
18 A.  "If a user is wearing a pace maker or similar device,
19 their physician should be contacted prior to using this
20 device.  The same should be said for women who are pregnant."
21 Q.  And the last paragraph?
22 A.  "Also, a small amount of ozone gas is generated as a
3 by-product.  Use in a well-ventilated area."
24 Q.  Now, I'd like to turn your attention back to December
25 2007.  Is that when you used the device in your eighth grade

Page 394

1 class to charge the gases --
2 A.  Yes.
3 Q.  -- to the best of your recollection?
4       MR. HAMILTON:  Your Honor, I want to just -- he
5 said December 7th.  I don't think that's completely
6 accurate.  I want to make sure we have the exact date.
7       MR. MILLSTONE:  I didn't say the 7th.  I said
8 December 2007.
9       MR. HAMILTON:  Okay.
10 A.  Okay.  I almost picked up the 7th too.  December 2007,
11 yes.  Yes.
12 Q.  Okay.  And you used that sometime during December 2007
13 to charge the gases in your eighth-period class.  Is that
14 correct?
15 A.  Yes.
16 Q.  You heard testimony from Zach here this morning, did you
17 not?
18 A.  Yes.
19 Q.  And you heard Mr. Short testify back on October 2nd and
20 3rd, did you not?
21 A.  Yes.
22 Q.  Do you recall that Mr. Short testified that he met with
23 and talked to [Student #7]   ?
24 A.  Yes.
25 Q.  And do you recall that he testified that [Student #7] told him

Page 395

1 that when he was in your classroom that he used the Tesla
2 coil when you asked him to pick something up to zap him in
3 the back with it?  Do you recall hearing that testimony?
4 A.  From Mr. Short?
5 Q.  Yes.
6 A.  It would be similar to what you're saying, yes.  I'm not
7 sure if you're quoting him.
8 Q.  I'm not quoting him.  I'm not in quotation marks.
9 A.  Okay.  Okay.
10 Q.  And you also heard Zach testify that he witnessed that
11 act this morning, did you not?
12 A.  Yes.
13 Q.  Let me ask you, did you do what Zach described and what
14 Mr. Short testified that [Student #7] told him, that he hurt him?
15 A.  Can you be a little more specific on that?
16 Q.  Did you do the act that Zach described, which is the
17 same as the act that Mr. Short had described again by [Student #7]
18 [Student #7] ?
19 A.  Mr. Short didn't go into detail like Zach did --
20 Q.  No, he did not.
21 A.  -- from my recall.  So your question is then?
22 Q.  Did you use the Tesla coil to -- and I'm going to use
23 the unscientific term of zap Zach in the back while he was
24 bending over the table?  I'm sorry, [Student #7] .
25 A.  [Student #7] .  [Student #7] was involved in that demonstration.  He

Page 396

1  sits off -- where his seat is, is off to the right.  When he
2  was going past me and heading back to his seat,
3  inadvertently, he was touched with the Tesla coil, yes.
4  Q.  So your testimony is that this occurred but it was
5  inadvertent?
6  A.  Yes.
7  Q.  And I take it [Student #7] didn't volunteer to be touched with
8  the Tesla coil.
9  A.  [Student #7] volunteers for everything.
10 Q.  But he didn't volunteer to be touched with the Tesla
11 coil as he walked by?
12 A.  Did he volunteer and say -- no, he did not volunteer.
13 Q.  Now, you heard Zach describe this morning that you asked
14 if any students wanted to see how it felt.  Is that accurate?
15 A.  Yes.
16 Q.  Yes.  At various times, I believe you have said either
17 that students want to see how it feels, they ask to see how
18 it feels, rather than they come up and want to see how it
19 feels.  There's a difference between that and you initiating
20 by asking if they want to see how it feels.  I don't want to
21 put words in your mouth.  I want to be clear about the
22 difference and make sure that I understand that you're the
23 one that asked if anybody wanted to see how it's done.  Is
24 that correct?
25 A.  Am I asking if anybody wants to volunteer to come up?

Page 397

1  Q.  Yes.
2  A.  Yes, if they want to volunteer to come up.
3  Q.  And you had several people volunteer.
4  A.  Yes.
5  Q.  Do you remember the number?
6  A.  No.
7  Q.  Zach said he thought it was four or five.
8  A.  I would expect that's probably accurate.
9  Q.  Okay.  So that's -- you're not sure.  It might have been
10 three, four, five, or six, but somewhere in that range?
11 A.  21 years of doing it, and that would be typical.
12 Q.  Now, do you do this in every class or only in some of
13 your classes?
14 A.  That year?  This past year?
15 Q.  This past year.
16 A.  It was not in every class.
17 Q.  And in prior years?
18 A.  In all classes typically.
19 Q.  Some years you might not have time to get to it at the
20 end of the period --
21 A.  Yes.
22 Q.  -- or you wouldn't do it?
23 A.  Or we're moving on, we're behind and let's move on, that
24 type of thing.
25 Q.  So you didn't have time either to get to it that

Page 398

1  particular day or because you were behind in where you were
2  on your lesson plan?  I'm just saying reasons like that is
3  why you might not do it.  Is that fair?
4  A.  Yes.
5  Q.  How did you do this?  You heard Zach's description.  Do
6  you disagree with that or agree with it?  Zach's description
7  was, he placed his arm on the overhead projector, you held
8  his hand with one arm and put a mark up and down and crossed
9  with the other.  That part is what I'm asking you about, not
10 what you described it as.  I'm going to ask you about this
11 later.  But the method by which you did it --
12 A.  You're -- I'm not getting the question.
13 Q.  I'm sorry.  I asked you, Is that accurate?
14 A.  Is that accurate?
15 Q.  I believe I said, Do you agree with Zach's testimony?
16 A.  No.
17 Q.  You tell us how did you it.
18 A.  When?  With Zach?
19 Q.  Okay.  Let's start with Zach.
20 A.  I do not remember to go into that detail.
21 Q.  Okay.  If you don't remember, are you sure that Zach is
22 inaccurate?
23 A.  Is he inaccurate?
24 Q.  In the way he described that you did it to him.
25 A.  I don't do it that way, so that would be inaccurate.

Page 399

1  Q.  How did you do it?
2  A.  Zach mentioned one way, students holding hands, I'm
3  holding it --
4  Q.  I'm talking specifically to Zach.  Did you put -- did
5  you use this device on Zach Dennis's --
6  A.  Yes.
7  Q.  -- arm?
8  A.  Yes.
9  Q.  And did it leave a mark that you saw?
10 A.  No.
11 Q.  And how did you do it when you used it on Zach's arm?
12 A.  The student comes up and gives their arm.  And I just
13 use the Tesla coil on them.  And most of the time, they pull
14 away.
15 Q.  Okay.  And if you would hold their arm down, they
16 wouldn't be able to pull away.
17 A.  I didn't hold his arm down.
18 Q.  That wasn't my question.  If you hold their arm down,
19 they wouldn't be able to pull away, would they?  That's my
20 question.
21 A.  If I held their arm down, would they be able to pull
22 away?  No.
23 Q.  Why do they pull away?  Because it hurts?
24 A.  It's -- because it hurts?  Yeah, I mean, you had it
25 demonstrated to you, I believe.

Page 400

1  Q. No, I have not had it. I have chosen not to have it
2  because it says do not come in contact with it.
3  A. Okay. I typically -- I shouldn't even say typically. I
4  always will do it to myself to demonstrate it. A lot of
5  excitement. The kids have all seen it before in the sixth
6  and seventh grade. A lot of excitement in the room.
7  Q. Are you saying in the sixth grade they see it? Or if
8  you don't know, that's fine.
9  A. I'm not sure.
10 Q. Now, Zach also testified that you had volunteers that
11 wanted to come up, and you had them hold their hands
12 together, hold their arms out and hold hands.
13 A. Typically, that's how I do it, they hold hands.
14 Q. And could you describe what you do there.
15 A. I hold the tip and tell them -- I usually use typically
16 the word "ET." They put their finger like that
17 (demonstrating), and they would get a shock from me and carry
18 it on.
19 Q. So you would do it to yourself? You hold the tip and
20 let them --
21 A. I hold the tip.
22 Q. -- feel it that way?
23 A. Yeah.
24 Q. How does that relate to the eighth-grade science?
25 A. Atoms, electrons, flow.

Page 401

1  Q. Now, when students come up and volunteer, does it ever
2  leave a mark?
3  A. Does it leave a mark?
4  Q. When you're dealing with individual students. I'm not
5  talking about where you have them holding hands like there.
6  But when you're dealing with an individual student and you're
7  marking their arm or you're using it on their arm, does it
8  ever leave a mark?
9  A. Slight red, yeah.
10 Q. Do you ever warn the students about any dangers?
11 A. Dangers?
12 Q. Danger in using it.
13 A. Yeah. It may leave a red mark.
14 Q. So you tell them it may leave a red mark?
15 A. Yes.
16 Q. Do you -- do you have them -- are you concerned about
17 whether or not they're grounded?
18 A. We do -- in the past, we do electricity. We do some
19 stuff with grounding. But with this, I'm not teaching
20 electricity. Your question is do I have them grounded?
21 Q. Do you have any concern when you're using this on a
22 student whether or not that student is grounded?
23 A. No.
24 Q. So you don't give them any instructions either to be
25 grounded or not to be grounded?

Page 402

1  A. No. When I teach electricity, yes. But with this one
2  here, no.
3  Q. And with respect to -- with respect to this instance
4  here back in December, did you inquire as to whether any
5  student had any type of health problem before you used it or
6  let them volunteer to have it used on them?
7  A. Health problems, no.
8  Q. Did you inquire as to whether any of them had any
9  implant or pacemaker?
10 A. No.
11 Q. Did you inquire as to whether any of them were pregnant?
12 A. No. I could see that one coming.
13 Q. Have you been using this to -- I'm sorry. Strike that
14 question. Zach also --
15 A. Can I get a drink of water?
16 Q. Sure. Go ahead.
17    Zach also testified that you indicated that this would
18 leave a mark like a tattoo of a cross for a short period of
19 time.
20 A. I do not remember saying that.
21 Q. You've seen the pictures?
22 A. Yes.
23 Q. And do you find that those are accurate depictions of
24 Zach's arm?
25 A. Are they? Yes.

Page 403

1  Q. At various times, this has been described as an X or a
2  cross. Quite frankly, I don't care which one it is at the
3  moment. But did you ever describe that you put an X on
4  students?
5  A. I do not remember ever saying anything about a cross.
6  Q. That wasn't my question. My question is, did you ever
7  say that you put an X on him?
8  A. Yes.
9  Q. Is an X a mark?
10 A. Yes.
11 Q. And is it your position here today that you put an X on
12 Zach and not a cross?
13 A. Yes.
14 Q. After listening to Zach testify, did you understand that
15 this hurt him, that what you did hurt him physically?
16 A. What he said, yes.
17 Q. And I believe that Zach testified that the lights were
18 out when you did this, when you charged the gases.
19 A. Yeah. When I charge the gases, yes, so you're able to
20 see them. I usually open the blinds so that some light comes
21 in because the kids are taking notes.
22 Q. So you keep it relatively dark so the gases are colored
23 or displayed better?
24 A. Yes. And I flip the lights on after we're done with
25 that.

Page 404

1 HEARING OFFICER: Let me interrupt for just a
2 moment. So that the reporter has an easier time, could you
3 wait until Mr. Millstone finishes his question. She'll be
4 able to transcribe that and then be able to get all of your
5 answer.
6 THE WITNESS: Okay. Thank you.
7 Q. Do you know any reason why Zach would not tell the
8 truth?
9 A. No.
10 Q. And do you know any reason why Zach would have a bias
11 against you when he reported this occurrence?
12 A. No.
13 MR. MILLSTONE: It's five of 12:00 now.
14 HEARING OFFICER: It is?
15 MR. MILLSTONE: I'm ready to switch into a
16 different area. Do you want to continue or do you want to
17 take a break at this point?
18 HEARING OFFICER: Do you have any estimation as to
19 how long that other area might take?
20 MR. MILLSTONE: Probably a similar length of time,
21 about 45 minutes to an hour.
22 HEARING OFFICER: Do you have any preference?
23 THE REPORTER: I don't.
24 HEARING OFFICER: Let's continue.
25 MR. MILLSTONE: Fine.

