IN THE MATTER OF TERMINATION

OF THE EMPLOYMENT OF

JOHN FRESHWATER

TRANSCRIPT OF PROCEEDINGS HELD ON 10/2/08

- - -

VOLUME I ᵒᶠ II

- - -

R. LEE SHEPHERD

Referee, presiding.

TAMMY K. MC GHEE
REGISTERED MERIT REPORTER
O'DONNELL & MC GHEE
13 PARK AVENUE WEST, SUITE 502
MANSFIELD, OHIO  44902
(419) 522-9700

---

APPEARANCES:

DAVID J. MILLSTONE
SQUIRE SANDERS
4900 Key Tower
127 Public Square
Cleveland, Ohio  44114-1304
(216) 479-8500

    On behalf of the Board of Education.

R. KELLY HAMILTON
ATTORNEY AT LAW
P.O. Box 824
Grove City, Ohio  43123
(614) 875-4174

    On behalf of John Freshwater.

ALSO PRESENT:

    SARAH J. MOORE

    JESSICA PHILEMOND

    JASON DESCHLER

I N D E X

OPENING STATEMENTS BY MR. HAMILTON          19:14

WITNESS ON BEHALF OF THE BOARD:

Steve Short

    Direct Examination by Mr. Millstone      35:19
    Cross-Examination by Mr. Hamilton        83:11
    Redirect Examination by Mr. Millstone   315:15

---

E X H I B I T S

| EXHIBIT | INTRODUCED | ADMITTED |
|---|---|---|
| Board Exhibit No. 1 - Amended resolution of intent to consider the termination of the teaching contract of John Freshwater | 37:11 | |
| Board Exhibit No. 2 - Letter to David Millstone from Kelly Hamilton dated 6/30/08 | 38:4 | |
| Board Exhibit No. 3 - Letter to Stephen Short from Jessica Philemond dated 4/14/08 | 39:18 | |
| Board Exhibit No. 4 - Letter to Stephen Short from Jessica Philemond dated 4/21/08 | 54:11 | |
| Board Exhibit No. 5 - Complaint | 54:23 | |
| Board Exhibit No. 6 - HR On Call investigation report | 55:10 | |
| Board Exhibit No. 7 - Photograph | 56:24 | |
| Board Exhibit No. 8 - Photograph | 56:24 | |
| Board Exhibit No. 9 - Letter to John Freshwater from William White and Brad Ritchey dated 1/22/08 | 59:18 | |
| Board Exhibit No. 10 - FCA handbook for public schools | 64:15 | |
| Board Exhibit No. 11 - Mount Vernon Administrative Guideline 2520C | 68:9 | |
| Board Exhibit No. 12 - Letter to John Freshwater from William White dated 4/7/08 | 71:21 | |
| Board Exhibit No. 13 - Letter to John Freshwater from William White dated 4/14/08 | 74:18 | |

---

| | INTRODUCED | ADMITTED |
|---|---|---|
| Board Exhibit No. 14 - Statement of John Freshwater | 76:13 | |
| Board Exhibit No. 15 - Memo to Steve Short from [Student #71] [Student #71] dated 4/21/08 | 80:13 | |
| Board Exhibit No. 16 - Teacher evaluation summary form | 81:2 | |
| Employee Exhibit No. 1 - FCA handbook for public schools | 155:24 | |
| Employee Exhibit No. 2 - Letter to John Freshwater from Jeff Maley dated 6/8/08 | 232:21 | |
| Employee Exhibit No. 3 - Press release | 283:10 | |

1    P R O C E E D I N G S
2                 - - -
3         THE COURT: Ladies and gentlemen, welcome to this
4    proceeding this morning.  Before we get started, just a few
5    preliminary matters.  I would ask that any of you who are in
6    possession of cell phones, turn them off so they're not a
7    disturbance during our hearing here today.
8         Also, there's previously been a decision made in
9    this case that there will be no broadcasting, reporting, nor
10   photographer within the chamber of this hearing.  I would
11   very much appreciate if that order is abided by.
12        Let me just explain briefly what brings us here
13   today.  Some of you may know.  I'm certain the attorneys and
14   the parties at the front table know.  But for those of you in
15   the gallery, the Ohio Revised Code sets up a process under
16   Section 3319.16.  The title of that section is termination of
17   contract by board of education.
18        In the State of Ohio, when a board of education in
19   any district throughout the state decides that they want to
20   undertake the termination of an employee, and in this case a
21   teacher, they must follow this section of the code.  This
22   section of the code allows the teacher to then ask for or
23   request, a hearing, before a referee, myself.  The referees
24   are appointed by the Ohio Department of Education and
25   selected by the attorneys who appear before you here today

1    from a panel of three choices.
2         It is my duty as referee to hear the evidence that
3    is at dispute here and specifically to consider the grounds
4    that are given by the board for termination of this teacher.
5    It is then my responsibility to write a report concerning the
6    evidence that I hear and to submit that report to the board
7    of education.  The board of education then must make a
8    decision to either accept or reject my report.  So that's the
9    purpose of our hearing.
10        Representing the parties here today, first to my
11   left is Attorney David Millstone.  Representing the teacher
12   to my right is Attorney Kelly Hamilton.  This proceeding is
13   set to be conducted both today and tomorrow and for some
14   further hearing dates later this month and will continue
15   until all the evidence has been presented these attorneys
16   wish to present.  And no doubt throughout the proceedings
17   there will be various motions, objections, a variety of
18   things.  It's very similar in nature to a courtroom
19   proceeding although, obviously, I am not sworn as a judge.  I
20   do not wear a robe and do not have that title.  But the
21   proceeding itself will be similar, although not exact in
22   nature, to what you would see in a courtroom within the State
23   of Ohio.
24        We will also have this proceeding recorded by the
25   individual that's seated here to my left so that a permanent

1    record is made of the proceeding and that record will also be
2    part of the documentation that is eventually forwarded to the
3    board of education.
4         Now, with those preliminary statements out of the
5    way, I would ask both attorneys, do you have any matters that
6    you want to present to me in anticipation of calling the
7    first witness today?
8         MR. HAMILTON:  Before I begin, I'm accustomed to
9    stand in the courtroom before the judge.  I don't know how
10   you want to address that matter and I certainly don't want
11   any disrespect to be taken if we don't stand when the
12   witnesses enter or when we speak.  So with your permission,
13   if we can sit during our --
14        THE COURT:  However you're comfortable is fine.
15        MR. HAMILTON:  Very well, sir.  The first motion
16   Mr. Millstone and I did speak about would be a motion for
17   separation of witnesses, Your Honor.  We both would stipulate
18   and concur to that particular motion being appropriate in
19   this matter.  We believe according to the rules of evidence
20   that certainly is applicable.
21        MR. MILLSTONE:  We certainly concur in that.
22        THE COURT:  That is granted.  Witnesses can be
23   separated, I'm sure, with the assistance of the law
24   enforcement officers.  We can find some location for them and
25   bring them in as they're called.

1         MR. MILLSTONE:  There's another room that is
2    available, as I understand it, perhaps even two rooms.
3         THE COURT:  All right.  Who do you have within the
4    chamber that you expect to have testify here today?
5         MR. MILLSTONE:  The only witness that we have who
6    will be testifying during the hearing that's here in the
7    chamber is Mr. Short, who is also here as the client
8    representative, and we expect him to be here throughout the
9    hearing.
10        THE COURT:  Are there any other individuals here in
11   the hearing room who are expected to testify or are on a
12   witness list for this case?
13        MR. HAMILTON:  Your Honor, obviously, the involved
14   teacher, my client, Mr. John Freshwater, is in the room.  I
15   don't know of any of the other parties, so it's going to be
16   incumbent upon Mr. Millstone, because I don't know who the
17   teachers, I don't know the particular witnesses.  It's going
18   to be incumbent on him to be mindful of who's in the room,
19   because I don't know their identities.
20        MR. MILLSTONE:  I don't see any.
21        THE COURT:  That's fine.
22        MR. HAMILTON:  Just for the record, I'm not
23   familiar with the identities of the alleged Doe family,
24   D-O-E, family.  I'm also not familiar with any of the other
25   students, nor even their parents, so I think that their

1  parents potentially could be called as witnesses.  Because of
2  that, I would ask for those to be excluded also.
3       THE COURT:  The same for myself.  I don't know
4  those individuals either.  Are any of those individuals in
5  the room?
6       MR. MILLSTONE:  I'm sorry, which --
7       THE COURT:  Any of the pseudonym persons or their
8  families or anyone that may be on your witness list?
9       MR. HAMILTON:  Specifically, Your Honor, anybody
10  associated with that family.  I don't care if it's grandma or
11  grandpa.  I don't care if it's aunt and uncle.  Anybody
12  associated with that family potentially could be called as a
13  witness.
14       MR. MILLSTONE:  There's at least one person who
15  would be associated with the family, not someone we intend to
16  call as a witness.
17       THE COURT:  But if I understand correctly, it may
18  be a witness that Mr. Hamilton might call or might be forced
19  to call depending upon other evidence that is presented, so I
20  would ask that they leave the chamber at this point.
21       MR. HAMILTON:  I have two additional motions when
22  you're ready, sir.
23       MR. MILLSTONE:  Could we have a moment?
24       MR. HAMILTON:  Certainly.
25       (Discussion held off the record.)

1       THE COURT:  Attorney Hamilton, you said you had a
2  few more motions?
3       MR. HAMILTON:  Yes, Your Honor.  After a discussion
4  with Mr. Millstone, it was learned that the, and I'm going to
5  call them -- let's call them student Doe for the moment,
6  because I'm not even certain the names, at the moment, Your
7  Honor, it's understood that there's no other people
8  associated with student Doe or student Doe's family.
9       However, student Doe's counselor in the federal
10  action is in the room.  That individual's name is Jessica
11  Philemond.  That individual, Your Honor, has made some
12  statements in the news media that are not statements that
13  were part of the investigation and were not statements part
14  of the termination recommendation basis.  Because of that,
15  although we certainly would not want to be inquiring into any
16  attorney/client privilege communication between she and her
17  client, there is the potential, because she's not a party to
18  this action, that she could be a witness as it relates to
19  things she has stated in the media.  Accordingly, Your Honor,
20  we would ask that she be excluded.
21       MR. MILLSTONE:  Your Honor, if I can speak to that
22  briefly?
23       THE COURT:  Sure.
24       MR. MILLSTONE:  First of all, we have no intention
25  of calling Ms. Philemond as a witness.  If we start looking

1  at people who have made statements in the media, I see a
2  number of people in this room who have made statements at one
3  time or another to the media.  You're almost going to have to
4  exclude a third of the room.  Certainly you do have the
5  attorney/client privilege between Ms. Philemond and her
6  clients and it would be inappropriate, as counsel has
7  indicated, to inquire into any of that.  So I don't see a
8  good reason for her exclusion.
9       THE COURT:  I'm going to overrule that motion and I
10  would reiterate that my job here is to confine this hearing
11  to the grounds that are given for termination.  At least at
12  this point I can think of no reason that Attorney Philemond's
13  testimony will be required on that particular issue to which
14  we are --
15       MR. HAMILTON:  I understand your ruling, Your
16  Honor.  Specifically, though, looking for further direction,
17  will it be permissible for me to inquire of student Doe and
18  student Doe's family as to the particular statements that are
19  attributed to their attorney?
20       THE COURT:  That gets us pretty deep into the issue
21  of attorney/client privilege by my reckoning.  We won't be
22  confronted by that certainly today.  I think if we are
23  confronted with that issue, that's going to require some
24  briefing and some law.
25       MR. MILLSTONE:  With no disrespect to the media,

1  what's reported in the paper is not necessarily accurate.  In
2  all indications, certainly matters -- I have seen inaccuracy
3  from time to time, so it's -- there's -- you almost have to
4  bring on the reporter, if you're going to go down that line,
5  you have to bring on the reporter as well as Ms. Philemond
6  and the Doe family.
7       MR. HAMILTON:  I think that's being a bit excessive
8  and I think that's taking it a little bit further.  But
9  nonetheless, I appreciate your effort there with the media.
10       THE COURT:  What else do you have for me?
11       MR. HAMILTON:  Your Honor, we would also make a
12  motion -- first of all, let me state we understand that you
13  have excluded cameras and any type of photographer from this
14  particular proceeding.  It's my understanding you've done so,
15  sir, based upon the need to protect any juvenile interest at
16  stake here, such as their identities, such as their public
17  portrayal.  We would ask that the media, along with their
18  cameras, along with their photographers, be included in those
19  portions of the hearing, sir, where there are no student
20  concern.
21       Specifically, there is a substantial amount of case
22  law that would indicate that the motion that I'm now making
23  for public access for the media, there's case law that
24  demonstrates that if you're going to deny that, there should
25  be an evidentiary hearing to that extent.  Also the First

Page 13

1   Amendment Right of the press to be public during particular
2   trials is a notion here in America that we hold quite
3   dearly. This right does extend to technology in the
4   courtroom, which would include the use of cameras, be they
5   video, motion, or photographer.
6          There's also substantial rulings and opinions,
7   including that by the attorney general's office, that states
8   even hearings such as this, township administrative hearings,
9   school board administrative hearings, that the media has a
10  right to access, and that includes the ability to take
11  pictures and photograph. So specifically what we are asking
12  for is that during those portions when students are not part
13  of the proceedings, we would ask that the media
14  representatives and their cameras and their photographers be
15  permitted in the courtroom.
16         THE COURT: Attorney Hamilton, I would renew the
17  decision that I've already rendered in that matter. I would
18  point out, as you are well aware, the media is represented,
19  as a matter of fact, possibly half the gallery here are
20  members of the media. It is not a situation where they're
21  being excluded or confined. They have access to everything
22  that is going to be presented at this proceeding. There are
23  limitations on their participation and those are set forth in
24  Ohio case law in the commentary in the rules that I have
25  cited in my decision.

Page 14

1          As we're all aware, they have legal counsel.
2   They've probably already spoke to those legal counsel. There
3   may be other legal proceedings under way at this moment
4   concerning that very issue. I don't know. And if so, then
5   higher powers will make a ruling. But until that point in
6   time, my decision stands. Your client requested a public
7   hearing. This is a public hearing. No, it's not a televised
8   hearing, but it is a public hearing and there's an
9   opportunity for the public to view it.
10         We will try and also make accommodations for other
11  members of the public to come in if some of these individuals
12  decide they do not want to stay throughout the continuation
13  into this afternoon and into tomorrow. So we will
14  accommodate that as best we can with the facility that we
15  have. But, again, I will renew the statements that I've set
16  forth in my earlier decision.
17         I should have allowed you to comment, Attorney
18  Millstone. If you'd like to, go ahead.
19         MR. MILLSTONE: No. But there is -- while we're
20  talking about separation of witnesses, I know we've gone
21  beyond that, but I wanted to go on record on one other
22  issue. Mrs. Freshwater's in the room and we have no
23  objection to her being here. It is possible that we may call
24  her as a rebuttal witness, depending on what goes on. But
25  even with that, we do not request her sequestration unless

Page 15

1   it's the intention of Mr. Hamilton to call her on direct
2   examination. But as to -- we waive the sequestration issue
3   with respect to Mrs. Freshwater for purposes in case we call
4   her on rebuttal.
5          THE COURT: Did I hear a qualifier on that, though?
6          MR. MILLSTONE: If we have to call her based on
7   calling her for rebuttal and the potential for that, we waive
8   sequestration. It's up to Mr. Hamilton. I mean, he should
9   have her removed if he didn't call her on direct in the first
10  instance. But just because of that and just to be on the
11  safe side, just to make the record is clear, we're waiving that
12  right if we call her on rebuttal.
13         MR. HAMILTON: Understanding the qualifier in this
14  particular situation, we do not intend to call Ms. Freshwater
15  as a witness. Because we do not intend to, I don't see any
16  need to exclude her, recognizing full well that you may call
17  her as a rebuttal witness.
18         MR. MILLSTONE: Just for all of our sakes, I wanted
19  to get the waiver on record.
20         THE COURT: All right. Thank you. Anything else?
21         MR. HAMILTON: Yes, Your Honor. This particular
22  space, I didn't do any reconnaissance. I expected it to be a
23  regular courtroom. We had already talked about this prior to
24  the proceedings beginning. Mr. Millstone and I talked about
25  this out in the hallway. This room, although it's public,

Page 16

1   although while they may do traditional hearings in here, the
2   workspace is not exactly set up the best.
3          I see that you have quite a significant workspace.
4   Mr. Millstone and I certainly do not. Although I have two
5   tables put together, this particular workspace with the
6   proximity, with the gallery being so close, I would simply
7   ask that we make accommodations to move to a larger venue.
8   Keep 25 seats if you want. At least give us a larger
9   workspace so that we can properly spread out.
10         I expect that during times when we are examining
11  witnesses, quite frankly, we're going to be getting into our
12  papers. We're going to be making notes. When I lean over to
13  talk to my client, it's going to be a bit difficult unless
14  there's, you know, additional white noise, et cetera, to have
15  some element of privacy or proper workspace the way that most
16  courtrooms are conducted. I would ask that we can begin this
17  morning. So I'm not asking for a delay whatsoever. I would
18  ask that we do find a larger, more appropriate room that
19  would allow us to properly spread out.
20         THE COURT: Attorney Millstone, do you have any
21  comment?
22         MR. MILLSTONE: This is used as a county commission
23  hearing room. The courtroom would be ideal, but we don't
24  have the courtroom available to us that we can have
25  throughout the hearing. We think this is an appropriate

1 space.

2 MR. HAMILTON: Your Honor, I'd also point out that
3 we're talking about a school system here I'm sure that has
4 access to other buildings. As you see right now, we're
5 thankful for the morning sun that is nearly blinding me as I
6 sit here. If I have to sit through that several hours a day,
7 much less all day long, the distractions are going to be
8 great enough. Concentration and sensitivity to the issues
9 are going to require that I be keen, and accordingly, I ask
10 that we have a better place to perform.

11 THE COURT: I can certainly make an inquiry of the
12 county authorities, but I will say this. I've conducted
13 these hearings before in much less ideal circumstances.
14 Courtrooms are not available for administrative hearings by
15 and large. And so administrative proceedings basically have
16 to take whatever is available. Again, I would comment that
17 this being what is available, it's better than I've had on
18 previous occasions. So we'll do what we can.

19 We'll see if we can get you some more workspace if
20 you need more room. I know there's going to be a bit of a
21 problem with our witness. Because unless you gentlemen use
22 the lectern for your examination, we're going to have to turn
23 that chair back and forth. I think we're going to have to
24 just work through that.

25 MR. MILLSTONE: Certainly in administrative

1 proceedings, I have no problem doing the examination from
2 this space as opposed to using the lectern, which opens up
3 the space a little bit more for the witness. You can have
4 the witness in the middle where we can see him or her.

5 THE COURT: That's a good point.

6 MR. MILLSTONE: That would open the space up a
7 little bit more.

8 THE COURT: Any objection to that, if we remove the
9 lectern and just put the witness chair back where it was
10 initially?

11 MR. HAMILTON: Well, obviously, I'll be mandated by
12 whatever your ruling is. I much prefer to work from a
13 lectern so that you can properly analyze the witness's
14 demeanor, the witness's response to the question. In this
15 particular amount of workspace, the witness is right on top
16 of you. Some would say that's great. I prefer to get a full
17 body view. But obviously I'm at your mercy.

18 THE COURT: If you want to use it, we'll leave it.

19 MR. HAMILTON: Very well, sir.

20 THE COURT: Anything else? Any further comments or
21 motions from either attorney?

22 MR. MILLSTONE: No, sir.

23 THE COURT: If not -- I'm sorry?

24 MR. HAMILTON: No, Your Honor.

25 THE COURT: If not, do either of you care to make

1 any sort of an opening statement?

2 MR. HAMILTON: Yes, Your Honor.

3 MR. MILLSTONE: We did not plan on making an
4 opening statement. We were going to just move into the
5 hearing and present the evidence.

6 THE COURT: All right. Do you choose to make any
7 comment before Attorney Hamilton?

8 MR. MILLSTONE: No. No, thank you.

9 THE COURT: All right. Attorney Hamilton.

10 MR. HAMILTON: Your Honor, I haven't had a chance
11 to even get to the lectern yet. Let me see if it's going to
12 be -- sun's right in my eyes. I'll just do it from here,
13 sir.

14 Your Honor, I have a brief opening statement. I
15 just want to begin by first saying that I'm very sad that we
16 are here. I am truly, truly sad that we are here. Because
17 we are here simply for the fact that a public school teacher,
18 John Freshwater, had the courage to keep a Bible on his
19 desk.

20 As you know, being an attorney, Your Honor, lawyers
21 are taught to come up with a theme for their particular
22 presentation, for their particular case. As I started
23 examining some of the different themes that were available in
24 this particular proceeding, I thought about the theme of
25 blatant lies. I thought about the theme of bias and

1 bigotry. I thought about the theme of jealousy, of envy. I
2 thought about the theme of misunderstanding.

3 But truly I came back to one overriding question.
4 That is, after considering all of these themes, after
5 considering all of the information that we have to date, you
6 simply have to keep coming back to this. What makes sense
7 versus what does not make sense.

8 Now, simplistically, why are we here today?
9 Because there's been some allegations made against John
10 Freshwater as a result of his public employment contract as a
11 teacher with the Mount Vernon City School system.
12 Specifically, those allegations as levied in this particular
13 recommendation for termination and as levied in the
14 investigative report says there were ten different
15 allegations.

16 Number one, that he burned a cross on a student's
17 arm. Number two, that he displayed the Ten Commandments.
18 Number three, that he kept Bibles in his classroom as a
19 display for the students. Number four, that he engaged in
20 religious teaching, including teaching his own beliefs from
21 the Bible. Number five, that he engaged in prayer at a
22 Fellowship of Christian Athletes student meeting. That he
23 led a healing session during an FCA meeting. That he
24 violated the school's permission policy.