Page 405

1 BY MR. MILLSTONE:
2 Q. Now, Mr. Freshwater, how long have you been involved
3 with the Fellowship of Christian Athletes?
4 A. 17, 18 years.
5 Q. Okay. And at the middle school, was that originally
6 known as the Cross Club?
7 A. Yes.
8 Q. And do you recall when it changed to the Fellowship of
9 Christian Athletes, if you recall?
10 A. Estimate?
11 Q. Estimate is fine.
12 A. Six, seven years, estimate.
13 Q. Okay. Now, do you serve as the leader?
14 A. The lead for eighth grade, yes.
15 Q. And you received a copy of the FCA handbook from
16 Mr. White, I believe.
17 A. Yes -- from Mr. White?
18 Q. Yes.
19 A. I was under the understanding it came from Mr. Short.
20 Q. Did Mr. White hand it to you from Mr. Short or did
21 Mr. Short hand it to you?
22 A. I've been trying to remember, and I really thought it
23 came from Mr. Short, directly from Mr. Short.
24 Q. Okay.
25 A. That's what I recall.

Page 406

1 MR. MILLSTONE: And if I could get Employee
2 Exhibit 1. Thank you. No, not Board.
3 HEARING OFFICER: You did say 1?
4 MR. MILLSTONE: Employee Exhibit.
5 HEARING OFFICER: I'm sorry.
6 Q. Have you had a chance to look through that?
7 A. Yeah. It's all here. I was just checking the pages.
8 Q. Now, is that a copy of the handbook that you were given
9 at the beginning of the school year?
10 A. Yes.
11 Q. And I guess I made an assumption. But was this given to
12 you somewhere near the beginning of the school year?
13 A. Yes. Yes.
14 Q. Do you recall who was present at the meeting when you
15 received it, if you recall?
16 A. Again, coming back to it, I believe it was Mr. Short
17 that handed it to me.
18 Q. Just the two of you?
19 A. Yeah.
20 Q. Okay. So Mr. Short's recollection that he gave it to
21 Mr. White to give it to you is inconsistent with your
22 recollection?
23 A. Yeah. Yes.
24 Q. Now, this has some marks in it.
25 A. Yes.

Page 407

1 Q. Some yellow marks on it.
2 A. Yes.
3 Q. There's some pencil marks on it. Mr. Short testified
4 that some of these are marks that he had made on it but not
5 all of them. Are some of them marks you made on this?
6 A. Yes.
7 Q. So it's a combination of things that either Mr. Short
8 highlighted or that you marked on it. Is that fair as we
9 look at Employee Exhibit No. 1?
10 A. Yes.
11 Q. Now, would you look at page 8. It talks about
12 restrictions on teachers in the same paragraph of that page.
13 What is that limitation? Do you know?
14 A. Let me just read it.
15 Q. Sure. Take a moment.
16 A. Okay.
17 Q. Is there a limit on what teachers can do?
18 A. From this paragraph, yes.
19 Q. And what is that?
20 A. It says, "Since teachers and coaches are employees of
21 the school, there is a concern that what they say may be
22 considered speech endorsed by the school." So what a teacher
23 says could appear to be endorsed by the school.
24 Q. Then if you would look at -- starting at the bottom of
25 page 13 --

Page 408

1  A.  Last paragraph?
2  Q.  No.  I'd like you to start -- just take a moment and
3  read, I guess, from the bottom of page 13, which is the
4  heading "Coaches and Teachers," and I'd just like you to read
5  to yourself to the top of 15, where the next section is.  So
6  you're reading -- you're reading under "Coaches and
7  Teachers."
8  A.  Okay.  I see what you're saying.
9  Q.  It starts generally on 14 and it ends at the top of 15.
10  A.  Okay.
11  Q.  What do you understand from that, from your review of
12  that?
13  A.  Teachers can be objective, in an objective manner.
14  Again, it comes back to what we just talked about a little
15  bit at first.  It would appear that the school endorses the
16  teacher's religious views.  "Teachers should take care to
17  separate their private religious" public speech from the
18  school as a public employee.
19  Q.  And it also says, " ... they may not engage in a
20  discussion of their own religious belief with students,
21  whether that is part of a student meeting or not."  Is that
22  true?
23  A.  Yes.
24  Q.  Now, I'd like you to take a look at page 16.  It talks
25  about how much involvement the sponsors should have in FCA.

Page 409

1  A.  Just read that question in the middle there?
2  Q.  Yeah, just read that to yourself.  Did you finish your
3  review?
4  A.  (The witness nodded.)
5  Q.  Is it fair to say that that paragraph makes it clear
6  that a supervisor is there in a nonparticipatory role if
7  they're school-employed?
8  A.  Yes.  Yes.
9  Q.  When you were given this, did you understand that it was
10  to be in a nonparticipatory role when you were given the
11  handbook?
12  A.  Yes.
13  Q.  Now, is this the first time you ever saw the FCA
14  handbook that you recall?
15  A.  Yes.
16  Q.  And yet you've been -- well, I guess only FCA for only
17  six or seven years.
18  A.  Yeah.
19  Q.  So this handbook --
20  A.  I actually -- because I was pondering that one.  It may
21  be seven or eight.
22  Q.  Six to eight?
23  A.  I'm trying to think of the year.  2000, I believe it was
24  around 2000.
25  Q.  So seven or eight years is what ...  Okay.  Now, I'm not

Page 410

1  trying to trip you up over it.
2  A.  Yeah.
3  Q.  That's just an estimate of what the time is.
4  A.  That's fine.
5  Q.  In that time, you've never seen an FCA handbook?
6  A.  No.
7  Q.  Were you ever curious whether there was one?
8  A.  I received parts, school policy parts.
9  Q.  Okay.  You received school policies.
10  A.  Yeah.  But an official handbook like this, to my recall,
11  no.
12  Q.  You understand the handbook isn't published by the
13  schools?  It's published by the FCA itself.  Do you
14  understand that?
15  A.  (The witness nodded.)
16  Q.  Did you understand that when you received that?
17       MR. MILLSTONE:  The witness shook his head yes to
18  the first question.
19  Q.  I'm sorry.  You need to answer out loud just for the
20  record.
21       HEARING OFFICER:  Do you want your question
22  repeated?
23  A.  Restate your question.
24  Q.  Yeah.  Let me start again.  You shook your head, and
25  I just started on.

Page 411

1  A.  Yeah.
2  Q.  You understood that this is not published by the schools
3  but by the FCA itself.  Is that correct?
4  A.  Yes.  This is the FCA handbook for public schools.
5  Q.  Now, do you remember how the decision was made to change
6  from Cross Club to FCA?  She can't get a shake of the head
7  no.
8  A.  You're right.  You're right.  I'm trying to go back
9  through some cobwebs here.  No, I do not recall or remember
10  when that transition took place or why the transition took
11  place.
12  Q.  Were you involved in that transition?
13  A.  To go to an FCA, with Matt Wilbur, yes.
14  Q.  Who's Matt Wilbur?
15  A.  He's the FCA supervisor from the high school --
16  Q.  Okay.
17  A.  -- in Mount Vernon.
18       THE WITNESS:  Could there be a bathroom break in a
19  little bit at an appropriate time?
20       MR. MILLSTONE:  Do you want to take a break?
21       HEARING OFFICER:  Go ahead.
22       MR. HAMILTON:  Can the rest of us go?
23       HEARING OFFICER:  Well, let's --
24       MR. MILLSTONE:  Take ten minutes.  Or do you want
25  to break?  Whatever is your pleasure.

Page 412

1    HEARING OFFICER: Let's try ten minutes and see if
2  we can get through the FCA portion of your examination.
3    Ten minutes, ladies and gentlemen.
4       (A recess was taken from 12:07 p.m. to
5       12:19 p.m.)
6    HEARING OFFICER: If we're all ready, we'll go back
7  on the record and continue with the examination by Attorney
8  Millstone of witness Freshwater.
9  BY MR. MILLSTONE:
10  Q. I'm sorry. Who did you say the gentleman was who was
11  the head of the FCA at the high school?
12  A. Matt Wilbur.
13  Q. Do you know a gentleman named Pat Street?
14  A. Yes.
15  Q. Who's Pat Street?
16  A. I'm not sure of his title. He's regional or district
17  supervisor of FCA.
18  Q. And did you have a meeting at your house with Mr. Street
19  and others who were involved with the Cross Club when you
20  were transitioning from Cross Club to FCA? Do you recall?
21  A. I recall meeting with some people and kids, yes, my own
22  kids.
23  Q. Did you have a meeting with Mr. Street?
24  A. Yes.
25  Q. And what was the purpose of the meeting?

Page 413

1  A. To deal with FCA.
2  Q. Who was in attendance at the meeting, if you recall?
3  A. Myself, Mr. Street.
4  Q. Okay. Well, that's two.
5  A. I do believe Mrs. Orsborn -- that would be Tammy
6  Orsborn -- and I do believe my kids were involved, probably
7  my son and my daughter.
8  Q. Okay. And this was back in either 2000, 2001, whenever?
9  A. Right.
10  Q. Again, I'm not asking you to give me a specific date.
11  A. Sure. Thank you.
12  Q. But, basically, seven or eight years ago?
13  A. Yes.
14  Q. And did Mr. Street explain about FCA in that meeting?
15  A. Yes.
16  Q. What did he explain about it?
17  A. I do not remember what was explained.
18  Q. Do you recall if there was any discussion about what
19  could or could not be done by a staff member in conjunction
20  with FCA meetings?
21  A. Do not remember, sir.
22  Q. Okay. Do you recall whether or not Mr. Street either
23  indicated that there was a handbook that FCA had or whether
24  he gave you such a handbook?
25  A. I don't know.

Page 414

1  Q. Do you think it was incumbent upon you as a supervisor
2  or monitor of FCA to learn what the rules were?
3  A. The rules of FCA, yes.
4  Q. You don't receive any compensation for serving in that
5  position. It is not a Board-sponsored position. Is that
6  correct?
7  A. That's correct.
8  Q. Now, there was a lot of discussion -- or some discussion
9  with Zach and a lot of discussion with Mr. Short about
10  permission slips.
11  A. Yes.
12  Q. Now, is it true that students who were attending FCA
13  meetings were required to have permission slips this past
14  year, 2007-2008, for part of the year?
15  A. There you go. Yes.
16  Q. I see you struggling.
17  A. Yes.
18  Q. That at some point during the year that the -- that you
19  were directed, as was everyone else involved, that there
20  needed to be permission slips for students who were going to
21  be participating in FCA during the lunch hour?
22  A. Yes.
23  Q. And this is the first time that you've had permission
24  slips. Is that correct?
25  A. Yes.

Page 415

1  Q. Did you express any concern about that?
2  A. Yes.
3  Q. What was your concern?
4  A. Being the first time, this is a new direction we're
5  going, and I'm confused. I'm not quite sure of the reason
6  why, what's the purpose.
7  Q. Did you -- did you immediately comply with the directive
8  for permission slips?
9  A. When did it -- the question is what date? What are we
10  talking about? When?
11  Q. Okay. I think you heard Zach testify that for a while
12  you permitted him, or he was permitted, to attend FCA
13  meetings even though he did not have a permission slip from
14  his parents to attend and he was supposed to. And, then, at
15  some point, he was told, You can't attend.
16  A. Um-hum. Yes.
17  Q. And so my question is, when the directive came out that
18  you had to have permission slips in order to attend, did you
19  implement that immediately?
20  A. There was some confusion, so we did verbal, phone
21  calls. Okay? So we did telephone calls because that's what
22  I'm used to doing. We do a combination. When there's trips
23  and things like that, we do parent phone calls.
24  Q. So phone calls to parents?
25  A. Yes.

Page 416

1 Q. So you didn't have written permission slips?
2 A. Verbal and written. We had both.
3 Q. Did you have written for all the students who were in
4 attendance?
5 A. Give me a time on that.
6 Q. After the directive came out that you were to have
7 written permission slips.
8 A. The question is, then, what is the -- when was the --
9 what -- when did the directive come out? Is this --
10 Q. When did you understand the directive came out?
11 A. Mr. Short and I talked September, October. And there
12 was -- at that time, there was some discussion on two
13 different topics that were new for FCA. The topics were
14 permission slips, and the other topic was dealing with
15 students getting the speakers in advance, the speakers that
16 would come in and speak.
17 Q. But was the permission slip piece implemented in
18 September, October?
19 A. I was very confused with it at that time. So for
20 myself, I did not have clarity on that.
21 Q. It wasn't until the first of the year that you
22 understood that it was --
23 A. Yes.
24 Q. -- implemented?
25 A. Yes.

Page 417

1 Q. Starting with the first of the year, then --
2 A. Okay.
3 Q. -- did you have permission slips from all of the
4 students, written permission slips, not the phone
5 conversation, for all the students to come into the FCA
6 meeting?
7 A. No.
8 Q. Okay. And how long before you finally complied with
9 that directive?
10 A. Can I make a statement here again? We were at a School
11 Board meeting, and a parent brought up how does a kid know he
12 wants to go to FCA if he doesn't try it out, if he doesn't
13 test -- try the club out. So it was like a trial period.
14 All three leaders were looking at it as a grace period, a
15 trial period on when to get the permission slips in.
16 Q. And when did you get the permission slips in for those
17 students attending? When you did you fully implement it?
18 A. I'll say February.
19 Q. And when in February? Early? Late? Middle?
20 A. Middle to late.
21 Q. Middle to late?
22 A. Yeah.
23 Q. Do you know how the others -- when the others had
24 implemented it? Whether they had already implemented it
25 before then, if you know?