25 Number eight, that he made statements about

Page 21

1  Fellowship of Christian Athlete members being the saved ones
2  whereas other people who were not part of the FCA were not
3  the saved ones and would go to hell.  Number nine, the
4  allegations are that he gave Bibles to other students.
5  Number ten, that he gave an extra credit assignment that
6  promoted the concept of intelligent design.  Simplistically,
7  that's why we're here.
8          The reality, though, is you have to keep coming
9  back to what makes sense on one hand versus what does not
10  make sense on the other hand.  Responding to these specific
11  allegations will be done.  They absolutely will be done.
12  We'll do it through every particular witness that the school
13  board presents and we will do it through witnesses that we
14  will call.
15          You'll actually hear from John Freshwater at some
16  point in time.  But responding to these specific allegations
17  are really quite simple.  As to him burning a cross on a
18  student's arm, you'll find out that it took 43 days for the
19  principal, Bill White, to even put anything on paper related
20  to that particular incident.  The alleged injury was only
21  recharacterized as a cross in this situation only after it
22  was discovered that John Freshwater would not take his Bible
23  off of his public schoolroom teacher's desk.
24          As far as displaying the Ten Commandments, it's
25  very, very interesting -- first of all, that's correct John

Page 22

1  Freshwater did remove the Ten Commandments when he was asked
2  to do so.  He absolutely did so.  There were no other
3  religious items pointed out to him by letter that he should
4  remove at any particular time.  But very interestingly,
5  what's not in the investigative report that will come out
6  through testimony is that that particular book cover, because
7  that's all it was, it was a book cover with motivational
8  statements on both sides posted on his door for a significant
9  period of time, including during the time of the previous
10  principal administration up to and including during the time
11  of the last school year that are at issue in this particular
12  situation.
13          Number three, in response to keeping Bibles in the
14  classroom as a display for students, John Freshwater never
15  kept a display of Bibles in his classroom.  Not his only
16  personal Bible and certainly not a bunch of Bibles that were
17  in the back that were in a box or a bag.  He never kept them
18  there to distribute nor to display.
19          In fact, it's quite interesting, the Fellowship of
20  Christian Athletes, of which he had been the monitor for 17
21  years, previously actually had the blessing of the
22  administration to keep those particular items in that
23  particular room.  John Freshwater was never ordered, never
24  instructed, that had he could not keep those items as part of
25  his duties as a monitor, a facilitator, or supervisor of this

Page 23

1  particular student led group.
2          As far as responding to engaging in religious
3  teachings and including his own beliefs from the Bible,
4  credible reliable evidence, sir, is going to demonstrate that
5  simply is a false allegation.  As far as him engaging in
6  prayer in FCA meetings, as the faculty approved and appointed
7  a facilitator, monitor, supervisor of the Fellowship of
8  Christian Athletes, John Freshwater was there for a
9  particular purpose.  He's there to make sure that the
10  students behave.  There to make certain that the students
11  don't tear up the room.  There to make certain that the
12  students aren't otherwise doing things the students shouldn't
13  do.
14          Otherwise, they're allowed to engage in their
15  particular activity.  The particular activity that the
16  Fellowship of Christian Athletes was engaging in during this
17  alleged prayer that John participated in, they were praying.
18  And as they were praying, it's alleged that John was
19  participating in that particular prayer.
20          What's very important for you to recognize is that
21  if John was participating in that particular prayer,
22  understanding what prayer means in the Christian faith, much
23  less any of the other faiths, if he was participating in a
24  prayer with that particular group, he would not have been
25  mindful of the time that was approaching, indicating that

Page 24

1  these particular students needed to get back to class.
2          As the facilitator, supervisor, monitor of the FCA,
3  John Freshwater had to make a decision.  How do I
4  appropriately interrupt these students during their student
5  led prayer, a group of which he was not a participant, and
6  make certain that they get to class on time?  John Freshwater
7  was appointed as the FCA faculty approved member for the sole
8  reason that he had the sensitivity, the understanding, to
9  respect these particular students and this particular
10  situation.  So he interjected and interrupted this particular
11  prayer with an appropriate Amen so that the students then
12  would simply get on with going to class.  John Freshwater,
13  you're going to learn, never participated nor led a prayer
14  during the FCA meetings.
15          It's stated that he led a healing session.  As I've
16  already stated, John neither led nor participated in a
17  healing session with this particular group.  He never engaged
18  in a group prayer with this particular group.  And as has
19  been asserted, he never engaged in any kind of demonic
20  extrication as was once reported.  He never did any such
21  thing.  He certainly didn't do it in a public school
22  classroom.
23          As far as him violating the school's permission
24  slip policy, not even the investigator hired by either the
25  law firm or the school board, we'll have to figure out which,

1  either way, even the investigator could not determine that
2  John Freshwater violated the permission slip policy as is
3  alleged.
4          Number eight, that he made statements about the FCA
5  members being the saved ones. Again, not even the
6  investigator could find credible evidence supporting that
7  particular allegation. It's going to be very important that
8  if we're going to sustain one particular allegation based
9  upon assertions by one person or one particular group, if one
10 allegation is not sustained, how many other allegations
11 really have the substance or the sufficiency of credibility
12 to be sustained also?
13         Number nine, he gave Bibles to distribute to other
14 students. It's going to be very interesting as we learn how
15 those particular Bibles came to be in John Freshwater's
16 classroom. Going to be very interesting to learn also how
17 these particular Bibles were actually stored in the
18 classroom. Again, as I said earlier, with the
19 administration's blessing. Not even the investigator could
20 find any violation there.
21         Number ten, that he gave extra credit assignment
22 involving intelligent design. I have to tell you, as a
23 former law enforcement officer, as an attorney who simply
24 tries to be as thorough and fair as possible, even a
25 marginally competent, even a marginally thorough

1  investigation, would have got to the real essence of the
2  matter as it relates to that extra credit assignment. We'll
3  make certain that you have that information at the conclusion
4  of this hearing.
5          On one hand, you're going to be asked to believe
6  that all of a sudden from December 7, 2007, to April 22nd,
7  2008, that John Freshwater did all of these ten allegations
8  as alleged. That's what you're going to ask to be believed
9  on the one hand. On the other hand, you have to ask yourself
10 what makes sense versus what doesn't make sense. On the
11 other hand, you're going to be asked to believe that John
12 Freshwater has been doing these particular ten violations for
13 a long and sustained period of time. Again, you've got to
14 ask yourself what makes sense versus what doesn't make
15 sense.
16         And as you take a look at John's personnel file,
17 you're going to notice that if he had been doing anything
18 wrong under the rules of the collective bargaining agreement,
19 under the rules of notice of due process, he had to be
20 notified of any particular deficiency unless it fit into one
21 of perhaps four categories.
22         In this situation you're going to have an
23 opportunity, sir, to review all 45 evaluations. We're going
24 to focus upon those particular evaluations. As you're going
25 to take a look at them, you're going to see that John's

1  personnel file, it's full of positive, positive performance
2  evaluations. There's not a single incident of discipline.
3  You're going to be able to make your own determination as to
4  whether or not there was some negligent supervision, whether
5  or not there was some fatal policies or policies not even
6  followed. One thing will be certain. After you evaluate all
7  of the particular personnel evaluations that we will go
8  through, John Freshwater was, is, and will be a role model as
9  a very good teacher.
10         We also have the issue of bias. Full and complete
11 analysis of John's personnel file will be the first
12 indication of a biased approach to this investigation which
13 was designed to reach a predetermined objective.
14 Interestingly, the investigator hired by, again, the school
15 board or the school board's attorney, he chose one evaluation
16 out of all 45 evaluations. He chose the January 21st, 2003,
17 evaluation by principal Jeff Kuntz wherein Principal Kuntz
18 directed John Freshwater, quote, to continue to adhere to
19 board policy and guideline 2270 with respect to religion in
20 the classroom.
21         You don't even have to understand the English
22 language very well. If John Freshwater was not adhering to
23 the policy of religion in the classroom, the principal, as an
24 authoritative evaluator and observer, would have said John,
25 start adhering to this particular policy of religion in the

1  classroom. Instead, he didn't put start. He put continue.
2  Which, of course, infers that John had been doing so all
3  along.
4          Since December 6, 2007, there's been all kinds of
5  alleged problems in John Freshwater's classroom.
6  Interestingly, we're going to find out, we're going to have
7  an opportunity to discuss it with Mr. White, he never once
8  stepped into the classroom and evaluated John Freshwater.
9  Not before December 6, 2007, and not after, up to, and
10 including April 22nd, 2008, when instead they put a monitor
11 in the classroom to evaluate and observe John Freshwater.
12         If there were problems going on in the classroom at
13 any point in time, either historically or between December 6,
14 2007, and April 22nd, 2008, certainly, you would think that
15 if there was a problem, the principal would have gone in and
16 evaluated John, would have gone in and at least checked
17 things out. Perhaps they would have put a monitor in there a
18 little bit sooner. But you're going to find out he didn't do
19 so.
20         Interestingly enough, this particular investigative
21 report, which is supposed to be objective, interestingly
22 enough, they didn't interview even one person, one person who
23 had been in John's classroom for the longest period of time,
24 the person who had been in John's classroom since calendar
25 year 2001. The investigator didn't see fit to ask that

1 person about John's conduct and performance in the
2 classroom. We're going to hear about it, though, eventually
3 in this particular forum.
4       Far from as reported in the media, served by the
5 investigation, the allegations against John, Your Honor, are
6 not proven. I ask that you pay particular attention to times
7 and places, to the people, and assess their credibility. And
8 as you're doing so, I think you're going to find out John
9 Freshwater, he did not teach religion in the public
10 classroom. John Freshwater did not teach intelligent design
11 nor creationism in the public classroom. John Freshwater did
12 not create a display of a religious nature. John Freshwater
13 certainly did not burn a cross onto a person's arm.
14       It's easier to terminate in the State of Ohio if
15 you can prove one of four things. By statute of which we're
16 going to talk about quite a bit, Ohio Revised Code 3319.16.
17 If you can demonstrate that a teacher has been grossly
18 inefficient, somehow immoral, somehow disregarded
19 persistently reasonable regulations of a particular school
20 board or for other just cause you can terminate that
21 particular teacher. But you cannot fire a schoolteacher
22 simply because they chose to keep a Bible on their desk.
23 Again, we'll come back to the primary issues, Your Honor.
24       What makes sense on the one hand if John was doing
25 something and what makes sense on the other hand if he

1 wasn't? Historically, John's been a teacher since 1987.
2 Technically, he's in his 22nd year. However, he begins his
3 22nd year of teaching in the status of suspended without
4 pay. Particularly egregious category to be in considering
5 that teachers even in this local community who have been
6 accused of far more heinous things than John has done,
7 they're suspended with pay. In this particular situation,
8 there's some real animosity, there's some real bias towards
9 John. We're going to expose and explore that as we go
10 through these particular witnesses.
11       I think it's very, very interesting that if John
12 Freshwater had been doing all of these horrible bad things as
13 listed in these particular ten allegations, you know, he
14 wouldn't have been nominated, not by the teachers, not by the
15 students, but nominated by the administration, his
16 supervisors, let me make sure I get this right, for
17 distinguished service award presented to John Freshwater in
18 recognition of exceptional leadership and devoted service to
19 the Mount Vernon City School System for the calendar year
20 2000 and 2001.
21       John didn't just receive this award once. It's
22 going to be very important as we take a look at calendar
23 years 2006/2007, John received because he was nominated and
24 because he was approved as having done a very good job. And
25 because of that, John went forward doing the same things that

1 he had been re-enforced to do based upon his personnel
2 evaluations, based upon conversations that he had with
3 administrators at the time. John Freshwater had been
4 performing as an exemplary employee, as a public school
5 teacher. And right here there's no greater proof. But
6 there's a lot of proof also in his personnel evaluations.
7       It will be interesting, because I will ask and we
8 will get an answer, how many other teachers have had the
9 distinction of being awarded two of these particular awards
10 during this short period -- this short time frame? It's
11 going to be important we take note of that.
12       This particular process of which we've already
13 engaged in this morning with the different motions, et
14 cetera, I think it's very important, and you've indicated,
15 Your Honor, that you have some experience with this
16 particular process. This particular process, as you know,
17 although it is quasi judicial in nature, doesn't necessarily
18 afford itself to discovery under the traditional rules of
19 civil procedure. Therefore, I expect that some of the
20 questioning that we will have to do, quite frankly, would
21 have been best in a deposition. Nonetheless, it's going to
22 have to take place in this forum because we have to create a
23 substantial record in this particular matter. Because of
24 that, I expect the matter to be lengthy.
25       As best we know, the evidence as promoted against

1 John Freshwater supporting the particular termination as
2 proposed is an investigative report based upon assertions by
3 different people, based upon statements by different people,
4 some of whom we've been able to decipher who they are, some
5 of whom we've never had the opportunity to speak with, much
6 less than their identity.
7       We got the investigative report as the primary
8 piece of evidence. We also have four letters. Those four
9 letters, one issued on June 8, 2006, a particular letter also
10 authored on January 22nd, 2008, and two additional letters
11 coming within a week of each other, one on April 7, 2008, and
12 one on April 14, 2008, all four of those letters along with
13 the investigative report are going to be essentially the sum
14 and substance of the evidence we've been able to examine so
15 far. I suspect there's going to be additional evidence for
16 that, but for the very first time we're going to have a
17 chance at taking a look at that evidence.
18       At the conclusion of that evidence, I'm going to
19 have to ask you to analyze not only the weight and
20 sufficiency of the testimony presented, but you're going to
21 have to analyze the credibility. I will tell you that John
22 Freshwater has earnestly been desiring this particular
23 hearing. He has wanted this particular opportunity to
24 explain the truth of the matter.
25       You're going to hear from John Freshwater. As you

1 hear from John Freshwater, although he's sick today, although
2 he's been sick for the past couple days, taking his
3 medication, et cetera, you're going to hear from him. When
4 you do, you're going to have to ask yourself what's the
5 weight and sufficiency of the testimony that you'll see
6 before you compared to the weight and sufficiency of the
7 testimony as presented?
8     It's been alleged that John Freshwater has violated
9 the nation's -- violated this nation's laws and this
10 particular school board's policies. I will tell you that
11 there have been violations of law. I will tell you that
12 there have been violations of policy. But I will also tell
13 you John Freshwater has not violated those laws nor those
14 policies. The proper explorations will demonstrate more
15 precisely who has violated the law and who has not adhered to
16 the policies.
17     People, teachers, administrators, maybe former
18 students, they may not like John Freshwater because of his
19 congenial Christian nature and because of his community
20 activism, but that doesn't mean you can terminate his
21 particular public employee contract with the Mount Vernon
22 City School System. You see, here in America, you can't fire
23 somebody simply because they kept a Bible on their desk.
24 We're going to examine that particular Bible.
25     We're going to ask you to accept the duty and the

1 responsibility that the Mount Vernon City School System
2 administration did not accept and that the investigator in
3 this situation did not accept, and that is to analyze all of
4 the evidence in a thorough manner. And that in and of that
5 particular presentation, we're going to ask you to evaluate
6 John Freshwater and his performance against the allegations.
7 We are going to ask that you recommend to the school board
8 that he be reinstated with full back pay and be able to
9 continue on with his particular contract. Thank you for your
10 time, sir.
11     THE COURT: Thank you, Mr. Hamilton. I would note
12 also that your comment concerning your client's medical
13 condition, if at any point in time he feels the need to
14 leave, just raise your hand or have him do so.
15     MR. HAMILTON: He is under continuing duty pursuant
16 to subpoena to be here. I think he probably would have been
17 here anyway. But he's not feeling good. He told me -- I've
18 asked him not to breathe too close to me, but obviously he's
19 going to continue to do so. I think he'll keep his coat on,
20 not because he wants to leave but because he's chilled.
21     THE COURT: I was told when we first began the
22 proceeding that we can disengage the fan. I notice he's not
23 the only one with a coat on. Maybe this would be a good time
24 to do that. There's evidently a switch on the thermostat.
25 If it's as simple as on/off, click it on/off. If it's not,

1 we'll get the sheriff to help us.
2     Unless there's anything further of a preliminary
3 nature, Attorney Millstone, I would ask that you call your
4 first witness.
5     MR. MILLSTONE: We would call Steve Short as our
6 first witness.
7     THE COURT: I would just state preliminarily, as
8 you're well aware, this matter is being recorded, so you have
9 to give verbal answers. Nods of the head cannot be noted on
10 the record. Also, try and speak clearly and distinctly. If
11 the court reporter has a problem, doesn't understand, she'll
12 ask you to repeat. If you're talking too quickly, she'll ask
13 you to repeat or to slow down. If you could just follow her
14 instructions if there are any. Before starting, if you would
15 raise your hand and repeat after me.
16     STEPHEN SHORT,
17 called as a witness on behalf of the Board of Education,
18 being first duly sworn or affirmed, testified as follows:
19     DIRECT EXAMINATION
20 **BY MR. MILLSTONE:**
21 Q. Would you state your name for the record, please.
22 A. Stephen Short.
23 Q. And where are you employed?
24 A. Mount Vernon City Schools.
25 Q. What position do you hold there?

1 A. Superintendent.
2 Q. How long have you been superintendent of the schools?
3 A. January 1st, 2008, until now.
4 Q. And how long have you been with the Mount Vernon
5 Schools?
6 A. I've been with them 24 out of 26 years in education.
7 Q. And could you please describe some of your prior
8 employment with the schools, other positions held.
9 A. I was a sixth grade teacher at the middle school for 11
10 years. I was a director of -- excuse me, I was an elementary
11 principal at Dan Emmett Elementary for nine. I was director
12 of student services for Mount Vernon City Schools for two.
13 And at that time I was also an interim superintendent and
14 then became superintendent in January.
15     Outside of Mount Vernon City Schools, I was a sixth
16 grade teacher at Hardin Northern Local Schools and also a
17 middle school principal at Crestline Exempted Village
18 Schools.
19 Q. How long were you serving as interim superintendent?
20 A. I was interim superintendent in -- for '06, for '07 for
21 about two months while the superintendent was dealing with a
22 medical situation. Then I became the interim superintendent
23 in August 1st of 2007.
24 Q. So you've either been the interim or superintendent for
25 all of the '07/'08 school year.

1  A.  That is correct, yes.

2  Q.  Now, as you know, we're here today to have a hearing

3  before this referee with respect to the issues concerning

4  consideration and termination of John Freshwater's

5  employment.

6  A.  Yes.

7  Q.  Did you make the recommendation to the board that they

8  consider the termination of Mr. Freshwater?

9  A.  Yes, sir, I did.

10  Q.  And I'd like to hand you what's been marked for

11  identification purposes as Board Exhibit Number 1.  Could you

12  identify that for the record, please.

13  A.  Yes, sir.  This is the amended resolution of intent to

14  consider termination of the teaching contract of John

15  Freshwater.

16  Q.  Okay.  And was this adopted by the board?

17  A.  Yes, it was.

18  Q.  And it indicates it's an amended resolution.  Do you --

19  did you go through or do you recall what happened or why

20  there's an amended resolution?

21  A.  I believe the amended resolution was due to a

22  grammatical change.  It was -- American content standards was

23  used in the original resolution, and it should have been an

24  academic content standards, so that was the cause for the

25  amendment.

1  Q.  Okay.  And just so that we get the record complete, did

2  Mr. Freshwater request that hearing?

3  A.  Yes, sir, he did.

4  Q.  Hand you what's been marked as Board Exhibit Number 2.

5  Ask if you can identify that for the record, please.

6  A.  Yes.  This is the request for a public hearing by

7  Mr. Freshwater.

8  Q.  And the cover sheet is addressed to me from

9  Mr. Freshwater's attorney?

10  A.  Yes, sir, it is.

11  Q.  Indicating it's attached?

12  A.  Yes.

13  Q.  Now, could you please indicate what the basis for your

14  recommendation to the board was.

15  A.  The basis for the recommendation began in December when

16  we received an initial complaint dealing with an etching or

17  mark on a student's arm.  Complaints continued along that the

18  teacher was teaching his religious beliefs in the classroom,

19  was not monitoring FCA appropriately, that creationism and

20  intelligent design was being shared, that an inappropriate

21  assignment was given to the class, and that there were

22  religious displays in the classroom.

23  Q.  Okay.  And is there a point in time when you decided

24  that you needed to have an outside investigation?

25  A.  We dealt with these -- a lot of these issues as they

1  came up individually as incidents as they took place.  And

2  then I would say as they accumulated and grew in number, we

3  felt that an independent investigator would help us to try to

4  come up with -- be able to do an investigation and allow us

5  to come up with an understanding of what all was taking

6  place.

7  Q.  And did you receive a report from the investigator?

8  A.  Yes, we did.

9  Q.  Before we get into that, you indicated that you had

10  multiple complaints.

11  A.  Yes, sir.

12  Q.  Were these complaints verbal or in writing?

13  A.  They were both.  We received verbal complaints dealing

14  with some of the things that we've talked about and then

15  written complaints that are also part of the investigative

16  report.

17  Q.  Okay.  I'm going to hand you what's been marked as Board

18  Exhibit Number 3.  Take a moment to take a look at that,

19  please.  Can you identify that document?

20  A.  Yes, sir.  This is allegations and concerns we received

21  from the John Doe's attorney.

22  Q.  Okay.

23         MR. MILLSTONE:  For the record, Your Honor, we've

24  redacted the names of the family that were contained in the

25  letter.  This being a school record, the concerns are the

1  Family Education Rights and Privacy Act.  There's also the

2  order in the federal court that this is a lawsuit in which

3  there is a pseudonym for the family that filed the lawsuit

4  and the board being a party is in potential contempt of court

5  were we to disclose the names.

6         MR. HAMILTON:  If I may respond, Your Honor, number

7  one, there's been a federal ruling indicating that, and I

8  think you're well aware of this, and that's the reason you

9  issued your ruling yesterday, they'll have easy access, but I

10  do have them available.  I think that at this point we can

11  dispense with the use of the pseudonym Doe.  We can dispense

12  with any other protective measures of trying to keep these

13  people confidential.  Let's just go ahead and start using

14  their names.

15         MS. MOORE:  With all due respect, Your Honor, Sarah

16  Moore.  I represent the board of education in the federal

17  litigation.  It would be our position, as Mr. Millstone has

18  indicated, that use of names other than the pseudonyms for

19  the John Doe family would be violative of the June 24th --

20  excuse me, June 23rd, 2008, order requiring that pseudonyms

21  be used in that lawsuit.  We do not have an order from the

22  Court allowing us to veer from that order and identify them

23  in these proceedings.