Page 418

1 A. Yeah. There was some discussion. I know another
2 teacher was doing verbals with -- the other leader was doing
3 verbal phone calls.
4 Q. So he didn't implement it either?
5 A. She.
6 Q. She. And what grade was that?
7 A. That would be seventh grade. The sixth grade, I'm not
8 quite sure. Written. I don't know if he did verbal or not.
9 Q. Okay. So you don't know what was done in the sixth
10 grade? As far as you know, they had written?
11 A. As far as I know, they were all written.
12 Q. Okay. Now, you also had a discussion, you indicated,
13 with Mr. Short about speakers. Could you tell us what was
14 that discussion.
15 A. That speakers needed to be notified one week in
16 advance --
17 Q. And who --
18 A. -- and turned in to the office.
19 Q. And who was to invite speakers?
20 A. Students.
21 Q. And was there a form that had to be filled out?
22 A. For the speakers, yes.
23 Q. And as the supervising staff, you had to sign for them.
24 Is that correct?
25 A. Yes.

Page 419

1 Q. Did the form indicate who the students were that were --
2 that had contacted the speakers, if you know?
3 A. Was there a slot for it? A line, you mean, for that? A
4 designated spot for it?
5 Q. You had to sign the form. Did the forms indicate the
6 students who had contacted the speaker?
7 A. Sometimes it did, yes.
8 Q. Okay. So sometimes it did and sometimes they didn't.
9 A. There was -- yes, I would say that. There was a
10 sign-off by the students on that and dated.
11 Q. Mr. Freshwater, I'm handing you a packet of papers that
12 are labeled for identification purposes as Board Exhibit No.
13 21. Would you take a few minutes and look through those
14 documents.
15 A. Sorry I'm taking so long.
16 Q. No, take your time. You've had a chance to review
17 those, Mr. Freshwater?
18 A. Yes.
19 Q. Are these the speaker request forms that you submitted
20 as the supervising staff member for outside speakers for the
21 FCA while you were there through April?
22 A. That the students submitted, yes.
23 Q. Well, these are all signed by you, are they not?
24 A. Yes.
25 Q. So students submitted them to you, and you then

Page 420

1  submitted them to the administration?  Is that the way that
2  worked?
3  A.  Students submitted to me?  Yeah, I made sure they got
4  the paperwork and made the phone calls.
5  Q.  All right.  Now, and this came about because there was a
6  speaker that was supposed to come in and there was concern
7  that the procedure hadn't been followed at the very beginning
8  of the school year, isn't that correct, before you had your
9  conversation with Mr. Short?
10  A.  Can you repeat that one?  I apologize.
11  Q.  Yeah.  Before you had your conversations with Mr. Short,
12  there was a speaker that was scheduled to come in, and this
13  procedure hadn't been followed.  And, therefore, Mr. Short
14  met with you to talk about the procedure that needed to be
15  followed.  Is that correct?
16  A.  Yes, yes, yes.
17        MR. MILLSTONE:  And if I could have Board
18  Exhibit 11, please.
19  Q.  At the time that he met with you, did he share with you
20  the guidelines for speakers?  And I'm handing you Board
21  Exhibit 11, which is the guidelines for FCA speakers.  Did he
22  show you that or did he just tell you about it?
23  A.  I don't recall him sharing this with me.
24  Q.  Sharing the document with you?
25  A.  Yeah, the document with me.

Page 421

1  Q.  So he just told you the procedure that needed to be
2  followed?
3  A.  To my best memory, yes.
4  Q.  Okay.  Now, did you ever contact any speakers to come
5  and speak?
6  A.  Did I contact them?
7  Q.  Um-hum.
8  A.  You're going to have to define the word "contact" for
9  me.
10  Q.  Did you ever make a call, send an e-mail, write a
11  letter, send a telegram, to any speaker or potential speaker
12  to ask them to come and speak?
13  A.  Yes, I contacted speakers.  I've contacted them.
14  Students will make the initial contacts.
15  Q.  Well, my question is --
16  A.  Yes, I have contacted speakers.  I have talked to
17  speakers, yes.
18  Q.  And which speakers have you contacted, if you recall?
19  A.  Most of these people in here I talked to pretty
20  regularly, so I do not remember.
21  Q.  But you have contacted some of these, and you were the
22  initial contact for them to come and speak.  Is that correct?
23  A.  Initial contact, no.
24  Q.  So you were never the initial contact?
25  A.  I do not remember being the initial contact.

Page 422

1  Q.  In all instances -- is it your testimony that in all
2  instances students made the initial contact?
3  A.  Yes, sir.
4  Q.  I see here if you go back to sort of in the middle,
5  the -- January 17th is the date of the request, and the date
6  of the activity was January 29th slash February 5th.  And the
7  name of the speaker is Ricky Warren.  Can you find that?
8  A.  I'm sorry.  Which one is that?  Give me the date at the
9  top.
10  Q.  January 17th to speak January 29th/February 5th.
11  A.  I've got January 9th, January 2nd, and January 17th.
12  That's for Dennis Turner.  Okay.  There it is.  I see it.  It
13  was the next page.  Okay, I've got it.
14  Q.  Okay.  Is it your testimony that -- who made the initial
15  contact with Mr. Warren?
16  A.  With Ricky, I would expect that my church -- my daughter
17  probably talked to him at our church.
18  Q.  You didn't make the request?
19  A.  I e-mailed Ricky a few times, but my daughter probably
20  talked to Ricky Warren, probably talked to him at church.
21  Q.  So you e-mailed him?
22  A.  Yes, I was e-mailing with Ricky.
23  Q.  And what was the purpose of the e-mail?
24  A.  I was in touch with him a lot during Will Graham.
25  Q.  We will talk about that later.

Page 423

1  A.  Okay.  All right.  With Will Graham, he was involved
2  with the Will Graham celebration, so, yes, I was e-mailed.
3  It's easier to get in touch with him by e-mail than he is on
4  the phone.
5  Q.  Okay.  Did you send him an e-mail asking him to speak?
6  A.  Yeah.  Just confirming it with my daughter, yes.  I
7  might have, yes.  I was in a lot of contact with Ricky.
8  Q.  I'm going to hand you what I've marked for
9  identification purposes as Board Exhibit 22.  Take a moment
10  and take a quick look at that.
11  A.  Okay.  Yes.
12  Q.  And do you recognize this?
13  A.  No.
14  Q.  Okay.  Is this a copy of an e-mail that you received --
15  A.  You know what?
16  Q.  -- which has a return e-mail that you sent?
17  A.  But I think my daughter probably sent this.
18  Q.  So that this is to Freshwater, John?
19  A.  Well, she was on my computer.
20  Q.  So you believe your daughter sent this?
21  A.  I do believe.
22  Q.  Okay.  So when he responds to you, he's really
23  responding to your daughter?  That's what your testimony is?
24  A.  Do you get what I'm saying?  If you ask me if I e-mail
25  Ricky, yes, I e-mail him a lot.  My daughter is on my

1  computer all the time.
2  Q.  So does she use your e-mail account from school for her
3  personal e-mail?
4  A.  She uses my computer at school, yes.
5  Q.  Does she use your e-mail account?
6  A.  If I have my e-mail up and I say, [Student #401] hey, you need
7  to contact Ricky.
8  Q.  So you would say that? [Student #401] you need to contact
9  Ricky?
10  A.  As a supervisor, monitor, yeah.  She's my daughter.
11  Sure.
12  Q.  All right.  Let's look at -- as you were looking at the
13  one on Ricky Warren, you pointed out the one before that was
14  Pastor Dennis Turner.
15  A.  Yes.
16  Q.  That was the page immediately before that, I believe you
17  indicated.
18  A.  Yes.  January 17th.
19  Q.  Okay.  Let's just pick that.  Did you -- did you contact
20  Dennis Turner directly and make the initial contact to invite
21  him to come and speak at the FCA?
22  A.  From my best understanding, I think [Student #68]
23  initially contacted him.
24  Q.  And how can you tell that from this document?
25  A.  Because [Student #68] was pretty persistent in touching base

1  with Dennis Turner.
2  Q.  And who's [Student #68]          ?
3  A.  Previous student of mine.
4  Q.  And where was he last year?
5  A.  Mount Vernon City Schools.
6  Q.  Was he an eighth-grade student last year?
7  A.  No.
8  Q.  Okay.  What was he doing in Mount Vernon City Schools
9  last year?
10  A.  What was he doing?
11  Q.  Yeah.
12  Q.  Give me more.  What do you mean by what?
13  Q.  Well, you say he was a former student of yours.
14  A.  Yes.
15  Q.  Is he a former student of the schools and he was there
16  as an employee?  Is he currently a student in the schools?
17  A.  Yeah, he's a current student of the schools, yes, yes.
18  Q.  Okay.  And what grade is he in?
19  A.  This year?
20  Q.  Last year.
21  A.  Last year, he would have been a freshman.
22  Q.  And so you would have -- there were students that
23  weren't in FCA at the middle school who would contact
24  speakers?
25  A.  Repeat that again.

1  Q.  There were students who were not at the middle school
2  who would contact speakers?  Last year, you say that
3  Mr. Sensinger was a freshman.
4  A.  Yes.
5  Q.  Middle school is six through eight, isn't it?
6  A.  Yes, it is.
7  Q.  So he was at the high school last year?
8  A.  Yes.
9  Q.  And you just testified that he was the one that
10  contacted Dennis Turner to speak at the middle school.  Is
11  that correct?
12  A.  Yes.
13  Q.  I don't want to misunderstand your testimony.
14      MR. HAMILTON:  I think he's answered.  He said yes,
15  Your Honor.
16      HEARING OFFICER:  He has answered.
17  Q.  So my question is, did you ask students who were not in
18  the middle school to contact speakers?
19  A.  Yes.
20  Q.  They did not just do it on their own, decide that they
21  wanted to have a speaker for the middle school and talk to
22  the students who were at the middle school and proceed to
23  invite someone?
24  A.  Can you restate that?
25  Q.  Okay.

1      MR. MILLSTONE:  Can you read that back, please.
2      THE WITNESS:  Yeah.
3          (Question read.)
4  A.  I said yes to that one.  Yes.
5  Q.  Now, if Pastor Turner were to come in here and testify
6  that he received a call directly from you and only from you
7  to speak at the middle school, you would say that that's
8  inaccurate?
9  A.  If Mr. Sensinger came in here -- Pastor Turner?
10  Q.  Pastor Turner came in and said that you were the one to
11  call him to speak at the middle school, you would say that
12  he's inaccurate?
13  A.  If I talked to Mr. Turner?  Yes, I've talked to him on
14  the phone.  Okay?  Did I make the initial contact?  No.  Did
15  I talk to Mr. Turner?  Yes, I talked to him.
16  Q.  The last two pages -- and I guess it's a little
17  difficult to read the photocopy on the next to last page, but
18  the speaker there is Father Hammond.  And it's for April
19  15th.  And then on the next page, it's also Father Hammond
20  for April 15th.  So you've got two different sheets filled
21  out for him.  Correct?
22  A.  Yes.  Yes.
23  Q.  For the same date?
24  A.  Yes.  Yes.
25  Q.  And, now, one indicates he was contacted by Dan

1  somebody.  I can't read it on mine because it's a poor
2  photocopy, or because it's a copy.  Correct?  Can you read
3  that?  Do you know who contacted him?
4  A.  I can see my daughter did.
5  Q.  Is her name Dan?
6  A.  No, her name is [Student #401]
7  Q.  Oh, so the -- with [Student #401]      -- oh, it says
8  "also."  Is that "also" at the end?  Then something also --
9  or not [Student #401]        .  What do you make that out to be?
10 A.  Looks like an "and" there.
11 Q.  And.  Okay.  So he was contacted by two people here?
12 A.  It appears that way, yes.
13 Q.  And the next one says the form was filled out by [Student #52]
14 [Student #52] ?
15 A.  Yes.
16 Q.  But not necessarily that he contacted him, just that he
17 filled the form out?
18 A.  I don't know.  He might have contacted him.  I do not
19 recall.
20 Q.  Okay.  But my question to you is, you did not make the
21 initial contact with Father Hammond.  Is that your testimony?
22 A.  Did I talk to Father Hammond?  Yes.
23 Q.  That wasn't my question.  You did not make the initial
24 contact with Father Hammond to invite him to speak?
25 A.  No, I did not.