24         MS. PHILEMOND:  Your Honor, if I may also be heard?

25         THE COURT:  Go ahead.

1    MS. PHILEMOND: Jessica Philemond. I represent the
2  Doe family. In Judge Frost's federal decision, what he found
3  was that he, as a federal district court judge, did not have
4  jurisdiction to rule upon this issue. But certainly the
5  State court of common pleas would. Your Honor, it is my
6  intention as the counsel for the Doe family to file an action
7  in the state court regarding whether they may be protected in
8  these proceedings.
9    I would ask, Your Honor, then, in these first two
10  days of the hearing proceedings, to use pseudonyms for this
11  family. And if my motion is denied, then obviously we would
12  have to disclose their names pursuant to court order.
13    MR. HAMILTON: Your Honor, they've had the
14  opportunity to go over to the courthouse for several days now
15  and file their motion to seek some sort of injunction, to
16  seek some sort of temporary relief that would have given them
17  exactly this measure. This is exactly the ploy that was used
18  on September 19th, I believe, when we had several weeks,
19  several weeks in existence where they knew your position on a
20  closed hearing -- a closed hearing versus open hearing and
21  you had chosen that the rights of the employee would be
22  protected. You said there would be an open hearing.
23    They waited for several weeks before they, I'm
24  going to say, teamed up together and then ran over to federal
25  court. They knew right then that they could have had an

1  action going not only in federal court seeking injunctive
2  relief. They could have sought injunctive relief at the
3  state court. This is simply a delay tactic. This is simply
4  an effort to create further additional work on me as his
5  particular representative in this particular proceeding.
6    You can see that there's two different attorneys
7  there represented by three different firms. I'm solo
8  associated with several other attorneys. This particular
9  tactic could have been long dealt with a long time ago. This
10  isn't the proper forum to deal with it. It is time to move
11  forward. Identify these people as your ruling has already
12  stated. If they wanted some sort of protective relief
13  because it was so important, they could have already done
14  so. I would ask that you deny their motion and let's get on
15  with using the identity of these people's names.
16    MR. MILLSTONE: If I may?
17    THE COURT: You may.
18    MR. MILLSTONE: When we had our prehearing
19  discussion with you and Mr. Hamilton, there was a request
20  whether I could structure my case so that I did not bring any
21  of the potential Doe students into the hearing room during
22  the first two days of this hearing. I have restructured my
23  case pursuant to that. That was not an order, but it was a
24  request as I understood it. I have done that in anticipation
25  of this issue being a potential problem.

1    THE COURT: Go ahead.
2    MR. HAMILTON: Rules of civil procedure, very
3  simple. They want this kind of motion. It needs to go
4  forward seven days before the hearing. This has been
5  available for it to go forward many days before the hearing.
6  They've chose not to bring it up now. There's already been a
7  federal ruling. This isn't even according to the rules of
8  civil procedure at this point. There's no need to protect
9  the identity of this particular person. There's not been any
10  incidents of alleged harm or harassment, et cetera, that can
11  be verified, that can be validated, that have been reported
12  to local law enforcement. It's time to move on, Your Honor.
13  This is simply a delay tactic.
14    THE COURT: Let me ask you, Attorney Millstone, do
15  your associate counsels here at the table with you have any
16  idea of a timetable on these other motions or proceedings
17  that may be brought in other courts?
18    MR. MILLSTONE: First of all, let me be clear.
19  These are counsel that are, one, representing the district in
20  the civil litigation. They're not representing them here at
21  this hearing. Counsel representing the Doe family. They're
22  not my associate counsel in this matter. We're proceeding
23  on -- as a different law firm and as the sole counsel for the
24  school district with respect to this proceeding. So let me
25  clear that up to start with.

1    THE COURT: All right.
2    MR. MILLSTONE: Secondly, I think that
3  Ms. Philemond indicated she intends to go to the state
4  court. That's what I just heard her say. I can't speak -- I
5  can't speak for her.
6    THE COURT: We'll let her speak for herself.
7    MS. PHILEMOND: Thank you, Your Honor. It is my
8  intention with the motions that have been filed and your
9  decision being made, I believe, yesterday. I've not had time
10  to get to Mount Vernon and file my motion yet, but I will be
11  doing that very shortly.
12    You know, Mr. Hamilton just referenced that there
13  is no threat against the student. I would strongly
14  disagree. I think we don't need to drive very far to see
15  signs in this community which read if the Bible goes, the
16  student goes. The family has been criticized publicly in
17  board meetings, being referenced as atheists. They're
18  Christian -- they're a Christian family and other things. So
19  I think there is a real threat against this family.
20    I think it's premature to disclose our identities
21  now when the state court judge in days or weeks prior to this
22  hearing being reconvened and their testimony being brought
23  before Your Honor might say that they should be remain
24  anonymous.
25    THE COURT: Lets me ask a few questions about the

1  issue of potential violation of a federal court order.  Do
2  the two of you counsel really believe that's at issue here?
3  If so, what's the basis for that?
4       MS. MOORE:  Your Honor, with respect to the June
5  23rd, 2008, order, the federal court had granted plaintiff's
6  motion to allow them to proceed in the federal lawsuit under
7  pseudonyms.  That motion was premised upon safety concerns
8  that had been articulated and substantiated in the motion
9  that plaintiffs put before the federal court.  We had filed
10  an emergency motion with the court in which we sought to have
11  the court extend that original order to these proceedings
12  specifically with relation to the Doe family and other minor
13  children.
14       As Mr. Hamilton has indicated, the federal court
15  ruled and ruled purely on a jurisdictional basis that it did
16  not have the ability under the Anti-injunction Act, which I
17  believe is 28 USC 2283, if memory serves, did not have the
18  authority under the Anti-injunction Act to issue that order
19  as they did not feel it was necessary in an effort to extend
20  their jurisdiction to maintain their jurisdiction.  And
21  within that order, they indicated that that was better left
22  to the state, given that RC 3319.16 provides for an
23  administrative proceeding with -- administrative proceeding
24  with yourself presiding and that you would be effectively in
25  a position to make those determinations, and that there were

1  also state court remedies available to plaintiff's counsel
2  should plaintiff's counsel desire to move forward with
3  those.
4       From the board of education's position, we believe
5  that, number one, as Mr. Millstone has indicated, the record
6  at issue that brings it before you is a record that squarely
7  falls as a student record under the Family Education and
8  Rights Privacy Act which requires that we are not allowed to
9  release the information regarding the students unless there
10  is a judicial order.  Even if there is a judicial order, we
11  are required to go through a procedure where we provide the
12  parents of the minor child the opportunity to object to the
13  information being disclosed.
14       So the issue that's been brought squarely before
15  you from our perspective on the FERPA would inherently
16  require you to allow the Doe family the opportunity to raise
17  their objection under FERPA through this record to the
18  information being disclosed.  We defer it back to you in
19  terms of the appropriate vehicle to do that.
20       Of course, Mr. Millstone can indicate to you what
21  he feels is appropriate.  With respect to the June 23rd,
22  2008, order, we want to make sure that we are doing
23  everything possible to insure that we are not taking steps
24  within this proceeding to indirectly violate that order or
25  directly violate that order by virtue of identifying this

1  family.
2       THE COURT:  First of all, if I can just get some
3  clarification here on FERPA, there is a subpoena exception.
4  Certainly, if this document had been subpoenaed into this
5  proceeding, it would be accepted under the FERPA rules, would
6  it not?
7       MS. MOORE:  Your Honor --
8       MR. MILLSTONE:  Subject to certain limitations as
9  counsel has described.
10       THE COURT:  If it hasn't been subpoenaed and you're
11  concerned about it being a violation of FERPA, I guess I
12  would wonder why you would introduce it as an exhibit at all.
13       MS. MOORE:  Your Honor, Mr. Millstone certainly has
14  the right to use a record in a proceeding with not -- without
15  disclosing the information that would be violative of FERPA.
16  Using the record that's being used is not inherently a
17  violation of FERPA unless the student's identity or the
18  student identifying information is disclosed within that
19  record, which it is not by virtue of it being redacted.
20       THE COURT:  Did you have another comment?
21       MR. HAMILTON:  Oh, I have several, if I may, sir.
22  Your particular decision, I believe it was yesterday,
23  responding to Ms. Philemond's statement that she believes
24  there's some sort of potential for harm, even your own ruling
25  on page 2 says, At present there is no evidence before me

1  which leads me to believe that there have been any incidents
2  calling for special or extraordinary measures of security.
3  Further, you stated, Although pleadings speak of
4  intimidation, retaliation, and/or inappropriate local or
5  national exposure, no evidence has been put forth citing
6  examples of such.
7       Number one, if we're going to continue this charade
8  or this shroud of secrecy, let's go ahead and have an
9  evidentiary hearing.  We've got no police reports.  We've got
10  nothing to indicate that anybody has threatened these
11  people.  We have simply somebody expressing their First
12  Amendment convictions of which we're allowed to do in
13  America.
14       As it relates to Ms. Moore, she was in the meeting,
15  were you not, Ms. Moore, when Judge Frost on the
16  teleconference, and I believe you were there also, David,
17  Jessica, I believe you were there, he clearly said if my
18  ruling comes out that we don't have jurisdiction, then you're
19  not going to be running afoul of contempt or any kind of
20  violation of judicial orders.  The judge even spoke about
21  that.
22       The -- as far as Ms. Moore saying that they've done
23  everything possible, they're trying to do everything possible
24  to comply with FERPA, if you're trying to do everything
25  possible, you wouldn't have waited several weeks.  You

1 wouldn't wait until this hearing to propose this particular
2 remedy.
3        Quite frankly, I see what's happening now.  You've
4 got Ms. Moore trying to promote her particular angle of the
5 case and now it's starting to interfere with Mr. Millstone,
6 because he's got to make a decision:  Does he include or
7 exclude the exhibit.  I'm almost to the point now where I say
8 you know what, I'm going to object to these two parties being
9 in this particular administrative hearing, because all it's
10 doing now is interjecting, interrupting, disrupting this
11 particular flow, and more importantly, jeopardizing the
12 rights of my particular client.
13        So at this time, Your Honor, I know you've already
14 got several motions before you, I'm going to make a motion
15 for an evidentiary hearing as it relates to any particular
16 harm that may be out there somewhere as it relates to the Doe
17 family.  I'm also going to make a motion that Ms. Moore and
18 Ms. Philemond be excluded from this particular proceeding.
19 They could have brought all this up in state court already.
20 They could have sought injunctive relief and quit wasting our
21 time.  It's time that we go ahead and have this particular
22 hearing.
23        I ask that either we go forward on the motion for
24 an evidentiary hearing and the motion to exclude these two
25 parties, or I don't know how we're going to get through this

1 in the seven days that we've allotted, already of which I had
2 to request a continuance of one of those days because of
3 these particular tactics that could have been taken care of
4 long ago.  With that, Your Honor, in case you can't tell, I'm
5 a bit frustrated.
6        MS. MOORE:  If I may, Your Honor, we certainly are
7 not here to interfere with the proceedings.  You asked me
8 questions relating to the order.  You asking me questions
9 relating to how those proceedings may affect these
10 proceedings certainly is within your purview.  If my mere
11 answering those questions serves as a basis, that would, of
12 course, have the effect of -- affecting your ability to get
13 the information you need to make your decisions.  So I'm not
14 here to frustrate things.  Certainly we have the right to be
15 here on behalf of the board of education.
16        THE COURT:  Let me have all counsel approach the
17 bench, if you would, please.
18        MR. HAMILTON:  Your Honor, when you say all
19 counsel, we have to introduce Josh Deschler for the record.
20        MR. DESCHLER:  Jason Deschler.
21        MR. HAMILTON:  I'm sorry.  It's Jason Deschler.  He
22 can introduce himself.
23        THE COURT:  You represent who?
24        MR. DESCHLER:  John Freshwater in the civil case,
25 federal court.

1        (Discussion held off the record.)
2        THE COURT:  Ladies and gentlemen, we've had
3 extended discussions amongst all legal counsel who are
4 present in the room.  At the conclusion of those discussions,
5 it has been determined that this proceeding will now be
6 adjourned at five minutes after 11:00 and we will reconvene
7 at 1:00 this afternoon.
8        The purpose for the adjournment is that there are
9 certain legal issues that have to be discussed, discovered,
10 and researched, and it probably will take all of the just
11 short of two hours to accomplish that task.  When we
12 reconvene at 1:00, then, after considering the answers to
13 those issues, a decision will be made by myself concerning
14 the continuation of this proceeding.  So with that, we will
15 stand adjourned.
16        I will tell the folks in the gallery that I don't
17 know if there are others outside waiting to get in to see
18 these proceedings.  You don't really have a reserved seat.
19 So I'm not saying you have to stay in your chair for the next
20 two hours, but certainly if you stray far from the building,
21 make sure you're back in time that you can get another seat
22 and come back in at 1:00.
23        MR. HAMILTON:  Your Honor, you said that -- I
24 thought we were going to lock the room down so Mr. Millstone
25 and I didn't have to pick up our stuff.

1        THE COURT:  The room will be locked.  You in the
2 gallery, you're certainly welcome to come in, but you won't
3 be able to be seated again until 1:00.  We're going to be
4 locking the room for all the equipment and belongings and
5 things that will be left in here.
6        UNIDENTIFIED SPEAKER:  Will there be a line of
7 people competing to get in, sir?
8        THE COURT:  I've spoken to the deputies a couple of
9 times this morning.  They're not aware of anyone else that's
10 out there waiting to get in that hasn't been in, but we're
11 not sure if someone else might show up in the interim.  There
12 may be a line.  I can't answer that.  I doubt that there will
13 be.  I think that everyone that's interested in this
14 proceeding is already here.
15        UNIDENTIFIED SPEAKER:  There are others that wanted
16 in.
17        THE COURT:  All right.  We'll be adjourned until
18 1:00.
19              - - -
20        The proceedings were in recess.
21              - - -
22        AFTER RECESS
23        THE COURT:  I would remind those of you in the
24 gallery about cell phones.  Please disengage those if you're
25 carrying them.  Also about recording in this chamber.

1 There's been -- as the gallery is well aware, there's been a
2 lengthy discussion, both this morning and now this afternoon,
3 concerning some matters that were associated with this
4 hearing but not directly concerning this hearing. We believe
5 that we have resolved those issues, and at this point in time
6 it's my understanding that one or more of the legal counsel
7 in the room would like to make a statement for the record to
8 resolve those issues.
9     MS. PHILEMOND: Thank you, Your Honor. Jessica
10 Philemond on behalf of the Doe family. Your Honor, we have
11 been fighting for some time now on behalf of the Doe family
12 and the children of Mount Vernon to protect their identities
13 in this matter, all of the children. The school district as
14 well. We have sought the agreement of John Freshwater and
15 his counsel in order to do that. They would not agree to the
16 protecting of the identities of the students of Mount
17 Vernon. Therefore, the Doe family has decided at this time
18 that they will come forward. They will no longer be a Doe
19 family. They are Jennifer and Stephen Dennis. Their son is
20 Zachary. You have our authority to share their names in this
21 hearing.
22     THE COURT: Thank you. That having been said, I
23 believe we can now return to the point of which we
24 discontinued the examination of your witness.
25 BY MR. MILLSTONE:

1 Q. You have in front of you Board Exhibit Number 3?
2 A. Yes, I do.
3 Q. Having heard that stipulation, can you identify what
4 that document is.
5 A. It's a document I received from Jessica Philemond,
6 attorney for Dennis family.
7 Q. And it contains?
8 A. It contains ongoing complaints, allegations against
9 Mr. Freshwater.
10 Q. And I want to hand you what's been marked for
11 identification purposes as Board Exhibit Number 4. Can you
12 identify that, please. And for the record, let me indicate
13 there is a redaction on this. It isn't as apparent as it is
14 on the other -- on Exhibit 3. On Exhibit 3 Dennis's name had
15 been redacted, but here it is -- the CC was also to -- is
16 redacted. That had been to, I believe, Steve Dennis or
17 Mrs. Dennis. I'm not sure which it was.
18 A. I'm identifying this as a letter I received from Jessica
19 Philemond from the -- representing the Dennis family and,
20 again, contained in that alleged complaint against
21 Mr. Freshwater.
22 Q. I'm going to hand you what's been marked for
23 identification purposes as Board Exhibit Number 5. Would you
24 identify that for the record, please.
25 A. This is a civil suit brought against the school, myself,

1 Mr. White, Mr. Freshwater, from the Dennis family.
2 Q. Now, you testified that you had an investigation done by
3 a third party.
4 A. Yes, sir.
5 Q. Do you recall the name of that third party?
6 A. HR On Call.
7 Q. And did you get a report?
8 A. Yes, sir, we did.
9 Q. I want to hand you what's been marked for identification
10 purposes as Board Exhibit Number 6. Ask you to review that
11 and tell me what it is, please, if you can.
12 A. This is a copy of the investigative report that the
13 school board received from HR On Call.
14 Q. Now, one of the areas that you indicated you received a
15 complaint about was a mark that was alleged to have been made
16 on a student's arm?
17 A. Yes, sir.
18 Q. Tell me when you first learned about that.
19 A. The parents set up a meeting with myself on December 7th
20 in the morning.
21 Q. Was that 2007?
22 A. 2007.
23 Q. Could you please describe what happened in that meeting.
24 A. During that meeting -- I'm sorry, I'm used to saying --
25 the Dennis family brought the pictures to me expressing

1 concern that her child had spent time that night not sleeping
2 and showed marks on the arm and they said it took place in
3 Mr. Freshwear's class with a science device, a science
4 device of some kind. They described it as something that is
5 used to test acids and bases is what they expressed.
6 Q. And did they tell you what they wanted done or what the
7 concerns were?
8 A. Well, as we sat and discussed and took a look at the
9 pictures and sat together, they were very adamant that they
10 did not want to see Mr. Freshwater fired. They were adamant
11 that they did not want to see him go to jail. They didn't --
12 they did not believe that he did it with the intent to abuse
13 the child. They wanted to make sure that it didn't happen to
14 someone else. There was some talk about it being in the
15 shape of a cross, but it wasn't the main focus of that talk.
16 I concurred with them as far as that that I don't believe
17 Mr. Freshwater would intentionally hurt a child using that.
18 But that it did leave a mark and it was a concern and it
19 would be something that we, as a district, would try to make
20 sure it doesn't happen again to our students. May I say
21 also, we made sure we wanted to investigate it first before
22 we came to any conclusion as far as what actually took place.
23 Q. I'm going to hand you what's been marked for
24 identification purposes as Board Exhibit 7 and 8. Can you
25 identify those, please.

1 A. Yes. Those were the pictures that were shown to me on
2 that morning, December 7th.
3 Q. Now, when the parents left your office, what did you do?
4 A. Well, when the parents left my office, Mr. White was not
5 in the district on the 7th, so I set up a meeting for him
6 first thing on the 10th to come to my office so that we could
7 make sure and meet with Mr. Freshwater and determine what had
8 happened, investigate what had taken place.
9 Q. Why the delay from the 7th to the 10th?
10 A. Because the 7th was Friday and the 10th was Monday.
11 Q. I see. And did you meet with Mr. White on Monday
12 morning, December 10th?
13 A. Yes, I did.
14 Q. Could you tell us what you did.
15 A. I asked Mr. White to find out if these actual marks had
16 taken place in the classroom and asked him to -- I told him
17 that the parents wished to remain anonymous and, again, they
18 didn't wish for anybody to lose their job, but they wanted to
19 make sure that it didn't happen to someone else and to make
20 sure that it didn't and to have that conversation. That
21 was -- that was the direction at that time. It was either
22 that time or shortly after I asked him to get the devices.
23 Q. What device?
24 A. To collect the devices.
25 Q. Do you remember whether it was then or shortly after

1 that?
2 A. It was shortly after that, I believe.
3 Q. Did you receive a report back from Mr. White?
4 A. Yes, I did.
5 Q. What did he tell you?
6 A. Mr. White said that at first that Mr. Freshwater --
7         MR. HAMILTON: Objection, Your Honor. This is
8 hearsay.
9         MR. MILLSTONE: This goes as to what was reported
10 back to him, not as to necessarily the truth of what -- of
11 what Mr. Freshwater said, but merely what was reported back
12 to him.
13         THE COURT: Overruled.
14 A. He reported that Mr. Freshwater reluctantly admitted
15 that he did use it during this conversation.
16 Q. And did you give him any instructions after you received
17 that report from him?
18 A. Did I give Mr. White any instructions?
19 Q. Any further instructions.
20 A. Again, I go back to the point where we made sure that we
21 selected those devices and to make sure that later on -- I
22 want to re-enforce the fact that he gave him written notice
23 as far as what had taken place in that conversation.
24 Q. So you asked him to put something in writing?
25 A. Yes, sir.

1 Q. Upon learning that Mr. Freshwater had used some
2 scientific device to place a mark on a student, did you make
3 a report to children's services?
4 A. No, sir, I did not.
5 Q. Could you explain why you did not.
6 A. With my background in working with children's services
7 before, if the parents wished to remain anonymous and did not
8 want to pursue it and the school didn't believe it was abuse,
9 that without the parents' cooperation and without them
10 wanting to be -- remain anonymous that they would not do
11 anything with it.
12 Q. Okay. Did Mr. White ultimately prepare a written
13 memorialization of what occurred in this meeting?
14 A. Yes, sir, he did.
15 Q. And did you participate in that at all?
16 A. Yes, I did.
17 Q. I'm going to hand you what's been marked as Board
18 Exhibit Number 9. Would you please identify that for the
19 record, please.
20 A. This is a letter that was given to Mr. Freshwater by
21 Mr. White and Mr. Ritchey.
22 Q. Was this the follow-up letter to the meeting they had?
23 A. This is the follow-up -- this letter is the follow-up to
24 the conversation they had December 10th, yes, sir.
25 Q. After January 22nd, did you ever learn what the

1 instrument was?
2 A. Yes, I did.
3 Q. Do you know what it's called?
4 A. A Tesla coil.
5 Q. Do you see the device in the room?
6 A. Yes, I do.
7 Q. Is this the type of device that was used?
8 A. It's the type of device that was used.
9 Q. Did you learn anything more about a Tesla coil and how
10 it's used or how it should be used?
11 A. After reading the report and going through the
12 investigative report, it talked about how it was used in the
13 classroom to charge a vacuum test tube of gases to get the
14 different colors of the gases. Also in looking at the
15 instructions and directions and reading about the safety
16 precautions, touching a student was not something that was
17 supposed to be part of the process and was dangerous.
18 Q. Is there any logical reason that you can see for
19 touching a student with this instrument?
20 A. No, sir.
21         THE COURT: Excuse me a moment, for clarification
22 on the record, could you spell the name of the machine you're
23 referring to.
24         MR. MILLSTONE: T-E-S-L-A.
25         THE COURT: That's what I thought. I just wanted

1  to make sure.

2  Q.  Did you learn anything more about what Mr. Freshwater's

3  activities had been with the Tesla coil when you received the

4  investigative report?

5  A.  At the time of the discussion with the parent, we can

6  only come up with one person, and that was Zack, as far as

7  being the person.  In reading the report, it talked about

8  three to eight students and expressed the fact that they had

9  volunteered to be part of that.

10  Q.  And so far as you know, everyone had volunteered.

11  A.  At that point, yes.

12  Q.  Did you learn whether Mr. Freshwater had used this

13  device on students in prior years?

14  A.  I believe in the report, yes, it did talk about past --

15  some past years.

16  Q.  And did you ever learn anything else outside of the

17  report with respect to how Mr. Freshwater may have used the

18  Tesla coil?

19  A.  I learned that a student that did not volunteer was, in

20  his words, zapped with the Tesla coil.