1  Q.  How did the students determine who they were going to
2  contact?
3  A.  A list of speakers that we used.
4  Q.  Did you suggest to them names of people they should
5  contact?
6  A.  We have a suggestion list, yes.
7  Q.  Did you maintain the list of prior speakers?
8  A.  Yes.
9  Q.  And so that was one source where you might go to or they
10 might go to to contact.  Is that --
11 A.  Yes.
12 Q.  Did you ever say to students, Why don't you call
13 so-and-so to come speak?
14 A.  Yes.
15 Q.  I'd like you to look at March 31st.  It is the date of
16 the contact.  And there's a couple that day, one for Pastor
17 Zirkle, one for Tom Staaman, one for Pastor -- is it
18 Swinnerman?  See those three?
19 A.  Yes.  I see them now, yes.
20 Q.  All of those say something a little different on them
21 than that the student contacted them.  What do they say in
22 terms of student information?  Does it say [Student #401]
23 confirmed?
24 A.  Yes.
25 Q.  And that's your daughter.

1  A.  Yes, it is.
2  Q.  Now, I read that -- I understand "confirmed" to mean
3  something different than "contacted."  Does that mean to you
4  that these speakers were contacted by someone else first and
5  she merely confirmed that they were coming?
6  A.  It could mean that, yes.
7  Q.  Do you know who contacted them?
8  A.  No, I don't.
9  Q.  Were any of these speakers contacted initially by you,
10 any of these three speakers, Pastor Swinnerman, Pastor
11 Zirkle, or Tom Staaman, on those dates?
12 A.  I would say no to that.
13 Q.  Now, I'd ask you to move a few sheets closer to the
14 front from those.  It's the one that's dated March 4th.  Move
15 to March 11th.  It looks like the speaker's name is Jeff
16 Cline.  And the comments are that Zach Dennis contacted the
17 speaker.
18 A.  Yes.
19 Q.  And do you recall Zach's testimony this morning that he
20 did not call Jeff Cline?
21 A.  I was under the understanding that he said he did.
22 Q.  He testified that he contacted a Pastor Bender and
23 someone else he couldn't recall, and then he testified that
24 he did not contact Pastor Cline, or Jeff Cline.  Is it
25 pastor?  That he did not contact Jeff Cline.

1  A.  I would have -- I don't recall.  I would have to listen
2  to that again.  I would have to go over the testimony from
3  this morning.
4  Q.  Do you know was anything -- without anything more, do
5  you know who contacted Jeff Cline to speak?
6  A.  I don't know.
7  Q.  Do you recall that Zach testified this morning that you
8  gave him the phone numbers to call on the two that he did
9  call?
10 A.  Yes.
11 Q.  Is that accurate?
12 A.  Yes.
13 Q.  Now, also this morning, Zach testified that there were
14 two different meetings of the FCA at the eighth grade.  One
15 occurred in your room on Mondays, and it was a leadership
16 meeting; and the one occurred on Tuesdays, and that was a
17 general meeting.
18 A.  Yes.
19 Q.  Was that accurate testimony?
20 A.  (The witness nodded.)
21 Q.  And he testified that you led the meetings on Monday but
22 not on Tuesday.  Is that accurate?
23 A.  No.
24 Q.  Did you select movies to show to the kids at the Monday
25 meetings?

Page 432

1  A. No.
2  Q. Did you show the movie *Obsession* to the kids?  Do you
3  recall?
4  A. Yes.
5  Q. And what is *Obsession* about?
6  A. I do believe it's a documentary.
7  Q. What's the subject matter of *Obsession*?
8  A. About the Muslims.
9  Q. In what way?
10 A. The Muslims' beliefs.
11 Q. Is it fair to say that the movie *Obsession* is a movie
12 warning about radical Muslim terrorism and the dangers of it?
13 A. Would it be fair to say that?
14 Q. Yes.
15 A. Yeah.
16 Q. Who decided to show that movie?
17 A. My daughter.
18 Q. She selected that movie --
19 A. Yes.
20 Q. -- and said, Dad, would you show that at FCA?
21 A. Yeah.
22 Q. Zach also testified about some other movies that you
23 showed.  One of them was called *Invisible Children*.  Do you
24 recall that?
25 A. Yes.

Page 433

1  Q. Did you show that movie?
2  A. Did I show it?  My daughter showed it.
3  Q. Your daughter showed it.  Zach also testified that he
4  observed you or witnessed you participating in a prayer
5  during the FCA meeting, during the leadership meeting
6  particularly.  Is that accurate?
7  A. That's not accurate.
8  Q. You did not pray with the students during the leadership
9  meetings of the FCA?
10 A. Sir, I pray all the time.  Okay?
11     HEARING OFFICER:  Would you like that question
12 repeated?  I don't know that's a direct answer.  Or you can
13 ask it again.
14     MR. MILLSTONE:  I'm thinking about it.
15 Q. Is it your answer that you prayed during the FCA?
16 A. I pray all the time, sir.
17 Q. Okay.  Do you ever ask students to lead prayer in the
18 leadership meetings of the FCA?
19 A. Yes.
20 Q. What about at the Tuesday meetings?  Did you ever ask
21 students to lead prayer there?
22 A. (The witness nodded.)
23 Q. Do you recall Zach's testimony about a particular day in
24 which Pastor Zirkle, or Reverend Zirkle, was there?
25 A. Yes.

Page 434

1  Q. And I don't know his title.  I don't mean any
2  disrespect.  Either one is --
3  A. Pastor Zirkle.
4  Q. Pastor Zirkle wasn't feeling well, and he testified that
5  you said, We should say a prayer for Pastor Zirkle.  Do you
6  recall that testimony, first of all?  Do you recall Zach's
7  testimony that way?
8  A. Yes, I do recall Zach's testimony.
9  Q. Do you recall that day?
10 A. Yes.
11 Q. Did you make such a statement?
12 A. I do not remember or recall ever initiating the prayer.
13 Q. Did you participate in the prayer?
14 A. I ended the prayer.
15 Q. How did you end the prayer?
16 A. Very quickly.
17 Q. What words did you use to end the prayer?
18 A. Amen.  Let's finish this off because it was -- the
19 bell's rung.  The kids were late.
20     MR. MILLSTONE:  That's all the questions I have on
21 FCA right now.
22     HEARING OFFICER:  Then that would be a very
23 opportune time to conclude.  And we will reconvene at 2:15.
24 If we could please have the original exhibits returned back
25 in before the attorneys leave the chamber, that would be

Page 435

1  appreciated.
2     (A recess was taken from 1:07 p.m. to
3     2:25 p.m.)
4     HEARING OFFICER:  All right, ladies and gentlemen.
5  We're ready to go back on the record for the afternoon.  We
6  will continue our proceeding today until nearly five o'clock,
7  if possible.  The remainder of the week, we are a bit more
8  constricted as to time, but today they've given us permission
9  to continue until 5:00.
10     Just preliminarily, before we get started with
11 further testimony from this witness, I was able to conduct a
12 very limited amount of research concerning the evidentiary
13 question which arose midmorning.
14     I would state, first of all, that as we're all
15 aware, as a referee in this proceeding, I am not bound by any
16 rules, whether they be evidence, civil, or otherwise.
17 Nonetheless, I do use those rules as a guide in trying to
18 conduct some sort of a logical and fair proceeding for all
19 parties involved.
20     In my cursory review of the Rules of Evidence for
21 purposes of guidance on this issue, I find nothing that would
22 necessarily limit Attorney Hamilton's examination of a party
23 called as an adverse witness.
24     I understand your objection, Attorney Millstone,
25 and I believe it was a good one, but I also believe if you

1  look at the evidence rules, especially the 600 numbers and
2  the case law that interprets those, you will see that when an
3  adverse witness is called, there's very wide latitude in
4  terms of questioning, leading questions, impeachment, so
5  forth and so on.
6          My objective here is to hear all of the evidence
7  that's credible and that does not stray too far afield of the
8  evidentiary rules.  And with that in mind and with my review
9  of Section 600, I would say that Attorney Hamilton, indeed,
10 can call those individuals back.  He may have chosen bad
11 terminology by saying he would forego cross-examination.
12 I don't believe that he meant he was doing that forever.  I
13 think he meant he was just doing it at this point in time and
14 would take that up at a later date when they were called as
15 an adverse witness.
16         All that having been said, Attorney Millstone,
17 I would also say that if I have missed something -- and,
18 certainly, there's a good chance I did in light of the fact
19 that it was about 20 minutes of very limited research --
20 certainly, if you could bring that to my attention with some
21 case law citations, we can revisit that at a later point in
22 time.
23         So that having been said, if you would like to
24 commence once again examining Mr. Freshwater.
25         MR. MILLSTONE:  Okay.  Thank you.

1  BY MR. MILLSTONE:
2  Q.  Mr. Freshwater, in your classroom last year -- and
3  I know you may not have them with you.  I did subpoena and
4  ask that you bring the posters or copies of posters that you
5  had posted in your room.  Do you still have those?
6  A.  I had a lot of posters, sir.  Which ones are we talking
7  about?
8  Q.  The ones that you were directed to take down that had
9  your -- that had the quotations on them and the various
10 things you removed when you were directed to do so.
11 A.  I will have to look and see if I have them.
12 Q.  Okay.  I'm going to ask you to bring those in when you
13 get a chance if you still have them.
14 A.  All right.
15 Q.  They're not necessary for purposes of my
16 cross-examination.
17 A.  Okay.
18 Q.  Right now, we want you to get them to identify what they
19 were, and I'm sure we can stipulate to that.
20         Now, you've had Ten Commandments posted in your room in
21 a variety of places, did you not, this past year?
22 A.  Yes.  Yeah.  I apologize.  You did say a variety?
23 Q.  I did say a variety of places.  You had more than one
24 copy of the Ten Commandments posted?
25 A.  Yes.

1  Q.  Were they all the same version of the Ten Commandments?
2  By the "same version," I mean were they all the same Ten
3  Commandments?
4  A.  Yes.
5  Q.  Are you aware that there are different versions of the
6  Ten Commandments?
7  A.  Yes.
8  Q.  But these were all the -- by "version," I don't mean one
9  by one publisher, but I'm talking about the same text.  So
10 these were all the same text?
11 A.  Yes.
12 Q.  And do you know how many different copies you had posted
13 in your room?
14 A.  No.
15 Q.  Was it at least three?
16 A.  I'll say two.
17 Q.  At least two?
18 A.  I would say two, yes.
19 Q.  And how many did you have posted in your front window by
20 the front door?
21 A.  I would restate that.  Okay?
22 Q.  Okay.
23 A.  I probably had three then, yes.
24 Q.  You had three there?
25 A.  Just from the size of the window, I will say three.

1  Q.  So you had at least three?
2  A.  Right, because it was a book cover.
3  Q.  With the Ten Commandments on?
4  A.  With the Ten Commandments on.
5  Q.  And it was that on one side and something else on the
6  other?
7  A.  As I recall, Helen Keller, some quotes.
8  Q.  And you also had them posted one other place in the room
9  in addition to on the door?
10 A.  I would -- yeah, I was given a small eight-by-four size.
11 Q.  Did you have another one of the book covers posted
12 somewhere in the room?  Was it -- let me refresh your
13 recollection.
14 A.  Yes, please do, please do.
15 Q.  Did you have -- did you have another one of the book
16 covers posted under the cabinet -- with the poster of
17 President Bush's cabinet?  Do you recall having one there now
18 that I have --
19 A.  You're shaking your head.  I'm taking the nod on that.
20 I'll say yes to that.
21 Q.  Okay.  So you had at least three on the door, a small
22 card with one in --
23 A.  I don't recall if that was in -- I was given a card of
24 one, and I think that was over there with FCA materials.
25 Q.  Now, also posted in your room, you had a poster of

Page 440

1  President Bush's cabinet in prayer, did you not?
2  A. I'm going to say no to that.
3  Q. Okay.
4  A. I'm going to say -- can I state something on that?
5  Q. I was going to ask you another question.
6  A. Go for it.
7  Q. You had a poster that had at least a picture of Colin
8  Powell on it, did you not?
9  A. Yes.
10 Q. And was there not a quote from James out of the Bible on
11 that poster?
12 A. Yes.
13 Q. Okay. And that's the one I'm referring to as President
14 Bush's cabinet. It may not have been the whole cabinet. I
15 haven't seen the poster. So I wasn't trying to mislead you.
16 That's the one I'm describing.
17 A. Okay.
18 Q. Now, you also had posters on a number of your cabinet
19 doors, did you not?
20 A. Yes.
21 Q. And each of those posters had a character statement or,
22 you know, a positive character statement on it in the main
23 center of it, and each one of them had a Bible verse at the
24 bottom. Is that not true?
25 A. Yes.