21  Q.  Did you meet with that student?

22  A.  Yes, I did.

23  Q.  And what did you learn from that student?  What did he

24  describe?

25  A.  The student described bending over to pick up a test

1  tube and getting zapped in the back left-hand side with the

2  Tesla coil.  Did not volunteer to have it done.

3  Q.  And was this student a regular education student?

4  A.  No, sir.  The student is a special education student.

5  Q.  Who did the student say had zapped him with the --

6  A.  He said Mr. Freshwater did.

7  Q.  Did he identify the type of equipment that was used?

8  A.  He identified the Tesla coil as what was being used,

9  yes, sir.

10  Q.  Did he know it was called the Tesla coil?

11  A.  No.  I can't remember what he described, but he said

12  that the -- I don't know -- I can't remember exactly the

13  words he used.

14  Q.  Did -- was he shown this type of instrument?

15  A.  Yes, he was.

16  Q.  Was that identified as being --

17  A.  He recognized it from Mr. Freshwater's science class and

18  he got zapped by it.

19  Q.  Did he indicate how it felt?

20  A.  He said it hurt.

21        MR. HAMILTON:  Objection.  Hearsay.

22        MR. MILLSTONE:  Again, this is direct questioning

23  by the superintendent of the student and his record of what

24  the statement informed him of.

25        THE COURT:  I understand that.  I will overrule the

1  objection, but if you could, try and keep the questioning out

2  of the vein of what someone else is telling you.  I know

3  that's difficult, but especially if that other someone is at

4  one point in time going to be a witness here as well.

5  Q.  Let's move to another topic.  Could you please tell us

6  what the Fellowship of Christian Athletes is.

7  A.  The Fellowship of Christian Athletes is a student led

8  group that meets and should be student led and is not a

9  school sponsored activity.

10  Q.  Is it also known as the FCA?

11  A.  FCA, Fellowship of Christian Athletes, yes.

12  Q.  During the 2007/2008 school year, was this a student

13  organization that was in the middle school?

14  A.  Yes, it was.

15  Q.  Was there a separate group for each grade level, or was

16  there just one group for the entire school?  Do you know?

17  A.  There was a leadership team group that would meet on

18  Monday.  It would meet with -- it would meet as a group, a

19  leadership team.  I believe it was eighth graders.  On

20  Tuesday they would have during the lunch period, sixth grade,

21  seventh grade and eighth grade during the three lunch

22  periods.

23  Q.  Did they meet together or did they meet independently?

24  A.  They met independently, three separate times.

25  Q.  Do you know what role, if any, Mr. Freshwater was

1  supposed to play with respect to the FCA at the middle

2  school?

3  A.  As a monitor.  His job was to insure that the students

4  behaved themselves and to make sure that it's a student led

5  organization.

6  Q.  Did you take any steps to make sure that those who were

7  working with the FCA at the middle school understood what

8  their obligations were?

9  A.  Yes.  I gave to Mr. White a copy of the FCA handbook

10  that was taken from the FCA website.  There was a handbook

11  for public schools.  I highlighted in that handbook some

12  things I wanted to make sure were clear and were clarified in

13  case there was any questions.

14  Q.  I'm going to hand you what's been marked for

15  identification purposes as Board Exhibit 10.  I want you to

16  take a moment to take a look at that and identify it for the

17  record, please.

18  A.  This is a copy of the FCA handbook that was printed off

19  from their website.

20        MR. HAMILTON:  Your Honor, I have an objection I'd

21  like clarification on.  This particular document, Board

22  Exhibit Number 10, the FCA Handbook for Public Schools, I

23  need to know if this is the copy of the document or is this a

24  copy of the actual document that was provided to Mr. White?

25        MR. MILLSTONE:  This is a copy of the document.

1  MR. HAMILTON: So it will not have his particular
2  highlights on it?
3  MR. MILLSTONE: This doesn't have his particular
4  highlights on it.
5  MR. HAMILTON: Thank you.
6  Q. Could you indicate what some of the things you
7  highlighted were as you go through the document and indicate
8  what some of the areas were.
9  A. To the best of my recollection, I would have highlighted
10  different things that would be with the fact that it is
11  student initiated, student led, the faculty can only be
12  involved to monitor.
13  Q. Could you indicate the page number that you're referring
14  to.
15  A. Page number 1 on this document.
16  Q. Okay.
17  A. And I guess in general it would have been anything -- at
18  that time I think it would have involved this student led --
19  this student led, the faculty as a monitor type piece. I
20  think there's a part in here where it talks about what can
21  fellow leaders do. It's on page 9. It deals with no
22  sponsorship of the meeting by school, students will be
23  allowed to participate without restriction, and then it goes
24  back to monitor, facilitate, supervise.
25  Q. Did you highlight --

1  A. That's the best of my recollection.
2  Q. In looking at the language on page 9, does it indicate
3  whether an employee or agent of the school can participate in
4  the FCA?
5  A. They can attend meetings only to monitor, facilitate, or
6  supervise, and that is to insure that, again, that the
7  activities are done by the students and there's no harm and
8  to insure the kids are safe.
9  Q. Did they refer in the beginning of that paragraph to the
10  Equal Access Act and provide a quote from it?
11  A. Is that 36, the footnote at 36?
12  Q. That would be the --
13  A. Yes, that would be it.
14  Q. And is there any emphasis that -- of that language that
15  the FCA saw fit to emphasize when they provided the quote
16  from that statute?
17  A. You see it in a number of different places.
18  Q. I'm talking about page 9.
19  A. Yes.
20  Q. Is there any -- in the quote, was there any emphasis
21  that the FCA --
22  A. That voluntary and student initiated, be no sponsorship
23  of meeting by the school, and employees or agents of the
24  school or government present only in a non-participatory
25  capacity.

1  Q. That's what they quoted. Is there any portion of that
2  that they have highlighted or emphasized?
3  A. Only in a non-participatory capacity.
4  Q. Was there an issue near the beginning of the school year
5  regarding FCA at the middle school and speakers at FCA
6  meetings?
7  A. At the beginning of the year I had a complaint from, I
8  would say it was a couple teachers and some -- I believe one
9  of them was a board member and a community person concerned
10  about the person that was -- concerned about the speaker.
11  One of the things that we took a look at was just to see if
12  board policy or guidelines were being met with the speaker
13  coming in, and there's a guideline that states that any
14  speakers that come during the regular school hours must
15  receive principal approval. So the person coming September
16  11th, we requested that they go through the principal
17  approval procedure, and that same person came back on the
18  25th and spoke.
19  Q. So there was an issue with respect to the following of
20  an administrative guideline?
21  A. I don't know if it had been previously enforced or not,
22  because the question came up why now. Basically Mr. White
23  and I were new administrators.
24  Q. And this was, as we say, you testified earlier this was
25  your first year where you were serving as both the interim

1  and ultimately the superintendent.
2  A. Yes.
3  Q. And how long had Mr. White been principal at the middle
4  school?
5  A. I believe August 1st was his hire date.
6  Q. So this was during his first month or two of service.
7  A. Correct.
8  Q. I'm going to hand you what's been marked for
9  identification purposes as Board Exhibit 11. Is this --
10  could you identify what this is, please, for the record.
11  A. This is a guideline for resource speakers.
12  Q. Now, did you have occasion to pay attention to policy
13  for student organizations in place?
14  A. Yes. One of the things that came from this and as part
15  of this -- it wasn't this in itself, but it was the fact that
16  our lunchtimes where kids are -- there's the most -- they're
17  grouped together in groups of 300, 350, 325, and trying to
18  keep track of where the kids are were part of it for safety
19  purposes. But we initially started with FCA trying to come
20  up with permission slips so not only did we know where the
21  kids were, but the parents also knew what their kids were
22  doing during a time that they were in lunch.
23  Then what we did was institute probably the next week
24  for all clubs, whether it be the elementary level or the
25  middle school level, that if they had people that came in and

1 had a club that met on a regular basis that we would come up
2 with a permission slip so that the parents, again, would know
3 where their children were when they were scheduled to be at
4 lunch.
5 Q. Did you have any problems getting compliance with that?
6 A. Yes, we had trouble getting compliance right away, yes.
7 Q. Did you ultimately get compliance with it?
8 A. Yes, we did.
9 Q. Now, as part of the complaints that you received
10 concerning Mr. Freshwater, did you receive any complaints in
11 terms of his role as a monitor for the FCA?
12 A. We received some complaints that, and it goes back to --
13 yes. It goes back to the things that we talked about or
14 looked at in the report dealing with a complaint with the
15 healing ceremony, a complaint that the speakers were being
16 called or contacted or set up by Mr. Freshwater rather than
17 the students. That -- I'm trying to think of the other
18 ones. If I could refer to -- I would say other ones -- other
19 complaints dealt with -- I'm sorry. It would basically be
20 the fact that he was not following the guidelines of FCA. He
21 asked the students to lead prayer was one of the ones that
22 was in here as far as FCA is concerned.
23 Q. Did you ever have -- prior to the investigative report,
24 were there ever any meetings with Mr. Freshwater concerning
25 any of the complaints about what he did with FCA?

1 A. I believe Mr. White met -- yes, there were.
2 Q. Did you participate in those meetings?
3 A. I did not.
4 Q. So those were by Mr. White?
5 A. Correct.
6 Q. Now, you also testified earlier about religious displays
7 in Mr. Freshwater's classroom?
8 A. Yes, I did.
9 Q. How did you learn about this?
10 A. Again, the complaint about the Ten Commandments being
11 posted on the front desk was a -- on the front window. And
12 what I directed the principal and assistant principal to do
13 would be to go to the classroom, see -- because there had
14 been complaints that there were motivational posters that
15 were up that had Bible verses on them and other display items
16 up there.
17  They, the principal and assistant principal, did go up
18 and did report that there were a number of things up there
19 that included motivational statements on the cupboard doors.
20 The motivational statements ended with a Bible verse or a
21 Bible verse was part of that motivational statement, that the
22 Ten Commandments were on the front door, that there were
23 other Ten Commandment posters, that there was a Bush cabinet
24 poster with a Bible verse on it, that there were two boxes of
25 Bibles in the back of the room, and then there was, I

1 believe, a Bible on the teacher's desk.
2 Q. And was a directive issued to Mr. Freshwater?
3 A. Yes, it was.
4 Q. What was that directive?
5 A. The directive was to remove the religious displays,
6 religious items that were part of -- that were displays that
7 were in the classroom.
8 Q. I am going to hand you what has been marked for
9 identification purchases as Board Exhibits 12 and 13. I'm
10 going to ask you to please read those and read through those,
11 and then I'm going to ask you some questions about them.
12  MR. MILLSTONE: For the record, there are
13 redactions on these letters. The redactions are
14 Mr. Freshwater's address, because under the Public Records
15 Act of Ohio, employee addresses are not public records and so
16 that is the redaction on both of these letters.
17  THE COURT: Thank you.
18  MR. MILLSTONE: If Mr. Hamilton objects to that
19 redaction, we can certainly disclose it.
20  MR. HAMILTON: No objection.
21 Q. Could you identify, first of all, Exhibit 12.
22 A. Exhibit 12 is the letter that was written to
23 Mr. Freshwater by Mr. White.
24 Q. When was that written?
25 A. April 7th.

1 Q. And did you receive a copy of that?
2 A. Yes, I did.
3 Q. And what were the directions in that letter?
4 A. Directions in the letter, the first part of the letter
5 dealt with role and FCA and, again, reviewed things that
6 basically his role is to re-emphasize that you're simply to
7 monitor, to insure that they're abiding by the rules, and we
8 expect you to enforce those. Religious materials in your
9 classroom, there was a request for the Bible on the desk and
10 the collage on the classroom door, and it talks about the
11 fact that those are part of the display and the display needs
12 to come down.
13 Q. At that time there's no reference to the posters you're
14 talking about or other religious materials in the April 7th
15 letter?
16 A. Correct. I don't see those listed. I see the Bible on
17 the desk and the collage on the classroom window is what I
18 see.
19 Q. Now, after that letter was issued, did you participate
20 in a meeting with Mr. Freshwater?
21 A. On April 9th, yes, I did.
22 Q. And could you describe what happened at that meeting.
23 A. At the April 9th meeting I met with Mr. Freshwater. I
24 believe it was Mr. White, and Ms. Miller, a teacher at the
25 middle school, was also there.

1  Q.  Why was Ms. Miller there?

2  A.  As a representative.  Mr. Freshwater could bring a

3  representative to that meeting.  He chose Ms. Miller.  At

4  that meeting we talked about some of the things that had been

5  brought up and things that dealt with some classroom things,

6  such as the use of the word "here" in the classroom which had

7  been a complaint that it was used as a -- that it was used in

8  the sort that disagreed with the textbook and disagreed with

9  some of those types of things.

10      Mr. Freshwater explained that if it said four billion

11 years that it could have been 3,999,000,000 years, so it was

12 a way for the students to read the textbook with

13 discernment.  When something was there that they were unsure

14 about, they would use the word "here".

15      We talked about at that point there had been an

16 accusation that Mr. Freshwater had discussed Easter in the

17 classroom and we talked about -- he shared with us the fact

18 that Easter, what he talked about was Easter in relationship

19 to the stars and astronomy where the different religious

20 states were and fit in with the stars.  The accusation stated

21 that he also talked about Easter and shared the meaning of

22 Easter with the students.  Mr. Freshwater couldn't remember

23 if he brought it up or the students brought it up, but he

24 said I may have spent one or two minutes talking about Easter

25 and talking about Easter, what it means to Christians, and

1  then I felt like that was one or two minutes too long.

2  Q.  Did you tell him that?

3  A.  Yes, sir, I did.  And the other thing we talked about

4  were the boxes of the books -- boxes of the Bibles -- boxes

5  of Bibles that were in the back of the room.  I'd asked him

6  at that time if he had ever given them out and he said that

7  he had not given them out.  He said the students knew they

8  were there, they could pick them up.  Then when we were kind

9  of done with the conversation, as we continued on, he said

10 that maybe he'd given them to some of the FCA kids if they

11 forgot theirs when they came.

12 Q.  Okay.

13 A.  I told him -- we talked about the Gideons for a minute

14 and John remarked that they're not allowed on school property

15 to give Bibles out and that was -- I told him that was my

16 point, that we're not allowed to do that either.

17 Q.  And I asked you to take a look at Board Exhibit Number

18 13 now.  See if you can identify that.

19 A.  Yes, sir.  It's a letter from -- to John from Bill

20 White, the principal and, again, there's a copy to me, and

21 Mr. Freshwater signed it down below to signify that it is --

22 he has received a letter and that letter asks him to re --

23 reminding him that these things need to be out of his room

24 end of the day on Wednesday, April 16th, and the other

25 religious DVDs, videos, et cetera, should be placed out of

1  sight and access of the students by this date.

2  Q.  Was this with respect to all of the assignments that

3  were on display in the room?

4  A.  I think at that point, with the number of things that

5  were there, it was difficult to determine what was and wasn't

6  on display.  So everything should have been put away.  We had

7  talked about his personal Bible at that time, that he could

8  keep his personal Bible on the desk, that when students came

9  into the room or it was time to teach that he put it away so

10 that it was out of sight at that time.

11 Q.  So with respect to his personal Bible, was he required

12 to remove that from the room?

13 A.  Not from the room, no, sir.

14 Q.  And was there a time when he was required to remove it

15 from his desk?

16 A.  Yes.  The time to remove it from his desk is when the

17 students came in or he was teaching or participating as a

18 teacher for the school system.

19 Q.  Did Mr. White go -- what was the deadline that he was

20 given?

21 A.  April 16th, Wednesday, April 16th.

22 Q.  And did you have Mr. White go in and check

23 Mr. Freshwater's class at the end of the day on the 16th?

24 A.  Yes, I did.

25 Q.  And did he report back to you whether Mr. Freshwater

1  complied with the directive?

2  A.  Yes, he did.

3  Q.  And what was the report?

4  A.  That there was still the poster of the Bush cabinet

5  with -- there was a poster still on the wall and the Bible

6  still on the desk.

7  Q.  And was there any statement that was issued by

8  Mr. Freshwater?

9  A.  Yes, there was.  A response.

10 Q.  Did you receive a copy of that?

11 A.  Yes, I did.

12 Q.  I'm going to hand you what's been marked as Board

13 Exhibit Number 14 and ask if you can identify that for the

14 record, please.

15 A.  Yes, I can.

16 Q.  What is that?

17 A.  It is -- it's Mr. Freshwater's statement that he shared

18 his response to the request from the board, and I believe --

19 that's it.

20 Q.  What did you understand this statement to be?  Was he

21 going to comply with your direct statement?

22 A.  This statement would mean he was not going to comply.

23 Q.  Did you, after April 16th, did you learn of any

24 additional actions by Mr. Freshwater to add to the religious

25 display in his room?

Page 77

1 A. He had checked out the Bible from the middle school
2 library and checked out, I believe the book was Jesus of
3 Nazareth, and placed them in his room.
4 Q. Where did he place them? Were they --
5 A. I believe it was on a science lab table.
6 Q. Again, were these part of a display? Did you ever go
7 and look at them?
8 A. I never went in to look at them, no, sir.
9 Q. So this was reported back to you?
10 A. This was reported to me.
11 Q. Do you consider Mr. Freshwater's conduct to have been
12 insubordination?
13 A. Yes, I do.
14 Q. Would you explain why, please.
15 A. When I was a teacher, we were told by our association
16 that if the administration asked you to do something -- not
17 asked. Directed. This was a directive. Directed you to do
18 something, you do it. Then if you don't agree with it, you
19 follow the grievance procedure. There was no grievance
20 procedure followed in this matter.
21     MR. HAMILTON: Your Honor, if I could interject one
22 second, I don't know whose laptop it is, but somebody's
23 making a whole lot of banging.
24     MS. PHILEMOND: I'll try to be quiet.
25 Q. Did you receive any complaints about what Mr. Freshwater

Page 78

1 was teaching in his classroom?
2 A. The Easter, which we had talked about before, was one of
3 the complaints. The complaint with the -- the complaints
4 that there were -- in the report here, there were a lot of
5 those that I did not have before that came to me or came to
6 me through the report.
7 Q. And some of those complaints really come to you for
8 the first time in a letter that came from the Dennis family?
9 If you look back at Exhibit 3, Board Exhibit 3.
10 A. Yes. The -- like I said before, the meaning of Easter
11 and Good Friday, that was something that I had heard about.
12 Had talked about this agreement teaching material based upon
13 his own religious beliefs, and the allegation is he advised
14 the students that although he is forced to teach from the
15 textbook, the teachings are wrong and not proven according to
16 the Bible. That was one that I had not dealt with before or
17 dealt with that year. Those are the only two that were in
18 the classroom.
19 Q. And so that was part of what the investigation was
20 about?
21 A. Part of the investigation. Again, we dealt with things
22 as isolated incidents, and then when they grew collective,
23 that was when the board felt like it was necessary to get an
24 independent investigator.
25 Q. Now, did you receive a subsequent letter complaining

Page 79

1 about some activity from Mr. Freshwater after you had already
2 informed him about the concerns and issues of religion in the
3 class and the religious displays in his classroom?
4 A. Are you referring to the April 14th letter?
5 Q. No. If you take a look at Board Exhibit Number 4.
6 A. Okay. Oh, yes. We received a complaint on the 18th
7 about an extra credit assignment. The extra credit
8 assignment would be having the students go to see the movie
9 Expelled and then write a follow-up to that.
10 Q. And were you told or did you find out what the movie
11 Expelled was about?
12 A. The movie Expelled dealt with intelligent design.
13 Q. After the investigation started, did you receive any
14 other information about things that had gone on in
15 Mr. Freshwater's class?
16 A. In the way of emails?
17 Q. In any way.
18 A. In the way of emails, two come to mind. One is from
19 a --
20 Q. I'd like you to take a look at Board Exhibit Number 6.
21 Look at attachment 15. If you can take a moment to read
22 through that.
23 A. I recognize this.
24 Q. Is that an email that you received?
25 A. It's an email I received from Jim Stockdale, who was a

Page 80

1 teacher in the school system.
2 Q. He's a former teacher or --
3 A. He's a former teacher. He's not currently teaching.
4 Q. And he provided information --
5 A. He taught and was a substitute teacher. He shared with
6 me an episode that took place in the classroom.
7 Q. Okay. And did you receive any other emails that you
8 recall?
9 A. I received another email from a student that was one of
10 Mr. Freshwater's in the past and talked about a dinosaur
11 handout.
12 Q. I'm going to hand you what's been marked as Board
13 Exhibit Number 15.
14 A. Yes, sir, I recognize this.
15 Q. Is that the email you were referring to?
16 A. Yes.
17 Q. And who is that from?
18 A. It's from [Student #71], [Student #71]   .
19 Q. Did you look back into Mr. Freshwater's personnel file?
20 A. Yes, I did.
21 Q. And did you find anything in there that gave rise to or
22 any indication or any prior concern with respect to what
23 Mr. Freshwater talked about in the classroom?
24 A. There was an evaluation from, I believe it was January
25 of '03, that was written by Mr. Kuntz.