Page 441

1  Q. That is correct?
2  A. Yes.
3  Q. And you had your Bible on your desk?
4  A. Yes.
5  Q. And that was the Bible you had with you here today, *My*
6  *Living Bible?*
7  A. Yes.
8  Q. And I believe that you also had a couple of old signs on
9  one of the bulletin boards from Cross Club. It had a picture
10 of a cross as well as the words "Cross Club."
11 A. Yes, there was the old posters for Cross Club.
12 Q. Did you have any other posters of a religious nature in
13 or around your room?
14 A. From what I remember, no.
15 Q. Okay. Now, you were directed to remove your religious
16 display. Is that not correct?
17 A. Are you saying remove all religious displays, are you
18 saying?
19 Q. Yes. This past year in the spring, you were instructed
20 to remove all of the religious displays in your room?
21 A. Yes. From my administration?
22 Q. By the administration, yes.
23 A. Yes.
24 Q. And you were told that with respect to your Bible, that
25 did not have to be removed from your room, but it had to be

Page 442

1  removed from your desktop while students were in your room,
2  while they were in class and in the room. Is that not
3  correct?
4  A. There was -- the first time I heard that, it was remove
5  from the room.
6  Q. So --
7        MR. MILLSTONE: Could we get Board Exhibit No. 6,
8  please.
9  Q. Mr. Freshwater, I'd like to see if we can refresh your
10 recollection on it.
11 A. Sure.
12 Q. Would you turn to Attachment No. 19 --
13 A. Yes.
14 Q. -- and read on the second page the first full
15 paragraph. Just read that to yourself a moment.
16 A. Okay.
17 Q. Have you had a chance to read through that?
18 A. Yes.
19 Q. Now, that letter was issued on April 7th, and you
20 received that letter, did you not?
21 A. Yes.
22 Q. And in that letter, what does that say about your Bible
23 and whether it has to be removed from your room?
24 A. Can I just read it out loud?
25 Q. You can choose to answer how you wish, Mr. Freshwater.

Page 443

1  A. "With regard to religious material in your classroom, it
2  has been brought to my attention that you have a bible out on
3  your desk and that the 'collage' on your classroom window
4  includes the 10 commandments. While you certainly may read
5  your bible on your own, duty free time [i.e., during lunch],
6  it cannot be sitting out on your desk when students are in
7  the classroom and when you are supposed to be engaged in" the
8  responsibilities of teaching.
9  Q. That's fine. That's as far as it goes?
10 A. Yeah.
11 Q. So that wasn't telling you you had to remove it from the
12 room?
13 A. No. But I recall verbally one time from my
14 administration, Mr. White, that it needed to be removed from
15 my classroom.
16 Q. But, certainly, the letter here indicates it's from the
17 desktop --
18 A. Yes.
19 Q. -- when students are in the room.
20 A. Yes.
21 Q. You would agree with that?
22 A. Yes.
23 Q. That that's what it says?
24 A. Yes.
25 Q. Now, after you were directed to do this -- April 7th was

Page 444

1  the first letter -- you didn't remove anything until April
2  16th. Correct?
3  A.  In that time frame.  In between April 7th and April
4  16th, yes.
5  Q.  By April 16th?
6  A.  By April 16th.
7  Q.  So you removed everything but two items.  Is that
8  correct?  I'll tell you the two things.
9  A.  Okay.  Okay.
10  Q.  The two items were your Bible and the poster of Colin
11  Powell and the reference to James on that poster.  Is that
12  correct?  You kept those two things in your room?
13  A.  With that poster, that's a patriotic poster of our
14  Commander in Chief.
15  Q.  That's not my question.  You did not remove that
16  poster.  Is that correct?
17  A.  Did I remove it?  No, I did not remove it.  And I don't
18  recall being told to remove it.
19  Q.  Okay.  And, in fact, you brought two additional
20  religious items into your classroom, did you not?  Two books
21  that you checked out of the school library?
22  A.  Yes, I checked out two books from the library.
23  Q.  And what were those two books?
24  A.  Well, it was *Oxford Bible*, and the other one was *Jesus*
25  *of Nazareth*.

Page 445

1  Q.  And why did you add those two books to your room?
2  A.  Well, went down to the library in that time period to
3  see if it had those.  And I was directed by the library, and
4  I was looking at them.  I checked them out.  And every day
5  when I went in my classroom after April 16th, I was expecting
6  my Bible to be removed out of my classroom.  And my daughter
7  and I would walk in -- my daughter would always open it up
8  and say, Dad, it's still there, Dad, it's still there.
9  That's my inspiration.  I'm not going to go without my
10  inspiration.
11  Q.  Well, I don't think you answered my question.  I asked
12  you about the two other books.
13  A.  Okay.
14  Q.  Why did you add those or put those in your classroom
15  after you were told to remove all items of religious display?
16  A.  Sir, I thought I answered that.
17  Q.  Did you tell -- to my knowledge, you didn't answer it.
18       MR. MILLSTONE:  Could you read back the answer that
19  he gave to the question the first time.
20       HEARING OFFICER:  Let me interrupt for a moment.
21       THE WITNESS:  Yeah.
22       HEARING OFFICER:  Mr. Freshwater, are you saying
23  that your answer concerning your personal Bible and it being
24  an inspiration was the answer to the question about these
25  other books?

Page 446

1       THE WITNESS:  To the other two books I had checked
2  out, yes, sir.
3       HEARING OFFICER:  I must admit it didn't seem
4  responsive to the question.  Maybe you need to hear the
5  question again.
6       THE WITNESS:  Yeah, please, recorder.
7  Q.  You took two books out from the library.  You testified
8  one was *Jesus of Nazareth* and the other the *Oxford Bible*.
9  Correct?
10  A.  Yes.
11  Q.  And you put them in your classroom on your lab table.
12  Is that true?
13  A.  Yes.
14  Q.  You did that after you were instructed to remove the
15  religious display from your classroom, to remove those items
16  that were religious display in your classroom.  Is that
17  correct?
18  A.  All items of religious display removed?
19  Q.  Is that correct?
20  A.  Was I asked to remove those?
21  Q.  You did that after you were directed to remove all items
22  of religious display from your classroom?
23  A.  In between the 7th and the 16th, yes.
24  Q.  You added those?
25  A.  Yes.

Page 447

1  Q.  Why did you add those?
2  A.  Again, one, I was curious about if the library had
3  them.  I wanted to look at them.  And I found some
4  interesting information.
5  Q.  Okay.
6  A.  So it was a curiosity.  Two, it's my inspiration.  I
7  thought that someday, after the 16th and on, that my Bible
8  would be removed out of my classroom, so I would have the
9  *Oxford* from the school library there.  And my thinking was
10  they're not going to remove the school library Bible.
11  Q.  Did you indicate to anyone that you added those to,
12  quote, make a point, unquote?
13  A.  I don't remember.
14  Q.  You don't remember saying that?
15  A.  I don't remember.  My point would be, again,
16  inspirational.  I want to have a Bible on my desk.  They're
17  not going to take the school library Bible off my desk.  That
18  was my thinking at the time.
19  Q.  Did you ask Bill White if you did not remove your Bible
20  whether that would be insubordination?
21  A.  I do not recall asking that, no.
22  Q.  Do you recall him telling you that if you did not remove
23  your Bible it would be insubordination?
24  A.  I think I can say yes on that.  Yes.
25  Q.  So you don't recall asking him, but you recall him

Page 448

1  telling you?
2  A.  Yeah, I believe there was a -- I don't remember when
3  that was, but ...
4  Q.  So you understood that by keeping your Bible on your
5  desk that that was considered an act of insubordination?
6  A.  I did not know it would be an act of insubordination.
7  Q.  But you do recall Bill White telling you that?
8  A.  To the best of my knowledge.
9  Q.  I think there's another thing you had posted in your
10  room.  And I don't know whether it was in the period from
11  April 7th to April 16th, but did you have a poster about Will
12  Graham up on your bulletin board?
13  A.  I do not remember if I did or not.
14  Q.  Do you remember whether you had ever had one?
15  A.  I've had some Will Graham posters, yeah.
16  Q.  Do you recall why you had -- this past year, did you
17  have a poster concerning Will Graham on your bulletin board?
18  A.  Yes.  I was the chairperson for the Will Graham
19  celebration.
20  Q.  Who's Will Graham?
21  A.  Billy Graham's nephew.
22  Q.  And was he -- what does he do?
23  A.  I guess his title would be evangelist.
24  Q.  And was there an event at Kenyon College --
25  A.  Yes.

Page 449

1  Q.  -- in conjunction with his evangelical work?
2  A.  Yes.
3  Q.  And is that what the poster was advertising?
4  A.  Yes, that's what the poster was advertising.
5  Q.  And you did have that poster in your room, someplace in
6  your room?
7  A.  I don't remember if I had that poster in my room.
8  Q.  You don't remember?  I'm sorry.  I thought you said you
9  knew that you had a poster, you just weren't sure whether --
10  A.  No, I was misunderstanding.  Did I have that poster?
11  Yes.  And I have had some posters.  Did I post it in my
12  room?  I don't remember.
13  Q.  You don't remember whether or not you posted it in your
14  room.  Now, I've also subpoenaed -- I'm going to change the
15  subject.  I also subpoenaed any handouts that you had for
16  students.  And I don't have the subpoena in front of me, so
17  I'll have to check it, but I believe it was from 2001-2002
18  school year to the last school year, any handouts that you
19  gave to students during the course of those school years
20  other than handouts that were directly from the text, the
21  teaching text.  And I know that you don't have those here
22  today.  There are some questions I want to ask you with
23  regard to those --
24  A.  Okay.
25  Q.  -- so I do need to have those to ask those questions.

Page 450

1  However, I can certainly go into a number of other questions
2  that I would like to review with you.
3  A.  Sure.
4  Q.  I guess I'd like to start with the discussion -- you
5  heard Zach's testimony that there was a discussion about
6  Easter and Good Friday in your classroom?
7  A.  Yes.
8  Q.  And I believe you also heard Zach testify that there was
9  an assignment made around the fact that the dates for Easter
10  changed, as to how that was determined, which is based on the
11  lunar calendar.  Is that correct?
12  A.  That is correct.
13  Q.  So was that assignment made to determine how the date of
14  Easter --
15  A.  An assignment?  No.  It was a discussion.  I don't
16  recall an assignment on that.  I may have gave them
17  something, but I don't recall.
18  Q.  You don't recall whether or not you did?
19  A.  Yeah.
20  Q.  But it was related to your unit on the moon.  Is that
21  correct?
22  A.  Yes.
23  Q.  Now, but beyond that, do you recall a discussion about
24  the meaning of Easter?
25  A.  Did a student bring it up about Easter?  The meaning of

Page 451

1  Easter?
2  Q.  Well, my first question was, do you recall whether there
3  was a discussion about the meaning of Easter?
4  A.  Yes.
5  Q.  Did that occur in only one classroom or did it occur in
6  more than one classroom last year?
7  A.  I would have to say probably in most of them, because we
8  were talking about the moon.  We were talking about Easter,
9  Thanksgiving, Christmas.  So did I talk about Easter?  Yes.
10  Q.  So you talked about the meaning of Easter?
11  A.  The meaning?
12  Q.  Yes.
13  A.  No.
14  Q.  That was my question.
15  A.  I apologize.
16  Q.  Was there a discussion about the meaning of Easter in
17  each of your classrooms or in more than one classroom?
18  A.  I don't remember about the meaning of Easter, but, yes,
19  we talked about Easter.
20  Q.  Do you recall a discussion about the meaning of Easter
21  in Zach's class, the eighth period?
22  A.  No.
23  Q.  And did Mr. Short have a meeting with you to discuss
24  that?
25  A.  Mr. Short did -- we did talk about that, yes.

Page 452

1  Q.  And you acknowledged when you met with him that you may
2  have spent one to two minutes talking about the meaning of
3  Easter to the students.  Isn't that correct?
4  A.  He mentioned that it was one or two minutes too long.
5  I remember that.
6  Q.  And he did say that to you?
7  A.  Yeah, I think one or two minutes too long is pretty
8  close.
9  Q.  And you heard Zach's statement that you thought Good
10  Friday should be the greatest Friday or the best Friday?
11  A.  Yes, I did.
12  Q.  Is that an accurate statement?  Is that a statement that
13  you --
14  A.  I don't remember.
15  Q.  You don't remember?
16  A.  Yeah, I can't remember.
17  Q.  Is it you don't remember whether or not you made a
18  comment like that or you don't remember that you made a
19  comment about that?  There's differences in the answer.
20  A.  I do not remember making a comment like that.
21  Q.  Do you recall ever referring to your Bible in any
22  discussions in class?
23  A.  No.
24  Q.  I'm talking about last year.
25  A.  No.