Page 81

1  Q.  I'm going to hand you what's been marked for
2  identification purposes as Board Exhibit Number 16.  Is that
3  a copy of that evaluation?
4  A.  Yes, sir.
5  Q.  Did you find anything else in the personnel file?
6  A.  I found a reference to a 2006, I believe, where
7  Mr. Freshwater was directed or was told that at the time a
8  handout that he had given did not meet standards for the
9  science being taught in his class.
10  Q.  And I would direct your attention to, again, to Exhibit
11  6, attachment 10.
12  A.  Yes.
13  Q.  Is that what you're referring to?
14  A.  Yes, it is.
15  Q.  Now --
16  A.  Well, this is the complaint where the letter was --
17  Q.  Did you read all the way down?
18  A.  I have now, yes.
19  Q.  Okay.  And what does that contain?
20  A.  It contains a complaint from a parent that he handed out
21  attach -- the attached paper, which was entitled Darwin's
22  Theory of Evolution, The Premise and Problem.  That he handed
23  it out to his son's eighth grade science class and collected
24  them at the end of class but his son kept his.  Checked the
25  source and he believes the source comes from All About God

Page 82

1  Ministries, and he does not believe -- his complaint is that
2  this isn't the proper source for science material and
3  especially in light of what the State school board's decision
4  was in February of that year.
5  Q.  And now in the copy that is in the investigative
6  report -- strike that.  And did he receive -- was this the
7  letter you're referring to that's attached to that?
8  A.  There are a couple letters.  One is a memo to Mr. Maley
9  and Dr. Weston from Chuck Adkins and Dick Cunningham talking
10  about their belief on a handout.  And then following that,
11  the last of that four-page attachment is the letter from
12  Mr. Maley to Mr. Freshwater with Mr. Freshwater's signature
13  having received it, telling him that the material passed out
14  did not pass scientific review and acceptance of the
15  scientific community.  I'm directing you to delete the
16  material from your supplemental resources.  It says in the
17  future please refrain from using materials that the source or
18  author cannot be readily identified.
19  Q.  Now, based upon all that you have learned and heard,
20  does it remain your recommendation that Mr. Freshwater's
21  employment be terminated?
22  A.  With the information I have in front of me, yes, sir.
23      MR. MILLSTONE:  Your witness.
24      MR. HAMILTON:  Your Honor, I would move that we
25  take a few minute break so I can get set up.  It's right

Page 83

1  after the lunch hour.  People are a little groggy.
2      THE COURT:  That's fine.  Five minutes enough?
3  Ten?
4      MR. HAMILTON:  I'm going to use restroom.
5      THE COURT:  I thought that was the point.
6      (Short break in proceedings.)
7      THE COURT:  Ladies and gentlemen, if we could come
8  back to order now.  Mr. Hamilton will do his
9  cross-examination of the superintendent.
10                  - - -
11              CROSS-EXAMINATION
12  BY MR. HAMILTON:
13  Q.  Mr. Short, you and I know each other, but nonetheless,
14  good day.  I have some questions I want to ask to you.
15  Before I begin those particular questions, I do want you to
16  recognize, as I'm sure your counsel will explain this to you,
17  if at any time you don't understand my question, make certain
18  that you gain clarity from me.  Number two, that you are
19  under a subpoena and I do anticipate gathering some
20  information from you today and that I do anticipate bringing
21  you back during our case in chief.  I tell you that in
22  advance just because I wanted you to know.
23      First document that I'd like for you to at least have in
24  your hand is going to be the collective bargaining agreement
25  between the Mount Vernon City School System and that of the

Page 84

1  bargaining unit, which is the Mount Vernon Education
2  Association.
3      MR. HAMILTON:  David, I assume you have a copy of
4  this, correct?
5      MR. MILLSTONE:  Not with me.
6      MR. HAMILTON:  I'm going to give this copy to the
7  referee and I assume you're pretty familiar with it.
8  Q.  Mr. Short, on page 5 of Section 101(A), would agree
9  that John Freshwater --
10      MR. MILLSTONE:  At this point I'm going to ask for
11  a short recess.  I do have a copy in my car and I can get it,
12  but I don't want to be without a copy.
13      THE COURT:  I wouldn't expect you to be.  If anyone
14  else in the room has one, he won't have to run to the car.
15      MR. HAMILTON:  I apologize, David.  I thought I had
16  enough in there.  I've got an incomplete third copy.
17      MR. MILLSTONE:  Few minute recess.  My car's not
18  right next door.
19      (Short break in proceedings.)
20      THE COURT:  Whenever you're ready.
21  BY MR. HAMILTON:
22  Q.  Mr. Short, with permission of the referee, if you need
23  to take a break at any time, he said give him the high
24  signal.  We'll finish that question from there.  If you
25  would, sir, turn to page 5 of the collective bargaining

Page 85

1  agreement.  It's article 101(A).  It's just an evidentiary
2  issue, sir.  John Freshwater as a teacher is covered by this
3  particular bargaining agreement, correct?
4  A.  That is correct.
5  Q.  And what kind of contract was John Freshwater serving
6  under during the calendar year, school year 2007/2008?
7  A.  I don't have that information.
8  Q.  Okay.  Is he a limited or continued employee, do you
9  know?
10  A.  I still don't have that information.
11      MR. MILLSTONE:  We can stipulate, if you'd like, on
12  that issue.
13      MR. HAMILTON:  And your stipulation would be that
14  he is a --
15      MR. MILLSTONE:  He's an employee with a teaching
16  contract scheduled to expire in 2008/2009.
17      MR. HAMILTON:  So he would --
18      MR. MILLSTONE:  It was a three-year contract that
19  is scheduled to expire the end of this current school year.
20  Q.  Mr. Short, if you would, turn to page 14, Article 301(A)
21  as in Adam.  Are you familiar with that particular provision?
22  A.  301(A)?
23  Q.  Yes, sir.
24  A.  Yes, I am.
25  Q.  And would you agree that you can observe, as the

Page 86

1  superintendent, a teacher for evaluation or other purposes at
2  any time?
3  A.  302(A), is that what you're talking about?  I thought
4  you said 301.
5  Q.  You're absolutely correct.  It's 302(A).  Thank you.
6  A.  Sir, I can.
7  Q.  And did you at any time evaluate or observe John
8  Freshwater during any part of the time last year?
9  A.  No, sir, I did not.
10  Q.  Did you at any time direct that John Freshwater be
11  observed by any administrative staff?
12  A.  No, sir, I did not.
13  Q.  And with the problems that have been alleged dating from
14  September of 2007 all the way through the end of the school
15  year, can you explain if there were problems why you wouldn't
16  have somebody sitting there as an observer.
17  A.  We did -- during the year we didn't have the questions
18  come up in the classroom, so to send someone to the
19  classroom, we're not dealing with the problems that we were
20  dealing with at that time.  When we did do the investigation,
21  we did put a monitor in the room.
22  Q.  You put a monitor in the room from April 22nd, 2008,
23  through the end of the year?
24  A.  I thought it was the 23rd.
25  Q.  You could be correct.  It was essentially April 22nd,

Page 87

1  23rd, 2008, through the end of the school year, correct?
2  A.  Yes.
3  Q.  But you didn't have anybody evaluate or observe John
4  Freshwater prior to that, did you?
5  A.  No, sir.
6  Q.  Do you know if anybody observed or evaluated John
7  Freshwater in the classroom?
8  A.  I'm not aware of anyone.
9  Q.  Okay.  You think it would have been prudent in light of
10  these allegations against John Freshwater to have somebody
11  observing?
12  A.  As I said before, we didn't have those problems in the
13  classroom.  Those didn't come to us.
14  Q.  Are you saying that you weren't advised of the concerns
15  by Stephen and Jennifer Dennis on December, 2007?
16  A.  With the one singular incident, yes.
17  Q.  Okay.  Taking a look at 301(D), article 301(D), take a
18  look at it and tell me when you're done, sir.
19  A.  302?
20  Q.  It's 302.  My notes say 301, so I made another mistake.
21  Thank you.
22  A.  I'm just trying to make sure.
23  Q.  You're doing an excellent job.  302(D).
24  A.  Yes, sir.
25  Q.  Explain the meaning of what that parameter in the

Page 88

1  contract permits you as an administrator or superintendent to
2  do.
3  A.  As part of the classroom observation, if you're
4  observing a person in reference to their evaluation, in
5  reference to hiring, and in reference to a contract, your
6  observations have to be at least 30 minutes, not less than 30
7  minutes.
8  Q.  Okay.  And I just want to make certain I understand.
9  You didn't have any concern about what was taking place in
10  John Freshwater's classroom after the December 7th meeting
11  with Mr. and Mrs. Dennis, did you?
12  A.  The December 7th meeting was an incident that we dealt
13  with, yes, sir.
14  Q.  Okay.  How did you deal with it?
15  A.  We didn't send anybody to the room to observe.
16  Q.  Okay.  And how did you deal with it?
17  A.  We met with Mr. Freshwater and informed him that we
18  expected that that electronic device would not be used and
19  not to use it on students.
20  Q.  Earlier you stated that you had that particular item
21  collected or confiscated.  Is that true?
22  A.  That's correct.
23  Q.  When did you have that done?
24  A.  It was shortly after that December 10th, I can't recall
25  the date, but I believe it was shortly after that time.  I

1  told him if he hadn't collected them to get them collected.
2  Q. Who did you tell?
3  A. Mr. White.
4  Q. And what month did you tell him, you think, roughly?
5  A. Well, December 10th was the meeting, so I would say it
6  was either shortly after that, which must have been
7  December. I can't remember.
8  Q. Do you know if he actually collected it?
9  A. I know that he did collect them. I don't know the date
10 by which they were collected.
11 Q. I want to make certain I understand. You stated he did
12 collect them in December, correct?
13 A. I stated that I requested that he collect them shortly
14 after the meeting.
15 Q. My question specifically to you, Mr. Short, is when did
16 Mr. White collect them to your understanding?
17 A. When did he collect them? I don't know the date. He
18 told me that he collected them.
19 Q. Would you have expected him to collect them within 30
20 days?
21 A. I can't -- 30 days from when I asked. But what I'm
22 saying is I can't remember how shortly after, if it was the
23 21st, if it was before they went on break at Christmas time.
24 I can't tell you that time frame.
25 Q. I appreciate that you can't tell me the time frame. I'm

1  asking you when would you have expected them to be picked up
2  from the teachers?
3  A. I would have expected them to be picked up in -- I
4  didn't give him a concrete time to pick them up. I told him
5  to collect them.
6  Q. Were you concerned that this particular object would
7  hurt a child?
8  A. I was concerned that this object hurt this child in this
9  instance, yes.
10 Q. And you didn't think it was necessary to make certain
11 that they were collected in a timely fashion?
12 A. I requested that they be collected.
13 Q. We'll come back to that. After the meeting with the
14 Dennises on December 7, 2007, according to the contract, you
15 could have gone in and observed, evaluated, or had somebody
16 else gone in and evaluated John Freshwater's class; is that
17 correct?
18 A. That is correct.
19 Q. But you didn't think it was important enough to do so?
20 A. I did not assign anyone to do so.
21 Q. That wasn't my question, sir. My question was, did you
22 think it was important enough in light of the Dennis's
23 allegation --
24 A. No, sir.
25 Q. You did not think it was important enough to have

1  anybody evaluate John Freshwater from December 7th, 2007,
2  until April 23rd, 2008, correct?
3  A. Correct.
4  Q. What happened between December 7, 2007, and April 22nd
5  to cause you to place an observer or a monitor in John
6  Freshwater's class?
7  A. As I stated previously, it was a collection of the
8  incidents that took place and dealing with the things that
9  had taken place, and the decision was made to place a monitor
10 in his room.
11 Q. Help me understand this. Are we talking about instances
12 that occurred during that particular school year, 2007/2008,
13 or are we talking about instances previous to that school
14 year?
15 A. We're talking -- we're talking at that time with the
16 monitor placed in, it was kind of a compilation of those,
17 because we had received emails -- can you do that one more
18 time. Ask me the question again.
19 Q. Sure. What -- I'm trying to make sure I ask you this
20 just right. Actually, can the reporter read it back.
21     (Pending question read by reporter.)
22 A. At that point we were talking about instances that had
23 taken place in that school year with references and we
24 received some allegations of things that had taken place in
25 the classroom, and I can't recollect anything from previous

1  times at that point.
2  Q. You said it was a collection of instances, a collection
3  of incidents. Could you go ahead and tell me again what
4  those incidents were.
5  A. Beginning on December 7th it would have dealt with the
6  Tesla coil. At that time it was an electric device. It
7  would deal with instances that were complaints and
8  allegations made about improper teaching in the classroom,
9  not following the curriculum. It would have involved
10 instances -- incidents that dealt with FCA and whether FCA
11 was being monitored properly or not. It would have dealt
12 with instances that dealt with the extra credit assignment.
13 It would have been -- I'm trying to think. And then we
14 received -- before the 22nd it dealt with things that took
15 place in the classroom.
16 Q. What was that last statement?
17 A. Before the -- you said the 23rd. Before that we had
18 received some other complaints of things that took place in
19 the classroom.
20 Q. Let me ask you this. If John Freshwater refused to take
21 the Bible off his desk on April 16, 2008, you put the monitor
22 in his class after that, correct?
23 A. It was after that.
24 Q. Did you put the monitor in his class to insure whether
25 he was teaching from the Bible?

Page 93

1  A.  To make sure that the allegations that we received were
2  not accurate.  We put the monitor in to make sure that
3  nothing took place that was inappropriate and make sure that
4  the rules were followed and make sure that -- and to see --
5  make sure that things were being followed.
6  Q.  What did the -- who was the monitor?
7  A.  The monitor was Debbie Strouse.
8  Q.  What did Ms. Strouse report to you?
9  A.  Ms. Strouse reported to Mr. White, but most of the time
10 I believe those reports were -- I can only think of one
11 instance where there was some question about some Bibles in a
12 book bag.
13 Q.  Were these written reports?
14 A.  I believe so.
15 Q.  How many written reports?
16 A.  I do not know.
17 Q.  Did you ever review any written reports?
18 A.  Yes.  I've read them, but I don't have them.
19 Q.  Okay.  How many different written reports did you review
20 by Ms. Strouse?
21 A.  I would say about 10 to 12.
22 Q.  Were these reports written daily?
23 A.  I understand that they were.
24 Q.  And who would she turn these daily reports in to?
25 A.  Mr. White.

Page 94

1  Q.  And there was a problem -- when did school end?
2  A.  I want to say May 30th or May 31st.  It was right
3  before -- it was before June.
4  Q.  Can you and I agree that there was approximately,
5  without me looking it up and being exact, 20, 25 days left in
6  the school year when Deb Strouse was placed in that
7  classroom?
8  A.  Yeah, I would say.  Take out Memorial Day and -- yeah,
9  yes, sir, I would say there would be about 24.
10 Q.  Did you direct she fill out a daily report on John
11 Freshwater's activities?
12 A.  I directed Mr. White to have her report to him, so
13 whatever form that report was, that would have been between
14 Ms. Strouse and Mr. White.
15 Q.  Are you aware as to whether or not there's more than 10
16 to 12 reports by Ms. Strouse?  Let me clarify.  Are you aware
17 as to whether or not there are more than 10 to 12 written
18 reports by Ms. Strouse?
19 A.  No.
20 Q.  Where would those documents be kept at?
21 A.  I would believe that Ms. Strouse or Mr. White would have
22 them.
23 Q.  Did you turn those over to your attorney?
24 A.  I don't have them.
25 Q.  Do you know if your attorney has them?

Page 95

1  A.  No, I don't know if he has them.
2  Q.  Did John Freshwater -- let me back up.  Those particular
3  reports, were those evaluations or observations?
4  A.  They were more of an observation.
5  Q.  Okay.  And those particular observations, there's a
6  contractual provision, is there not, that any observation or
7  evaluation should be signed off on by the teacher?
8  A.  Can you point to me where you're referring to.
9  Q.  I believe I'm referring to, I want to make sure I get it
10 right, 302(G) as in George.
11 A.  The written observation shall be dated and signed by
12 both the evaluator and the teacher that has been observed for
13 evaluation purposes.
14 Q.  What was John evaluated for?
15 A.  John was not -- he was not being evaluated per se.  He
16 was being monitored.
17 Q.  Okay.  And explain the difference to me.
18 A.  Well, for evaluation purposes would be in going through
19 the process of renewing his contract.
20 Q.  Or terminating his contract?
21 A.  Could be, yes.
22 Q.  So if we were in the process of reviewing or considering
23 whether or not to keep him under contract, technically,
24 whatever you want to call it, Deb Strouse was in there
25 evaluating or observing John Freshwater, correct?

Page 96

1  A.  She was monitoring Mr. Freshwater.
2  Q.  So you're saying that she was not evaluating John
3  Freshwater?
4  A.  That was not what she was asked to do.
5  Q.  Are you saying she was not observing John Freshwater?
6  A.  She was monitoring Mr. Freshwater, yes.
7  Q.  Just trying to make certain we have clarity, sir.
8  A.  Okay.
9  Q.  Give me all of your understanding as to the direction
10 given to Deb Strouse as she was to conduct this monitoring
11 evaluation or observation.
12 A.  The monitor was to monitor and make sure that -- to make
13 sure that Mr. Freshwater followed board policy.
14 Q.  Do you know if she ever --
15 A.  And standards.  I'm sorry.
16 Q.  What was that?
17 A.  And standards.
18 Q.  Did Deb Strouse ever report back that she believed that
19 John Freshwater had not been following board standards or
20 policies?
21 A.  No.  As I said, the only time that I remember something
22 coming back was dealing with a duffel bag that had Bibles in
23 it that were sitting in the back of the room.
24 Q.  What do you know about that duffel bag?
25 A.  That the duffel bag was gone shortly after that.

1 Q. Did you look in the duffel bag?

2 A. No, sir.

3 Q. Is there anything in any of the written reports

4 identifying what was in the duffel bag?

5 A. I believe if you go to the HR On Call report, it talks

6 about going there and seeing it.

7 Q. Going to page 15, schedule of evaluations under Article

8 303, are you familiar with that particular provision?

9 A. Yes, I am.

10 Q. How many evaluations or observations should John

11 Freshwater have had during the 2007/2008 school year?

12 A. He would not have had to have had any.

13 Q. So you're saying that he would not have had to have had

14 any at all.

15 A. Correct.

16 Q. Okay. Can an administrator or a principal, I don't know

17 the answer, I just have to have you confirm it, can they

18 conduct an observation simply because they want to, or do

19 they have to express a particular need?

20 A. Can you tell me what you're referring to, please.

21 Q. I'm just referring to general evaluations, observations

22 as they go. Does an administrator, such as a principal,

23 yourself, Ms. Weston, do any of those individuals have to

24 have a specific reason to go in and evaluate a teacher, or

25 can they just pop in and take an observation?

1       MR. MILLSTONE: I'm going to object to the question

2 in the sense of observation can be used in -- it is a term

3 that can be used in a variety of ways. I'm not sure how

4 you're using it, if you're using it in conjunction with an

5 evaluation or observation generally.

6       MR. HAMILTON: Just pursuant to contract.

7       MR. MILLSTONE: Okay. So you're talking about an

8 observation and an evaluation. I withdraw my objection.

9 A. 302(A), the last sentence, says that these individuals

10 may also observe classrooms for purposes other than to

11 evaluate the teacher. So the answer to your question would

12 be yes.

13 Q. Yes, they can pop in anytime and take a look at the

14 teacher and see what they're doing, right?

15 A. They can go in and observe the classrooms for purposes,

16 but if they're going in to a classroom to do any kind of

17 observation, we try to do some type of communication with the

18 person before they go in.

19 Q. Is that contractually required that you do some kind of

20 communication?

21 A. No.

22 Q. It's just a nice thing to do?

23 A. We try to make sure that it's understood, yes.

24 Q. So my question to you is, could Bill White, the

25 principal in the school where John Freshwater taught, could

1 he pop in and observe and evaluate John during this time

2 period?

3 A. Yes.

4 Q. Do you know if he did?

5 A. I'm not aware of any visits.

6 Q. Earlier you stated that that was his first school year

7 there, correct?

8 A. Yes, it is. Yes, I did.

9 Q. Do you know if he evaluated, observed any other

10 teachers?

11 A. I don't have that record in front of me.

12 Q. Do you, as the leader of this particular school

13 district, believe that it would be appropriate or prudent for

14 a new principal to go in and check on their subordinates?

15 A. It would be for a new principal coming in to get to know

16 the staff, to find ways to get to know the staff. It would

17 be prudent, yes.

18 Q. Would that include observing the classes?

19 A. It may or may not. It depends on where we are in the

20 contract. It depends on the number of teachers. It depends

21 on needs.

22 Q. Who hired Bill --

23 A. I'm sorry.

24 Q. I did it to you again. Go ahead, sir.

25 A. I'm fine. Go ahead.

1 Q. Who hired Bill White?

2 A. Mr. White was hired by the board of education on August

3 1st. I believe it was August 1st. That's usually when most

4 administrative contracts begin.

5 Q. Were you part of the interview team that interviewed

6 him?

7 A. Yes, I believe I was. I wasn't the superintendent at

8 the time.

9 Q. So we don't have any evaluations during the 2007/2008

10 school year by any Mount Vernon City School administrator of

11 John Freshwater, correct?

12 A. Correct.

13 Q. So the basis for the allegations that we have read so

14 far are the students' assertions that John Freshwater had

15 done these things; is that correct?

16 A. The basis for the allegations that we have deal with the

17 complaints that we've had. I would say some of it stem from

18 students, but they also have other things stemmed -- if you

19 look at the HR On Call, we have teachers, we have other

20 instances of other people besides students.

21 Q. We'll get to those. But my specific question to you is,

22 during the 2007/2008 school year, the basis for the

23 allegations are assertions made by students. Is that true?

24 A. Yes.

25 Q. Could you -- do you believe that there's student bias,

1  bias towards a particular teacher?  You've been a teacher,
2  you said, correct?
3  A.  Correct.
4  Q.  You ever have a kid that just didn't like you?
5  A.  I'm sure there was.
6  Q.  What are some of the reasons that students may not like
7  a teacher?  Can you give me any --
8  A.  Same reason kids at home don't want to be disciplined.
9  If you're trying to make them -- trying to get them to do the
10  things that they're supposed to do could be a reason.
11  Q.  Any other?
12  A.  Sometimes kids don't like when you move the seats around
13  and you put them in assigned seats by somebody they don't
14  like.
15  Q.  I just heard that from my daughter last week, so I'm
16  well aware of that.  Any other?
17  A.  Maybe they think you give too much homework.
18  Q.  Anything else you can think of?
19  A.  Somebody continually asking them questions when they
20  don't want to answer.
21  Q.  Am I falling in that category, sir?
22  A.  No, sir.
23  Q.  Do you know of any point -- do you know of any
24  particular bias that any of these students who made any
25  assertions against John Freshwater, are you aware of any bias

1  they may have had?
2  A.  No, sir.
3  Q.  Is it your experience, having dealt with students for 20
4  some years, that a child is more easily influenced to commit
5  a falsehood than an adult?
6  A.  Not necessarily.  I don't know if I'd say that.  You're
7  saying children more likely to lie than adults?
8  Q.  That's another way to say it, sure.
9  A.  I don't think I can -- I think it depends on the
10  individual.
11  Q.  At any time during the 2007/2008 school year, have you
12  had any suspicions that anybody, student or otherwise, have
13  promoted any falsehoods against John Freshwater?
14  A.  Have promoted any falsehoods?  I'm sorry, do you mean
15  have they said anything about him that was inaccurate?
16  Q.  Have you had any suspicions, Mr. Short, that any of the
17  allegations leveled against John Freshwater have been
18  suspicious enough to where you did not put credibility into
19  believing that allegation?
20  A.  I think when I received the -- when I receive
21  complaints, I feel like I have to investigate no matter.
22  Q.  Okay.  Was it because you didn't believe them?
23  A.  Didn't believe whom?
24  Q.  Whoever is giving you the assertion that John Freshwater
25  had done something in error.