Page 453

1  Q.  Do you recall when you were doing the unit on volcanos
2  talking about the end of the earth and that you knew about it
3  because you had read the book and holding up the Bible or
4  words to that effect?
5  A.  I don't remember having that conversation.
6  Q.  We saw the video *Watchmaker* here earlier today.  Did you
7  ever show that to students?
8  A.  Did I show it?  No.
9  Q.  Was it ever shown in any of your classes or at an FCA
10  meeting?
11  A.  Yes.
12  Q.  Where was it shown?
13  A.  FCA meeting.
14  Q.  And who chose to show that?
15  A.  My daughter [Student #401]
16  Q.  And do you know the Web site where that comes from?
17  A.  No.  That was forwarded to me.
18  Q.  Did you show it to your daughter after it was forwarded
19  to you?
20  A.  Yes.
21  Q.  Did you suggest to her that she might want to show it at
22  FCA?
23  A.  No.  If I remember correctly, she says, Let's show this
24  at FCA; it's good.
25  Q.  Did you ever -- do you know what "Answers in Genesis"

Page 454

1  is?
2  A.  Do I know it?  Yes.
3  Q.  You know that's a Web site?
4  A.  Yes.
5  Q.  And do you know what an apologetic is?
6  A.  Yeah.
7  Q.  And is "Answers in Genesis" an apologetics ministry Web
8  site?  Do you know?
9  A.  I wouldn't know for sure.  Informational apologists.
10  I'm not sure they would call themselves apologists or not.
11  Q.  I'm going to hand you a two-page exhibit that's been
12  marked for identification purposes as Board Exhibit 23.  Have
13  you had a chance to read through that?
14  A.  Yeah.  Let me look at the second page.  Okay.
15  Q.  You'll notice in the bottom left-hand corner it says
16  "http://answersingenesis.org/about."
17  A.  Yes, I do.
18  Q.  Could you read the paragraph that says "Our message" on
19  the first page.
20  A.  "Answers in Genesis is an apologetics (i.e.,
21  Christianity-defending) ministry, dedicated to enabling
22  Christians to defend their faith and to proclaim the gospel
23  of Jesus Christ effectively."
24  Q.  The whole paragraph.
25  A.  "We focus particularly on providing answers to questions

Page 455

1  surrounding the book of Genesis, as it is the most-attacked
2  book of the Bible.  We also desire to train others to develop
3  a Biblical worldview, and seek to expose the bankruptcy of
4  evolutionary ideas, and its bedfellow, a 'millions of years
5  old' earth (and even older universe)."
6  Q.  Now, have you referred students to look in "Answers in
7  Genesis"?
8  A.  You're saying --
9  Q.  I'm asking Zach or any other student.
10  A.  I did with Zach, yes.
11  Q.  And I believe he testified that that was with respect to
12  dinosaurs, the age of dinosaurs.
13  A.  It was with respect to a standard of mine.  I can make
14  comments about biases.
15  Q.  About what?
16  A.  Biases and looking at things objectively.
17  Q.  And did you -- did you ever -- Zach also testified that
18  he recalls that you went to this Internet site in your
19  classroom.
20  A.  That we were looking at that standard?  Yeah, because,
21  again, it's run by standards.
22  Q.  In your class this year, did you ever discuss the Big
23  Bang Theory?
24  A.  Yes.
25  Q.  And did you suggest to students that the Big Bang Theory

Page 456

1  was not likely to have occurred?
2  A.  We studied it.  We examined it, yes.
3  Q.  Did you suggest to students that a creator was more
4  likely to have done this in terms of creation of the
5  universe?
6  A.  I don't say the word "creator" in the classroom.
7  Q.  Designer?
8  A.  No.
9  Q.  Did you offer alternative theories to the Big Bang
10 Theory to your students?
11 A.  When we're looking at that standard we were talking
12 about.
13 Q.  Did you offer an alternative to the Big Bang Theory to
14 your students?
15 A.  An alternative?
16 Q.  Yeah, alternative theories.
17 A.  We discuss a lot of different theories, yes.
18 Q.  What different theories did you discuss concerning the
19 Big Bang?
20 A.  We're talking -- I believe we talked about a lot of
21 different theories.
22 Q.  Well, what theories?
23 A.  If you're referring to the one Zach talked about, the
24 hydrosphere theory ...
25 Q.  I'm asking, what alternative theories to the Big Bang

Page 457

1  Theory did you discuss with students when you were talking
2  about the creation of the universe?
3  A.  The hydrosphere theory.
4  Q.  Okay.  Any others?
5  A.  With the Big Bang Theory?
6  Q.  Yeah, I'm talking about the Big Bang here.
7  A.  We can get into some pretty wild ones out there,
8  Martians and some wild different things out there.
9  Q.  And you heard Zach describe the hydrosphere theory.  Was
10 that essentially how that was discussed in class?  Does he
11 have a good recollection of that?
12 A.  I would have to listen to that again.
13 Q.  Okay.  How would you describe the hydrosphere theory
14 then?
15 A.  It's a theory.
16 Q.  Can you tell us what the theory is?
17 A.  It's a theory that's out there that there was a water
18 vapor canopy covering the earth.
19 Q.  And what does that theory support?  What does it
20 demonstrate?
21 A.  That there's a lot of different theories out there.
22 Q.  Is that the only thing that you offered it for, that
23 there are different theories out there?
24 A.  Yeah, because the -- there are so many different
25 theories out there.

Page 458

1  Q.  Could you define a theory for us, please, a scientific
2  theory.
3  A.  Something that's backed up with scientific information
4  and knowledge.  But is it 100 percent -- is it a law?  No.
5  Q.  What is a law?
6  A.  A law is scientific knowledge that's proved as fact.
7  Q.  And a theory is what?
8  A.  Just evidence that supports information that's fairly
9  substantial.
10 Q.  And how strong does that evidence have to be before
11 something can be labeled theory?
12 A.  I can't answer that.
13 Q.  Mr. Freshwater, I assume that you went to college.
14 A.  Yes.
15 Q.  I assume that you were a major in science or in
16 education.
17 A.  Yes.
18 Q.  Which?  I said alternatives.  Maybe both.  Were you a
19 major in science?
20 A.  Yes.
21 Q.  When you were in college in science, did you learn what
22 a scientific theory is and what type of evidence is necessary
23 for something to be called a theory?
24 A.  Yes.
25 Q.  Is a theory merely a hypothetical?

Page 459

1  A.  Is a theory hypothetical?  No.
2  Q.  So a theory is proven but there may be some doubt.  Is
3  that what you're --
4  A.  Yes.
5  Q.  And is the hydrosphere theory a scientific theory?
6  A.  It's a theory that's out there, yes.  Is it a
7  substantial -- yes.
8  Q.  I guess I'm having trouble understanding your answer.
9  When you say -- I asked a pretty specific question.  Is it a
10 scientifically accepted theory?
11 A.  Yes.
12 Q.  Okay.  Are there alternative theories to the Big Bang
13 Theory on the creation of the universe that are accepted
14 scientific theories?
15 A.  Yes.
16 Q.  What are they?
17 A.  Again, you're talking about accepted.  Accepted by
18 whom?  There's a lot of scientists.  There's a large number
19 of scientists that accept many different theories out there
20 besides the Big Bang Theory.
21 Q.  In order to be accepted, does a theory have to be
22 published in a reputable scientific journal with peer -- and
23 subject to peer review?
24 A.  I would say both.  You'll have to repeat that, because
25 I'm not quite clear on your statement on that one.

Page 460

1   MR. MILLSTONE:  Could you read back the question.
2       (Question read.)
3   A.  I would say no.
4   Q.  Does it have to be published and subject to peer review?
5   A.  I don't see the difference between the two.
6   Q.  I dropped reputable scientific journal.
7   A.  Okay.  Now, I'm thinking about it, okay.
8   Q.  And published might be as a doctoral thesis, for
9   example, or a paper that isn't published in a reputable
10  scientific journal.  So, yeah, there's a difference in the
11  question.
12  A.  I might have a hard time -- I'm a little confused on
13  being able to answer that.  What I believe -- okay.  We're
14  kind of in an area of what do I believe.  I am not an
15  expert.  I'm an eighth-grade science teacher.
16  Q.  During this past year, being the '07-'08 school year,
17  did you ever permit a debate in your eighth-grade science
18  class concerning creationism versus evolution during
19  '07-'08?
20  A.  Yes.
21  Q.  I'm going to ask your personal view of something,
22  Mr. Freshwater.  Science is not factual.  There are no
23  witnesses.  It is theory.  But the Bible is factual.  It is
24  history.  Do you personally believe that is true?
25      MR. HAMILTON:  I'm going to object.  I think

Page 461

1   there's a rule of evidence that gets into a particular
2   witness's religious beliefs, and I don't know his religious
3   beliefs necessarily apply in this particular situation.  We
4   have a conduct that we're examining.  There's a standard for
5   that conduct, and that's what we're here about.
6       HEARING OFFICER:  I'm going to overrule the
7   objection.
8   A.  Do you want to have her read that back?
9   Q.  Science is not factual.  There were no witnesses.  It is
10  theory.  But the Bible is factual.  It is history.
11  Personally, do you agree or disagree with that statement?
12  A.  Disagree.
13  Q.  You disagree with that?
14  A.  I disagree.
15  Q.  That's what you said?
16  A.  Yeah.
17  Q.  And you've never made that statement in class then if
18  you disagree with it.  Is that accurate?
19  A.  Yeah.  Yes.
20  Q.  Or words to that effect?
21  A.  To my memory, yes.
22  Q.  Did you ever tell your students there are certain things
23  I'd like to teach, but, technically, I can't do that unless
24  you ask me about it, or words to that effect?
25  A.  No.

Page 462

1   Q.  You've never said that to your students?
2   A.  Not that I recall.
3   Q.  Have you ever indicated to your students that the age of
4   the earth and solar system -- what is the scientifically
5   accepted age of the solar system?  Do you know?
6   A.  Yes.
7   Q.  What is it?
8   A.  Did you say the earth or the universe?
9   Q.  The universe.
10  A.  The universe.
11  Q.  We'll start big and go small.
12  A.  20 billion.
13  Q.  Approximately.  And the earth?
14  A.  Five billion.
15  Q.  And did you ever indicate that that influenced your
16  religious beliefs?
17  A.  No.
18  Q.  Did you ever say that at least -- I'm sorry.  Did you
19  ever say that the Bible traces time back only so many years
20  and how can you believe anything occurred that was
21  inconsistent with the Bible?
22  A.  Some of these questions you're asking me, at my house,
23  at my church, yes.
24  Q.  Okay.  But did you ever say that to students?
25  A.  Yes, at my house, at school -- at my house and at

Page 463

1   church.
2   Q.  At church.  You just said school, but I assume that was
3   a mistake.  You meant your house and church?
4   A.  Yeah, house and church.
5   Q.  But not at school is what you're saying?
6   A.  No.
7   Q.  Did you ever say the dinosaurs were made-up creatures?
8   And I'm talking about at school.
9   A.  Made-up creatures?
10  Q.  Yes.
11  A.  No.
12  Q.  Did you ever indicate that dinosaurs and man walked the
13  earth at the same time to students?
14  A.  Yes.
15  Q.  Did you ever say to students that Catholics aren't
16  Christians?
17  A.  No.
18  Q.  Have you ever said that to a student who might have
19  heard it elsewhere?
20  A.  Possibly.
21  Q.  Did you ever say to your students that Tyrannosaurus rex
22  didn't have their teeth deep enough to have been carnivores?
23  that they weren't rooted deep enough?
24  A.  Did I say that?  Yes.
25  Q.  What was the context when that discussion occurred?

Page 464

1  A.  Some of the evidence that was showing up when we were
2  talking about dinosaurs, the geological section of the book.
3  Q.  In geologic time?  I'm sorry.  I'm just not hearing
4  you.
5  A.  Repeat the question again.
6      MR. MILLSTONE:  Could you repeat the question back,
7  please.
8          (Question read.)
9  Q.  The earlier question was about the teaching on the
10  Tyrannosaurus rex and the context in which that discussion
11  occurred.
12  A.  When we were talking about dinosaurs and talking about
13  T-rex.
14  Q.  And was that in conjunction also with what you said
15  about the geologic age of the earth?
16  A.  Yeah.  That's all that chapter, yeah.  That's part of
17  that chapter.
18  Q.  Mr. Freshwater, are you familiar with the book *Chicken*
19  *Soup for the Teenage Soul*?
20  A.  Um-hum.  Yes, sir.
21  Q.  Did you ever read that in the classroom to your
22  students?
23  A.  Yes, sir.
24  Q.  What about, are you familiar with the book *Jesus Freaks*?
25  A.  Yes.