1  A.  I believe that what I received, the allegation or the
2  complaint, that I then do an investigation regardless.
3  Q.  Specifically I'm going to ask you again, at any point
4  during this investigation process involving John Freshwater,
5  have you had any suspicions that anybody was lying, telling a
6  falsehood, or somehow speaking something that you know was
7  not true?
8        MR. MILLSTONE:  I'm going to object.  It's three
9  different questions.
10        MR. HAMILTON:  It's actually clarity so he can make
11  sure he understands.
12        THE COURT:  It doesn't sound like three different
13  questions, but it just sounded like three different formats
14  or versions of the same thing.  He's looking to see if this
15  gentleman had suspicions about those allegations.  It's the
16  second time he's asked it, so I think he's just trying to
17  make it a little more clear than the first time he asked it.
18  Q.  Have you suspected, sir, that anybody's told a lie
19  regarding the allegations against Mr. Freshwater?
20  A.  I've investigated them.  I don't know if -- do you want
21  me to say that they lied about him for the purpose of
22  investigating?
23        THE COURT:  If I could interrupt for a moment.  If
24  we can clarify the question in any way, we'll help you do
25  that.  He's asking about your own perception, whether you had

1  suspicions.  That's the question.
2  A.  The people that I talked to I felt were earnest in what
3  they shared.
4  Q.  So every student you have spoken to, you believe that
5  they were telling you the truth, correct?
6  A.  I have not spoken -- I've spoken to one student.
7  Q.  What's that student's name, sir?
8  A.  [Student #7]
9  Q.  Sir, I'll ask the second part of the question.
10  A.  [Student #7]
11  Q.  Can you spell that for me.
12  A.  [Student #7]
13  Q.  When did you speak to [Student #7]          sir?
14  A.  It's about the middle of August.
15  Q.  Middle of August, 2007?  2008?
16  A.  2008.
17  Q.  Any other students that you spoke to regarding
18  Mr. Freshwater?
19  A.  I have spoken to them on their way to be interviewed or
20  talking to them before interview, but never sat in the
21  interview.
22  Q.  Okay.  Who have you spoken to as they were on their way
23  to the interview?
24        MR. MILLSTONE:  Obviously you're waiting for an
25  objection, but I can't -- this isn't a student record.  This

Page 105

1  is -- you can answer these questions. I understand your
2  concern. This is the student record. You're testifying
3  about students that you may have spoken to that have been on
4  the way to an interview. That does not fall within the
5  student record of which we have concerns about.
6  A. Current students, I believe [Student #6]    , [Student #5] ,
7  two Es. I want to say [Student #2] , but I can't really
8  remember --
9  Q. Is that a last name?
10 A. I think his first name is [Student #2]
11 Q. Can you give me your phonetic spelling of the last name.
12 A. I think [Student #2]
13 Q. Anybody else, sir? If the record would just reflect
14 that Mr. Short is examining Exhibit Number 6.
15 A. Last name of [Student #4] think his first name is [Student #4]
16 That's the best that I can remember.
17 Q. So you spoke to [Student #6]    .
18 A. Yes, sir.
19 Q. You spoke to [Student #5] .
20 A. Yes, I did.
21 Q. You spoke to [Student #2]
22 A. [Student #2]    I think.
23 Q. [Student #4]
24 A. [Student #4]
25 Q. Anybody else? You said -- I'm sorry.

Page 106

1  A. I'm thinking. I can't think of anybody else.
2  Q. You said you spoke to them on their way to the
3  interview, correct?
4  A. (Nods head.)
5  Q. And you spoke to [Student #7]     sometime in mid August.
6  Did you speak to any other students about John Freshwater in
7  any other point in time during the 2007/2008 school year up
8  to and including 3:00 today?
9  A. No, sir.
10 Q. Where did you talk to -- did you talk to [Student #6]
11 [Student #5]  , [Student #2]  and [Student #4] in the same place?
12 A. They were all at central office, but it was at different
13 times.
14 Q. What were they doing at central office?
15 A. They were either meeting with the HR On Call or meeting
16 with Mr. Millstone.
17 Q. They met with HR On Call obviously prior to June 19th,
18 2008, at least once?
19 A. Yes.
20 Q. Do you know if they met with HR On Call after June 19th,
21 2008?
22 A. I'm not aware of that.
23 Q. Do you know when they met with Mr. Millstone?
24 A. No, sir, I don't have those dates.
25 Q. Do you know if it was before or after they interviewed

Page 107

1  with HR On Call?
2  A. I don't believe [Student #2]     interviewed with HR On
3  Call. It would have been after.
4  Q. So let me make sure I understand. We have to go back
5  now. When I asked you those four students, you said that you
6  saw them at central office and they were either coming to
7  interview with HR On Call or Mr. Millstone. Now, are you
8  telling me that [Student #2] did not interview with HR On
9  Call?
10 A. Yes, sir.
11 Q. Who did he interview with?
12 A. Mr. Millstone.
13 Q. Do you know if [Student #6] , [Student #5] and [Student #4] interviewed
14 with Mr. Millstone?
15     MR. MILLSTONE: Object in terms of any type of
16 attorney/client privilege or work product in preparation for
17 this hearing.
18     MR. HAMILTON: Not asking about the content of the
19 conversation. I'm not asking Mr. Short about a conversation
20 that Mr. Millstone had with a client. I'm asking
21 specifically about students that met with Mr. Millstone.
22     THE COURT: I'll overrule the objection with the
23 understanding that that's going to be the extent of the
24 questions concerning Attorney Millstone.
25 Q. So the answer to the question, Mr. Short, would be what?

Page 108

1  A. Can I have the question?
2     (Pending question read by reporter.)
3  A. I believe [Student #5] did, [Student #5]
4  Q. When you saw them at central office, what was your
5  purpose of seeing them there?
6  A. To direct them to the room.
7  Q. What was your -- tell me what you and [Student #6]
8  talked about.
9  A. I didn't talk to -- I said hello to [Student #6] I talked to
10 his mom about their other son who was playing soccer in
11 Cleveland.
12 Q. Do you know the [Student #6] family?
13 A. Yes, I do.
14 Q. Do you -- how do you know the [Student #6] family?
15 A. At one point we went to church together. My son played
16 basketball with their son. Their daughter-in-law was hired
17 as an elementary teacher at our elementary school. She took
18 pictures of the basketball team and shared those pictures
19 with us. I believe when [Student #6] was in sixth grade he took
20 video pictures of games and we sent those to my parents when
21 they were in Myrtle Beach.
22 Q. So you know the [Student #6] family pretty well.
23 A. Fairly well.
24 Q. Talk to [Student #6]    's parents about the matter
25 involving John Freshwater?

Page 109

1  A.  No, I didn't.
2  Q.  Didn't have any words of wisdom or encouragement,
3  solace, comfort, any type of those words prior to [Student #6]
4  [Student #6] going in to interview?
5  A.  I called them and told them that they were interested in
6  having him be interviewed and the report would be -- would
7  not include names.
8  Q.  You told them that the report would not include names.
9  A.  Well, I think we were going to try to do the students
10  anonymous.
11  Q.  Do you know if [Student #6]    or his parents had
12  reservations about him talking to you or to the investigator?
13  A.  They didn't express any.
14  Q.  Did they ask that his name not be used in the
15  investigative report?
16  A.  I can't remember that question being asked.
17  Q.  How did [Student #6]    come to be identified as a person
18  to be interviewed?
19  A.  I don't know.  I was asked to contact them.
20  Q.  When you contacted them, what did you communicate to
21  them, Mr. Short?
22  A.  That they were requested to come in for an interview.
23  Q.  Did they ask or did you tell how their name came up to
24  be interviewed?
25  A.  I didn't -- I don't remember doing that.

Page 110

1  Q.  I want to make sure I understand very clearly.  You
2  are -- do you have any knowledge as to why [Student #6]    was
3  interviewed as it relates to the John Freshwater
4  investigation?
5  A.  I can venture to guess.
6  Q.  Go ahead and venture to guess, sir.
7       MR. MILLSTONE:  I'm going to object.  Speculation.
8       MR. HAMILTON:  Your Honor, he offered it.
9  A.  Go ahead.  I'm sorry.
10       THE COURT:  I'll overrule the objection.
11  A.  That HR On Call was requesting him to come in for an
12  interview.
13  Q.  Mr. Short, HR On Call didn't just simply pick up a class
14  list of everybody and start saying we want to talk to this
15  person, that person, and that person, did they?
16  A.  I'm not sure how they collected all their information.
17  Q.  Okay.  Do you have any knowledge about what [Student #6]
18  [Student #6] communicated to the investigator?
19  A.  No, I don't.
20  Q.  Do you have any knowledge as to why the investigator
21  wanted to speak to [Student #6]    ?
22  A.  No.
23  Q.  Let's talk about [Student #5]   How do you know [Student #5]
24  [Student #5] ?
25  A.  I was his principal from kindergarten through, I want to

Page 111

1  say fourth grade.
2  Q.  How else do you know the family?
3  A.  There's Hanna, who is a student, a stepsister.  Nate was
4  a student, stepbrother.  [Student #566] was a kindergarten
5  student, brother.  I know the parents through either PTO
6  work, work at school.
7  Q.  Do you communicate socially with the [Student #5] family?
8  A.  I attended Hanna's graduation party this summer.
9  Q.  What grade did she graduate from?
10  A.  Twelfth grade.
11  Q.  You look at me like you're surprised.  There are other
12  graduations.  Believe me, I got four kids.  I'm going to
13  graduation for every little thing.  She graduated from high
14  school, then, correct?
15  A.  Yes, sir.
16  Q.  So you got a pretty good relationship with the family,
17  correct?
18  A.  I know the family.
19  Q. [Student #5]    you earlier stated he communicated with
20  Mr. Millstone; is that correct?
21  A.  That is correct.
22  Q.  Do you know if he also communicated -- do you also know
23  if Mr. [Student #5]    communicated with HR On Call?
24  A.  Yes, he did.
25  Q.  Why did HR On Call want to speak with Mr. [Student #5]   ?

Page 112

1  A.  They didn't share that with me.
2  Q.  How did [Student #5]    learn that he was going to be
3  contacted?
4  A.  I contacted the family and requested that he come in.
5  Q.  Did the family ask you any questions?
6  A.  I can't recall any -- I mean, I can't recall.  I can say
7  that they wanted to talk to him and that we would do our best
8  to keep things anonymous for the kids.
9  Q.  So you talked about anonymity and confidentiality with
10  the [Student #6] family and now also with the [Student #5] family.
11  A.  Uh-huh.
12  Q.  Just so I understand, did you also discuss it with the
13  [Student #2]   family?
14  A.  I'm trying to think how the -- I don't think I contacted
15  the [Student #2]   family.
16  Q.  Did you discuss confidentiality with [Student #4] s
17  family?
18  A.  Yes, I did.
19  Q.  Mr. Short, have you maintained any notes, your personal
20  notes, your notes related to this investigation?
21  A.  I have some notes.  I took some notes earlier, but I'm
22  not sure where all the notes are.
23  Q.  Well, we'll find those here in a second.  I am just
24  curious, what kind of notes did you take?
25  A.  Mostly they were notes with the meeting that I had with

1  Mr. Freshwater on April 9th.
2  Q.  What other notes do you have related to the Freshwater
3  matter?
4  A.  I'm trying to think.  I don't know if I have any other
5  notes from the incident -- from that piece of --
6  Q.  Did you give any notes to your attorney?
7  A.  I don't -- I can't recall giving him any notes.
8  Q.  Let me ask you this, Mr. Short.  You're the leader of
9  this particular school entity, correct?
10  A.  Yes, sir.
11  Q.  Would you believe it's important to make notes on an
12  incident such as this involving John Freshwater?
13  A.  As I -- as our meetings would be, if we had some
14  meetings, yes, I would try to make some notes.
15  Q.  Did you make any notes related to the phone calls you
16  made to the four students?
17  A.  The only thing I think I did was list the names of the
18  students.
19  Q.  You listed them where?
20  A.  On a piece of paper.
21  Q.  Okay.  And what other notes did you make on that piece
22  of paper?
23  A.  Phone numbers.
24  Q.  Any other notes?
25  A.  No.

1  Q.  So it just had their names and their phone numbers on
2  it, correct?
3  A.  Yes.
4  Q.  Talk to me or tell me about the contents of your
5  conversation with [Student #2]                .
6  A.  Hello and here's the room.
7  Q.  How do you know the [Student #2] family?
8  A.  I don't.
9  Q.  Did his parents ask you any questions?
10  A.  I don't remember talking to his parents.
11  Q.  Did he come alone to the interview?
12  A.  I think his mom was with him.
13  Q.  You and the mom talk prior to him going into the
14  interview?
15  A.  Beyond saying hello, that would be about it.
16  Q.  Do you know if all the parents went into all these
17  different interviews?
18  A.  I believe the parents -- yes.  The only time that a
19  parent did not go in an interview was with Leevi.  We sent an
20  adult in with him.  That was my secretary.
21  Q.  How old is [Student #5]
22  A.  I'm not sure.  He's in the ninth grade right now.
23  Q.  Well, was his parent contacted?
24  A.  Yes.
25  Q.  His parent give consent for you to speak to him?

1  A.  Yes.
2  Q.  And the parent just says I don't want to be involved or
3  the parent couldn't be there?  What do you know?
4  A.  The parents said they didn't feel like they needed to
5  come.
6  Q.  And who went in there with [Student #5] then?
7  A.  Terry Streby.
8  Q.  Would you please spell that for me.
9  A.  S-T-R-E-B-Y.
10  Q.  Ever talk to Terry Streby about --
11  A.  No, I didn't.
12  Q.  You haven't talked to Terry Streby about any of this?
13  A.  About -- when you say any of this with the students?
14  Q.  Let me make sure I clarify, sir.  Have you talked to
15  Terry Streby -- you said she is your secretary, correct?
16  A.  That's correct.
17  Q.  Have you talked to her at all about the John Freshwater
18  investigation or those allegations against John Freshwater?
19  A.  I've talked to her about stress and different things,
20  but not necessarily about the investigation.
21  Q.  You said that you talked to her about stress and
22  different things?
23  A.  About my stress.
24  Q.  Would Ms. Streby, does she usually maintain your notes
25  for you?

1  A.  No.
2  Q.  She doesn't maintain your files of notes, or anything
3  like that?
4  A.  No.
5  Q.  Talk to me about your discussion with [Student #4]      When
6  did this occur?
7  A.  Again, I received the name to call to ask the family to
8  come in.
9  Q.  How do you know [Student #4]    family?
10  A.  I don't know.  [Student #4]
11  Q.  Did you talk to [Student #4]      before he went into the
12  interview?
13  A.  No, sir.
14  Q.  Were you there when he arrived?
15  A.  Yes, I was.
16  Q.  Didn't say a word to him?
17  A.  I might have -- I'm sure I said hello.
18  Q.  Did you talk to him about the investigation at all?
19  A.  No, sir.
20  Q.  Did you talk to any of these four students?  Did they
21  ask you any questions related to the investigation?
22  A.  Nope.
23  Q.  Not one single student asked you a single question
24  related to their interview or to this investigation?
25  A.  I can't recall one, no.

Page 117

1  Q. Tell me what you discussed with [Student #7]
2  A. [Student #7]      was a name that we got from two students
3  who said that he had been -- had the Tesla coil done to him.
4  Q. Who were those two students that told you about [Student #7]
5  [Student #7] ?
6  A. They didn't tell me. They told -- I believe they told
7  our attorney.
8  Q. How do you know [Student #7]       ?
9  A. [Student #7]      I was his elementary principal.
10 Q. Do you have any knowledge or information as to which two
11 students told your investigative team about [Student #7]     ?
12      MR. MILLSTONE: I'm going to object to the
13 question. Again, his testimony was that this was told to his
14 attorney. This was done in the course of conversations with
15 his attorney.
16      THE COURT: Is that the meeting that you're
17 referring to, Attorney Hamilton?
18      MR. HAMILTON: I'm referring to how they came
19 across [Student #7]    . That's what I'm trying to find out.
20      THE COURT: It would be privileged information if
21 it concerns a conversation with the attorney.
22 Q. I can't read my own notes. You say you did or did not
23 speak to [Student #7]     ? My question is very specific. Did
24 Mr. Short speak to [Student #7]     ?
25 A. Yes, I did.

Page 118

1  Q. That's what you told me happened in the middle of
2  August, 2008, correct?
3  A. Yes, sir.
4  Q. What did you talk to [Student #7]      about?
5  A. I talked to [Student #7]      about getting the Tesla coil
6  done to him.
7  Q. What's your understanding of when this allegedly
8  occurred?
9  A. December -- at the same time that the others -- that the
10 other -- the ones took place on December 6th, I believe.
11 Q. I'm not understanding. Are you saying that [Student #7]
12 [Student #7] had the Tesla coil applied to him on December 6th?
13 Is that what you're saying?
14 A. I don't -- it was in that same time frame as the other
15 ones were, yes.
16 Q. Did you ask [Student #7]      why he didn't come forward at
17 that time?
18 A. We asked -- I asked him -- I can't remember what his
19 response was.
20 Q. Did you make any notes about that particular response?
21 A. No, I didn't.
22 Q. Talk to any other students, other than those five
23 students we just talked about?
24 A. I can't recall any.
25 Q. Talk to any parents about the allegations against John

Page 119

1  Freshwater?
2  A. Parents of the students or -- I'm sorry?
3  Q. Have you talked to any parents of any students, the
4  students who go to Mount Vernon City Schools, about John
5  Freshwater in this investigation?
6  A. Current students? I'm trying to --
7  Q. I appreciate. You're trying to find out are we talking
8  about current students of any grade or students who have
9  graduated. Let's stick first with the students of any grade
10 who are still in the Mount Vernon City School System.
11 A. Dennis family.
12 Q. Who else?
13 A. The students that I mentioned before.
14 Q. Who else? You seem like you're having a hard time
15 recalling. Would you have made any notes about these
16 particular conversations with parents?
17 A. No, sir. I think that was it. I'm trying to think of
18 some more, but I think that was it.
19 Q. Talk to any Mount Vernon City School employees about the
20 investigation involving John Freshwater?
21 A. I've talked to employees, administrators. I've talked
22 to Mr. Ritchey. I've talked to Mr. White. I believe I've
23 talked to Ms. Strouse. I've talked to -- I've talked to
24 Karen Seward, who is an MVA person, just about logistics, not
25 about the case itself. Elle Button. I've talked very

Page 120

1  briefly to Bill Oxenford.
2  Q. Can you spell his last name for me sir.
3  A. O-X-E-N-F-O-R-D. Andrew Thompson. I'm trying to think
4  of the people that I talked to in particular.
5  Q. Going back to the parents, did you ever talk to a Steve
6  Thompson?
7  A. Steve Thompson's not a parent of student.
8  Q. I'm just asking in general as a parent.
9  A. Yes. Steve Thompson came in and I spoke with him.
10 Q. Any other teachers that you spoke to?
11 A. I talked to Mr. Freshwater. Lori Miller was in there
12 also.
13 Q. Talk to Lori Miller subsequent to the April 9th, 2008,
14 meeting you had with John Freshwater?
15 A. Yes, I have.
16 Q. I'm sorry?
17 A. Yes, sir.
18 Q. Regarding the allegations against John Freshwater?
19 A. No.
20 Q. You spoke to Lori about other things, correct?
21 A. Yes, sir.
22 Q. Unrelated to the Freshwater investigation?
23 A. Yes, sir.
24 Q. But related to religious items in the classroom?
25 A. Yes, sir.

1  Q.  And what was your discussion with her?
2  A.  Discussion with her is we requested that she remove her
3  religious displays that she had, which would have been a
4  poster and other items.
5  Q.  Did she tell you, though, that was not part of a
6  display?
7  A.  That what was not part of the display?
8  Q.  The poster or any other items you asked her to remove?
9  A.  She said she had a personal Bible.
10 Q.  Did you ask her to remove the personal Bible?
11 A.  No, sir.
12 Q.  Why not?
13 A.  It wasn't part of the display of items.  And we had not
14 had any complaints of her teaching or dealing with
15 allegations of teaching religion in the classroom or
16 allegations of improper conduct in that manner.
17 Q.  Going back to the former students' parents, I know you
18 talked to Steve Thompson.  Any other parents of former
19 students?  Talk to the Barones?
20 A.  Yes.  Yes, I did.
21 Q.  Other parents?
22 A.  I'm going to say I can't recall.
23 Q.  I want to make sure I understand your answer.  You
24 talked to former students' parents.  That's Steve Thompson
25 and the Barones.  Did you talk to both the Barones?

1  A.  I don't believe so.  I talked to Sam.
2  Q.  You didn't talk to Paula?
3  A.  Yes, I did.  Paula did submit something -- shared with
4  me, I guess, the concern or rumor that they had some of the
5  students in the science class had -- would get extra credit
6  if they memorized Bible verses in science class.
7  Q.  That's the first time I've heard about this, sir.  Let
8  me make sure I understand this very precisely.  You talked to
9  Paula Barone, and she's a former school employee.  Is that
10 true?
11 A.  I talked to Paula Barone and there was -- I'm sorry, I
12 have to sort through what I've heard and what I've read.
13 Q.  Let me make sure and be very clear here.
14 A.  I know.
15 Q.  I want from you the most certain definite answers you
16 can give.  I mean, I don't want to come back later with
17 parents names and then find out that something you remembered
18 that yes, in fact, you spoke to them.  That's why I want to
19 make certain to give you all due deliberations here.  But at
20 the same time, I don't want the element of surprise that
21 suddenly you remember who that was.  That's why I'm trying to
22 painstakingly work through this.
23 A.  I cannot recall if I sat down and talked to her.  I
24 don't believe I sat down and talked to Paula in particular,
25 but if that was something that came from a conversation she

1  had with somebody.
2  Q.  Okay.  So what did Paula Barone report to you?
3  A.  I don't think it was reported to me directly.  I think
4  it was reported to someone else.  I can't -- I can't --
5  Q.  When was the alleged Bible verses memorization extra
6  credit completed by John Freshwater?
7  A.  I can't recall.
8  Q.  Did you learn of it during 2007/2008 school year?
9  A.  I think I learned of it during the investigation.
10 Q.  What part of the investigation?
11 A.  I don't know if it was an accusation or it was something
12 that they investigated.  I can't recall.
13 Q.  Okay.  Are you saying that the investigators knew about
14 this alleged Bible verse memorization extra credit
15 assignment?
16 A.  I can't recall.  I really can't recall.
17 Q.  I appreciate that you can't recall.  I know what you're
18 doing.  Nonetheless, what I would like for you to understand
19 is that I need to get as much information from you.  So do
20 you know whether or not the investigators had information
21 that Bible memorization --
22 A.  I don't know that.
23 Q.  Okay.  You had this information, though, delivered to
24 you, correct?
25 A.  I don't recall how I -- I don't recall if it was a

1  conversation someone heard and it was unfounded.  I don't
2  recall how I heard it.
3  Q.  Okay.  Did you cause an investigation to be done on this
4  Bible verse memorization extra credit assignment?
5  A.  I think it was shared -- I think -- I can't remember --
6  I can't remember who I shared it with or if it was shared
7  with anybody or if it came in an email.  I can't remember.
8  Q.  So you're saying you don't know if you forwarded this
9  information on to anyone in the investigation?
10 A.  I believe I did, but I can't recall where it came from.
11 Q.  Should that allegation have been a part of the HR On
12 Call investigative report?
13 A.  Yes.
14 Q.  But it wasn't, was it?
15 A.  I don't believe it is.
16 Q.  Any other former parents of -- I'm sorry, former
17 parents.  Any other former students that you have spoken to
18 their parents?  We've got the Barones.  We've got the
19 Thompsons.  Anybody else?
20 A.  Button, Elle Button.
21 Q.  So she has current and former students?
22 A.  No.  Elle is former.  Elle was enlisted before as a
23 teacher.
24 Q.  What did you and Elle Button discuss?
25 A.  We discussed the fact that she was concerned about, I

1 think it was [Student #71] being anonymous.