Page 465

1  Q.  Did you ever read that to students in your classroom?
2  A.  I do not recall.  I don't remember.
3  Q.  Now, you have already there Exhibit 6, I believe.
4  A.  This here?
5  Q.  No, that's it.
6  A.  This here.
7  Q.  I'd like to refer you to Attachment 8 for a moment.
8      THE WITNESS:  If there's any type of break,
9  whenever.
10     MR. MILLSTONE:  Well, before I get into these
11  questions --
12     THE WITNESS:  Is this a good time?
13     MR. MILLSTONE:  Yeah, as good a time as any.  It's
14  up to the Referee.
15     HEARING OFFICER:  No, certainly.  Let's reconvene
16  at 3:30, seven or eight minutes.
17         (A recess was taken from 3:21 p.m.
18          to 3:33 p.m.)
19     HEARING OFFICER:  Mr. Millstone, if you would
20  continue.
21     MR. MILLSTONE:  Sure.
22  BY MR. MILLSTONE:
23  Q.  I believe you are looking at Attachment 8 to Exhibit 6.
24  Now, do you recognize the two worksheets that are attached
25  there?  One is labeled "The Giraffe" and one is labeled "The

Page 466

1  Woodpecker."
2  A.  Yes.
3  Q.  And are those worksheets that you handed out to students
4  or have handed out to students?
5  A.  If you're asking me if I use them or if I created them,
6  I didn't create them.  I use them.
7  Q.  I'm just asking if you handed them out and used them
8  with students.
9  A.  Yeah.
10  Q.  And if you look at the last one on page 2 of, first,
11  "The Giraffe" and then "The Woodpecker," there is the same --
12  and I'm talking about the typed material, not the handwritten
13  materials there.
14  A.  Okay.
15  Q.  In the typed material, there's the same statement.  And
16  what is that statement?
17  A.  You're saying the last statement there?
18  Q.  The very last statement there.
19  A.  "Is there an I.D. involved?"
20  Q.  And if I understand from your earlier testimony, that's
21  intelligent design.  Is that correct?
22  A.  That's what most people would say, yes.
23  Q.  Didn't you say that's what it was earlier?
24  A.  I didn't create this, so the person who created this --
25  I have no idea.

Page 467

1  Q.  Where did you get these worksheets?
2  A.  Somebody else.  I don't know.  I really don't remember
3  where I got this.  I remember a worksheet like this one of my
4  students made.
5  Q.  And how many years have you used this worksheet, if you
6  can recall?
7  A.  Prior to 2003, probably about four or five years ago.
8  Q.  And did you stop using it?
9  A.  After 2003, after the issue came up, yes.
10  Q.  So why did you stop using it?
11  A.  Because that's when the academic standards came up.  And
12  I had a proposal of critically analyzed evolution presented
13  to the Board.
14  Q.  Do you understand these worksheets as being intelligent
15  design-related?
16  A.  They could be.
17  Q.  Do you understand these to be intelligent
18  design-related?
19     MR. HAMILTON:  Asked and answered, Your Honor.
20     HEARING OFFICER:  Sustained.
21  Q.  I'd like to ask you to turn to Attachment 9.  Have you
22  ever seen any of those documents before?
23  A.  Yes.
24  Q.  Do you know where they come from?
25  A.  The source where they came from?

Page 468

1  Q. Yes.
2  A. We couldn't find the source.
3  Q. Did you use these as handouts in your class?
4  A. Prior to 2003, yes.
5  Q. If I understand your testimony earlier -- strike that.
6  I'd like you to turn to Attachment 10. Do you recall back in
7  2006 handing out a document labeled "Darwin's Theory of
8  Evolution, the Premise and Problem"?
9  A. What year did you say, sir?
10 Q. Do you recall in 2006 handing out a document labeled
11 "Darwin's Theory of Evolution, the Premise and Problem"?
12 A. Yes.
13 Q. And where did you get that from?
14 A. I couldn't find the source.
15 Q. Did it just appear on the air?
16 A. No.
17 Q. You had to get it from somewhere. Did somebody hand it
18 to you?
19 A. That's a possibility, yes.
20 Q. Did you find it on the Internet somewhere?
21 A. I tried to find it on the Internet and could not find
22 it. And I went as far as -- I spent some time on that,
23 actually, too. I went as far as a computer technician,
24 Mr. Ken Wiles, and he looked for hours and couldn't find it
25 either. We couldn't find the source.

Page 469

1  Q. But you handed this out. You had to have it from
2  somewhere. You had to get it somewhere.
3  A. Yes, you're right.
4  Q. And you just don't have any idea where it came from?
5  A. No.
6  Q. Is the same thing true with "Dragon History" back
7  there? You have no idea where that came from? In back of
8  Attachment 9.
9  A. I don't recall where it came from, sir. Like I said, I
10 tried to find it and couldn't find it.
11 Q. Do you often have handouts to students that you don't
12 know where they came from?
13 A. I keep lots of -- I keep a lot of stuff. You can hear
14 my wife back there. Some of the stuff, she says, Get it out
15 of here, take it to school. I save stuff that I've used when
16 I was over in China, which was brought up.
17 Q. You would describe yourself as a pack rat then, I take
18 it.
19 A. But not a very organized pack rat. You can put my wife
20 on the stand.
21 Q. Do you recall a handout to students that you had called
22 "Survival of the Fakest"?
23 A. No, I don't, sir.
24 Q. Do you know -- did you ever give that handout to
25 students?

Page 470

1  A. Not that I remember.
2  Q. Let's see if I can refresh your recollection.
3  A. Okay.
4  Q. Take a moment to review that. Have you seen that
5  document before?
6  A. Yes.
7  Q. Did you use that as a handout in one of your classes
8  ever?
9  A. Yes. 2003.
10 Q. Did you ever receive any complaints from parents about
11 that?
12 A. This document?
13 Q. Yes.
14 A. No.
15 Q. Now, Mr. Freshwater, did you have your students study
16 the periodic table?
17 A. Yes.
18 Q. And how long have you been teaching the periodic table?
19 A. Oh, all the years I've been teaching.
20 Q. Now, is -- so approximately 21 years, give or take a
21 couple?
22 A. 24.
23 Q. So you taught it also prior to Mount Vernon?
24 A. Yes.
25 Q. Is the periodic table part of the standards?

Page 471

1  A. You're saying presently?
2  Q. Presently.
3  A. Presently speaking. It is -- I mentioned before about
4  atoms, cells. But the periodic table, I have to discuss some
5  of that when I'm talking about atoms, yes.
6  Q. How much time have you spent on the periodic table with
7  students?
8  A. About five minutes at the beginning of the class.
9  Q. I'm sorry?
10 A. About five minutes at the beginning of the class.
11 Q. One day? Five minutes?
12 A. No. A week and a half, a week and a half, two weeks.
13 Q. So for about two weeks did you say?
14 A. It varies. I'll put different questions up. It's not
15 always the same question. Such as H, what is it? Hydrogen.
16 Short discussion.
17 Q. Let me go back to one of the things you said. You
18 assigned Zach to look at "Answers in Genesis" for -- you said
19 it was for a standard. Did you assign any other students to
20 look at "Answers in Genesis" for any material related to that
21 standard or any other standard?
22 A. Have I? Yes.
23 Q. Do you know approximately how many? Are we talking a
24 handful? Are we talking a couple dozen? Just an estimate.
25 A. A dozen maybe.

Page 472

1  Q.  I'm sorry?
2  A.  I would say a dozen.  I'll say a dozen.
3  Q.  Is there any benchmark or indicator for eighth-grade
4  science that includes chemistry?
5  A.  I don't know about benchmarks, sir.  Standards, I
6  haven't looked at them for a while, so I wouldn't be able to
7  answer that exactly.
8  Q.  Is there any standard or benchmark in the eighth grade
9  for teaching controversy or has there been in eighth-grade
10  science?
11  A.  Standards -- the standards came up in 2003, so teaching
12  controversy, I'm not sure what you're saying about a teaching
13  controversy.
14  Q.  There's a tenth-grade standard, isn't there, when you
15  talk about teaching controversy and you can teach the
16  controversy concerning that?
17  A.  There was.
18  A.  There was.
19  A.  In 2003.
20  Q.  It was only adopted to tenth grade, was it not?
21  A.  Yes.
22  Q.  And that was then repealed by the State Board in 2006?
23  A.  Yeah, I think that's correct, sometime in 2006.
24  Q.  Sometime in 2006?
25  A.  Yeah.

Page 473

1  Q.  What's Dover, Pennsylvania?
2  A.  That was a case, and then Ohio adopted it.  It struck
3  down creationism.
4  Q.  So that was struck down as unconstitutional?
5  A.  Yeah, from what I know about the case.
6  Q.  Now, was there a point at which you -- and I believe you
7  testified there was -- that you proposed you add teaching
8  intelligent design to the curriculum.
9  A.  Repeat that.
10  Q.  Was there a point, and I believe you testified there
11  was --
12  A.  I understand.
13  Q.  -- one time when you proposed adding teaching
14  intelligent design in the science curriculum.
15  A.  No.
16  Q.  Okay.  Did you make the proposal to change the science
17  curriculum?
18  A.  Yes.
19  Q.  What was your proposal?
20  A.  Critically analyze evolution.
21  Q.  I'm sorry.  Critically analyze evolution.  My
22  apologies.  And that proposal was made when?
23  A.  At the end of the 2002 school year.  Was that 2003?  I
24  think it was the end of the 2003 school year.  It was the
25  2002-2003 school year.

Page 474

1  Q.  So the spring of '03?
2  A.  Yes, I believe so.
3  Q.  And that was rejected by the Board?
4  A.  Yes.
5  Q.  And by the science department?
6  A.  Yes, prior to the Board.
7  Q.  Before the Board acted?
8  A.  Yes.
9  Q.  The science department reviewed and recommended that it
10  be rejected?
11  A.  Mr. Kuntz.  And he was in charge of the science group
12  that brought that forward.  And, like you said, they denied
13  it.  And I asked him, What's next?  And he said they would
14  take it to the School Board.
15  Q.  Prior to your making that proposal, do you recall a
16  meeting that you had with Bonnie Schutte, Dick Cunningham,
17  Mr. Kuntz, and Miss Kasler?
18  A.  Dealing with?
19  Q.  The curriculum issues and what you were teaching before
20  you made that proposal.  Sometime in the early spring of
21  '03.
22  A.  No.
23  Q.  You don't recall any such meeting?
24  A.  No.
25  Q.  Did you ever have complaints raised with you from the

Page 475

1  high school science department about what you were teaching,
2  whether either directly or indirectly, whether it came
3  through your principal, whether it came from the science
4  department of the high school directly, whether it came from
5  any source?
6  A.  Yes.
7  Q.  Okay.  When did you have those raised?
8  A.  I don't recall.  I did have them, but I can't pinpoint
9  it.
10  Q.  Was this on just one occasion that you're aware of or
11  was it more than one occasion?
12  A.  More than one occasion.
13  Q.  Do you recall what the concern was?
14  A.  Over -- the topic of evolution, yes.
15  Q.  And what specifically was the complaint, if you recall?
16  A.  The topic of how I teach evolution.
17  Q.  And what was their concern with how you taught
18  evolution?
19  A.  I don't know.  I won't be able to quote what they said.
20  I can't remember.
21  Q.  So did they ever raise any issues with you teaching the
22  periodic table in addition to evolution?
23  A.  That concern came up, yes, recently.
24  Q.  More recently?
25  A.  More recently, yeah.

Page 476

1  Q. And what was that concern?
2  A. That my understanding on that, that was not -- it was
3  not -- it wasn't one of my standards.
4  Q. And did you understand the concern that was being
5  raised?
6  A. Yeah, I did understand. Yeah, absolutely.
7  Q. You continued to teach it even after that concern?
8  A. Yes, because it was dealing with atoms. The kids had to
9  have a true understanding of atoms. You do recall my OAT
10  scores, right?
11  Q. What do you have students do on the periodic table?
12  A. What do I have them do?
13  Q. Yeah.
14  A. Memorize it, the first 18.
15  Q. Memorization of so many? The first 18?
16  A. First 18.
17  Q. The movie *Expelled*, did you play a role in getting that
18  movie brought to Mount Vernon?
19  A. A role? Did I call them up? I talked to the movie
20  theater.
21  Q. Did you tell -- strike that. Who was the chair of the
22  science department last year at Mount Vernon?
23  A. Bill Oxenford.
24      THE REPORTER: I didn't hear you, sir.
25      THE WITNESS: Bill Oxenford.