2 Q. Talk to her about the allegations against John

3 Freshwater?

4 A. No, I did not.

5 Q. Did you talk to Bill Oxenford about the allegations

6 against John Freshwater?

7 A. No, I did not talk to him about coming over to see the

8 On Call investigation.

9 Q. Do you know if he did?

10 A. Yes, he did.

11 Q. Did you have any further discussion with Bill Oxenford

12 regarding these allegations?

13 A. No.

14 Q. Did you talk to him about whether or not you believed

15 these allegations?

16 A. No, sir.

17 Q. What about Andrew Thompson?  What was your conversation

18 with him about this allegation?

19 A. Andrew expressed his concern for Mr. Freshwater and was

20 sharing his thoughts that -- and this was after the

21 investigative report I believe was in at different times.

22 Q. So you don't know if he spoke to the investigators?

23 A. I do not know that.

24 Q. Do you know if he's ever spent time in John Freshwater's

25 classroom?

1 A. I believe he did, yes.

2 Q. Okay.  And when did you know that he had spent time in

3 John Freshwater's classroom?

4 A. When he came in and talked to me.

5 Q. You state you did not know prior to the investigative

6 report that Andrew Thompson had spent time in John

7 Freshwater's classroom?

8 A. I remember he student taught, but I can't remember who

9 he student taught with.

10      MR. MILLSTONE:  Excuse me, if we come to an

11 appropriate break, can we take a short break?

12      MR. HAMILTON:  I'll let you make the decision.  I

13 can go right to this.

14      MR. MILLSTONE:  I don't want to interrupt you if

15 you want.

16      MR. HAMILTON:  May I continue?

17      THE COURT:  Let's try for about five more minutes

18 until about 20 till.

19 Q. Earlier you stated that you had no reason to believe

20 that there were any lies or falsehoods related to any of

21 these allegations, correct?

22 A. I believe the people came to me, yes.

23 Q. And when the burn by Zachary Dennis was first presented

24 to you, you stated you did not report it, correct?

25 A. Correct.

1 Q. Why didn't you report it?

2 A. Because of twofold.  One, the parents weren't going to

3 press it and we didn't believe -- I didn't believe it was

4 abuse.  I didn't believe that John meant to hurt the person

5 and neither did the parents.  So without the parents'

6 support, without the school or the parents turning it in, I

7 didn't believe children's services would act on it.

8 Q. Do you believe John Freshwater hurt [Student #7]        on

9 purpose?

10 A. [Student #7] did not volunteer, which was different than what

11 the original piece was as far as volunteering, so I did call

12 [Student #7]

13 Q. Did you report pursuant to law the alleged shock that

14 John Freshwater administered to [Student #7]      ?

15 A. Yes, I did.

16 Q. Who did you report it to?

17 A. Children's services.

18 Q. What did they do with it?

19 A. They said that they were not going to act on it.

20 Q. So but for the fact that Zachary Dennis's parents didn't

21 want to report it, you would have reported it?  Is that what

22 you're saying?

23 A. No.  I wouldn't -- I didn't report it, because I go back

24 to the part where I didn't believe that children's services

25 would act on it because of not -- the school and the parents

1 not believing that abuse would follow.  In April I talked to

2 children's services and they -- in an informal talk, and they

3 concurred with what I thought.

4 Q. Do you have notes on that informal talk?

5 A. No, sir.

6 Q. I'm sorry?

7 A. No, sir.

8 Q. Who did you talk to?

9 A. Gloria Parsisson and Roger Shooter.

10 Q. Gloria?

11 A. Parsisson, P-A-R-S-I-S-S-O-N.

12 Q. And?

13 A. Roger Shooter, S-H-O-O-T-E-R.

14 Q. Come back to that at a different time.  I want to keep

15 my commitment to the referee.

16      MR. HAMILTON:  We can end there for a recess.

17      THE COURT:  Let's break for about ten minutes

18 here.

19      (Short break in proceedings.)

20      THE COURT:  If you could take your seats, we'll get

21 started again with your cross-examination.  I've spoken to

22 representatives from the commissioner's office.  We'll be

23 concluding just a few minutes before 5:00, so we'll try and

24 continue.  If someone needs a break during this last hour, by

25 all means, speak up.  We'll try and push through and have

1  another hour and five minutes.
2  **BY MR. HAMILTON:**
3  Q.  Mr. Short, redirect your attention to page 17 of the
4  collective bargaining agreement, Article 401, teacher
5  conditions.  If I may approach, I need to -- I can't find my
6  particular document, so I just need to see this.  Thank you,
7  sir.  Are you familiar with that particular provision of the
8  contract?
9         THE COURT:  What number are we referring to?
10        MR. HAMILTON:  Page 17, Article 401, first
11 provision.
12 Q.  Would you explain the meaning of that particular
13 contractual provision.
14        MR. MILLSTONE:  Objection.
15 A.  I wasn't part of the group that put it together.
16        THE COURT:  Maybe you would like to rephrase it.
17 Q.  As the leader of this particular school board, what is
18 your understanding of the constitutional rights that John
19 Freshwater has in his classroom?
20 A.  It states, Further, the board recognizes that teachers
21 have the right to engage in a variety of personal activities
22 and the board will not take disciplinary action against a
23 teacher unless a teacher's personal activities interfere with
24 the teacher's performance of his contractual duties.  Nothing
25 herein shall grant to any teacher the right to communicate to

1  any board member regarding matters which would otherwise
2  constitute an unfair labor practice as contemplated pursuant
3  to Chapter 4117 of the Revised Code.  I am not sure what 4117
4  of the Revised Code is.
5  Q.  Would you agree, though, that John Freshwater has
6  constitutional rights in the classroom?
7  A.  It says the board will not take disciplinary action
8  against a teacher unless a teacher's personal activities
9  interfere with the teacher's performance of his contractual
10 duties.
11        MR. MILLSTONE:  We'll stipulate that the contract
12 states that the teachers have those rights as granted by the
13 constitution and the --
14        MR. HAMILTON:  I appreciate the stipulation.  What
15 I'm trying to get is Mr. Short's understanding, because his
16 understanding is going to be very important as to his
17 administration and his leadership of this particular entity.
18 So what I'm trying to find out is to understand, does he
19 clearly have a grasp of the contract.
20 A.  I believe I do.
21 Q.  Do you believe that you insured that John Freshwater has
22 received all of his constitutional rights?
23 A.  I believe I have.
24 Q.  Okay.  Are you aware of any constitutional decisions
25 prohibiting the public school teacher from keeping a Bible on

1  their desk in a public school classroom?
2  A.  Can you state that one more time.
3         MR. MILLSTONE:  I'm going to object.  He's asking
4  for a legal analysis by this witness.
5         THE COURT:  Well, I don't think so.  It sounds as
6  if he's just asking if he is aware of any such decisions, not
7  their meaning or intent.
8  A.  No.
9  Q.  So from your understanding, a teacher could keep a Bible
10 on their desk in the classroom?
11 A.  I go back to the part about unless it interferes with
12 his activities.
13 Q.  Okay.  Does the mere presence of a Bible promote
14 religion?
15 A.  Depends where you're at.
16 Q.  You're absolutely right.  It does depend upon where
17 you're at, doesn't it?  Let me ask you this.  Does the mere
18 presence of a cross promote religion?
19        MR. MILLSTONE:  Again, I'm going to object as to --
20 this is going down the road of what is his understanding of
21 interpretation of the law.
22        MR. HAMILTON:  May I respond?
23        THE COURT:  Sure.
24        MR. HAMILTON:  I'm not asking for his
25 interpretation of the law.  I'm asking as the leader, as the

1  administrator of this particular school board -- of this
2  particular school entity, whether or not he would tell
3  somebody to remove a cross, a Bible, et cetera, because he
4  believes as a leader that it is in violation of contract.
5         THE COURT:  Well, I'm going to overrule the
6  objection, but please let's be reminded that this hearing is
7  to be confined to the grounds given for the termination, and
8  this seems to stray from that a bit.  I mean, you seem to be
9  going into a different area.  Let's try and confine it to
10 what's in the board's resolution and relate the questions to
11 that.
12        MR. HAMILTON:  Yes, sir.
13 Q.  It's been alleged that John had posters in his room,
14 correct?
15 A.  Correct.
16 Q.  Posters of a religious nature, correct?
17 A.  Correct.
18 Q.  Those posters of a religious nature, could they also be
19 termed motivational sayings?
20 A.  Are you talking about the 20 that are on the cupboard?
21 Q.  I'm talking about any of them.
22 A.  I believe I previously testified they were motivational
23 sayings with Bible verses attached to them.
24 Q.  Were those mentioned in the -- in any of the
25 correspondence given to John about removing certain items

1  from his classroom?

2  A.  I did not see in the written correspondence.

3  Q.  Will you agree with me that the written correspondence

4  from Bill White only talks about the Ten Commandments,

5  correct?

6       THE COURT:  Let's have -- if you remember, let's

7  have the exhibit so he can look at that.

8  Q.  We used employer's Exhibits as the April 7 and April

9  14 --

10      MR. MILLSTONE:  Those would be board Exhibits 12

11  and 13.

12      THE COURT:  They're just single sheets.  Well, one

13  is a double and one's a single.

14  A.  Board attachment 12 was Bible on the desk, collage in

15  the classroom window, and that was in that one.  And then in

16  the one on the 14th it was Bibles, other religious DVDs,

17  videos, et cetera.

18  Q.  Neither of those two letters mention anything about 20

19  statements around the cupboard, correct?

20  A.  Correct.

21  Q.  So were these 20 statements around the cupboard, were

22  they part of the concern that you had?

23  A.  Yes.

24  Q.  But they weren't listed by Mr. White as part of the

25  concern, correct?

1  A.  They weren't listed, correct.

2  Q.  So John Freshwater had no idea what these 20 items

3  surrounding the cupboard, that they caused you any kind of

4  concern, correct?

5  A.  I believe he was told to remove them by Mr. White.

6  Q.  Okay.  Strike -- never mind.  I withdraw.  You believe

7  that Mr. White informed John Freshwater to remove those,

8  correct?

9  A.  Yes, sir.

10  Q.  Do you know if they were removed?

11  A.  Yes, sir.

12  Q.  Could those 20 statements be considered virtuous or

13  motivational statements instead of Biblical or religious

14  statements?

15  A.  I think I read maybe one of them.  It was kind of a

16  motivational piece, again, with the Bible verse linked to it.

17  Q.  You read one of the 20.  Is that what you're saying?

18  A.  Yes.

19  Q.  You didn't read the other 19?

20  A.  No.

21  Q.  Let me make sure I understand what you're saying.  Are

22  you saying that he had 20 Bible verses put around his room?

23  Is that what you're saying?

24  A.  I estimated.

25  Q.  You didn't get an exact number?

1  A.  No, sir.

2  Q.  Were these 20 items part of the collage that you're

3  referring to?

4  A.  You'll have to ask Mr. White.

5  Q.  Did the investigator do any investigation related to the

6  20 statements around the cupboard?

7  A.  I do not recall.

8  Q.  Let me ask you this, Mr. Short.  In your position as

9  administrator, could statements from the Bible, the Koran,

10  the Torah, could those be statements of virtue, motivation,

11  without prohibiting -- without promoting a particular

12  religion?

13  A.  Again, I'd go back to the display piece with a number of

14  Bibles and posters and those type of things that's promoting

15  that certain religion, and he would be asked to take them

16  down.

17  Q.  So my understanding is your concern is with the word

18  "display" and whether or not John Freshwater had a display in

19  his classroom, correct?

20  A.  Yes.

21  Q.  So if credible evidence comes out that he did not have a

22  display, that they were simply pieces of virtue, statements

23  of motivation, then you'd have no problem with those being in

24  the classroom.  Is that what you're saying?

25  A.  Ask me that one more time.  I'm sorry.

1  Q.  If your concern is a display and credible evidence can

2  demonstrate that the statements around his room, these 20

3  statements or any others that you have or have not identified

4  were motivational statements or classified as statements of

5  virtue, you wouldn't have a problem with this, correct?

6  A.  If it was a motivational statement, there wasn't Bible

7  verses attached to it and it stood by itself, that would be

8  different.

9  Q.  Now, earlier I really like what you said.  I asked you

10  does the mere presence of a Bible promote religion, and you

11  said well, it depends upon where you're at.  Were those your

12  words?

13  A.  As best as I can recollect.

14  Q.  Okay.  So part of what you're saying is depending upon

15  where you're at, either physically or mentally, you're going

16  to put a connotation upon whatever motivational statement you

17  see upon a wall.  Is that true?

18  A.  I mean, where I'm at mentally?

19  Q.  Where you're at mentally.  Suppose nobody -- suppose

20  somebody had no understanding of Christianity, they didn't

21  understand how you cite Bible, chapter and verse, and they

22  saw a statement upon the wall.  If they see that statement

23  upon the wall but they don't know the citation process, does

24  that statement become religious in and of its nature simply

25  because of the statement or because of the citation?

Page 137

1  A. I would say the Bible verse is a reference to that trait
2  or that characteristic for someone to look up.
3  Q. Okay. And did you ever come across anybody who
4  professes to be a Christian and -- actually, let me strike
5  that. You ever come across somebody who sees a particular
6  statement upon a board and they say, you know what, that's a
7  really nice statement, I like that statement, that's a good
8  statement of virtue. Even if it comes from the Christian
9  Bible, would that make that a religious statement or a good
10 statement of virtue?
11         MR. MILLSTONE: Objection to the speculative nature
12 of the question.
13         THE COURT: I'm going to sustain the objection.
14 Let's try and get back to a point here.
15         MR. HAMILTON: Got a very clear point. I'm trying
16 to understand exactly what Mr. Short said earlier. He said
17 that it depends upon where you're at as to whether a Bible
18 promotes religion. I think the same context applies here.
19 It depends upon where you're at as to whether or not a Bible
20 verse is Biblical, Christian, Jewish, or Islamic in nature.
21 It depends upon where you're at not only physically, but it
22 also depends upon where you're at mentally. So because of
23 that, I'm trying to understand can there be virtuous
24 statements that may have come from the Bible, the Koran, or
25 the Torah, but they have no religious connotation. If I may

Page 138

1  proceed, I'll ask that.
2         THE COURT: Try and condense it.
3         MR. HAMILTON: That's a lot to condense, sir.
4  Q. Have you ever heard the -- have you ever heard the
5  statement woe to every slanderer or defamer? You ever heard
6  that statement?
7  A. No, sir.
8  Q. Okay. Would you believe that you should not tell a lie?
9  A. I believe you should not tell a lie, yes, sir.
10 Q. Would you believe that you should not bear false witness
11 against your neighbor?
12 A. We're going to go through the Ten Commandments?
13 Q. I am not, but you can. Go ahead. I'm just asking
14 you --
15 A. You're asking me if I -- I'm sorry, what was the
16 question?
17         MR. MILLSTONE: I'm going to object. The question
18 is this is what he believes.
19         THE COURT: We're getting way off point if we're
20 going to start examining this gentleman's personal beliefs.
21 That's not what we're here for.
22         MR. HAMILTON: I'm not here to examine his personal
23 beliefs, Your Honor. I'm here to examine the nature of a
24 virtuous statement. What I'm trying to get Mr. Short to
25 answer is that all three of those statements came from three

Page 139

1  different sources. Two of them just so happen to be related
2  to religion, but they're all statements of virtue. What I'm
3  trying to get at is can statements of virtue come from a
4  particular religious source but yet not promote that
5  religion?
6         MR. MILLSTONE: Is there a question -- is that a
7  question, or is this a response to the sustained objection?
8         THE COURT: Do you have a question concerning that
9  particular area for Mr. Short?
10 Q. Can a statement that comes from the Bible be virtuous
11 but have no Biblical connotation?
12 A. A statement from the Bible have no Biblical connotation?
13 Q. That's my question.
14 A. If found in the Bible?
15 Q. That's my question. Could a statement that comes from
16 the Bible be a statement of motivation?
17         MR. MILLSTONE: Objection. This is the second
18 question. There is a question on the floor that Mr. Short's
19 thinking about. He's now asked the second question.
20         THE COURT: Sustained. Mr. Short is trying to
21 develop an answer for your initial question.
22 A. Could the Bible quotation not be Biblical? Could be it
23 motivational?
24         MR. MILLSTONE: Have the Court reporter read back
25 the first question that was asked where he was interrupted

Page 140

1  with the new question.
2         THE COURT: I believe it had the word connotation
3  in it.
4         (Pending question read by reporter.)
5  A. Can a statement that comes from the Bible be virtuous
6  but have no Biblical connotation? That depends upon the
7  reader.
8  Q. Exactly my point. Just as it depends upon where that
9  person's at, either in time, or as you just said, from that
10 person's perspective.
11         MR. MILLSTONE: I'm going to object to the approach
12 here. This is supposed to be question and answer, not an
13 argument with the witness.
14         MR. HAMILTON: I'm just trying to get an answer.
15         MR. MILLSTONE: That wasn't a question.
16         THE COURT: Go to your next question. It did seem
17 to be framed as a debate.
18 Q. Could you adhere to a virtuous statement that comes from
19 a religious source and not be a follower of that religion?
20 A. Me personally in my beliefs?
21 Q. No, sir. I'm not all that concerned with your beliefs.
22 I'm concerned with society at large, because that's where
23 we're at. So my question is very simple, sir. Could you
24 adhere to a virtuous statement --
25 A. You say could you. You're talking to me.

1    MR. MILLSTONE: I object.

2    THE COURT: Let's hear the question. Restate it.

3  Q. Could a person adhere to a virtuous statement that comes

4  from a religious source and that person not be a follower of

5  that particular religion?

6    MR. MILLSTONE: Objection again. It gets into the

7  personal belief of this witness.

8    MR. HAMILTON: Absolutely not. In fact, we changed

9  the question up so it didn't focus on him.

10   THE COURT: He did frame it. It's a general

11 question. I guess that's what concerns me. It's general.

12 We've got to get back to the specifics that we're dealing

13 with here. I'll overrule this objection and we can restate

14 it again for Mr. Short, but you're seeking his personal

15 opinions on these issues that to me don't seem to be related

16 to the case.

17   MR. HAMILTON: No, sir.

18   THE COURT: Seem far afield. Now, if you can tie

19 them in somehow, that's great. But we're going into areas

20 that don't seem to be concerned with this resolution and his

21 part and the issuance thereof and getting to the bottom of

22 whether this resolution was proper, things of that nature.

23   MR. HAMILTON: Sir, if I may respond, all we're

24 trying to get is from this leader of this particular school

25 entity as to whether or not, in this multi-cultural,

1  multi-plural society, whether or not he has to negotiate or

2  navigate through all these different personalities and all

3  these different beliefs and understand that a particular

4  virtuous statement that just so happened to come from a

5  religious source may not have any religious connotation to

6  that particular person. That's all we're trying to get to.

7    In fact, to follow that up, his answer at the very

8  beginning of this line of questioning, that this depends upon

9  where a person is at, is the exact crux of the issue as it

10 relates to whether or not somebody is going to be promoting

11 or denigrating religion. And that's going to be a very

12 important part as we get into some of the understanding and

13 bias of what these people allegedly thought they had concern

14 with.

15   THE COURT: Well, when you say these people, we're

16 talking about a resolution of a board here. We're talking

17 about this gentleman enforcing board policy.

18   MR. HAMILTON: And if we're going to enforce board

19 policy, Your Honor, what's going to be important is that if

20 you're going to enforce policy, you're not going to promote

21 or denigrate a particular religion, then you're going to have

22 to be in a position to understand why a particular item is

23 religious in nature. Because if we're going to ban the Ten

24 Commandment, it's pretty much understood that the Ten

25 Commandments are related to the Christian Bible.

1    If we talk about other good and virtuous statements

2  that may or may not have an understanding based upon, as he

3  said, where that person is at, then it's going to be

4  important that we be able to navigate through this particular

5  understanding. I can assure you this is some tough stuff to

6  grasp, but if you simply let me work with it, I think we can

7  get to some answers.

8    MR. MILLSTONE: As I concept, I have to object to

9  your comment about the Ten Commandments being in the

10 Christian Bible. It is not.

11   MR. HAMILTON: I didn't -- quite frankly, I was

12 hearing you, but I wasn't listening. I'm sorry.

13   MR. MILLSTONE: To your characterization of where

14 the Ten Commandments comes from.

15   THE COURT: The question --

16   MR. MILLSTONE: It's clearly held that the Ten

17 Commandment are not something that can be displayed in a

18 public setting.

19   MR. HAMILTON: I understand that.

20   MR. MILLSTONE: Except as part of a story collage,

21 not a collage of the Ten Commandments.

22   MR. HAMILTON: That's so far all we have,

23 Mr. Millstone, is that the Ten Commandments is at issue

24 here. We've got all these other religious items of display

25 that may or may not have been observed and may or may not

1  involve 20 pieces around the cupboard of motivational

2  statements or may or may not involve other things around.

3  All we clearly have are Ten Commandments that are at issue

4  and then other religious items. I'm trying first to find out

5  what these other religious items are, and then number two, to

6  demonstrate just because they may have application to a

7  particular religion doesn't mean that they were religious in

8  nature as they were presented in the classroom.

9    THE COURT: Well --

10   MR. MILLSTONE: You had testimony -- I'm sorry.

11   THE COURT: You gentlemen and I can debate this

12 until the cow comes home. What we need to do at this point

13 is get back on track with questions and answers of this

14 witness. Now, if you haven't noted where you stopped and you

15 want to go back to your last question or we can have it read

16 back. Let's see if we can get back on track.