Page 477

1      THE REPORTER: Thank you.
2      MR. MILLSTONE: O-X-E-N-F-O-R-D.
3      THE WITNESS: Yes. It always has been spelled
4  wrong.
5  Q. Did you tell Mr. Oxenford that you were going to see
6  that the movie was brought to Mount Vernon and that you would
7  talk to the --
8  A. Yeah. Do I recall a conversation with Bill? I may
9  have. I may have.
10  Q. And you heard Zach's testimony this morning, which was
11  that you took a bunch of students from the FCA that you
12  gathered together on a Friday and a bunch of you went to see
13  a movie?
14  A. My daughter said something about going to see that
15  movie, and they picked a day. I think it was a Friday.
16  Q. And he also said that you encouraged the students in FCA
17  to call the movie theater and urge them to have it filmed
18  here.
19  A. Yeah.
20  Q. Was his testimony accurate in that regard?
21  A. I'd have to listen to it.
22  Q. So you didn't listen too carefully when he was
23  testifying?
24  A. Well, I was listening, but I'm not going to -- was it
25  accurate? I'd have to go back through and look at each

Page 478

1  sentence.
2  Q. He also testified that you discouraged the students to
3  go see *The Golden Compass*, the movie *The Golden Compass*. D
4  you recall that?
5  A. I recall it being a movie.
6  Q. Do you recall ever telling the students they shouldn't
7  go see it?
8  A. We talked about it. I know it was talked about.
9  Q. Have you ever talked about homosexuality in your class?
10  A. Yeah, we've talked about it.
11  Q. How does that come up?
12  A. It usually comes up with Channel 1. It's a pre-school
13  -- it's a pretaped TV that comes into the school. It's
14  during morning announcements, five minutes, eight minutes,
15  and they have some controversial issues on Channel 1. And we
16  have homerooms, and they're interested in controversy. I'm
17  sure it's the presidential election now that's being talked
18  about. It's usually a takeoff on a discussion on that or a
19  takeoff of a health issue, something that's health-conscious
20  or comes off of Channel 1.
21  Q. Within the last two years, do you recall ever saying to
22  students that homosexuality is a sin?
23  A. No, I don't recall that.
24  Q. I'm sorry?
25  A. I don't recall that.

Page 479

1  Q. Do you recall ever relating magnets with opposites
2  attracting and saying it should apply in humans as well?
3  A. That's a good way to describe it so kids can understand
4  that opposites attract.
5      MR. MILLSTONE: Can we have a short recess just to
6  review all my notes here?
7      HEARING OFFICER: Five.
8      MR. MILLSTONE: Thank you.
9          (A recess was taken from 4:02 p.m. to
10          4:12 p.m.)
11      HEARING OFFICER: Attorney Millstone, are you ready
12  to continue?
13      MR. MILLSTONE: Yes, I am. Thank you.
14      HEARING OFFICER: All right.
15  BY MR. MILLSTONE:
16  Q. Freshwater, approximately how many students do you
17  have each year in various science classes?
18  A. I had a total of 111 last year in five classes, so
19  approximately 25, 28. Some are smaller, some classes are
20  smaller.
21  Q. So somewhere between 22, 23 and 30. Okay. Now, I want
22  to go back for a second to the one exhibit that's "Survival
23  of the Fakest." I just want to make sure that I heard you
24  correctly. Now, I believe you testified that you haven't
25  used that since 2003. Is that correct?

1  A.  To the best of my understanding, I have not used this
2  since 2003.
3  Q.  But it's possible that you may have used it as a handout
4  after 2003?
5  A.  No, to the best of my understanding.
6  Q.  Is it possible that you have used it as a handout after
7  2003?
8  A.  I'm going to confirm that it's 2003 and prior.
9  Q.  That it's only 2003 and prior?
10  A.  To the best of my knowledge.
11  Q.  Have you ever shown any videos in class that involve
12  Kent Hogan?
13  A.  In class, yes.
14  Q.  Okay.  What videos have you shown?
15  A.  I don't know the names of them.  Some pieces.
16  Q.  Okay.  But does he have a series of videos that -- you
17  say "pieces" of it.  When you say "pieces" of it, I'm sort of
18  lost on what you mean.
19      HEARING OFFICER:  Excuse me for a moment, if
20  I could interrupt once again.  Wait for the question, then
21  give the answer.  And Attorney Millstone --
22      MR. MILLSTONE:  The same.
23      HEARING OFFICER:  -- don't give another question in
24  the middle of his answer, for the benefit of the reporter.
25  A.  Go back.

1  Q.  Do you want me to ask the question again?
2  A.  Please.
3  Q.  You say that you've shown "pieces" of them in class.
4  What do you mean by "pieces"?
5  A.  Kent Hogan's videotape.
6  Q.  And what is that videotape about?
7  A.  It relates to the standards.
8  Q.  What is it about?
9  A.  Well, whales and peppered moths.
10  Q.  And what does it purport to teach with respect to those
11  things?
12  A.  I'm not sure what you're asking.
13  Q.  When it talks about peppered moths and whales, is it
14  intended to debunk evolution?
15  A.  It's to examine evolution.
16  Q.  Is it intended to call into question whether the theory
17  of evolution is a legitimate scientific theory?
18  A.  It's evidence of evolution.
19  Q.  Evidence of evolution or evidence that evolution should
20  not be taught?
21  A.  Showing evidence of evolution.
22  Q.  What evidence of evolution is it showing?
23  A.  The evolution of the whale and peppered moth.
24  Q.  So it says that the peppered moth has evolved?
25  A.  It talks about the evolution of the peppered moth and

1  the experiment that was done on it.
2  Q.  And is it saying that the whale has evolved?
3  A.  It's talked about the evolution, among others.
4  Q.  So if somebody came in here and testified that Kent
5  Hogan's tapes question whether evolution occurred, you would
6  say they're wrong?
7  A.  It's questioning evolution.  It's examining evolution.
8  Q.  So you wouldn't disagree with that description of it,
9  that it questions whether evolution is --
10  A.  I would agree.
11  Q.  Now, in your room, you keep a book called *Icons of
12  Evolution*.  Is that correct?
13  A.  Yes.
14  Q.  What is the subject matter of *Icons of Evolution*?
15  A.  Looking at evolution and the icons of it, the basis of
16  evolution.
17  Q.  And is it supportive of the theory of evolution?
18  A.  Is it supportive?  It's a book I keep in my cabinet.  So
19  if you're saying --
20  Q.  That's not the question I asked.  I understand you keep
21  it in your cabinet.  Is the book *Icons of Evolution*
22  supportive of the theory of evolution as a scientific theory?
23  A.  No.
24  Q.  Do you have a tape in your classroom or did you have a
25  tape in your classroom labeled "Lies in the Textbooks" --

1  "Lies in the Textbooks, Part A, Ten Lies of Evolution"?
2  A.  I may have.  It's not ringing a bell, but, like I told
3  you before, my wife, she says, Get this stuff out of the
4  house and take it to school.  Yeah, that could be in there,
5  but that one's not ringing a bell.
6  Q.  So you don't know if you've ever shown that?
7  A.  What is it again?  "Ten Lies of" --
8  Q.  "Ten Lies of Evolution."
9  A.  A textbook or VCR?  What is it?
10  Q.  It looks like a VHS tape.
11  A.  Yeah, I probably -- you saw my desk.
12  Q.  And you have a book that's called *Refuting Evolution*?
13  Did you have a book called *Refuting Evolution*?
14  A.  I think so, yes.
15  Q.  Have you ever shown a video to your science classes on
16  the existence of the Loch Ness monster?
17  A.  Yeah.  I would say yes to that.
18  Q.  And did that video indicate the earth was only 6,000
19  years old and that dinosaurs walked the earth with humans, if
20  you recall?
21  A.  I haven't watched that.  That's a video I probably
22  showed prior to 2003, so I don't know.
23  Q.  So you would not have shown that after 2003?
24  A.  To my knowledge, no.
25  Q.  I'd like you to look again at Board Exhibit No. 6,

Page 484

1  please. And I'd like you to turn to Attachment No. 6 in
2  Board Exhibit No. 6. Would you look through that, please.
3      Now, that contains a proposal or suggestion for a policy
4  on objective origins science. Correct?
5  A. Yes.
6  Q. And this is the proposal that you submitted back in
7  2004 --
8  A. Yes.
9  Q. -- correct? Now, when I looked at that, it indicates
10 that this comes from the intelligent design method. Is that
11 where you got this?
12 A. No, sir.
13 Q. Where did you get it?
14 A. That was a reference, a place of reference for them to
15 look to obtain more information.
16 Q. I see.
17 A. This was a combination of cut and paste and personal.
18 Q. But this policy is the policy that's recommended by the
19 intelligent design network, is it not? Isn't that what you
20 say here?
21 A. It's a place you can look at it, yes.
22 Q. Well, I guess it says here this statement and policy
23 itself copied from www.intelligentdesignnetwork.org. Does
24 that mean that you copied it from the Intelligent Design
25 Network?

Page 485

1  A. I don't recall if I took it from there or another source
2  from them. It may have been a link to it.
3  Q. And might you have taken it from the Discovery
4  Institute?
5  A. I may have. Yes, I may have. I don't recall. It was a
6  long time ago.
7  Q. What is the Discovery Institute website?
8  A. I don't know a whole lot about it, to be honest with
9  you. I really don't.
10 Q. Do you know what the Intelligent Design Network is?
11 A. Yes.
12 Q. What is it?
13 A. It's a Web site that "Answers in Genesis" --
14 Q. Which we've talked about.
15 A. Okay. I apologize.
16 Q. That's all right. We've been at it a long time.
17 A. I don't know. I apologize. But in my mind, I was
18 thinking "Answers in Genesis." Repeat the question again.
19 I lost it.
20 Q. Do you know what Intelligent Design Network is?
21 A. I'd say no.
22 Q. And you don't know what Discovery Institute is about?
23 A. This part of it came from somebody else, okay, who's
24 foreign to me. So if you asked the site, I don't know if
25 I really visited a site. I suspect I have, because I've been

Page 486

1  to plenty.
2  Q. Who forwarded this to you?
3  A. I want to say the name Barry Sheets. I do believe -- I
4  do believe that's how I found them.
5  Q. And did you ask that he send you something along these
6  lines or did he call you and say, Mr. Freshwater, I have
7  something for you and I'm going to send it to you?
8  A. I don't know how it got into my hands exactly. I think
9  it was someone said, hey, talk to this person, he's got some
10 policy. And I was tracking at the time the No Child Left
11 Behind policy very closely in 2001, 2002, 2003. So in
12 tracking that, somehow, I came in touch with him, Mr. Sheets,
13 Barry Sheets. He forwarded it to me, I'm guessing.
14     MR. MILLSTONE: I think that's it, Mr. Freshwater.
15     THE WITNESS: Thanks.
16     HEARING OFFICER: Thank you. 4:32. They want us
17 out of the building by 5:00. I'm not sure you're going to
18 have a witness that's going to be extremely brief. I would
19 suggest that we adjourn for the day. If you have something
20 brief, we'll see if we can get it in.
21     MR. MILLSTONE: I think it would probably be at
22 least a half an hour, maybe about 40, 45 minutes at least.
23 Probably closer to 40 minutes.
24     HEARING OFFICER: Then let's save it for tomorrow.
25 We will adjourn the hearing for today. We will reconvene

Page 487

1  tomorrow morning at 9:00 a.m.
2      (This proceeding recessed at 4:33 p.m.)
3
4
5          CERTIFICATE OF REPORTER
6      I, Joan C. O'Donnell, Registered Professional
7  Reporter, do hereby certify that the foregoing, consisting of
8  pp. 328-487, is a true and complete transcript of the
9  proceedings conducted on the 28th day of October, 2008,
10 before Mr. R. Lee Shepherd, Referee. I further certify that
11 I was personally present throughout the said proceedings.
12     Subscribed this 12th day of November, 2008.
13
14
15
16         Joan C. O'Donnell
            Notary Public, State of Ohio
17          My Comm. expires 09/13/2007.
18
19
20
21
22
23
24
25

NOV-16-2009  13:31     SQUIRE SANDERS                          2164798780     P.002/002
11/16/2009 13:38  Case 2:08-cv-00575-GLF-NMK  Document 60-15  Filed 11/16/09  Page 41 of 41  PAGE  02/02

Page 487

1   tomorrow morning at 9:00 a.m.

2                    (This proceeding recessed at 4:33 p.m.)

3

4

5                    **CERTIFICATE OF REPORTER**

6            I, Joan C. O'Donnell, Registered Professional

7   Reporter, do hereby certify that the foregoing, consisting of

8   pp. 328-487, is a true and complete transcript of the

9   proceedings conducted on the 28th day of October, 2008,

10  before Mr. R. Lee Shepherd, Referee.  I further certify that

11  I was personally present throughout the said proceedings.

12           Subscribed this 12th day of November, 2008.

13

14

15

16                         Joan C. O'Donnell
                           Notary Public, State of Ohio
17                         My Comm. expires 09/13/2012.

18

19

20

21

22

23

24

25

O'DONNELL & McGHEE, LLC
(419)522-9700