17 Q. Mr. Short, could a person adhere to a virtuous statement

18 that comes from a religious source and not be a follower of

19 that religion? I don't care about your personal beliefs. I

20 care about your ability to lead in this particular school

21 district.

22 A. Can you repeat that question.

23   (Pending question read by reporter.)

24 Q. Could you read it again.

25   (Pending question read by reporter.)

1  A.  I suppose that a person could.
2      THE COURT:  Thank you.  Next question.
3  Q.  Unless you knew the Bible, Mr. Short, or were acquainted
4  with Christianity, isn't it true you would not know where to
5  look unless you understood the citation system of the Bible?
6      MR. MILLSTONE:  Objection.
7      THE COURT:  Basis?
8      MR. MILLSTONE:  It's irrelevant to -- again, where
9  does that get us into the issues that are at hand here?
10     THE COURT:  Mr. Hamilton?
11     MR. HAMILTON:  Very simple.  Now I've learned today
12 that there's 20 something around a cupboard.  I've learned
13 that there's other religious statements around his room, one
14 including a poster of George Bush leading his cabinet in
15 prayer with the Bible verse James 5:16 on it.  I want to go
16 through a particular examination of that material to
17 demonstrate that unless you understand the citation system of
18 the Christian Bible, you may not know whether it's 5:16 in
19 the afternoon, whether or not somebody's name is James, or
20 how that particular citation system is applicable.  So that's
21 what I need to make certain we understand here.
22     MR. MILLSTONE:  Obviously you didn't learn that
23 here today.  There's been no testimony about James 5:16
24 having been on that poster.  So you're aware what was on
25 there before you came here today.

1      MR. HAMILTON:  I am aware of that.  I'm going to
2  ask him about it, yes.
3      THE COURT:  Go ahead.
4      MR. HAMILTON:  Thank you, sir.
5  Q.  My question to you, Mr. Short, is this.  Unless you knew
6  the Bible citation system, is it possible that you would not
7  even know what a citation after a Biblical verse meant?
8      MR. MILLSTONE:  Objection.  Speculative in nature.
9  He's asking the witness to speculate on what others might
10 know.
11     THE COURT:  Overruled.
12 A.  It's possible.
13 Q.  Are you familiar, Mr. Short, with John Freshwater's
14 assertion that he kept his Bible on his desk because it
15 inspires him enough to get through the day?
16 A.  I've heard that.
17 Q.  Do you have any reason to doubt that?
18 A.  No, sir.
19 Q.  Do you have any information that John Freshwater teaches
20 from the Bible that was on his desk?
21 A.  Are you saying -- can you define teaching for me.  I
22 mean --
23 Q.  However teaching is used in the investigative report.
24 A.  If you look at the investigative report, it will tell
25 you that there was examples of teaching religion in the

1  classroom.
2  Q.  The question to you, do you have any knowledge that John
3  Freshwater taught from his Bible?
4  A.  Just in the report that there was religion taught.
5  Q.  Any knowledge that he opened up his Bible and taught
6  from it in class?
7  A.  No direct knowledge, no, sir.
8  Q.  Are you aware of anybody who asserts that he opened his
9  Bible and taught from it in class?
10 A.  No, sir.
11 Q.  Is it possible that John Freshwater or any other public
12 school teacher would keep a Bible on their desk and not
13 otherwise promote or denigrate a particular religion?
14 A.  It is possible.
15 Q.  Is it possible that John Freshwater could have a picture
16 of the president and the rest of his presidential cabinet on
17 the wall with a Bible verse on it and not otherwise promote
18 or denigrate a particular religion?
19 A.  Is it possible that a teacher can put that poster on the
20 board and not promote a certain religion?
21 Q.  Yes, sir.
22 A.  With the Bible verse with it, I would say -- I would
23 have trouble with that.
24 Q.  Okay.  You state you would have trouble with it.  Does
25 that mean it's not possible to promote or not possible to

1  denigrate that particular religion or any religion?
2  A.  I'm leaping to the more less possible.
3  Q.  There was a book titled Jesus of Nazareth on his science
4  lab table; is that correct?
5  A.  That's correct.
6  Q.  Does the presence of a book titled Jesus of Nazareth
7  promote or denigrate a particular religion?
8      MR. MILLSTONE:  Objection to the general nature of
9  the question.  It is related specifically to Mr. Freshwater's
10 class, that's one thing.  This seems to be a general
11 question.
12     THE COURT:  I do believe there was prior testimony
13 that the book was in Mr. Freshwater's room.
14     MR. MILLSTONE:  Yes.  But the way the question has
15 been asked is a general question.  It wasn't stated to refer
16 to Mr. Freshwater's class.
17     MR. HAMILTON:  I thought my question stated science
18 lab, but I'll make sure it does.
19 Q.  On John Freshwater's science lab table in his classroom
20 that he had last year, does the mere presence of a book
21 entitled Jesus of Nazareth promote or denigrate a particular
22 religion?
23 A.  I would say yes.
24 Q.  And how so, sir?
25 A.  Jesus of Nazareth would promote the Christian religion.

Page 149

1  Q. Okay. Could it be a different of Jesus of Nazareth?
2  A. I'm not familiar with another one.
3  Q. Does that mean there's not another one?
4  A. Not another Jesus of Nazareth?
5  Q. Yes.
6  A. I'm not familiar with anyone else.
7  Q. Again, it comes back to it depends upon where you're at
8  with your understanding, correct?
9  A. It comes back to my understanding of Jesus of Nazareth,
10 yes.
11 Q. So you understand Jesus to be from Nazareth and you
12 associate that with Christianity. True?
13 A. True.
14 Q. Is it possible somebody could hear the book titled Jesus
15 of Nazareth and not associate it with Christianity?
16 A. It's possible.
17 Q. So in this situation, as it relates to John Freshwater,
18 why is he being found in violation of the curriculum standard
19 without any further evidence that he had created a display?
20 A. Curriculum standard?
21 Q. It's my understanding pursuant to the violation here he
22 had other religious items in his classroom. True?
23 A. True.
24 Q. Is Jesus of Nazareth, the book that is referenced in the
25 investigative report, included as one of those items?

Page 150

1  A. Yes, it is.
2  Q. Okay. Going back to your earlier statement, part of the
3  understanding I'm trying to accomplish here, to agree or
4  disagree, but does not some of this debate as to whether or
5  not John Freshwater had religious items in his classroom
6  depend upon the connotation that a particular person puts
7  upon that particular item?
8  A. Yes.
9  Q. You said a few minutes ago you thought Jesus of
10 Nazareth, the book, in your position, you believe that it
11 promoted religion, correct?
12 A. Yes.
13 Q. Okay. And you believe that Jesus of Nazareth can only
14 be one person, and that's the one person known in
15 Christianity as Jesus Christ, correct?
16 A. Yes.
17 Q. Okay. That depends upon your understanding of that
18 particular religious doctrine, correct?
19 A. Yes.
20 Q. If you didn't understand that particular religious
21 doctrine, would that be promoting or denigrating a particular
22 religion?
23 A. If you didn't understand who Jesus of Nazareth was, no.
24 Q. Okay. Are you familiar, sir, with James 5:16, the Bible
25 verse that was allegedly upon the poster in John Freshwater's

Page 151

1  room?
2  A. No, sir.
3  Q. Okay. You said you're not familiar with it being --  I
4  didn't -- are you familiar that John Freshwater had a poster
5  in his room with a Bible verse on it called James 5:16?
6  A. If that poster was of the Bush cabinet praying, yes,
7  sir.
8  Q. My first question to you would be, do you know whether
9  or not that Bible verse was covered up in part or in whole?
10 A. No, sir.
11 Q. If it were covered up in part or in whole, would that be
12 part of the religious items prohibited by your resolution?
13 A. I think at that time, yes, it would be, because of any
14 number of things that were there.
15 Q. Okay. Earlier it was just the Ten Commandments. Then
16 although not in the investigative report, you stated that
17 there was 20 other statements --
18 A. I stated that, yes, sir.
19 Q. What I'm trying to understand, sir, is I need to
20 understand fully what you consider to be a part of this
21 display. You consider the Ten Commandments to be a part of
22 the display, correct?
23 A. Correct.
24 Q. You consider the George Bush poster that was up on the
25 wall part of the display, correct?

Page 152

1  A. Correct.
2  Q. You consider 20 motivational statements that may or may
3  not have been religious in nature part of the display,
4  correct?
5  A. They include the Bible verses, yes.
6  Q. But those did not make it in the report, correct?
7  A. They were not in the report, no.
8  Q. Any other items here that you believe --
9  A. Two boxes of books.
10 Q. Okay. Two boxes of books. Where were they located?
11 A. I was told in the back of the room.
12 Q. You never saw them personally, correct?
13 A. Didn't see them personally.
14 Q. Were they in a box or a bag?
15 A. I was told a box. When I brought it up in the meeting,
16 I wasn't correct.
17 Q. Okay. Did they say Holy Bible on the outside of the
18 box?
19 A. I couldn't tell you.
20 Q. Did it have a sign pointing to here are Bibles?
21 A. I couldn't tell you.
22 Q. Okay. So really is it reasonable to believe that a box
23 of Bibles that may be in the back of the classroom are part
24 of a display?
25 A. Isolated as one, maybe not. But as a total -- with the

1 picture you described, it becomes.
2 Q.  How do students know what was in the box, sir?
3 A.  How did the students know what was in the box?  I don't
4 know.
5 Q.  So how can it be part of a display if the book is in a
6 box?
7 A.  It was part of what was in the room as part of the --
8 and in the conversation with Mr. --
9 Q.  So we've -- I interrupted you.
10 A.  And in the conversation with Mr. Freshwater, he said
11 there were Bibles in the box.
12 Q.  Were there any other items that you believe are part of
13 this display?
14 A.  I believe there was a cross club sign that was there and
15 he was asked to remove.
16 Q.  That's another new one.  Did that make it into the
17 report?
18 A.  No, sir.
19 Q.  Did that make it into any of the letters written by Bill
20 White to John Freshwater telling him to remove religious
21 items?
22 A.  No, sir.
23 Q.  Any other items that you can think of that may or may
24 not have made it into the report?
25 A.  No, sir.

1 Q.  Page 17, Article 401 of the collective bargaining
2 agreement, paragraph 2.
3 A.  Yes, sir.
4 Q.  Tell me after you've completed reviewing it.
5 A.  I believe he had me review this before.
6 Q.  Okay.  What types of other situations in your leadership
7 position either as a principal, as a teacher, or as a
8 superintendent, have that particular provision arisen either
9 in this school district or in another?
10 A.  I can't remember as far as an elementary principal
11 dealing with -- as a personal activity -- a personal activity
12 might be something that I've dealt with, be it a parent who
13 has a son that has an away game and the game's at 5:00 and we
14 let him go at 3:00 and we cover the class or we do something
15 along those lines, that would be a personal activity that I
16 can think of that we've worked with.
17         MR. HAMILTON:  Can we approach, Your Honor?
18         (Discussion held off the record.)
19 Q.  Mr. Short, earlier you had testified that you had given
20 John Freshwater a document called FCA Handbook for Public
21 Schools; is that correct?
22 A.  Yes, sir.
23 Q.  Does that look like the document that you had given John
24 Freshwater?
25         MR. MILLSTONE:  Could you hand it to him so he

1 could take a look at it?  Take it out of the paper.
2 A.  Yes, sir.
3 Q.  I am going to ask you to take a few moments.  I want you
4 to look at that document and compare it to this particular
5 document and tell me if they match up approximately the
6 same.  You're more than welcome to do it at my table or at
7 your counsel's table.  Mr. Short, you had a chance to review
8 the document that I handed you?
9 A.  Yes.
10 Q.  Tell me the title of that particular document.
11 A.  FCA Handbook for Public Schools.
12 Q.  Does this appear to be the same document that you had
13 examined as Exhibit 10?
14 A.  With some modifications.
15 Q.  What would be those modifications?
16 A.  There's DNA or there's letters in here or things that
17 were underlined with pencil that I didn't do.
18 Q.  But other than that, this appears to be a document
19 that --
20 A.  This document, the one I gave him, is the one that was
21 sent to me from the FCA handbook.  The one that I printed was
22 right from the FCA website.
23         MR. HAMILTON:  I think at this point we're going to
24 have to call this Employee's Exhibit Number 1.
25         THE COURT:  I think that's a better suggestion than

1 substitution.  We might as well have both documents
2 available.  We can get copies of that, I assume.
3         MR. MILLSTONE:  Let me point out there are some
4 things that didn't appear underlined or -- I'm sorry,
5 highlighted in this copy that were highlighted in there, or
6 vice versa.  I'm not sure which --
7         MR. HAMILTON:  These are color copies is all I can
8 tell you.
9         MR. MILLSTONE:  That would explain why some of it
10 is a little different, especially the yellow.
11         MR. HAMILTON:  Employee Exhibit 1.
12 Q.  Mr. Short, that particular document that you're holding,
13 Employee's Exhibit Number 1, was that the exact document that
14 you handed to John Freshwater?
15 A.  It's the document, but there's markings on here that
16 weren't mine.
17 Q.  Let's go ahead and talk about those markings that aren't
18 yours first, then we can talk about your actual markings.
19 Would you go ahead and identify by page first and then by
20 line number the markings that you believe you did not make.
21 A.  There's DNA written on a lot of these in yellow marker
22 that I did not do.
23 Q.  I want to make certain I understand.  Are you stating
24 that it says DNA, the letter D, the letter N the letter A,
25 and you're saying you did not write that on any paragraph of

1  this document?
2  A.  I do not recollect writing that on the document.
3  Q.  Would you --
4        MR. MILLSTONE:  The first one on page 5?
5        MR. HAMILTON:  I'm sure he's going to identify for
6  us.
7  A.  The first DNA I come across is on page 5.
8  Q.  Focusing upon that DNA on page 5, would you agree that
9  the marker there used to write the words DNA is yellow in
10 nature?
11 A.  Yes, sir.
12 Q.  Would you agree that the portions that you highlighted
13 was done with a yellow marker?
14 A.  Yes, sir.
15 Q.  Would you go ahead and identify any other markings after
16 page 5 that you believe you did not make.
17 A.  On page 6 there's DNA on both the top and the first
18 question and the second question.
19 Q.  So two times?
20 A.  Yes.  It's marked twice.
21 Q.  Okay.  Next.
22 A.  On page 7 underlined in pencil was line -- on line 7 and
23 8.  And the second question on there says DNA.
24 Q.  On page 7, sir?
25 A.  Yes, sir.

1  Q.  Next?
2  A.  If you go to page 9 and I go to the third line and I go
3  to the fourth line and I go to the fifth line, there are some
4  words underlined in pencil.  On page 10 the very first full
5  question, there's a DNA on the answer.  It looks like DNA.  I
6  think it's a D.  Sometimes it looks like a P.  On page 13 the
7  whole DNA, that whole answer is DNA.  On page 14 at the top
8  there is -- it's not underlined.  It's circled with an
9  asterisk on the first line.  Line 5, there's underlining.
10 Line 16, there's underlining.
11      On 15, there's a DNA.  And then there's also -- on the
12 answer there's also in line 5, line 10, line 5 and 10 also
13 have asterisks.  Line 11, line 12 with an asterisk, line 16.
14 On page 16, there is a red underline.  On line 8, line 9,
15 line 9 also has a pencil underline.  Line 11, line 12 and
16 line 13 also have pencil underlines.
17      Page 17, line 3 has a red underline with a parentheses
18 around a word.  Line 4 has a red line with a red asterisk.
19 Line 5 has a red line.  Line 6 has a red line.  Line 17 on
20 page 17 down farther, line 23, line 24, line 25, line 26 have
21 red underlines, and there's also a yellow DNA on that
22 question.  On 18, there's a DNA on the second.  There's a DNA
23 on 18 at the bottom.  There's nothing with that on that
24 page.  Then I believe that is it.
25 Q.  Other than those exclusions which you just made note of,

1  does that document appear to be the exact document that you
2  would have delivered to John Freshwater?
3  A.  It appears to be.
4  Q.  Okay.  And how, again, did you get that document to
5  him?  Was it pursuant to Bill White?
6  A.  Bill White gave it to him.
7  Q.  And why did you have that delivered to John?
8  A.  We -- in talking to him on the September 11th, there was
9  some questions -- it was right around September 11th, because
10 I know that was one of the topics.  We talked about, because
11 the question came up with a public speaker needing to get
12 principal's notice, what things do we want to make sure that
13 we did, so we provided this so we could make sure we would be
14 on the same page.
15 Q.  You obtained it from what kind of website?
16 A.  FCA.  There's an FCA website.
17 Q.  Did you discuss with anybody this document prior to
18 giving it to John Freshwater?
19 A.  I think I discussed it with -- Bill and I sat down, Bill
20 White and I sat down.
21 Q.  Did you discuss it with any board members?
22 A.  I can't recall.
23 Q.  Anybody else other than Bill White?
24 A.  I can't recall a discussion with anybody else.
25 Q.  Did you intend the handout to be training for John

1  Freshwater?
2  A.  I intended it to be a document that would have us on the
3  same page as far as FCA is concerned.
4  Q.  So would that be training, then?
5  A.  Yes.
6  Q.  Anybody else receive this document?
7  A.  I believe the other FCA people received the document.
8  Q.  Are you certain about that or --
9  A.  Yes, sir.
10 Q.  Lori Miller is one of the other FCA faculty monitors,
11 correct?
12 A.  Correct.
13 Q.  And who is the other one?  Sixth grade?
14 A.  Those people weren't in our meeting with John on the --
15 with John being the leadership team person.  John was not in
16 that meeting with the people that came in to speak, so
17 Lori -- I mean, John was there.  Lori was not there and
18 Mr. D'Ettorre was not there.
19 Q.  And other than the -- the only reason you had this
20 document printed out was because you were having some kind of
21 concern or issue related to a speaker coming in to visit?
22 A.  No.  In the conversation with Mr. Freshwater, with the
23 speaker, with Mr. White, there were questions that came up
24 about what things we can and can't do.  Because before they
25 had been able to have their speaker come in, and Mr. White

Page 161

1 and I had worked on getting permission for a person to come
2 in during the school hours. So from that conversation I
3 asked Mr. White to give this document to Mr. Freshwater.
4 Q. Do you know if John Freshwater had any prior training
5 related to his activity with the FCA prior to you giving him
6 that document?
7 A. I do not know.
8 Q. Do you know if anybody there in the Mount Vernon City
9 School System has had training as it relates to FCA?
10 A. I do not know. I do know. I'm sorry. Mr. Wilbur.
11 Q. Give me his full name, sir.
12 A. Matt Wilbur.
13 Q. What grade is he?
14 A. He teaches math.
15 Q. What kind of administrative oversight does the
16 administration provide to the teacher as it relates to FCA?
17 A. We provided the rules that we expected to be followed.
18 Q. Okay. And you provided those rules how? In what form?
19 A. In this form.
20 Q. Okay. And that was given in September of 2007, correct?
21 A. Correct.
22 Q. And prior to that, do you know of any training John
23 Freshwater received related to his -- his activities for the
24 FCA?
25      MR. MILLSTONE: I'm going to object. Again, he

Page 162



1 indicated he became the interim superintendent the full
2 school year, active two months in the prior year at some
3 point when the former superintendent was ill. There's no way
4 that this would be in the knowledge of this witness.
5      MR. HAMILTON: If he had a conversation with John
6 Freshwater and Bill White and an alleged speaker, it may have
7 been learned that John had never received training prior to
8 that time.
9      THE COURT: Well, I guess my concern was the
10 question had been previously asked and answered, but I may be
11 mistaken. Didn't you ask him that question once before?
12      MR. HAMILTON: I think you just gave Mr. Millstone
13 there his next objection. Nonetheless, let me make certain,
14 then, what the answer is, then. I can either have the court
15 reporter read it back to me, Your Honor, or I can have him.
16 I need to know whether or not John Freshwater, in his 17
17 years as the monitor, facilitator, or supervisor of FCA, has
18 received any other training than that document given in 2007.
19      THE COURT: Do you remember your previous answer?
20 If you don't, we'll look back for the question.
21 A. Since I was an interim superintendent and
22 superintendent, that's the only conversation I've had with
23 him about training.
24      MR. HAMILTON: Your Honor, I'm about to get into
25 another line of questioning that may assume a few more

Page 163

1 minutes. You told me to make certain that I advise you a few
2 minutes before, because you need to have the room cleared.
3      THE COURT: We've got five more minutes.
4 Q. Did you read that document, Mr. Short?
5 A. I have read the document.
6 Q. You made those marks in the document, correct?
7 A. The ones that I recognize, the yellow lines, the
8 highlighted words.
9 Q. Why did you mark the document like that?
10 A. It dealt with questions that we had when we sat down and
11 talked.
12 Q. Were you emphasizing those particular points?
13 A. I was -- those were particular points that we had talked
14 about before.
15 Q. Were there any points that you did not think were
16 relevant to the Mount Vernon City School FCA leadership
17 club? Any part of that document that you didn't think were
18 relevant?
19 A. I would say the question on page 5 about FCA clubs get
20 funding from school for their activities. Question -- on 6,
21 the question not recognized as a student club. How can we
22 hold meetings on campus that are not recognized as a student
23 club. It wasn't a question that came up.
24 Q. Okay. Any other?
25 A. On page 10, I don't believe the FCA is interested in

Page 164

1 becoming a community group. On page 15, we really didn't get
2 into talking about coaches. By that I take that to be
3 football coaches or basketball coaches or some type of
4 coach. We didn't discuss 18, can coaches meet with other
5 coaches and teachers. And I -- we did not get into the
6 differences in the university. So your question, I believe,
7 was -- what was your question?
8 Q. The question is what parts didn't apply? I thought
9 you'd be able to take a quick look at that, but your answers
10 would be those items you just listed, correct?
11 A. Those parts don't apply.
12      MR. HAMILTON: Got the answer to my question.
13      THE COURT: I would suggest with that that we
14 conclude for this afternoon. I must remind everyone that the
15 commissioners and the security staff have asked that we all
16 leave by the front door. Everything else at this point is
17 secure and locked down. And we will reconvene tomorrow
18 morning at 9 o'clock a.m. in this same location.
19      MR. MILLSTONE: Before we continue, the question
20 was does not apply. The witness has answered these do not
21 apply. I don't know what it doesn't apply to.
22 A. The question was --
23 Q. What parts of this document do not apply to the
24 situation as it relates to John Freshwater and Mount Vernon
25 City School System?

1   A.  And that's with the coaches and the pieces that I didn't

2 go over.  There were some things that weren't underlined that

3 I didn't go through.  Okay.

4        THE COURT:  Thank you.

5              - - -

6        The proceedings were adjourned until 9:00 a.m. on

7 Friday, October 3, 2008.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25