IN THE MATTER OF TERMINATION
OF THE EMPLOYMENT OF
JOHN FRESHWATER

TRANSCRIPT OF PROCEEDINGS HELD ON 10/3/08
- - -
VOLUME II
- - -
R. LEE SHEPHERD
Referee, presiding.

TAMMY K. MC GHEE
REGISTERED MERIT REPORTER
O'DONNELL & MC GHEE
13 PARK AVENUE WEST, SUITE 502
MANSFIELD, OHIO  44902
(419) 522-9700

---

**Page 166**

1    MORNING SESSION,
2    Friday, October 3, 2008.
3    - - -
4    THE COURT:  Ladies and gentlemen, we're ready to
5    resume day two of the hearing to consider the termination of
6    the teaching contract of Mr. John Freshwater.  I will remind
7    all in attendance that I would ask that you turn off your
8    cell phones so that they are not a disturbance during the
9    proceeding, and also we are prohibiting the recording of this
10   proceeding by either broadcast or tape recording and we're
11   not allowing photographers as well.
12        When we ended yesterday afternoon, the
13   cross-examination of the superintendent Mr. Short was taking
14   place by Attorney Hamilton on behalf of Mr. Freshwater.  We
15   will resume at that point in time.
16        I will remind you, Mr. Short, you are under oath
17   as you were yesterday.
18   BY MR. HAMILTON:
19   Q.  Good morning, Mr. Short.  I want to pick up a point from
20   yesterday for a little clarification on.  Article 303 on
21   evaluations, the question I have for you is if John
22   Freshwater is exonerated of all these allegations and he
23   resumes his teaching duties for this particular school year,
24   it's my understanding he's in the third year of a limited
25   contract; is that correct?

---

**Page 167**

1    A.  He's in the third year of a limited contract?  Can I see
2    what you're referring to?
3    Q.  Yeah.  I'm handing you, Mr. Short, the collective
4    bargaining agreement that would cover the employment of John
5    Freshwater.  I'm referring specifically to Article 303 as it
6    relates to scheduled evaluations.  My question to you is,
7    first of all, confirm that he's in the third year of a three
8    year limited contract.  Explain to me -- don't explain to
9    me.  Let me just confirm.  At the end of that particular
10   contract period, he would either be rehired on a new
11   continuous -- new three year contract, correct?  Or he would
12   not be renewed.  One or the other, correct?
13   A.  I believe that's the sequence, yes.
14   Q.  If he's exonerated of all these particular allegations,
15   it's been asserted that the school board would not have to
16   rehire him and that he could simply just be without a job.
17   Is that true?
18   A.  I haven't heard that.
19   Q.  Okay.  So according to the contract -- and the reason
20   this is important here is I need to make certain that I
21   clarify my understanding.  If he comes to the end of this
22   three year contract and he's exonerated of these particular
23   actions, he's going to be rehired.  Yes or no?
24   A.  I would probably confer with our attorney.
25   Q.  Okay.  But according to the contract, based upon your

---

**Page 168**

1    understanding of the contract, based upon what the
2    contractual provisions are there, so long as he has at least
3    two evaluations, then he has to be reconsidered for rehire.
4    Is that true?
5         MR. MILLSTONE:  I'm going to object to the question
6    he's asking.  For the witness to reach a legal conclusion is
7    demaning of the contract.
8         MR. HAMILTON:  I'm not asking for a legal
9    conclusion.  I'm asking for his interpretation because he is
10   the -- he hides behind the charade of legal interpretation,
11   religious issues.  I'm trying to get to what his
12   understanding is as the leader of this organization.  If he
13   continues to be evasive or hide behind these objections, then
14   the concern is that we're never going to find out what his
15   managing style is, what his leadership abilities are.
16        MR. MILLSTONE:  First of all, this is an outrageous
17   allegation that Mr. Hamilton has just made.  This witness has
18   been forthright.  He has testified.  The objection is made by
19   me.  It is not made by him.  I have made the objection
20   because he has asked for a legal conclusion.  A contract is a
21   legal document.  And the answer that he gave would be that he
22   would consult with his legal counsel.  Therefore, as he
23   continues to ask this question, he's asking this gentleman to
24   reach a legal conclusion on a legal document.  The
25   interpretation of that document is a legal matter.

Page 169

1  THE COURT: Thank you. I'm going to sustain the
2  objection. He has answered that in that event, and that in
3  itself is speculation to some extent, but in that event, he
4  would seek a legal opinion, which would be the right thing to
5  do.
6  Q.  In your administrative understanding, Mr. Short, what's
7  your understanding of how many evaluations have to occur in
8  the final year of a limited contract?
9  A.  You have to have two observations between the tenth day
10 of the school year and December 15th with the written
11 evaluation provided to the teacher by December 15th.
12 Q.  So there's two different evaluations that have to occur,
13 correct?
14 A.  Second evaluation period is from January 1st to April
15 1st, and you need two observations at that time and then
16 April 10th would be your evaluation you would provide to the
17 teacher.
18 Q.  In this particular situation, John Freshwater is not
19 teaching school this year at this point, correct?
20 A.  That is correct.
21 Q.  And at this particular juncture he would not have the
22 opportunity to be evaluated; is that correct?
23 A.  That's correct.
24 Q.  And according to the contractual provision 305, if
25 Mr. Freshwater is exonerated of these particular charges and

Page 170

1  he's essentially reinstated from his suspension, he would
2  then have the right to appeal his non-renewal of contract,
3  correct?
4      MR. MILLSTONE: I'm going to object to the line of
5  questioning. Again, he's asking for speculation on what
6  happens if -- what happens if. And, that's first of all,
7  speculation as to whether he's exonerated. Secondly, there's
8  a whole issue in terms of what the legal interpretation of
9  the contract is.
10     THE COURT: I'm going to sustain the objection. I
11 don't see the relevance of this line of questioning.
12 Certainly there are other avenues and other proceedings that
13 may result from this, but this particular question doesn't
14 seem to be relevant to the matter that is at hand.
15     MR. HAMILTON: Yes, sir.
16 Q.  Yesterday we talked on page 17 of the contract, Article
17 401, paragraph 2, and as we were talking about that, my
18 question to you would be what kinds of personal activities
19 could interfere with a teacher's contractual duties?
20     MR. MILLSTONE: Objection. Asked and answered.
21     THE COURT: I'll allow the question as opposed to
22 searching back to see if it actually was. I think you're
23 making a reference to a line of questioning. You didn't ask
24 this particular question, did you?
25     MR. HAMILTON: I didn't ask this particular

Page 171

1  question. I'm picking up right where my notes left off from
2  yesterday.
3  A.  Yesterday I said that it would be, for example, if a
4  teacher had to leave at 3:00 to go to a son's game that might
5  be at 5:00 somewhere else, that would be a personal activity
6  that we would try to work with that teacher on.
7  Q.  Okay. If John Freshwater stood outside an abortion
8  clinic in protest, would that potentially interfere with his
9  contractual duties?
10 A.  As long as he was not engaged in that activity during a
11 school day when he should be at work or otherwise.
12 Q.  So as long as it's on his personal time, correct?
13 A.  Yes, sir.
14 Q.  And you don't see how that would in any way interfere
15 with his contractual duties, correct?
16 A.  As I stipulated, if he wasn't supposed to be at work.
17 Q.  What if John Freshwater organized a Christian youth
18 conference? Would that somehow interfere with his
19 contractual duties?
20 A.  If he did not do it at school and if he did it outside
21 as a, quote, community group type, then no.
22 Q.  No, it wouldn't interfere with his contractual duties,
23 correct?
24 A.  Correct.
25 Q.  Are you aware that John Freshwater checked out some

Page 172

1  books from the school library?
2  A.  Yes, I am.
3  Q.  What books are you aware of him checking out?
4  A.  I'm aware of the Bible and Jesus of Nazareth.
5  Q.  Would it be legitimate for John Freshwater to check out
6  the Bible from the school library if he wanted to compare
7  that to the Bible that was alleged to be on his desk?
8  A.  Yes.
9  Q.  Would the mere fact of checking out a Bible from the
10 school library, would that be promoting or denigrating
11 religion from your perspective?
12 A.  Simply checking out the Bible? I'm sorry? No.
13 Q.  Placing it on the science lab desk, a particular Bible
14 or Jesus of Nazareth, would that be promoting or denigrating
15 a particular religion?
16 A.  No.
17 Q.  Trying to get a greater understanding, Mr. Short, as to
18 how John's actions promoted or denigrated a particular
19 religion. Yesterday we talked a little bit about display.
20 Help me understand the circumstances from your administrative
21 view how the items in his room contributed to creating a
22 display.
23 A.  When you take the items as an individual piece, it's one
24 thing. But when you look at a collective group, you look at
25 the Ten Commandments on the front door, you look at the

1  different posters that are in the room, you look at the
2  posters that are on the cupboard that contain a Bible verse,
3  when you look at the Bible on a desk, when you look at the
4  cross club sign in the back, when you take those things as a
5  whole and it doesn't deal with the science curriculum that he
6  is teaching, then it becomes a display.
7  Q.  If he has a patriotic poster up in his room and it's not
8  part of the science curriculum, is that prohibited?
9  A.  What's the patriotic poster say?
10  Q.  It could be any patriotic poster.
11  A.  It would depend what the patriotic poster is.
12  Q.  Suppose he has a picture of the flag that has the pledge
13  of allegiance and has the words one nation under God.  Is
14  that part of a display?
15  A.  No, sir.
16  Q.  Okay.  So it mentions God.  Do you know which God that
17  particular poster mentions?
18  A.  I believe I do.
19  Q.  And that would be?
20  A.  God.
21  Q.  Is it the God of the Jews, the God of the Muslims, the
22  God of the Christian, or the God of mother nature?  Do we
23  know?
24       MR. MILLSTONE:  I'm going to object to the
25  question.

1       MR. HAMILTON:  Your Honor, very clearly --
2       THE COURT:  Basis for your objection?
3       MR. MILLSTONE:  One, relevance.  Two, beyond the
4  scope of direct examination.  Three, speculative and
5  hypothetical without any basis for it.
6       THE COURT:  I'm going to allow the witness to
7  answer the question.
8       MR. HAMILTON:  Thank you, Your Honor.  Can I have
9  the court reporter please read back the question?
10       (Pending question read by reporter.)
11  A.  It would be the God of the person that was speaking.
12  Q.  Okay.  That particular answer you gave just there would
13  depend upon the person's perspective, correct?
14  A.  Yes.
15  Q.  That would depend upon the person's personal experience,
16  correct?
17  A.  Yes.
18  Q.  Do you have any knowledge how John Freshwater promoted
19  or denigrated religion from his perspective by displaying the
20  Ten Commandments, the different posters that didn't make it
21  into the investigation, the different posters around the
22  cupboard that didn't make it part of the investigation, the
23  crosswalk sign that didn't make it into the investigation,
24  and his Bible?  Do you have any information, you personally,
25  how those particular items that you yourself listed, were

1  promoted or denigrated as it relates to religion by John
2  Freshwater?
3  A.  It was a cross club, not a crosswalk.  But what I go
4  back to is the fact that all those items together did not
5  have to deal with the science curriculum, so they become a
6  display.
7  Q.  Referring you to the collective bargaining agreement,
8  page 17, article 402, paragraph 1, line 1.  Tell me after
9  you've had a chance to look at it.
10  A.  Yes.
11  Q.  You see the word administration in there, sir?
12  A.  Yes.
13  Q.  Identify who the administration would be.
14  A.  Administration would be any administrator.  It could be
15  a central office administrator.  It could be the building
16  administrator.  It could be the superintendent.  It could be
17  anyone with administrative hiring.
18  Q.  Would this include board members also or not?
19  A.  No, sir.
20  Q.  Yesterday you stated that a decision was made to
21  investigate.
22  A.  Yes, sir.
23  Q.  How was that decision arrived at to investigate these
24  particular complaints?
25  A.  When these complaints came to me, I asked -- I directed

1  our principal to investigate.
2  Q.  So you directed the principal to investigate.  I'm a
3  little confused here.  You directed the principal to
4  investigate the December 6, 2007, allegations as presented by
5  the Dennis family, correct?
6  A.  That is correct.
7  Q.  And eventually you stated that an outside independent
8  investigator was hired, correct?
9  A.  That is correct.
10  Q.  And why was that independent outside investigator hired?
11  A.  As I stated yesterday, it was because the whole series
12  of incidents accumulated to a point where the board felt an
13  independent investigation would be the best way to proceed.
14  Q.  So the board thought that or you thought that?
15  A.  I thought that, and then I would say the board agreed.
16  Q.  Okay.  Did you recommend to the board that they should
17  hire an outside investigator?
18  A.  As I recall, yes.
19  Q.  And then they went forward based upon your
20  recommendation.  Is that your understanding?
21  A.  Yes.
22  Q.  How was the investigator -- why was the investigator
23  chosen from outside school personnel?
24  A.  Because the emotional piece of this whole thing had
25  gotten quite large in the district, and the feeling was that

Page 177

1  someone that was perceived not to have direct ties to the
2  administration or Mr. Freshwater would be the people to do
3  the investigation.
4  Q.  First of all, what was the name of the investigative
5  company?
6  A.  HR On Call.
7  Q.  And how was that particular group chosen?
8  A.  We asked our attorney to find us an independent
9  investigator.
10  Q.  So you didn't find the investigator yourself, correct?
11  A.  Correct.
12  Q.  And your attorney is the one who recommended this
13  particular investigator?
14  A.  Yes, sir.
15  Q.  Do you know of any previous relationship that you or any
16  board members have with HR On Call?
17  A.  No, sir.
18  Q.  What did you know about HR On Call's credentials?
19  A.  I knew that from -- I knew that they were a human
20  resource group.
21  Q.  Did you have a choice of selecting from a group of
22  investigators, or were you simply given one choice?
23  A.  We requested -- the board -- we requested that
24  Mr. Millstone find us an investigative group, so there was no
25  choice.

Page 178

1  Q.  Okay.  So you know HR On Call is a human resource
2  group.  Do you know anything else about the credentials?
3  A.  No, sir.
4  Q.  Did you ever question their ability to conduct the
5  investigation?
6  A.  No, sir.
7  Q.  Did you ever question their credentials?
8  A.  No, sir.
9  Q.  You just simply went along with the recommendation,
10  correct?
11  A.  Yes, sir.
12  Q.  In your understanding, how many investigations have been
13  given to an outside investigator during your experience with
14  the Mount Vernon City School System?
15  A.  There were a -- I don't know.  I am not aware of any.
16  Q.  Is it fair to say you weren't conducting the
17  investigation?
18  A.  Yes, sir.
19  Q.  And you weren't directing the investigation, correct?
20  A.  Correct.
21  Q.  Do you know of any board members that were conducting
22  the investigation?
23  A.  No, sir.
24  Q.  Do you know of any board members that were directing the
25  investigation?

Page 179

1  A.  No, sir.
2  Q.  Do you know who the investigator met with first?
3  A.  No, sir.
4  Q.  Did you -- what's the date?  If I can see the exhibit.
5  Directing your attention to Exhibit Number 6.  It's the HR On
6  Call investigative report.  What's the date of issuance on
7  that particular report?
8  A.  Just a second, please.  June 19, 2008.
9  Q.  Mr. Short, did you review that investigative report
10  prior to June 19th, 2008?
11  A.  I did not review this document, no.
12  Q.  Okay.  Did you review any notes related to that document
13  prior to June 19th, 2008?
14  A.  Yes.
15  Q.  What kind of notes did you review, sir?
16  A.  I believe it was a draft of some kind.
17  Q.  A draft of what kind, sir?
18  A.  A draft of parts of the report.
19  Q.  How many pages did it consist of?
20  A.  I do not recall.
21  Q.  Was it more than the pages you have there in your hand
22  you think?
23  A.  No, sir.
24  Q.  The investigative report is actually 15 pages long, is
25  it not?

Page 180

1  A.  Yes, sir.  Well, tentatively.  Yes, sir.
2  Q.  Yes is an answer to is the document 15 pages?
3  A.  The document without attachments is 15 pages.
4  Q.  The notes that you reviewed, were they more or less than
5  15 pages?
6  A.  I don't recall.
7  Q.  Where did you get the notes?
8  A.  I believe it was from Attorney Millstone.
9  Q.  You didn't receive them directly from HR On Call?
10  A.  No, I didn't.
11  Q.  What was the purpose of you receiving these notes?
12  A.  I would say to review.
13  Q.  Did you review them?
14  A.  I reviewed them.
15  Q.  Did you keep a copy of them?
16  A.  No, sir.
17  Q.  Did you make any notes of your own?
18  A.  No, sir.
19  Q.  What was the purpose of your review?  Were you there to
20  critique it?
21  A.  Just to look -- just to review it.
22  Q.  Approximately how many days before June 19, 2008, did
23  this review take place?
24  A.  When was June 19th?  What day was June 19th?
25  Q.  I'm not certain.  Is your question to me in an effort to

1 understand what day of the week June 19th was, or are you
2 trying to understand --
3 A. What day of the week June 19th was.
4 Q. I'm not certain. Ask yourself this. What day do you
5 remember reviewing these particular notes? What day of the
6 week?
7 A. That's what I was trying to -- that's why I wanted to
8 know what day June 19th was.
9 Q. Would you have had a calendar commitment on your
10 administrative calendar that would have demonstrated what day
11 you reviewed these notes?
12 A. Potentially.
13 Q. When you reviewed the particular draft prior to the
14 actual report coming out, what kind of critique and comment
15 did you send back?
16 A. I didn't send any critique or comment back.
17 Q. You didn't make any notes on that particular draft?
18 A. No, sir.
19 Q. You didn't give any suggestions?
20 A. I don't recall giving any.
21 Q. Okay. You saw some items that were not in that
22 particular investigative report, correct? Let me rephrase
23 that. That wasn't a very good question. Did you notice that
24 there was some items missing from that investigative report?
25 A. No, sir.

1 Q. Okay. Earlier you testified that there were some sort
2 of motivational statements around a cupboard that you believe
3 contributed to a display, correct?
4 A. Correct.
5 Q. Did you see any mention of these motivational statements
6 in the investigative report?
7 A. Can I refer you to -- let's see, I'm trying to find the
8 letter. Attachment 20.
9 Q. You're referring me to that because?
10 A. Because I believe the letter to John from Mr. White on
11 April 14th, 2008, it says -- that first sentence says, This
12 letter is to follow up on the letter you were given in our
13 conversation concerning the removal of religious items from
14 your classroom. And I believe in that and in the next part
15 where it says, Bibles and other religious DVDs, videos, et
16 cetera, should be placed out of sight, I believe that is what
17 Mr. White was referring to with the posters.
18 Q. We'll come back to that. That's your explanation right
19 now as to why you believe that the 20 motivational statements
20 around the cupboard are included as part of the investigative
21 material in this report. Is that my understanding?
22 A. That's what I testified to, yes.
23 Q. I notice that the -- when you reviewed that particular
24 draft of the report, did you notice any mention of the cross
25 club poster that you just described a few minutes ago?

1 A. No. I testified yesterday I did not.
2 Q. Okay. And so you didn't send any notes back saying
3 investigator, maybe you missed something here?
4 A. No. I guess what I'm referring to is the 14th, and it
5 was gone.
6 Q. We'll come back to that. I just need to make certain I
7 understand as it relates to my present question. Did you
8 edit the report at any time?
9 A. No, sir.
10 Q. Did you speak with the investigators?
11 A. No, sir.
12 Q. You were never interviewed by the investigator?
13 A. Oh, yes, I was. I'm sorry.
14 Q. Okay. When was that interview?
15 A. I don't know the date.
16 Q. How many times did you interview?
17 A. Once.
18 Q. How many times did you speak with the investigators?
19 A. About the interview? Once.
20 Q. How many times, sir, did you speak with the
21 investigators?
22 A. Can you clarify the question for me.
23 Q. Certainly. I'm going to say it exactly the same way I
24 said it. How many times did you speak with the interviewers?
25 A. I was interviewed once.

1 Q. Okay. Did you speak to them any other time?
2 A. To say hello and to get them in the room and different
3 things.
4 Q. Did you ever pick up the phone and talk to them?
5 A. I don't recall doing that, no.
6 Q. Is it possible you picked up the phone and talked to
7 them?
8 A. If we were trying to set up arrangements, yes, I might
9 have.
10 Q. What I'm trying to figure out, sir, is how many times
11 you spoke to the investigators. We know you spoke to them
12 once in the interview, correct?
13 A. Correct.
14 Q. Roughly how long does that last?
15 A. I would say an hour, hour and a half.
16 Q. During that hour, hour and a half, that's one time. How
17 many other times did you communicate with them?
18 A. A rough estimate would be the times that they came up.
19 I believe they came five to six times. I would set up
20 arrangements for them as far as a room is concerned.
21 Q. So now we're up to six or seven times that you've had
22 some sort of personal communication with these people,
23 correct?
24 A. Correct.
25 Q. And just so we understand, when we say investigators,

1  would you identify them by name.
2  A.  Tom and Julia Herlevi.
3  Q.  It's possible you may have had a phone conversation with
4  them, correct?
5  A.  Correct.
6  Q.  During these five to six times that you visited with
7  them, what was the substance of your conversations?
8  A.  Five or six times that I talked to them were basically
9  getting them set up, getting them in different rooms.
10  Q.  Outside of your interview, did you talk to the
11  investigators about how the investigation was going?
12  A.  No, sir.
13  Q.  During your discussions with them, did you ask to see a
14  copy of the report prior to its final release?
15  A.  No, sir.
16  Q.  Prior to the release of the final report, is it your
17  testimony that you only spoke to the investigators one time
18  in your interview about the substance of these allegations?
19  A.  Yes.
20  Q.  Did you talk to the investigators since the report came
21  out?
22  A.  No, sir.
23  Q.  Have you communicated in any form with the investigators
24  since the report came out?
25  A.  No, sir.

1  Q.  Haven't seen them?
2  A.  No, sir.
3  Q.  Haven't talked to them?
4  A.  No, sir.
5  Q.  Have you seen any communication from the investigators,
6  other than the investigative report since June 19th, 2008?
7  A.  No, sir.
8  Q.  I'll direct your attention, Mr. Short, to page 17,
9  Article 402.
10  A.  Move back to this one?
11  Q.  Collective bargaining agreement, yes.  Page 17, Article
12  402, paragraph 2, line 1.
13  A.  Paragraph 2?
14  Q.  Tell me after you're done reviewing it.
15  A.  Yes, sir.
16  Q.  John Freshwater is supposed to be given a comprehensive
17  opportunity to -- given an opportunity to provide a
18  comprehensive written response to the complaint.  Is that
19  true?
20  A.  If he or she chooses to, yes.
21  Q.  Do you know if he was given that option?
22  A.  No, sir, I don't.
23  Q.  Whose responsibility would it have been to make certain
24  he had that option?
25  A.  The building principal.

1  Q.  Okay.  And how would the building principal insure that
2  that was done?
3  A.  Well, the person with the responsibility, the person
4  against whom the complaint is made will be given the
5  opportunity to provide, so anytime you --when you sit down
6  with the investigation, it would have also fallen on
7  Mr. Freshwater.
8  Q.  Okay.  We'll come back to that in a second.  A moment
9  ago you said it also is the building principal's
10  responsibility, correct?
11  A.  Yes, sir, I did.  I reread this statement and it says,
12  The person against whom the complaint is made will be given
13  the opportunity to provide a comprehensive written response
14  to the complaint.  So at any time he could have, if there
15  was -- in the investigation he could have provided that
16  response.
17  Q.  Let me ask you this.  You had a chance to review the
18  report before it actually came out, correct?
19  A.  I looked at a draft, yes.
20  Q.  Okay.  Did that cause you any concern, this particular
21  contractual provision?  Did you ask yourself wow, maybe John
22  Freshwater should be given an opportunity to provide a
23  written statement?
24  A.  I didn't say he couldn't provide a written statement.
25  Q.  Didn't say that you didn't, sir.  I'm asking if you

1  considered it, as part of your contractual obligations to
2  abide by the contract, if you considered this particular
3  contractual provision?
4  A.  No, sir.
5  Q.  Do you know how many times the investigator met with
6  John Freshwater?
7  A.  No, sir.
8  Q.  Did you read the investigative report?
9  A.  Yes, sir.
10  Q.  Do you know he met at least once, right?
11  A.  I do, yes.
12  Q.  Do you know of any follow-ups?
13  A.  No, sir.
14  Q.  Do you know of any attempted follow-ups?
15  A.  I have no knowledge of that.
16  Q.  Do you know if there was a follow-up scheduled by the
17  investigator but then cancelled?
18  A.  I have no knowledge of that.
19  Q.  Did you have any discussion with the investigators about
20  any interviews that had taken place?
21  A.  No, sir.
22  Q.  So when you had your interview, you simply went in there
23  for your own interview, correct?
24  A.  When I went in for my interview, I went in for my own
25  interview, yes, sir.

1  Q. Did they present to you any materials that they had
2  gained from other interviews?
3  A. No, sir.
4  Q. Do you know who the union representative is for the
5  collective bargaining agreement?
6  A. Yes, sir.
7  Q. That person's name is?
8  A. Karen Seward is the Mount Vernon representative.  Jeff
9  Tesner is the OEA representative.
10  Q. Did you speak with either of those two individuals about
11  the allegations against John Freshwater?
12  A. No, I did not.
13  Q. Not at any time?
14  A. No.  At that point they had read their paper.  I didn't
15  bring it up.  I just requested that someone be there as a
16  union rep for them so there's no need to discuss.
17  Q. Direct your attention to page 17 in the contract,
18  Article 402, paragraph 3, line 1.  Tell me after you're done
19  reviewing, sir.
20  A. 403?
21  Q. 402, paragraph 3.
22  A. Okay.  Yes, sir.
23  Q. Is it correct that the investigator will interview all
24  witnesses each party identifies?
25  A. That's what he states in paragraph 3, yes.

1  Q. Okay.  So is that a contractual provision?
2  A. It is in the contract, yes.
3  Q. So it's a requirement, correct?
4  A. After interviewing the complainant and the teacher
5  against whom the complaint is made, the investigator will
6  interview all witnesses each party identifies and, if
7  possible, obtain a written statement from each witness
8  interviewed.  That's part of the contract, yes.
9  Q. Okay.  Was this procedure followed completely?
10  A. By HR On Call?
11  Q. We'll break it down.  We'll go HR On Call.  Who else do
12  you think should have this responsibility?
13  A. I would say that I'm not aware of this procedure being
14  followed, no.  Well, I am -- can I --
15  Q. Please.
16  A. What's your question?
17  Q. My question is, was that particular procedure followed?
18  A. I'm not aware.
19  Q. You reviewed the report, correct?
20  A. Yes, sir.
21  Q. Did you have any discussions about witnesses that were
22  identified but not interviewed?
23  A. No, sir.
24  Q. When did Andrew Thompson come and speak with you that we
25  talked about yesterday as it relates -- I understand that's a

1  big question, because he might have spoke to you many times.
2  When did he come speak to you about John Freshwater?
3  A. I believe it was the end of July or beginning of August.
4  Q. Before or after the investigative report came out?
5  A. After the investigative report.
6  Q. And you're certain about that?
7  A. That's what I recall.
8  Q. To clarify, you're not certain whether or not all
9  witnesses identified were interviewed, correct?
10  A. That's correct.
11  Q. As you were reviewing the draft before the final report,
12  did you have any concerns about witnesses that had not been
13  interviewed and were not listed in the report?
14  A. No, sir.
15  Q. Do you have any knowledge of somebody that's been
16  identified as a potential witness but that's been
17  specifically excluded from the report?
18  A. I don't have any recollection of that, no, sir.
19  Q. I appreciate you don't have any recollection.  Is there
20  a possibility that somebody --
21  A. There's a possibility.
22        MR. MILLSTONE:  I'm going to object.  He's calling
23  for speculation.
24        THE COURT:  Sustained.  Strike the answer.
25  Q. Do you have any notes that you would have made about

1  people who should have been interviewed but were specifically
2  not?
3  A. No, sir, I don't.
4  Q. You related that part of the contractual provision
5  states that if possible obtain written statements from each
6  witness interview; is that correct?
7  A. Yes, sir.
8  Q. That's a requirement for investigations.  True?
9  A. If possible, yes.
10  Q. Okay.  Let me ask you, were there any written statements
11  gathered from any witness that was interviewed?
12        MR. MILLSTONE:  Objection.  He didn't conduct the
13  investigation.  Much of this line of inquiry at this point
14  goes into what the investigators may or may not have done.  I
15  think he's testified as to what his contact with the
16  investigators are, and so I object to the whole line at this
17  point.
18        THE COURT:  I sustain your objection.  If you could
19  confine your question to his knowledge of that fact, not
20  whether it happened.
21  Q. Mr. Short, do you happen to have any knowledge, sir, as
22  to whether or not any written statements were obtained from
23  any witness during the interview?
24  A. I have no knowledge.
25  Q. Okay.  When you reviewed the particular draft report,

Page 193

1  sir, did you have a concern based upon a contractual
2  provision that a written statement should have been obtained?
3  A. No, sir.
4  Q. Were you not worried about getting statements?
5  A. No, sir.
6  Q. Why not?
7  A. I wasn't part of the investigation.
8  Q. But you're part of the administration, correct?
9  A. Yes, sir.
10  Q. You're part of the individuals who have to insure that
11  the contract is complied with, correct?
12  A. Yes, sir.
13  Q. Do you know which Mount Vernon City School employees
14  were interviewed by the investigators?
15  A. I have a list, yes.
16  Q. Where's that list, sir?
17  A. It is in my office, I believe.
18  Q. How many pages is that list?
19  A. One.
20  Q. How many names are on that list?
21  A. Roughly 17.
22  Q. So you believe of those 17 names -- first of all, let me
23  ask you, what's that list for?
24  A. That list was a list of people that were requested to be
25  contacted to set up interviews for.

Page 194

1  Q. Do you know if all 17 were contacted?
2  A. Yes, I do.
3  Q. Do you know if all 17 were interviewed?
4  A. Yes, I do.
5  Q. Okay. Of those 17 people interviewed, do you know if
6  there's any written statements that they authored as it
7  relates to this investigation?
8  A. I am not aware of any statements.
9  Q. Based upon the contract, should you have insured the
10  written statements were provided?
11  A. If possible and, again, it's part of the -- part of the
12  interview from the independent investigator.
13  Q. Do you know of any reason why it would have been
14  impossible to have gained written statements from these 17
15  Mount Vernon City school employees?
16  A. I am not aware.
17       MR. MILLSTONE: I'm going to object. Again, the
18  line of questioning is going to what happened in the
19  investigation. He's testified what his knowledge is about
20  the investigation. He did not -- he was not the
21  investigator. There was outside investigators. This whole
22  line of questioning is extending the hearing unnecessarily
23  and is going beyond what this witness's knowledge is. I
24  think he's adequately found out what this witness knows about
25  the investigation and what he didn't.

Page 195

1       MR. HAMILTON: I didn't adequately find out,
2  because when I asked him earlier what kind of notes he had as
3  it relates to the investigation, we now find out that there's
4  a list with 17 names on it. We didn't find that out earlier
5  when I asked what kind of notes he kept as he reviewed this
6  particular document. This is exceptionally important because
7  this particular witness has knowledge of how to administer
8  the contract and he may have knowledge about how the
9  particular investigation was conducted. This is critical.
10       THE COURT: Your point's well taken about the
11  information about the list of witnesses. However, I am a bit
12  concerned that at times it seems as if we're working on a
13  grievance as opposed to termination of the contract here.
14  There obviously are contractual issues. If they relate into
15  this termination hearing, that's fine. But make sure they
16  relate.
17       MR. HAMILTON: Your Honor, absolutely everything
18  I'm asking relates, because as it relates to this
19  investigation, this is the way the investigation is supposed
20  to be conducted. If the school board -- the contract is
21  violated, that's certainly a concern that we have.
22       THE COURT: If it's to show a flaw in the process
23  of termination, I agree. If it's to show a potential
24  grievance in the contract, that's another matter of which I'm
25  not concerned.

Page 196

1       MR. HAMILTON: I'm not concerned about filing a
2  grievance either, because we're well past that point, Your
3  Honor. What I am concerned is about whether or not this
4  contract was followed as it's supposed to be. These are, as
5  I said, critical questions.
6       THE COURT: Right. Your last question was, if you
7  recall?
8       MR. HAMILTON: I don't recall.
9       (Pending question read by reporter.)
10       THE COURT: I'll overrule the objection. You can
11  answer.
12  A. No.
13  Q. From your administrative perspective, not legal
14  interpretation, was the contract broken as it --
15       MR. MILLSTONE: I'm going to object to the question
16  right at this point. If there's any allegation that the
17  contract is broken, that allegation needs to be taken up
18  through a grievance under the contract procedure. Any
19  hearing with respect to grievances and arbitration under the
20  contract are private hearings by agreement of the parties,
21  and this is not the forum to bring up alleged violations of
22  the contract. Any violation of the contract has been waived
23  if there is no grievance that has been filed.
24       THE COURT: That's sustained.
25  Q. How many students do you have knowledge of that were

1  interviewed?  Yesterday you stated five, correct?
2          MR. MILLSTONE:  Objection.  Asked and answered.
3          THE COURT:  Sustained.
4  Q.  Do you know whether or not it was considered to
5  interview the rest of the students in the class on December
6  6, 2007?
7  A.  No, sir.
8  Q.  Do you think, as an administrator, it would have been
9  important to interview those other students?
10 A.  No, sir.
11 Q.  Why not?
12 A.  Because in the investigation with Mr. Freshwater,
13 Mr. White understood there to be one student.
14 Q.  Understood there to be one student what?
15 A.  That had been marked on or etched on and that there was
16 no one else.
17 Q.  Are you stating you had no knowledge of anybody else
18 volunteering for this scientific experiment?
19 A.  On December 7?  No, sir.
20 Q.  When did you learn that other students had been involved
21 in this scientific experiment?
22 A.  After the report came out.
23 Q.  You didn't know it beforehand?
24 A.  No, sir.
25 Q.  You had absolutely no knowledge that other students were

1  involved?
2  A.  No, sir.
3  Q.  Do you know if the investigator inspected the school at
4  all?
5  A.  Yes, sir.  It said something in the report.
6  Q.  Do you know what areas he inspected or they inspected?
7  A.  I don't know what areas they inspected.  I know one of
8  them was from Freshwater's room.
9  Q.  So the investigator only focused upon John Freshwater's
10 classroom?
11 A.  I said I don't know what other areas.
12 Q.  Do you know, Mr. Short, know of any potential witnesses
13 to any of these allegations that were not interviewed by the
14 investigators?
15 A.  I'm not aware of any.
16 Q.  In the investigative report on page 1, Exhibit 6, do you
17 know at the bottom it says there was a decision made to
18 enlarge the scope of the investigation because --
19 A.  I'm sorry, you said Exhibit 6?
20 Q.  Exhibit 6, which is the entire document in your hand.
21 Page 1.
22 A.  Thank you.
23 Q.  I think I'm looking at page 1 and it's turned over.
24 Down towards the bottom.  It states that HR On Call surfaced
25 another complaint.  Do you see that language?

1  A.  Yes, sir, I do.
2  Q.  How did they surface that particular complaint?
3  A.  I don't know.
4  Q.  Who made the decision to include that particular
5  complaint in the report?  Do you know?
6  A.  No, sir.
7  Q.  Are you aware of any particular directions given to the
8  investigators?
9  A.  No, sir.
10 Q.  Do you know of any particular evidence that was excluded
11 from the report?
12 A.  No, sir.
13 Q.  Are you aware of any guidance given to the investigators
14 after all of the interviews were completed?
15 A.  No, sir.
16 Q.  Do you believe that particular report identified as
17 Exhibit Number 6 is a thorough report?
18 A.  I believe so.
19 Q.  And you believe this even though you yourself know there
20 were certain items not referenced in that report?
21 A.  I don't recall what items you're referring to.
22 Q.  What about the motivational stickers around the
23 cupboard?
24 A.  Again, I believe I said I thought that was covered.
25 Q.  Do you believe this report to be credible?

1  A.  Yes, I do.
2  Q.  Do you believe this report to be accurate?
3  A.  Yes, I do.
4  Q.  Do you know of any audiotapes that were made of any of
5  the interviews?
6  A.  Yes, I do.
7  Q.  What audiotapes do you know about?
8  A.  Mr. Freshwater.
9  Q.  Any others?
10 A.  No, sir.
11 Q.  Are you aware of any transcription of that audio?
12 A.  No, sir.
13 Q.  Mr. Short, I hand you back Exhibit Number 1 as marked by
14 the employee.  Please confirm that that's the FCA handout.
15 A.  Yes, sir.
16 Q.  Mr. Short, as an administrator, what's your
17 understanding of what a public school teacher can do for the
18 FCA?
19 A.  Public school teacher can monitor.  That is if it's a
20 student led, student participating group.  He's there to
21 monitor or she is there to monitor to make sure that the
22 students are safe and that their proper procedures are
23 followed as far as safety is concerned and the group is
24 conducted in a manner that needs discipline behavior.
25 Q.  So he's there to watch over their behavior, correct?

1  A.  Yes, sir.

2  Q.  Making certain that they get to class on time?

3  A.  Yes, sir.

4  Q.  Prior to September, 2007, when you handed this document

5  or delivered this document to John Freshwater, are you aware

6  of any training completed or done by the district as it

7  relates to FCA and the responsibilities that a public school

8  teacher should take?

9       MR. MILLSTONE:  Objection.  Asked and answered.  We

10  went through this line of questioning yesterday.

11       THE COURT:  You're referring to the

12  cross-examination?

13       MR. MILLSTONE:  Yes.  Cross-examination.

14       THE COURT:  I know we did end the day with a number

15  of questions concerning this particular document.

16  Mr. Hamilton, the question you're asking is new and of a

17  different variety than what we covered yesterday afternoon?

18       MR. HAMILTON:  I think so or I wouldn't ask it,

19  sir, yes.

20       THE COURT:  Go ahead.  Overruled.

21  A.  Can you read it.

22  Q.  Very simple.  Are you aware of any training John

23  Freshwater was provided as it relates to his duties as

24  monitor of the FCA?  Are you aware of that training occurring

25  prior to September, 2007?

1  A.  I have no -- no, sir.

2  Q.  How did the FCA come to be a club with the Mount Vernon

3  Middle School?

4  A.  I don't know.

5  Q.  Have you at any time reviewed any notes from previous

6  administrations as it relates to the FCA there at the middle

7  school?

8  A.  No, sir.

9  Q.  Is there a potential that a file does exist somewhere in

10  any of the Mount Vernon City School System buildings

11  detailing the activities of the FCA?

12  A.  I'm not aware of any.

13  Q.  Would it be incumbent upon the teacher to keep any kind

14  of documents as it relates to their monitoring of the FCA?

15  A.  I believe so.

16  Q.  What kind of things should they document?

17  A.  I would say any discussions or meetings that they've had

18  and expectations that are there, any questions that they

19  might have and might arise that can be answered.

20  Q.  Anything else, sir?

21  A.  The rules and regulations that deal with FCA.

22  Q.  Anything else?

23  A.  Rules and regulations that deal with children, the

24  students.

25  Q.  Is that your understanding of all the things that a

1  teacher could or should document?

2  A.  Rules and regulations for leadership, rules and

3  regulations for student participation, teacher participation,

4  and any kind of notes or things that had taken place from a

5  time.

6  Q.  This would be notes like concerning what speakers came

7  to speak at the FCA?

8  A.  That could be something, yes, that a person should keep.

9  Q.  Are you aware of how many participants were in the

10  eighth grade FCA?

11  A.  No, sir.

12  Q.  Are you aware of how many participants were in the

13  eighth grade FCA leadership group?

14       MR. MILLSTONE:  Objection.  There's no time frame

15  on this.  It's sort of an open ended question.  When are we

16  talking about?

17       THE COURT:  Sustained.

18  Q.  Let's focus on the 2007/2008 school year, Mr. Short.

19  Are you aware of how many students participated in the FCA

20  leadership club?

21  A.  No, sir.

22  Q.  Do you know whether or not John Freshwater had children

23  participate in the FCA?

24  A.  His own children?

25  Q.  Yes, sir.

1  A.  Yes.

2  Q.  Do you know his children's names?

3  A.  Yes, I do.

4  Q.  What are they?

5  A.  [Student #401]

6  Q.  Any other students participate in FCA through John's 17

7  years?  Be specific.  Any other children that John has?  Are

8  you ready?  Any other children that John has, do you know

9  whether or not they participated in FCA through 17 years of

10  his being a monitor?

11  A.  At the middle school?

12  Q.  Yes, sir.

13  A.  No, sir.

14  Q.  Did your own children participate in the FCA, sir?

15  A.  Yes, they did.

16  Q.  And what grades did they participate?

17       MR. MILLSTONE:  Objection as to relevance.

18       MR. HAMILTON:  Relevance is very simple.  If John

19  Freshwater was doing some of these things as alleged not only

20  during the 2007/2008 school year but in prior years as has

21  been alleged, then if his child was in there, then certainly

22  as a parent he might be able to shed some light as to whether

23  or not his child actually made any allegations that John had

24  somehow violated the rules of FCA administration.

25       THE COURT:  Did your question specify that

Page 205

1  particular school year, or was it just a general question
2  about FCA participation?
3        MR. HAMILTON:  I can do it either way, sir.
4        THE COURT:  Confine it to that year is acceptable.
5  Objection overruled.
6  Q.  2007/2008, any of your children, your biological
7  children, participate in the FCA?
8  A.  Not at the middle school.
9  Q.  You stated that John's daughter [Student #401] participated in
10  the FCA.  Was that during the 2007/2008 school year?
11  A.  Yes, sir.
12  Q.  When did you learn of her participation in the class
13  that her father was monitoring?
14  A.  At a September meeting.
15  Q.  So you learned September, 2007?
16  A.  Yes, sir.
17  Q.  Did you perceive that there might be a conflict with him
18  being the monitor or the leader of the group and his own
19  child being in the group?
20  A.  No, sir.
21  Q.  Let me ask you a question.  Is John Freshwater expected
22  to separate his duties as a teacher from that of a parent
23  even though his child is in that particular class that he's
24  monitoring?
25  A.  Yes, sir.

Page 206

1  Q.  Are there any policies in the Mount Vernon City School
2  System that prohibit a teacher from having their own
3  biological child in their class?
4  A.  I'm not aware of any, sir.
5  Q.  Are you aware of any instances where a teacher -- where
6  a student has been excluded from their parent's class simply
7  because they are a teacher?
8  A.  Yes, I do.
9  Q.  And those instances would be?
10  A.  At Dan Emmrett when I was an elementary principal, the
11  mother didn't want her son in the class.
12  Q.  Any other instances?
13  A.  No, sir.
14  Q.  Do you know of any training provided in the Mount Vernon
15  City School System as it relates to conflicts between
16  teachers and their students?
17  A.  No, sir.
18  Q.  John Freshwater allowed to speak to his daughter about
19  FCA as she's in school?
20  A.  As long as it's in a monitor process.
21  Q.  Is he allowed to speak to his daughter at home about
22  FCA?
23  A.  As long as his teaching duties as a monitor, part of
24  being a monitor, yes.
25  Q.  Let's make sure we understand that.  I am not certain I

Page 207

1  understand.  Is John Freshwater allowed to speak to his
2  daughter at his home about FCA that occurs at school?
3  A.  He can speak to his daughter about FCA, yes.
4  Q.  Okay.  Can John Freshwater ask his own child to pray at
5  the FCA meeting?
6  A.  Did he?  Is that your question?
7  Q.  Can he, sir?  Can he ask his daughter [Student #401] or any of
8  his other children to pray at the FCA meeting?
9  A.  No, sir.
10  Q.  Just so I make sure I clarify, because I'm certain -- I
11  need to make certain.  If he talks to his daughter at home
12  about praying at the FCA meeting, are you saying that is or
13  is not permissible?
14  A.  If he's saying it as the monitor, it's not permissible.
15  Q.  But if he's at home and he is talking to his daughter,
16  is he allowed to ask his daughter to pray at the FCA meeting?
17  A.  Not if he's a monitor for the FCA.
18  Q.  Okay.  So then what you're saying is that a conflict is
19  presented between his responsibilities and privileges as a
20  parent versus the duties of a monitor at the FCA, correct?
21  A.  Yes.
22  Q.  Okay.  And so now you recognize that there could be a
23  conflict.  Is that true?
24  A.  What you shared with me, yes, that's a conflict.
25  Q.  Let me make sure I understand that.  You just came to an

Page 208

1  awareness of that conflict right here at 10:35 a.m. on
2  October 3rd, correct?  You can check your own watch.
3        MR. MILLSTONE:  Plus or minus three minutes.
4  Q.  Let's have a margin of error plus or minus three
5  minutes.
6  A.  Yes, sir.
7  Q.  Make certain that our clarity is precise for both of us
8  on this issue.  Your statement is that John Freshwater, even
9  when he's at home, cannot ask his daughter to pray at an FCA
10  meeting because he is the actual monitor of that FCA class,
11  correct?
12  A.  Correct.
13  Q.  And you now perceive that as a conflict whereas before
14  you did not perceive it as a conflict with John and his
15  daughter being in the same group, correct?
16  A.  I don't perceive it as a conflict at home.
17  Q.  Okay.  I want to make sure I understand this.  Any
18  complaints related to John Freshwater's conduct as the
19  monitor, supervisor, or facilitator of the FCA has been
20  confined to the 2007/2008 school year.  Is that your
21  understanding?
22  A.  That's what I'm aware of, yes.
23  Q.  Are you aware of any complaints made prior to that
24  school year 2007/2008?
25  A.  I wasn't in this capacity, no, sir.  I'm not aware of

1  any, no, sir.

2  Q.  Okay.  Actually, you answered in your capacity at any

3  time as a Mount Vernon City School employee, are you aware of

4  any particular allegation that John has somehow violated his

5  duties as the monitor, facilitator, supervisor of the FCA

6  prior to the 2007/2008 school year?

7  A.  Yes, sir, I do.

8  Q.  When did you become -- first of all, let's identify how

9  many potential allegations of misdeed you know about that

10 John Freshwater committed prior to the 2007/2008 school year.

11 A.  There's an allegation that FCA was held on the stage in

12 the cafeteria.

13 Q.  Any other allegations?

14 A.  No, sir.

15 Q.  When did this allegation supposedly occur?

16 A.  2006/2007.

17 Q.  When was that allegation brought to your attention?

18 A.  I would say after this investigation, after everything

19 was done.

20 Q.  After the investigation began or after the investigative

21 report came out?

22 A.  After the investigative report came out.

23 Q.  And who did you learn this from?

24       MR. MILLSTONE:  I'm going to object at this point.

25 Looking at Board Exhibit Number 1, ground number three deals

1  with Fellowship of Christian Athletes.  It deals with his

2  role exceeding his mandatory non-participatory role, asking

3  students to lead prayer, went beyond his role as monitor and

4  contacted guest speakers.  Those are three specific

5  allegations.  They're not allegations into holding the events

6  on the stage at lunchtime.  That is a part of the allegations

7  in the charge.  So I'm going to object.

8       MR. HAMILTON:  Well, I think the allegation in the

9  charge, Your Honor, is very specific.  He exceeded his

10 boundary.  That's part of the allegation.  If he exceeded his

11 boundaries, when did he exceed them, what did they know, and

12 when did they know it?  That's going to be critically

13 important here.  It almost appears it's kind of selective.

14 That's what I'm trying to ascertain.

15       THE COURT:  The objection is overruled.

16 Q.  Mr. Short, very specifically, it's my understanding you

17 learned of this potential new allegation you state after this

18 report came out, correct?

19 A.  Yes, sir.

20 Q.  And the potential new allegation that we're speaking of

21 is about an FCA meeting that occurred in the cafeteria?

22 A.  Yes.

23 Q.  Tell me what you understand occurred in the cafeteria.

24 A.  Well, I understand that they had a meeting that was held

25 in the setting in the cafeteria on stage.

1  Q.  Okay.  So they had a meeting in the cafeteria.  What

2  else do you know about it?  Anything else?

3  A.  I've heard from -- I cannot recall who it was that

4  shared it with me that the curtain was open.

5  Q.  Okay.  The curtain was open.  Do you know who allegedly

6  was speaking at the meeting?

7  A.  No, sir.

8  Q.  Are you aware ever of members of the Ohio State football

9  team coming out and speaking to the FCA group?

10 A.  Yes, sir, I remember that.

11 Q.  Would this be the incident that the football players

12 came out and spoke at?

13 A.  I don't recall.

14 Q.  When the football players did come out and speak, do you

15 remember what year that was?

16       MR. MILLSTONE:  I'm going to object, again, as to

17 relevance to the charge that's here.

18       MR. HAMILTON:  May I speak?

19       THE COURT:  Sure.

20       MR. HAMILTON:  Relevance is very simple, Your

21 Honor.  Previously some information will be deduced

22 throughout this testimony -- throughout this hearing that

23 some football players came out and spoke at an FCA meeting.

24 They spoke to a large number of people.  There was no

25 administrative action taken at that particular time.  What

1  I'm trying to find out is what kind of training, what kind of

2  direction, was John Freshwater given through his 17 years of

3  leading this particular group?  All we know so far is that

4  some allegations were made in 2007/2008, and the FCA docume

5  Exhibit Number 1 for the employee was handed to John

6  Freshwater.  Prior to that, apparently there may have been

7  some instances where the FCA may have or may not have

8  exceeded their particular boundaries.  But there was no other

9  guidance or action given at that time, so the analysis

10 becomes what is John Freshwater supposed to be if he's not

11 corrected along the way?

12       MR. MILLSTONE:  If he has an issue that he wishes

13 to bring forward, we'll deal with objections to that at the

14 time.  Then let him bring forward that evidence.  Mr. Short

15 has just testified that he doesn't recall when the football

16 players were there.  He doesn't recall that that was part of

17 the -- whether or not that was part of this complaint or

18 charge that he has talked about or learned about after the

19 investigation.

20       THE COURT:  I'm going to overrule the objection.

21 Even if the football player incident is not a part of this

22 resolution of the board, in the explanation provided by

23 Attorney Hamilton it could still have some bearing.

24 Q.  Mr. Short, sir, you stated you don't know when the

25 football players came out, correct?

Page 213

1  A. Correct.
2  Q. Is it possible that the football players were involved
3  in the cafeteria behind the curtain meeting that you just
4  referred to?
5       MR. MILLSTONE: I'm going to object to the
6  speculative nature of the question.
7       THE COURT: Objection sustained.
8  Q. Were the football players involved in the incident? I'm
9  not asking is it possible. I'm asking were they. Were they
10 involved in the cafeteria incident that you described that
11 something took place behind the curtain?
12 A. I don't know.
13 Q. I understand FCA has sixth, seventh, and eighth grade
14 clubs. Is that true?
15 A. Sixth, seventh, and eighth grade students are part of
16 the FCA.
17 Q. Do they have separate groups for each grade level?
18 A. They meet at different times, yes.
19 Q. So the answer would be that the sixth grade has a group,
20 the seventh grade has a group, and the eighth grade has a
21 group, correct?
22 A. They have different meeting times, yes.
23 Q. Do some of them meet before school or after school?
24      MR. MILLSTONE: Objection, again, as to the time
25 frame of this. Are we talking about 2008? Are we talking

Page 214

1  about 1965? Are we talking about --
2       THE COURT: Sustained.
3  Q. Unless I tell you otherwise, Mr. Short, all of my
4  questions will relate to the 2007/2008 school year, unless I
5  ask otherwise. Do you understand, sir?
6  A. Yes, sir.
7  Q. Does the sixth, seventh, and eight grade -- sixth,
8  seventh, or eighth grade meet before or after school?
9  A. No, sir.
10 Q. They all meet during school?
11 A. Yes, sir.
12 Q. They all meet during lunchtime?
13 A. Yes, sir.
14 Q. Taking a look at the FCA handout, which is the document
15 you have in your hand, there on page 9, bottom of the page,
16 second to the last line, do you concur -- it actually begins
17 on the third to the last line. However, the activities of
18 the meetings must be primarily led by students. Would you
19 agree that's what that says?
20 A. Yes, sir.
21 Q. How do we interpret the word primarily in this?
22 A. The primary leader. The leader is the students.
23 Q. But earlier you testified that yes, in fact, a monitor
24 has certain duties, too, correct?
25 A. Yes, he does -- yes, they do.

Page 215

1  Q. Do you have any knowledge that prior to this particular
2  school year in question that the FCA student led groups were
3  given direction that they are supposed to lead the group and
4  not the teacher?
5  A. I have no knowledge.
6  Q. Would you agree that a teacher can talk about religion
7  in an objective manner?
8  A. Yes.
9  Q. There's no prohibition against mentioning the word
10 religion, correct?
11 A. Correct.
12 Q. Earlier you testified that John Freshwater, part of his
13 duties for the FCA, he's supposed to receive notice of the
14 student selected speakers, correct?
15 A. Yes.
16 Q. And is it my understanding that that particular order or
17 directive was only issued in September, 2007?
18 A. Again, I can't go back to previous, but yes, it was in
19 2007.
20 Q. You don't have any knowledge of that order being
21 directed previous to that, correct?
22 A. No, sir.
23 Q. Are you aware of John Freshwater's religious activities
24 in the Mount Vernon community?
25 A. No, sir.

Page 216

1  Q. Can John Freshwater speak about FCA activities outside
2  of school?
3  A. Yes, sir.
4  Q. Who can he speak to?
5  A. It shouldn't be students as far as the monitor piece and
6  taking them different places, but I'm sure he can refer to
7  different adults about what FCA possibly means to him.
8  Q. So he cannot speak to any students about FCA? Is that
9  what your testimony is?
10 A. No. He -- what he cannot do is lead the students to do
11 different things, activities, for FCA.
12 Q. That's during FCA. When he's outside of the school, is
13 he allowed to talk to students about FCA?
14 A. If he's a monitor as an FCA person, as far as leading
15 the group, as far as to select speakers or do things like
16 that, no.
17 Q. Do you have any knowledge that he actually selected a
18 speaker?
19 A. Yes, I do.
20 Q. I'm sorry?
21 A. Yes, I do.
22 Q. Who did he select?
23 A. Dennis Turner.
24 Q. When?
25 A. I can't tell you the date.

1  Q.  Was it during this particular school year?
2  A.  Yes, sir.
3  Q.  Is that before or after September, 2007?
4  A.  I believe it was after two thousand -- yes, sir.  After
5  September, 2007.
6  Q.  Is your testimony, or my understanding of your
7  testimony, are you stating that if John Freshwater is at his
8  church, he cannot speak to a student who may also be in his
9  FCA class about the topic of FCA?
10  A.  About the topic of FCA as long as he's not doing it as a
11  monitor.
12  Q.  I need to make sure I understand your clarity, sir.  It
13  is your understanding, not mine.  Are you stating he can't
14  talk to that child that's in his FCA monitor class about FCA
15  activities?
16  A.  He can talk to the child, yes.  He can't -- yes, he can
17  talk to the child about FCA.
18  Q.  What would be your limitations?  What would be your
19  instructions?  John, you can't talk at your church or in the
20  community to a student who you are monitoring in this
21  particular FCA class about, and you fill in the blank?  What
22  can he not talk about?
23  A.  It should be a student led piece.  The student should be
24  the person that leads the FCA, so anything that -- anything
25  that would put him in a leadership or a facilitator

1  participant role would be not acceptable.
2  Q.  What if they're asking him questions about can the
3  speaker come and talk?  How is he to respond?
4  A.  If he chooses to have them come, yes.
5  Q.  Okay.  So it's my understanding that a public school
6  teacher, from your perspective as an administrator, cannot
7  talk to a student that they may be leading in an FCA class,
8  they can't continue any dialogue with that child about the
9  FCA, correct?
10  A.  As long as he's not doing it as a participant, as a
11  facilitator or a leader.
12  Q.  Is there any time during the school day when a teacher
13  is not acting as a school employee?  In other words, they're
14  not on duty where they can be permitted to talk to a child
15  about FCA?
16  A.  Outside their contracted day.  Their contracted day, I
17  believe, is 7:25 to 3:15, something in that range.  So after
18  3:15 or before 7:25.
19  Q.  They can speak to that student about FCA?
20  A.  Yes, sir.
21  Q.  Okay.  Suppose the student comes up to the teacher, as
22  the monitor, facilitator, supervisor of the FCA and that
23  student comes up to the teacher during the school day, can
24  the teacher talk to the student then about FCA?
25  A.  It depends what the discussion is about.

1  Q.  Asking if a particular speaker could come in, could they
2  ask that question and have a dialogue about it?
3  A.  Yes, sir.
4  Q.  Could they ask hey, do you have any Bibles that may have
5  been left in your room?
6  A.  You could ask that question.  I'd ask why they have
7  Bibles in their room, but yes, they can.
8  Q.  We'll cover that.  As far as storing those Bibles in the
9  room, is it possible a student left a Bible in the room?
10  A.  There's always that possibility.
11  Q.  So that would be an acceptable, permissible discussion
12  from your perspective if a student left a Bible in the room
13  and they're asking hey, is it there?
14  A.  Yes, sir.
15  Q.  There's an allegation that some Bibles were in the back
16  of John Freshwater's room.  You were aware of that allegation
17  I'm sure, yes?
18  A.  Yes.
19  Q.  Do you know where those Bibles came from?
20  A.  No, sir.
21  Q.  Do you know if John Freshwater brought those to school?
22  A.  No, sir.
23  Q.  Do you know if any OSU football players gave those
24  Bibles to the FCA?
25  A.  Not aware.

1  Q.  Is it possible that somebody other than John Freshwater
2  brought those Bibles to school?
3  A.  It's possible.
4  Q.  Okay.  Is it possible the Bibles actually belonged to
5  the FCA membership?
6  A.  It's possible.
7  Q.  Do you know of any specific prohibitions about the FCA
8  keeping items from their club in a public school teacher's
9  classroom?
10  A.  No, sir.
11  Q.  Prior to September, 2007, are you aware of any
12  information that John Freshwater was given any directive by
13  previous administrations that he's not to keep FCA materials
14  in the classroom?
15  A.  I'm not aware.
16  Q.  Do you know how long those Bibles were in the back of
17  the classroom?
18  A.  No, sir.
19  Q.  It's my understanding you consider those Bibles part of
20  a display, correct?
21  A.  That is correct.
22  Q.  Describe how those Bibles were stored in the back of the
23  room.  Yesterday we talked about they'd be in a bag or box.
24  Did you ever yourself see the bag or the box of Bibles?
25  A.  You asked me two questions there.

1  Q.  Did you yourself ever see the bag or the box in the back
2  of the classroom that allegedly had these Bibles in it?
3  A.  No, sir.
4          MR. MILLSTONE:  Objection.  Asked and answered.
5  He's already answered.
6          THE COURT:  Sustained.
7  Q.  Who alleged that John Freshwater passed out those
8  Bibles?
9  A.  I believe the complaint came from the Dennis family.
10 Q.  Any other complaints?
11 A.  No, sir.
12 Q.  Do you have anybody other than the Dennis family that
13 ever saw John Freshwater pass out a Bible at school?
14 A.  I'm not aware of any.
15 Q.  Should John Freshwater have instructed the FCA members
16 to remove all their materials from the classroom at the end
17 of the meeting?
18 A.  Remove all their materials?
19 Q.  All their materials.  Apparently they kept materials in
20 his room.  Are you aware of any -- let me ask you this.  Are
21 you aware of any materials that the FCA members kept in the
22 room?
23 A.  No, sir.
24 Q.  It's my understanding that one of the allegations we've
25 talked about, if you can confirm for me, allegedly John

1  Freshwater engaged in prayer at one of these FCA meetings.
2  Is that true?
3  A.  That's an allegation, yes, sir.
4  Q.  Did he do this singularly by himself in prayer in front
5  of all these people, or did he do it with others?
6  A.  According to the report, it was done in front of others.
7  Q.  Now, you said in front of others.  Did he do it with
8  others as part of a group, or did he simply stand and pray
9  off to the side on his own?
10 A.  According to the report, it said that he led prayer.
11 Q.  Did John Freshwater lead a prayer with his own child
12 while on school property?
13 A.  Yes, sir.
14 Q.  Are you aware of any allegation that John Freshwater
15 used prayer to cast out a demon?
16 A.  I'm aware of the allegation, yes, sir.
17 Q.  Where did you learn that allegation?
18 A.  Through the complaint that came -- a letter from the
19 Dennis family.
20 Q.  Now, as part of that complaint about John casting out a
21 demon, was that made a part of the investigative report?
22 A.  Yes, sir, it was.
23 Q.  That he actually -- that actual allegation was made a
24 part of the investigative report?
25 A.  I believe so.  May I refer to the document?

1  Q.  Yes, sir.
2  A.  Yes, sir, there's a reference to it.
3  Q.  Are we talking about the healing session, or are we
4  talking about casting out a demon?
5  A.  I'm talking about the demon part here.
6  Q.  Do you know if that allegation was sustained?
7  A.  It wasn't sustained.
8  Q.  It's your understanding that John allegedly engaged in
9  prayer as a group with the students of the FCA, correct?
10 A.  Correct.
11 Q.  John's duties there are to monitor, facilitate, and
12 supervise, yes?
13 A.  Correct.
14 Q.  And part of his responsibilities, as we stated earlier,
15 is for him to make certain that students get to class on
16 time.
17 A.  Yes.
18 Q.  Okay.  If that's his duty, how should he appropriately
19 interrupt or end a prayer conducted by the Fellowship of
20 Christian Athletes during class time when the next class is
21 approaching?
22 A.  Not by himself praying.
23 Q.  I'm sorry?
24 A.  Not by himself praying.
25 Q.  Okay.  Let's talk about that.  What exactly do you mean

1  not by himself praying?
2  A.  He is not to lead prayer.  He's not to be the person
3  leading the prayer in FCA.
4  Q.  I understand he's not to lead prayer.  How is he to
5  interject and interrupt to end a prayer when students need to
6  get to class on time?
7  A.  Kids, it's time to go.
8  Q.  If he's going to do that, is that potentially -- are you
9  saying that he should simply use the words, kids, it's time
10 to go?
11 A.  Yes.
12 Q.  If he were to do just that, in fact, could that possibly
13 be perceived by that group as denigrating their particular
14 religion or interrupting their prayer?
15 A.  You're asking me to say what the kids are thinking?  I
16 don't know.
17 Q.  I'm asking you as an administrator, sir.  Is that
18 possible -- John Freshwater came to you and said Mr. Short, I
19 need to interrupt the prayer sometimes because these kids
20 like to get into some long prayer, what would be your
21 instruction to him?
22          MR. MILLSTONE:  Objection as to the speculative
23 nature of the question and perhaps multiple aspects to the
24 question.
25          THE COURT:  Sustained.  See if you can restate it.

1 Q. If the FCA students are in prayer, what's the
2 appropriate way? My understanding is you state that the
3 appropriate way is to say kids, let's go, correct?
4 A. Something along those lines, yes.
5 Q. Would it be appropriate to say amen?
6 A. Not if it's part of the prayer.
7 Q. Okay. But if it's not involved in the prayer, it's not
8 part of the prayer, is it?
9 A. Is amen the end of a prayer?
10 Q. Could be the end of a prayer, yes. But is it a prayer
11 that he's involved in?
12 A. If he says amen and that's the conclusion of the prayer.
13 Q. Have you ever heard anybody just say amen?
14 A. Yes.
15 Q. Okay. And did you see them maybe sometimes not praying
16 after they said it?
17 A. Yes.
18 Q. Okay. So it is possible that John Freshwater could have
19 uttered the word amen to interject appropriately to end these
20 students prayer so that he didn't otherwise offend them. Is
21 that possible?
22     MR. MILLSTONE: Objection. Speculative nature of
23 the question.
24     THE COURT: Overruled.
25 A. Is it possible? Can you repeat the question? I'm

1 sorry.
2     (Pending question read by reporter.)
3 A. I don't believe so in his capacity as monitor.
4 Q. So you believe in the capacity of monitor the only way
5 for him to appropriately interrupt a prayer is just to say
6 kids, let's go?
7 A. Something along the lines that doesn't include him in
8 the student led activity.
9 Q. Okay. You think that's the only reasonable approach,
10 correct?
11 A. Yes, sir.
12 Q. And you think that it is unreasonable for him to
13 interject with the word amen to signify that these kids need
14 to get on to class?
15 A. Yes, sir.
16     THE COURT: Mr. Hamilton, I'm going to interrupt
17 you for a moment. Let's take about a 10 minute break.
18     (Short break in proceedings.)
19     THE COURT: Attorney Hamilton, when you're ready,
20 you can resume.
21 BY MR. HAMILTON:
22 Q. Mr. Short, my understanding is you believe the only
23 appropriate way as we've already discussed is to end a
24 student led religious group meeting by saying kids, let's go,
25 correct? Would you agree that that is the only -- would you

1 say that that's the way you should interrupt a prayer
2 conducted by a Muslim religious group of students?
3 A. If that person is there as a monitor, yes.
4 Q. Do you believe that that would be the way that you would
5 interrupt a Jewish group or any other religious group?
6 A. Yes, sir.
7 Q. Do you have an understanding as to why John Freshwater
8 was appointed or asked to be the monitor of the FCA?
9 A. No, sir.
10 Q. Do you have any other religious groups, other than a
11 Christian group, meeting as a student led club?
12 A. No, sir.
13 Q. If John was participating in this particular prayer,
14 would you anticipate, based upon your knowledge of
15 Christianity, would you anticipate that his eyes would have
16 been open or closed?
17 A. People pray different ways.
18 Q. Okay. So his eyes could have been open or they could
19 have been closed is what you're saying?
20 A. Yes, sir.
21 Q. If John was actively engaged in this particular prayer,
22 do you believe that he would have been able to keep aware of
23 the time that the students needed to be dismissed?
24 A. As a monitor, yes, I would expect him to know the time.
25 Q. Not my question. I do want to confirm. As a monitor,

1 you do expect him to be aware of the time, correct?
2 A. Correct.
3 Q. If John Freshwater was alleged to have been involved in
4 this group prayer, how would he have known that it was time
5 to be dismissed?
6     MR. MILLSTONE: Objection. Speculative in nature.
7 Asking what is in someone else's mind.
8     MR. HAMILTON: I'm not asking what's in somebody
9 else's mind. I am asking the pragmatics of being able to
10 tell the time of what time it is to get back to class.
11 That's what we're asking. We're trying to figure that out.
12 He's actively engaged in a group prayer, he's not going to be
13 aware of the time, telling these kids amen, stop, and go to
14 class or what have you. It's very important we have an
15 answer to this question.
16     THE COURT: Could you read the question back.
17     (Pending question read by reporter.)
18     THE COURT: Overruled.
19 A. Looking at the clock.
20 Q. If he was looking at the clock, then perhaps he wasn't
21 engaged in the prayer. Is that possible?
22     MR. MILLSTONE: Objection. Speculation.
23     THE COURT: I'll sustain that.
24 Q. Were you aware of who initiated the prayer for the
25 healing session?

1  A. No, sir.
2  Q. Are you aware of how many people were there in the
3  prayer involved in the healing session?
4  A. No, sir.
5  Q. Are you aware of the speaker who was involved at the
6  healing session that they were praying for?
7  A. Yes, sir. I believe it was Pastor Zirkle.
8  Q. Do you have any personal knowledge or social
9  relationship of Pastor Zirkle?
10 A. No, sir.
11 Q. Are you aware of a student group called the Korean Club?
12 A. Yes, sir.
13 Q. What is the difference between the Korean Club and the
14 FCA?
15 A. Korean Club was a club that met and the monitor was a
16 person that shared information in parts of growing up in
17 Korea.
18 Q. When you said the monitor, is that the leader of the
19 Korean Club?
20 A. No. The monitor. The person that the Korean Club --
21 the volunteer that came in on a volunteer basis was not a
22 school employee.
23 Q. So if they're not a school employee, they would still be
24 called a monitor of that particular group?
25 A. I would call them a monitor, yes.

1  Q. Is it the same kind of monitoring they're supposed to be
2  in the Korea Club as John Freshwater is supposed to be in
3  FCA?
4  A. In the Korean Club, this was a person that actually
5  lived in Korea, came and actually shared those types of
6  things in her life that was in Korea.
7  Q. I appreciate that, sir. My question is, are the duties
8  of the monitor of the Korean Club the same as the duties of
9  the monitor of the FCA?
10 A. No, sir.
11 Q. How are they different, sir?
12 A. She is not a school employee, one. And two, she's
13 sharing as a volunteer her time in Korea.
14 Q. So they're not a school employee. Is she school
15 sanctioned to be there?
16 A. It was a -- again, it was a volunteer group that met.
17 They had permission to meet, but it wasn't anything that
18 was -- students did sign permission slips for that.
19 Q. So this monitor, was she the only speaker in the group?
20 A. That I'm aware of.
21 Q. And as a monitor/speaker, can we call her by name?
22 What's her name?
23 A. I don't know what it is.
24 Q. We know she's the Korean leader -- Korean lady? Can
25 we -- I want to make certain. Can we just call her the

1  leader of the Korean Club? I want to make certain we give
2  her a title.
3  A. You can call her that.
4  Q. Okay. The leader of the Korean Club, did anybody
5  monitor her actions?
6  A. I believe that there was some time spent by the
7  administrator and her group at one point or another. Not all
8  the time.
9  Q. How often, from your understanding, did that monitor go
10 into the -- the administrator go into the monitor of the
11 Korean Club?
12 A. I don't know.
13 Q. But you believe it's at least once?
14 A. Yes, sir.
15 Q. Do you know who it would have been?
16 A. It would have been either Mr. White or Mr. Ritchey.
17 Q. But it's your understanding they did not monitor her all
18 the time?
19 A. Correct.
20 Q. Do you know if she kept notes or gave any kind of
21 reports about the contents of the Korean Club activities?
22 A. I'm not aware of any.
23 Q. Are you aware of the -- any religious discussions that
24 took place in the Korean Club?
25 A. No, sir.

1  Q. Are you aware of any allegations that religious
2  discussions took place in the Korean Club?
3  A. No, sir.
4  Q. And my understanding is you state the Korean Club and
5  the FCA are essentially the same as far as the regulations
6  that would -- that would monitor or that would regulate both
7  clubs, correct?
8  A. Can you read that to me.
9        (Pending question read by reporter.)
10 A. No, sir.
11 Q. How are they different?
12 A. Different as far as the volunteer on one basis. The
13 other is it's a school employee.
14 Q. Any other difference?
15 A. No, sir.
16 Q. Mr. Short, I'm handing you board Exhibit Number 9. This
17 is a letter dated June 6, 2000 -- I'm sorry, June 8 -- I got
18 the wrong one?
19 A. Yes, sir.
20 Q. Mr. Short, I hand you an Exhibit called Employee Number
21 2. Are you familiar with this document, sir?
22 A. Yes, sir.
23 Q. Would you identify this document by date.
24 A. June 8, 2006.
25 Q. It's a letter from whom to whom?

Page 233

1  A.  It's a letter to Mr. Freshwater from Mr. Maley.
2  Q.  Okay.  Tell me, have you reviewed this letter before?
3  A.  Yes, I have.
4  Q.  What was the purpose of your review?
5  A.  The purpose of the review is I read it in -- the purpose
6  of the review was to look into the personnel file to see what
7  things were there.
8  Q.  So you did a complete and exhaustive review of the
9  personnel file?
10  A.  I looked through the personnel file, yes.
11  Q.  Did you do a -- did you look at all the documents in the
12  personnel file?
13  A.  I would not say I looked at all the documents, no, sir.
14  Q.  Let me make sure I understand something.  Earlier you
15  testified that you recommended John Freshwater for
16  termination, correct?
17  A.  Correct.
18  Q.  And you made that recommendation to the school board.
19  A.  Correct.
20  Q.  And your recommendation was done so without examining
21  the full and complete personnel file of John Freshwater?
22  A.  Yes.
23  Q.  This particular letter you stated that you were looking
24  at it for the purpose of just reviewing the personnel file?
25  A.  Yes, sir.

Page 234

1  Q.  When did you do that?
2  A.  I don't remember the date precisely.
3  Q.  Did you do it before or after your recommendation?
4  A.  Before.
5  Q.  Did you do it by yourself or with others?
6  A.  I reviewed this document by myself.
7  Q.  What's your understanding of the purpose of this
8  particular letter dated June 8, 2006?
9  A.  The purpose of the letter is to inform Mr. Freshwater to
10  not -- they received a complaint from a parent questioning a
11  handout entitled Darwin's Theory of Evolution - The Premise
12  and the Problem.
13  Q.  Okay.  So they received that.  Was there any instruction
14  given to John Freshwater from your understanding?
15  A.  The last paragraph states, After review, I have
16  determined the material in question cannot be attributed to a
17  particular author or source.  The material has not passed the
18  test of scientific review and acceptance of the established
19  scientific community.  I am directing you to delete the
20  material from your supplemental resources.  Also, in the
21  future please refrain from using materials that the source or
22  author cannot be readily identified.
23  Q.  Do you have any communications with R. Jeff Maley, the
24  former superintendent of schools, regarding this particular
25  letter he wrote to John Freshwater?

Page 235

1  A.  No, sir.
2  Q.  Have the academic contents standards changed from June
3  8, 2006, to June 1, 2008?
4  A.  I'm not aware.
5  Q.  Specifically, the academic contents standards as they
6  relate to the eighth grade science curriculum?
7  A.  I'm not aware.
8  Q.  When this particular letter was written to John
9  Freshwater, did that finish that particular issue as it
10  relates to using that particular handout?
11  A.  I would assume so, yes.
12  Q.  There were no further proceedings related to that
13  letter, correct?
14  A.  I'm not aware of any.
15  Q.  Okay.  I want to make sure I confirm with you.  The only
16  issue that Mr. Maley had with this particular document,
17  Darwin's Theory of Evolution - The Premise and the Problem,
18  was that it did not contain a source for the material,
19  correct?
20      MR. MILLSTONE:  Objection.  The -- this witness
21  cannot know what concerns or problems Dr. Maley may or may
22  not have had, but he has the document which will speak for
23  itself in terms of what was written to Mr. Freshwater.
24      THE COURT:  Sustained.
25  Q.  Do you have any information from reading this particular

Page 236

1  letter that Mr. Maley was directing John Freshwater not to
2  use the materials of a religious nature?
3  A.  The only sentence I can find that might be related is I
4  informed you that I would ask the science achievement coach
5  at the middle school and the science department head at the
6  high school to review the material and help make the
7  determination of acceptability in a science classroom.
8  Q.  Based upon your -- I'm sorry.  I interrupted you.
9  A.  Then that would have led to the last sentence.
10  Q.  So but for the use of an unsourced, untitled -- I'm
11  sorry, unsourced document, the use of that document would be
12  otherwise appropriate, correct?
13      MR. MILLSTONE:  Objection.  Asking for a conclusion
14  of this witness where he wasn't involved in --
15      THE COURT:  Sustained.
16  Q.  If Mr. Maley had a problem with John using this
17  particular document because of a religious nature, would you
18  expect as an administrator he would have included that in
19  this June 6 -- or June 8, 2006, letter?
20      MR. MILLSTONE:  Objection.  He can't account for
21  what Mr. Maley may or may not have done.
22      THE COURT:  Sustained.
23      MR. HAMILTON:  Your Honor, he can account for his
24  position now as an administrator if there was a problem.  It
25  would have been put in the letter.

1  THE COURT: You can certainly ask him what his
2  reaction would be, but we cannot put ourselves in the
3  position of his predecessor.
4  Q. Mr. Short, if this document had come to your attention
5  and it was an unsourced document and you had a concern
6  because of its religious content, would you yourself have put
7  that in a letter directing John not to use that document?
8  A. I would put the reasons for that and it would have been
9  done through the investigation. I don't know if my
10 investigation would have been the same as Mr. Maley's.
11 Q. I can appreciate that. If you had a problem with the
12 religious content of that particular document, would you put
13 the employee on notice?
14 A. Yes.
15 Q. Mr. Short, I hand you Exhibit Number 9. We previously
16 heard some testimony related to that. This is a letter from
17 Bill White to John Freshwater dated January 22nd, 2008,
18 correct?
19 A. Yes, sir.
20 Q. Now, I notice that as we take a look at that letter,
21 looking at the form of the letter, looking at the content of
22 the letter, I notice that it's different in form from
23 Exhibits Number 12 and 13. I want to hand you these to you.
24 Take a look at those for a second. Would you agree there's a
25 different font style?

1  A. Yes, there's a difference in font style.
2  Q. Would you agree there's a difference in the title of the
3  principal between the three documents?
4  A. Yes, I do.
5  Q. Would you agree that there's a difference as to whether
6  or not there is a CC to Steve Short, which, of course, would
7  be you?
8  A. Yes, there is.
9  Q. The particular letter that you're holding in your hand,
10 January 22, 2008, do you have knowledge who actually wrote
11 that letter?
12 A. I believe it was written by Mr. White, the principal.
13 Q. Do you have any understanding it may have been written
14 by somebody else?
15 A. No, sir.
16 Q. Taking a look at the document April 7, 2008, I believe
17 it's document number 12, it states that it's a letter from
18 Bill White to John Freshwater, correct?
19 A. Yes.
20 Q. Do you have any knowledge as to who actually wrote that
21 letter?
22 A. I believe we sought counsel for that letter.
23 Q. Okay. Now, are you stating that your counsel
24 actually -- are you stating that Bill White didn't actually
25 write that letter?

1  MR. MILLSTONE: Objection if he's looking for
2  advice from counsel. Attorney/client privilege.
3  THE COURT: I'll overrule the objection.
4  Q. My question to you specifically, sir, is this. Is it
5  your understanding that Bill White did not write the letter
6  of April 7th, 2008?
7  A. We sought counsel's assistance for the letter, yes.
8  Q. But Bill White signed the letter, correct?
9  A. Correct.
10 Q. But Bill White didn't actually write the letter,
11 correct?
12 A. Correct.
13 Q. Now, on the April 14th, letter, Exhibit Number 13, it is
14 a letter that's written by who to who?
15 A. Mr. White to Mr. Freshwater.
16 Q. Did Mr. White actually write that letter?
17 A. Yes, sir.
18 Q. You don't have any other knowledge that somebody else
19 would have written the letter, correct?
20 A. No, sir.
21 Q. On the particular letter, we're going to focus on
22 Employee Exhibit Number 2, the January 22nd, 2008, letter.
23 THE COURT: 22nd, 2008, is Board Exhibit 9.
24 Employee's Number 2 is June 8, '06.
25 MR. HAMILTON: Thank you.

1  Q. Typically at the bottom of letters it'll have some
2  initials as to who the letter is copied to. It will have the
3  capitalized letters of the person who wrote -- who signed the
4  letter and the small case letters of the person who typed up
5  the letter. Is that your understanding?
6  A. Yes, sir.
7  Q. Would you agree that all three of these letters are
8  different as to who wrote the letter and who signed the
9  letter?
10 MR. MILLSTONE: Objection. And it's really just a
11 point of clarification. We've talked about four letters
12 here, so what are the three letters that you're referring
13 to? You had four letters.
14 MR. HAMILTON: Actually, I'm talking about three
15 different letters as in document.
16 Q. I'm talking at the end of the document, Mr. Short, if I
17 may approach, at the end of the document where we have where
18 it says CC to somebody, where we have things such as, let me
19 see which document, right there it says CC. There it says
20 CC, but it also has RJM/LS. Do you see what I'm talking
21 about now, sir?
22 A. Colon TS?
23 Q. Yes.
24 MR. MILLSTONE: Which letter are we talking about?
25 MR. HAMILTON: We're talking about all three of

Page 241

1  them, gentlemen, because all three are different.
2          MR. MILLSTONE:  But you have four documents.
3          THE COURT:  Tell us which ones.
4          MR. HAMILTON:  January 22nd, 2008; April 7th, 2008;
5  and April 14th, 2008.
6          THE COURT:  Those are board Exhibits 9, 12, and 13.
7          MR. HAMILTON:  Yes, sir.
8          MR. MILLSTONE:  Thank you.
9  Q.  Would you concur that the demarcations at the end of
10  each of those letters that would indicate who was the
11  signature on the letter versus who typed the letter, all
12  three of those are different?  Would you agree?
13  A.  Not all three of them, no, sir.
14  Q.  But they don't all -- they're not all the same, correct?
15  A.  The three exhibits are not all the same, no.
16  Q.  This particular letter, and we're focusing upon Board
17  Exhibit -- actually, it's Employer Exhibit Number 9, January
18  22nd, 2008, letter, my understanding -- my question was going
19  to be did Bill White show this letter to anybody.
20  Essentially what you're saying is this letter was presented
21  to Bill White for his signature; is that correct?
22  A.  January 22nd, 2008?
23  Q.  Yes.
24  A.  Board Exhibit 9?  No, sir.
25  Q.  Bill White actually wrote that one, right?  I'm

Page 242

1  confusing the exhibits now.  I've confused everybody
2  thoroughly, including myself.  Let's hold on one second.
3  What I want to make certain, Mr. Short, is that as we're
4  taking a look at these particular documents, let's just focus
5  on January, 2008, it's going to be document Number 9, do you
6  know, sir, this particular document as it relates to
7  informing John Freshwater not to use the electrostatic
8  device, do you know if he showed -- Bill White showed that
9  letter to anybody prior to giving it to John Freshwater?
10  A.  He showed it -- he discussed it with me.  He didn't show
11  it to me.
12  Q.  So he discussed it with you.  Did he discuss it or show
13  it to anybody else?
14  A.  Not aware.
15  Q.  So you didn't actually see the letter before it went to
16  John Freshwater, correct?
17  A.  It was read to me.
18  Q.  Read to you what?  Over the phone or in person?
19  A.  Over the phone.
20  Q.  Would you agree that the purpose of the letter was to
21  tell John Freshwater not to use the electrostatic device?
22  A.  Yes, sir.
23  Q.  Paragraph 1, line 1, of this letter that you had read to
24  you states that this is a follow-up, that the letter was an
25  actual follow-up to the conversation that occurred on

Page 243

1  December 7, 2008, correct?
2  A.  No, sir.
3  Q.  December 10th, 2008.  Is that better?
4  A.  No, sir.
5  Q.  Which one are we looking at?
6  A.  We're looking at the same one.  You keep saying 2008 and
7  it was 2007.
8  Q.  Thank you for correcting me.
9  A.  You're welcome.
10  Q.  It states that this particular letter is a follow-up to
11  a conversation that occurred December 7, 2007, correct?
12  A.  No.
13          MR. HAMILTON:  Your Honor, my cold is affecting me.
14          MR. MILLSTONE:  I would like you to take judicial
15  notice --
16  Q.  Mr. Short, I'm suffering from whatever John had.
17          MR. HAMILTON:  Your Honor, I'd be more than happy
18  to continue, but quite frankly, if we could have a recess for
19  lunch.  We anticipated 12:15.  I'm not going to finish with
20  this particular topic before 12:15.  Would it be permissible
21  to break now for lunch, sir?  But I will keep going if you
22  desire.
23          MR. MILLSTONE:  I'd just as soon if we could get
24  through this witness.  He indicated about an hour ago when we
25  broke before.

Page 244

1          THE COURT:  If it's at all possible, I'd like to
2  continue until at least 20 after so we're finishing the hour
3  we started at 20 after.
4  Q.  Mr. Short, it states this letter is a follow-up to a
5  conversation that was held December 10th, 2007, correct?
6  A.  Yes, sir.
7  Q.  Were you involved in that conversation, sir?
8  A.  No, sir, I wasn't.
9  Q.  Okay.  Did you review any notes related to that
10  conversation?
11  A.  No, sir.
12  Q.  Who was involved in that conversation from your
13  understanding?
14  A.  From my understanding, it was Mr. White and
15  Mr. Freshwater and I believe Mr. Ritchey was involved.
16  Q.  It occurred there at the middle school?
17  A.  Yes, sir.
18  Q.  Do you know precisely which electrostatic device was
19  spoken about?
20  A.  Yes, I do.
21  Q.  Is it the electrostatic device that counsel had
22  presented to you during direct examination?
23  A.  Yes, sir.
24  Q.  And you're stating that that is the exact electrostatic
25  device that John Freshwater allegedly used upon Zachary

1 Dennis on December 6, 2007?
2 A. I'm not aware if that's the exact one, no, sir.
3 Q. Okay. So where did that one come from?
4 A. That one came from our middle school science lab.
5 Q. Okay. How many did you have?
6 A. Three.
7 Q. And you have two others just like that?
8 A. Yes, sir.
9 Q. Do you know whether or not you have John Freshwater's
10 Tesla coil that he used in his science class?
11 A. We have all three of them.
12 Q. So it's your belief that you have the actual Tesla coil
13 that John Freshwater used, correct?
14 A. Yes, sir.
15 Q. Okay. Did you ever speak to John Freshwater about this
16 Tesla coil?
17 A. No, sir.
18 Q. Anybody other than Bill White or Brad Ritchey talk to
19 John about this electrostatic device from your knowledge?
20 A. I'm not aware.
21 Q. Earlier you testified that you'd learned some history
22 about the electrostatic machine. How did you know where to
23 look for that information?
24 A. It was presented to me by our attorney.
25 Q. So you actually didn't go get it yourself?

1 A. No, sir.
2 Q. You didn't do any other independent research about the
3 electrostatic device on your own?
4 A. No, sir.
5 Q. When you confiscated those particular three devices that
6 you referenced, were they in boxes?
7 A. No, sir.
8 Q. There was no box around?
9 A. There were no boxes around.
10 Q. Who actually confiscated those?
11 A. Mr. White.
12 Q. Anybody else confiscate one?
13      MR. MILLSTONE: I'm going to object to the
14 question. I believe that the testimony of this witness has
15 been that he directed Mr. White to obtain -- there's no
16 evidence that he was there or that he engaged in getting
17 them, meaning Mr. Short.
18      MR. HAMILTON: My question is, did he have
19 knowledge if anybody else collected them.
20      THE COURT: Overruled.
21 A. I believe Mr. Oxenford assisted Mr. White in obtaining
22 those.
23 Q. Do you know if these particular Tesla coils are also
24 used at the high school?
25 A. No, sir.

1 Q. They're not used at the high school, or you don't know?
2 A. You said did you know and I said no, sir, I don't know.
3 Q. That's why I clarified.
4 A. Okay.
5 Q. Have you yourself ever used the Tesla coil before?
6 A. No, sir.
7 Q. Do you know if there were any directions found with
8 these three Tesla coils?
9 A. I'm not aware of directions found, no, sir.
10 Q. Prior to December 7 -- prior to December 7, unless I say
11 otherwise, we're talking about December 7, 2007, prior to
12 that particular date, had you ever heard about the use of the
13 Tesla coil before?
14 A. No, sir.
15 Q. Not in your 27 years of employment as a teacher? You
16 never heard about its use?
17 A. 26 years, but no, sir.
18 Q. Okay. So I assume you never used the machine, correct?
19 A. Correct.
20 Q. You've never personally had a discussion with John about
21 this, so you wouldn't have learned anything from John about
22 his use of the Tesla coil, correct?
23 A. Correct.
24 Q. During the discussion between the Dennis family and
25 yourself, they allege that John had used this Tesla coil,

1 correct?
2 A. Correct.
3 Q. Did they make any comment to you about religious items
4 in the classroom?
5 A. On December 7th, no, sir.
6 Q. On December 6, 2007?
7 A. You said before we're referring back to December 7th.
8 Q. Let me clarify. You're very keen.
9      MR. MILLSTONE: I'm going to object to the remarks
10 that counsel is making to the witness. He should be limiting
11 himself to questions of the witness.
12      MR. HAMILTON: I appreciate that, sir.
13      THE COURT: So noted. I'll assume it was a
14 compliment.
15      MR. HAMILTON: Absolutely.
16 Q. On December 6, 2007, did you have any discussion with
17 the Dennis family about religious items in John Freshwater's
18 classroom?
19 A. No, sir.
20 Q. When was the first time that the Dennis family presented
21 religious items of concern to you?
22 A. I can't recall the date.
23 Q. Can you recall which year?
24 A. I believe it was 2008.
25 Q. Was the first time you heard about religious items in

Page 249

1 the classroom as a result of the April 14, 2008, letter
2 written by Jessica Philemond directed to you?
3 A. No, sir.
4 Q. When was the -- so it was definitely before that time,
5 then, that you heard about these religious items in the
6 classroom?
7 A. Yes, sir.
8 Q. Was it during the month of April, you believe?
9 A. Yes, sir.
10 Q. Just for clarification, you believe it was during the
11 month of April that these religious items -- during the month
12 of April, 2008, that these religious items were first brought
13 to your attention?
14 A. Yes.
15 Q. So prior to April, 2008, had you heard any complaints
16 about John Freshwater having posters of a religious nature in
17 his classroom?
18 A. Prior to when? I'm sorry.
19 Q. April, 2008.
20 A. No, sir.
21 Q. All my questions are going to be related prior to April,
22 2008, for these next few questions. Had you ever heard any
23 complaints about the Ten Commandments prior to April, 2008?
24 A. No, sir.
25 Q. Had you ever heard any complaints about the Bible on

Page 250

1 John Freshwater's desk prior to April, 2008?
2 A. No, sir.
3 Q. Do you know if those items were present on December 6,
4 2007, when Zachary Dennis was involved in the volunteer
5 experiment in John Freshwater's classroom?
6 A. No, sir.
7 Q. After December 6, 2007, your conversation with the
8 Dennises, did you go and inspect John Freshwater's classroom?
9 A. No, sir.
10 Q. Did you direct that anybody should?
11 A. No, sir.
12 Q. I understand part of this order from Mr. White to
13 Mr. Freshwater is that he should not use the Tesla coil to
14 shock students.
15 A. Yes, sir.
16 Q. And the reason that order was issued is because the
17 manufacturer said not to, correct?
18 A. The reason it was ordered is because it left a mark on a
19 student.
20 Q. Is that the first time you ever heard of a mark being
21 left on a student from the use of a Tesla coil?
22 A. Yes.
23 Q. That particular letter that you hold in your hand from
24 Mr. White to John Freshwater, does it reference one Tesla
25 coil or multiple Tesla coils?

Page 251

1 A. It references one or multiple.
2 Q. Okay. Do you have any knowledge at that time after
3 December 6, 2008, as to who else was making use of Tesla
4 coils?
5 A. No, sir.
6 Q. When did you learn, sir, or have you learned that other
7 Mount Vernon City School teachers have used the Tesla coil?
8 A. I learned when I watched the news one night and a
9 teacher said that she had used it in class.
10 Q. Which teacher, sir?
11 A. Lori Miller.
12 Q. Do you have any other knowledge of any other teachers
13 using these Tesla coils?
14 A. Yes, I do.
15 Q. Who are those other teachers, sir?
16 A. Dino D'Ettorre.
17 Q. Is it Dena or Dino?
18 A. Dino.
19 Q. Anybody else?
20 A. Bill Oxenford.
21 Q. Anybody else, sir?
22 A. No, sir.
23 Q. Did you learn about their use of the Tesla coil before
24 or after the June 19, 2008, investigative report?
25 A. After.

Page 252

1 Q. Did you speak to those other teachers about their use of
2 the Tesla coil?
3 A. I spoke to Lori Miller.
4 Q. When did you do that?
5 A. I believe it was August 21st of this year.
6 Q. What's your understanding of her use of that Tesla coil?
7 A. She said she used it in a science class and she used it
8 to, quote, zap kids' hands. She expressed that she made a
9 quick motion.
10 Q. Did she tell you how long she'd been doing it, sir?
11 A. No, sir. I don't remember that.
12 Q. You didn't ask her?
13 A. I might have asked her. I don't remember.
14 Q. Lori Miller is the only one you spoke to about her use
15 of the Tesla coil? You didn't speak to any other teachers
16 about their use of the Tesla coil?
17 A. No, sir.
18 Q. Mr. White's letter directs that the machine should be
19 removed and locked up so the students have no access. Do you
20 have any knowledge as to exactly when these three Tesla coils
21 were collected?
22 A. No, sir.
23 Q. But for this Tesla coil here, where are the other three
24 Tesla coils -- the other two Tesla coils at now?
25 A. In my office.

Page 253

1  Q. Are they able to be used by any Mount Vernon City School
2  employee right now?
3  A. No.
4  Q. Do you anticipate that they will be used by any Mount
5  Vernon City School employee in the future?
6  A. They may be used in a proper manner.
7  Q. Do you have instructions for the use of those Tesla
8  coils now?
9  A. They're in the report, yes, sir.
10 Q. Okay. My specific question to you is, as the
11 administrator of this school district, do you have
12 instructions on hand --
13 A. I have access to instructions, yes.
14 Q. And how would you have access to those instructions?
15 A. Through the report through the web site.
16 Q. Are you aware of any policy or order that exists
17 within the Mount Vernon City School System that directs a
18 teacher how to use a Tesla coil?
19 A. You have the directions. The directions for them would
20 be in use.
21 Q. It's my understanding, though, you have access to those
22 directions, correct? Or those instructions of how to use a
23 Tesla coil, correct?
24 A. Correct.
25 Q. Prior to December 6, 2007, are you aware of any

Page 254

1  instructions or policy directed by the Mount Vernon City
2  School System advising a teacher how to make use of a Tesla
3  coil?
4  A. I'm not aware.
5  Q. Okay. As we take a look at Mr. White's letter, he
6  states that subject to you following through -- I want to
7  make certain I understand exactly what John Freshwater was
8  supposed to follow through and do.
9  A. Electrostatic machine should not be used for purposes of
10 shocking students and the machine should be removed from the
11 classroom or locked up so that students cannot have access to
12 these machines.
13 Q. So is there two or three there? Supposed to not use it,
14 he's supposed to remove it, supposed to lock it up and make
15 sure students don't have access. Essentially four things,
16 correct?
17 A. Four, yes.
18 Q. On the first one, do you have any other knowledge after
19 December -- January 22nd, 2008, that John Freshwater
20 otherwise used a Tesla coil on a student?
21 A. No, sir.
22 Q. Do you have any knowledge that after January 22nd, 2008,
23 that John Freshwater collected or didn't collect the Tesla
24 coils?
25 A. No, sir.

Page 255

1  Q. Do you have any knowledge as to whether or not he locked
2  these up?
3  A. No, sir.
4  Q. Do you have any knowledge as to whether or not he kept
5  students from having access to them?
6  A. No, sir.
7  Q. Essentially this letter, is it your understanding that
8  if John did those four things that this particular document
9  would not become a part of his permanent personnel file?
10 A. Yes, sir.
11 Q. Is it your understanding that if John relied upon those
12 assertions of doing those four things that he could rely upon
13 Mr. White, that he would not put this letter in his file?
14 A. Yes, sir.
15 Q. Based upon this letter, as long as John did those four
16 things, the matter was complete, correct?
17 A. Yes, sir.
18 Q. So when did the matter become alive again? When did the
19 matter become a matter of focus again?
20 A. The matter -- the focus began again when we looked at
21 this. We looked at this as a singular incident. After the
22 report came out, there was three to eight people. It was
23 supposedly voluntary and we found out that it also was not
24 voluntary.
25 Q. Okay. I want to make sure --

Page 256

1      MR. HAMILTON: Could you read back his answer to
2  me, please.
3      (Pending answer read by reporter.)
4  Q. This was a singular incident. If nothing else occurred,
5  everything would be fine, correct?
6  A. Yes.
7  Q. And you testified earlier that the Dennis family did not
8  come forward with any other concerns until April of 2008,
9  correct?
10 A. As far as what concerns?
11 Q. Any concerns.
12 A. No, sir.
13 Q. Then maybe I misunderstood your testimony. Let me make
14 sure I understood this. When was the first time you had any
15 concerns presented to you about religious items in John
16 Freshwater's classroom?
17 A. April.
18 Q. Okay. And who made those allegations known to you?
19 A. The Dennis family.
20 Q. And they made them known to you through Jessica
21 Philemond's letter of April 14, 2008; is that correct?
22      MR. MILLSTONE: Objection. Asked and answered.
23 A. No, sir.
24      MR. HAMILTON: It was asked and answered, and then
25 I get new information that --

Page 257

1  A. You asked for --
2       MR. MILLSTONE: You don't recall what the answer
3  was, apparently. It was asked and it was answered. He
4  advised you that he had heard it before the letter -- he
5  received the letter, and then you specifically -- so you
6  heard this from the Dennises before you received the letter.
7  He answered yes. And we can go back to the record and find
8  that. So this has been asked and answered.
9       MR. HAMILTON: I'm happy to go back in the record
10 and find it.
11      THE COURT: It did sound as if he conflicted his
12 previous answer in just this last series of questions. It
13 sounded as if he answered in a different way.
14      MR. MILLSTONE: There was no conflict in his
15 testimony, Mr. Referee. What the testimony -- the questions
16 were about religious articles, when did he learn of religious
17 articles. The other question that is supposedly in conflict
18 here is did he have other complaints from the Dennis family.
19 And he said that was before. And in his other testimony,
20 earlier testimony, he testified about other complaints that
21 he received from the Dennis family.
22      THE COURT: All right. Your last question did
23 pertain to religious articles, did it not?
24      MR. HAMILTON: Yes, sir.
25      THE COURT: All right. And that has been answered

Page 258

1  previously.
2  Q. Let me --
3       THE COURT: I will sustain that.
4  Q. Mr. Short, when did you learn of other complaints not
5  related to the Tesla coil and not related to religious items
6  in the classroom? When did you learn of these other
7  complaints?
8  A. I would say in January, sometime late January.
9       THE COURT: For clarification, could we have the
10 year.
11 A. 2008.
12 Q. So in late January, 2008 -- first of all, what were the
13 other complaints made to you?
14 A. The complaints dealt with --
15      MR. MILLSTONE: I'm going to object unless we --
16 there were -- the testimony on direct examination is there
17 were multiple complaints over a period of time. If you're
18 asking about in January, he can answer that. If you're
19 asking about something else, he can answer that. I think he
20 needs to know what time frame you're talking about.
21 Q. January, 2008, what complaints were made to you
22 regarding John Freshwater?
23 A. I believe at that point it dealt with permission slips
24 not being turned in or weren't being signed as part of it.
25 Q. Any other complaints? Permission slips would be one.

Page 259

1  Any other complaints made to you by anybody related to John
2  Freshwater in the month of January, 2008?
3  A. That's my best recollection.
4  Q. Do you have any notes that you would have kept on this
5  situation?
6  A. No, sir.
7  Q. Do you have any correspondence that somebody would have
8  sent to you on this particular situation?
9  A. No, sir.
10 Q. So you didn't receive a letter from the Zachary Dennis
11 family, correct?
12 A. Direct.
13 Q. And you didn't receive -- you didn't receive in January,
14 2008, a letter from the Zachary Dennis family, correct?
15 A. Correct.
16 Q. You didn't receive any other complaints from the Zachary
17 Dennis family in January, 2008, other than their concern
18 about permission slips, correct?
19 A. Yes, sir.
20 Q. And just to make sure, whether you asked or answered or
21 not, there's only one conditional complaint that you learned
22 about in January, 2008, and it relates to the permission
23 slips, correct?
24      MR. MILLSTONE: Objection. This is badgering at
25 this point.

Page 260

1       THE COURT: Sustained.
2  Q. What did you learn about any complaints made in February
3  of 2008 by anybody against John Freshwater?
4  A. I believe at that point there was some questions as far
5  as prayer was concerned. There was some questions about
6  leading prayer and being more of a leader instead of a
7  monitor.
8  Q. Any other complaints that you received in February of
9  2008?
10 A. No, sir.
11 Q. Who was that complaint made by, sir, in February of
12 2008?
13 A. The Dennis family.
14 Q. Just so I make certain, the complaint made in January of
15 2008 was also made by the Dennis family, right?
16      MR. MILLSTONE: Objection. Asked and answered.
17      MR. HAMILTON: I want to make sure it wasn't
18 anybody else. Let me ask it a different way.
19      THE COURT: He's already said it.
20 Q. In March of 2008, Mr. Short, were there any complaints
21 made against John Freshwater?
22 A. In March of 2008, I believe that was one of the
23 complaints in the classroom that dealt with teaching the
24 meaning of Easter. We didn't get that complaint until we
25 came back from spring break, I believe. And I believe

Page 261

1  through that period of time there were still -- let me go
2  back.  There were still complaints about the permission slip
3  not being followed.  Those are what I can remember.
4  Q.  The complaints about the permission slips not being
5  followed continued from January of '08 until the next month?
6  A.  Yeah.  February and March.
7  Q.  And just for clarification, the investigator found that
8  John Freshwater had actually followed the permission slip
9  policy, correct?
10  A.  I believe it was reported that in March, yes, he did.
11  It was in his report.
12  Q.  These particular exhibits here, Exhibit Number 7 and 8,
13  are pictures of these alleged marks made by John Freshwater
14  on the arm of Zachary Dennis.  Is that true, sir?
15  A.  Yes.
16  Q.  Have you seen any other pictures of these alleged marks
17  made by John Freshwater?
18  A.  Yes, I believe I saw one other one.
19  Q.  When did you see it?
20  A.  When -- with my attorney.
21  Q.  So there's been a total of three pictures?
22  A.  That I can remember.
23  Q.  What did the other picture that is not a part of the
24  exhibit, what did it show?
25  A.  Same thing.

Page 262

1  Q.  Was it a duplicate?
2  A.  No, sir.
3  Q.  So it was a different picture altogether of these
4  alleged marks?
5  A.  It was a different picture, but it was the marks, yes,
6  sir.
7  Q.  I understand you learned of the marks for the very first
8  time on December 6, 2007, correct?
9  A.  Yes, sir.
10  Q.  And the Dennis family called you?  They called you on
11  the phone?
12  A.  You said the wrong date.  I'm sorry.  You said December
13  6th.
14        THE COURT:  You said the 6th.
15        MR. HAMILTON:  I thought the previous testimony was
16  on December 6, to --
17        MR. MILLSTONE:  No, it has not been that.  You have
18  referred interchangeably between December 7 and December 6
19  throughout your examination.  The testimony was he met with
20  the Dennises on December 7th.
21        MR. HAMILTON:  What was that?
22        MR. MILLSTONE:  That he met with the Dennises on
23  December 7th.  It's been his testimony on direct and cross.
24  When you've used the 6th, he has said no.
25  Q.  I apologize.  I'm getting my dates mixed up.

Page 263

1  A.  Yes, sir.
2  Q.  On December 7th when you first learned about that, you
3  hadn't learned about it previous to that, correct?
4  A.  Correct.
5  Q.  And the Dennises picked up the phone and called you?
6  A.  They called to set up a meeting with me.  They called my
7  secretary.
8  Q.  And so they ended up having a meeting with you that day?
9  A.  December 7th.
10  Q.  Who was at the meeting?
11  A.  It was myself and Mr. and Mrs. Dennis.
12  Q.  How long did the meeting last?
13  A.  45 minutes.
14  Q.  And this took place where?
15  A.  In my office.
16  Q.  And what did they present to you at that time?
17  A.  They presented the pictures of the arm to me.
18  Q.  Did they present their son also?
19  A.  No, sir.
20  Q.  So you didn't see the son Zachary Dennis on December
21  7th, 2007, correct?
22  A.  No, sir.
23  Q.  So is it your understanding that these pictures were
24  taken either the day of the event, December 6, 2007, or the
25  day that they met with you, December 7th, 2007?

Page 264

1  A.  They took them that evening, I believe, when they came
2  home from practice -- yeah, hockey practice.
3  Q.  Did they tell you that they had taken the pictures in
4  the evening, or is that just your assumption?
5  A.  No.  They told me they took the pictures.
6  Q.  And they said something about hockey practice.  Would
7  you relate what they said about hockey practice.
8  A.  They went to hockey practice.
9  Q.  They tell you where?
10  A.  No.
11  Q.  Did they tell you why they thought hockey practice was
12  important for you to know?
13  A.  No.
14  Q.  At any time from December 7th, 2007, have you actually
15  seen the arm of Zachary Dennis?
16  A.  I've seen the arm of Zachary Dennis.
17  Q.  Let me be more precise.  Have you seen it in person?
18  A.  I've seen his arm in person.
19  Q.  Have you seen this mark on his arm in person?
20  A.  No, sir.
21  Q.  Okay.  So you didn't actually see the mark on his arm at
22  any time from December 7, 2007, until the present, correct?
23  A.  No, sir, I didn't.
24  Q.  Did you ever think it would have been appropriate to ask
25  to see the arm?

Page 265

1  A.  No, sir.
2  Q.  And why is that?
3  A.  Because I received the pictures of the arm.
4  Q.  Is it possible that a picture could have been tampered
5  with to present to you?
6  A.  It's possible.
7  Q.  Do you have any suspicions that these pictures were
8  tampered with to present to you?
9  A.  No, sir.
10 Q.  Was the student Zachary Dennis in school that day,
11 December 7, 2007?
12 A.  I can't recall.
13 Q.  Did you ever feel any need to check on Zachary Dennis
14 after December 7, 2007, to go and talk to him in school?
15 A.  No, sir.
16 Q.  So your first perception of these burn marks are only
17 because of these pictures and no other materials, correct?
18 A.  That is my first impression, yes.
19 Q.  Do these pictures look the same as the pictures you saw
20 on December 7th?
21 A.  Yes, sir.
22 Q.  How was the burn mark first described to you, sir?
23 A.  As a burn.
24 Q.  What word did the Dennis family use to describe that
25 mark?

Page 266

1  A.  A burn.
2  Q.  What other words?
3  A.  I don't recall any other words.
4  Q.  Mr. Short, on December 7, 2007, did Mr. or Mrs. Dennis
5  make any assertion to you that the marks in Exhibit 7 and 8,
6  did they state at any time that they thought those marks were
7  a cross?
8  A.  Yes.
9  Q.  How did they describe that to you?
10 A.  It looks like a cross.
11 Q.  That was their words?
12 A.  That's what I recollect, yes, sir.
13 Q.  Did you make any notes on it?
14 A.  No, sir.
15 Q.  Did you believe the mark was a cross when you looked at
16 it?
17 A.  Yes, sir.
18 Q.  At any time did you --when was the first time you
19 presented information to Bill White related to these
20 particular marks?
21 A.  December 10th.
22 Q.  Did you show him pictures?
23 A.  Yes, sir.
24 Q.  And how did you describe that mark to him?
25 A.  I believe I described it as a cross or as a mark.

Page 267

1  Q.  Okay.  A cross or a mark.  What would that other mark
2  be?
3  A.  A mark.  A mark.
4  Q.  Okay.  Any kind of mark?
5  A.  The arm is marked.
6  Q.  Would you agree that on January 22nd, 2008, there is no
7  mention of any mark described as a cross in the letter from
8  Bill White to John Freshwater?  Is that true?
9       MR. MILLSTONE:  Objection.  The document speaks for
10 itself.
11      THE COURT:  Overruled.
12 A.  That is true.
13 Q.  Do you believe on January 22nd -- let me ask you this.
14 Would you not have thought as an administrator it would have
15 been important to follow up on what you believed was a cross
16 marked on a student's arm?
17 A.  I believe I did follow up.
18 Q.  How did you do that?
19 A.  I followed up with the principal to meet with the
20 teacher and make sure, again, that it didn't happen again and
21 follow those procedures.
22 Q.  After December 7th, 2007, have you met with the Dennis
23 family since that time?
24      MR. MILLSTONE:  Objection.  Asked and answered.
25 He's testified that he's met with the Dennis family.  He's

Page 268

1  just testified a short while ago to that effect.
2       MR. HAMILTON:  I can be more precise.
3       THE COURT:  I'll sustain the objection.  Be more
4  precise.
5  Q.  How many other times after December 7th, 2007, have you
6  met with the Dennis family?
7  A.  I would say three or four.
8  Q.  Where did those meetings take place?
9  A.  My office.
10 Q.  Any other place?
11 A.  Not aware of any other place, no, sir.
12 Q.  Did you ever go to their home?
13 A.  No, sir.
14 Q.  During those meetings, during those other three or four
15 meetings that occurred after December 7th, 2007, who were at
16 those meetings?
17 A.  Myself and Mr. Dennis.
18 Q.  Anybody else?
19 A.  No, sir.
20 Q.  So you met three to four additional times after December
21 7, 2007, with Mr. Dennis, correct?
22 A.  Yes, sir.
23 Q.  You didn't meet with Mrs. Dennis.  Did you meet with
24 Mrs. Dennis during any of those other times?
25 A.  No, sir.

Page 269

1  Q.  Have you ever met with the Dennises' attorney, Jessica
2  Philemond?
3       MR. MILLSTONE:  In what time period?
4  Q.  After December 7, 2007, to the present.
5  A.  Just meeting between myself and Ms. Philemond?  No.
6  Q.  I'm going to narrow the time down.  From December 7th,
7  2007, until April 22nd, 2008, did you at any time meet with
8  Ms. Philemond?
9  A.  No, sir.
10 Q.  But you believe you met with her after April 22nd, 2008?
11 A.  I didn't say that.
12 Q.  You thought that maybe you had met with her.  Is that
13 your testimony or not?
14 A.  I can't recall myself sitting down with Ms. Philemond,
15 no.
16 Q.  Did you ever have any phone conversations with
17 Ms. Philemond?
18 A.  I don't recall those, no.
19 Q.  Would you have made any notes relating any
20 communications that you had with Ms. Philemond?
21 A.  I didn't have any meetings, no.
22 Q.  So you wouldn't have made any notes after any meetings.
23 Would you have made any notes or any other kind of
24 communication with her?
25 A.  No, sir.

Page 270

1  Q.  As you take a look at those pictures in Exhibit 7 and 8,
2  could those -- that mark on the arm also be an X?
3  A.  It would be tough to call it an X.
4  Q.  You directed Mr. White to follow up and issue John
5  Freshwater a directive January 22nd, 2008.  When was the next
6  time that you heard about the issue of a mark upon Zachary
7  Dennis's arm?
8  A.  The next time it became an issue is after the report was
9  released.
10 Q.  During your discussions with John Freshwater -- you
11 didn't have a discussion with John Freshwater.  From your
12 understanding, did Mr. Bill White ask John Freshwater, from
13 your understanding, whether or not what kind of mark that was
14 on Zachary Dennis's arm?
15 A.  I don't recall that being part of our conversation.
16 Q.  When did you first report to the board of education
17 about these marks on Zachary Dennis's arm?
18 A.  I believe one board member knew about it in January and
19 the rest of them I believe in April.
20 Q.  Which board member did you report to in January of 2008?
21 A.  I believe it was Ms. Goetzman.
22 Q.  And what was the substance of your conversation with
23 Ms. Goetzman as it relates to this cross on Zachary Dennis's
24 arm?
25 A.  Just basically that I believe she had -- I'm trying to

Page 271

1  remember if she had called me to say that she had gotten a
2  complaint and I explained what we did.
3  Q.  Was she satisfied with your resolution from your
4  understanding?
5  A.  From my understanding.
6  Q.  And then you're stating that the issue of the cross on
7  the arm did not come back up again until April, 2008?
8  A.  Correct.
9  Q.  And that came up in the context with the board members
10 how?
11 A.  I believe in a board meeting, executive session.
12 Q.  Who informed the board?
13 A.  Myself.
14 Q.  How did you describe the mark on the board?
15      MR. MILLSTONE:  Objection.  He's asking for
16 disclosure of what went on in executive session of the board
17 of education.
18      THE COURT:  To my knowledge, there's no prohibition
19 on a person sharing what goes on in executive session.
20 Overruled.
21 A.  I shared that it was a mark and it looked like a cross.
22 Q.  Did you ever suspect that the mark as you saw in those
23 pictures was ever fabricated?
24 A.  No.
25 Q.  How would you describe the severity of the injury here

Page 272

1  that you would see in these particular pictures?
2  A.  I'm not a doctor.  I'm not sure.
3  Q.  Did the Dennis family explain to you on December 7th,
4  2007, any difficulties that Zachary Dennis had because of
5  that particular mark?
6  A.  Difficulty sleeping because it was painful.
7  Q.  Any other difficulties that they articulated to you?
8  A.  I remember sleeping because it was painful.  Those were
9  the two.
10 Q.  If a teacher burned a cross on a student's arm -- let me
11 ask you this.  Did you believe that -- did you believe on
12 December 7, 2007, that John Freshwater had actually burned a
13 cross on a student's arm?
14 A.  I believe that -- I believe that Mr. Freshwater possibly
15 would have burned a cross on the arm, yes.
16 Q.  Would you say that's part of his character or not part
17 of his character?
18 A.  It's -- I've testified that it's not his character to
19 abuse a student, but I think it's part of his character to
20 promote his religion.
21 Q.  And how long have you known about his particular
22 character to promote his religion?
23 A.  I've known -- I don't know.  I can't go back to what
24 year it would have been.
25 Q.  Let me ask you this.  On December 7, 2007, did you have

Page 273

1  an understanding of what John Freshwater's character was as
2  of that date?
3  A.  Yes.
4  Q.  Do you believe that his character, as of your knowledge
5  as of that particular date, that he would actually burn a
6  religious symbol onto a student?
7  A.  In the context of -- I don't think -- I don't -- can you
8  ask me that question one more time, please.
9       (Pending question read by reporter.)
10       MR. MILLSTONE:  As of that particular date,
11  December 7, 2007?  That's the date you're referring to?
12       MR. HAMILTON:  For clarification, that is true.
13  A.  I do not believe he meant to hurt the student, but I
14  would not be surprised if it was a cross.
15  Q.  And you had that impression on what date, sir?  December
16  7, 2007?
17  A.  December 7th, because the parents stated that
18  Mr. Freshwater stated that it was a cross he was going to put
19  on.
20  Q.  Let me make sure I understand this.  Are you stating
21  that the Dennis family told you -- granted, we're getting
22  into all kinds of hearsay, but is it your understanding that
23  the Dennis family communicated to you their belief that John
24  Freshwater put a cross on the kid's arm?
25  A.  Yes, I vaguely remember some conversation about that.

Page 274

1  Q.  So during the 45 minutes of conversation that you had
2  there at your office on December 7, 2007, was there any
3  discussion between yourself and Mr. and Mrs. Dennis about
4  John Freshwater's religious character?
5  A.  No, sir.
6  Q.  You stated that you believe the mark was first a cross,
7  correct?  And you also stated that you believed it could be
8  John's character to put a religious mark, such as a cross, on
9  him.
10  A.  No.  Okay.  What I'm saying is I remember part of that
11  conversation being that part of that group, which would make
12  me --
13       MR. MILLSTONE:  Wait until there's a question.
14  There's no question at this point.
15       THE COURT:  Go ahead.
16  Q.  Reporter, would you please read me back my last
17  statement.
18       (Pending question read by reporter.)
19  Q.  There's two questions there, Mr. Short.
20       MR. MILLSTONE:  Objection.  Two questions.
21       THE COURT:  Take them one at a time.
22  Q.  You believe that it was a cross that you saw on that
23  particular date?
24       MR. MILLSTONE:  Objection.  Asked and answered.
25       THE COURT:  Sustained.

Page 275

1  Q.  You believe, based upon your understanding of John
2  Freshwater's religious characterization or religious
3  character, you believe he was capable of putting a cross on a
4  student's arm?  Is that what you're saying?
5       MR. HAMILTON:  Let the record reflect that the
6  witness is looking over to his attorney for some sort of
7  guidance.  I would ask that the referee just simply instruct
8  the witness to answer the question.
9       THE COURT:  He's so instructed.
10  A.  I would say that it did not surprise me that it was a
11  cross.  That came from the parents, part of the parents'
12  complaint.
13  Q.  Does that mark look like a wound or an injury?
14  A.  It looks like an injury to me.
15  Q.  Are you familiar with Ohio Revised Code that requires
16  teachers, administrators, anybody in a position such as
17  yourself, to report to children's services any alleged injury
18  or wound that would indicate neglect or abuse?
19  A.  Yes, sir.
20  Q.  And in this situation, your earlier testimony was that
21  you did not do so.
22  A.  Correct.
23  Q.  Your earlier testimony, though, said that you didn't do
24  so because you didn't think children's services would get
25  involved, correct?

Page 276

1  A.  Correct.
2  Q.  And what gave you that impression that children's
3  services would not get involved?
4  A.  For a number -- the reasons were that the people
5  wished -- the family wished to remain anonymous.  They did
6  not believe it was abuse.  I did not believe it was abuse.
7  If the parent didn't want to go any further and the school
8  district and the parent agreed that there was no abuse, that
9  they would not pursue that.
10  Q.  So you and Mr. and Mrs. Dennis agreed on December 7,
11  2007, that that particular mark was not an act of abuse,
12  correct?
13  A.  That's what I've testified.
14  Q.  Can you tell me anywhere in the Ohio Revised Code that
15  allows a school superintendent and a student's parents to
16  make an agreement to do something other than what the law
17  mandates?
18  A.  No, sir.
19  Q.  If you believed on December 7th, 2007, that it was
20  possible that John Freshwater could have burned a cross into
21  a student's arm, would that be an act of gross inefficiency?
22  A.  If he burned a student, yes.
23  Q.  I just want to make certain that I get a definite
24  response.  You're stating to me that you believe that if
25  John -- from your perspective on December 7, 2007, that if

Page 277

1  John Freshwater had burned a cross with a Tesla coil onto a
2  student's arm that that would constitute gross inefficiency?
3  A.  Yes.
4  Q.  Do you believe that same cross with those same
5  understandings that John Freshwater's acts as you perceive
6  them would be an act of immorality?
7  A.  I don't want to mark any kids.
8  Q.  Sir, would you consider the act of marking kids, with
9  your understanding or your belief of John Freshwater's
10 religious character, would you believe that the act of doing
11 so would constitute an immoral act?
12 A.  I do not believe it was an immoral act.
13 Q.  Okay.  Do you believe that doing that particular act
14 would have been just cause for termination at that time?
15 A.  I didn't believe so at that time.
16 Q.  You believe John Freshwater harmed a child, although
17 unintentionally, and you chose not to remove him from class
18 at that time.  Is that true?
19 A.  That is true.
20 Q.  So the class wasn't in any danger?
21 A.  No, sir.
22 Q.  When did the class become in danger, sir, that required
23 a monitor to be placed in his room?
24 A.  When the different -- all the accumulated allegations
25 came together.

Page 278

1  Q.  Was the mark put on Zachary Dennis's arm ever described
2  to you as a branding?
3  A.  I've heard it described as a branding.  It wasn't
4  described to me as a branding.
5  Q.  Let me be more specific.  On December 7 --
6        MR. MILLSTONE:  Objection.  He's answered the
7  question.  There's nothing to be more specific about.
8        THE COURT:  Well, let's hear what his next question
9  is.
10 Q.  On December 7th, 2007, did the Dennis family describe
11 the mark on their son's arm as a branding?
12       MR. MILLSTONE:  Objection.  Asked and answered.
13       THE COURT:  Sustained.
14 Q.  If a supervisor did not provide supervision to a
15 subordinate such as John Freshwater, would that be an act of
16 gross inefficiency?
17 A.  Say that question one more time.
18 Q.  Actually, I'll change it up.  If a supervisor such as
19 yourself or Mr. White did not provide supervision to a
20 teacher such as John Freshwater, would that be any of gross
21 inefficiency, immorality, violation of persistent --
22 violation of reasonable rules and conduct, or other good or
23 just cause?  Would it be any of those?
24       MR. MILLSTONE:  Objection.
25       THE COURT:  Basis?

Page 279

1        MR. MILLSTONE:  There are multiple bases, first of
2  all.  Speculative, secondly.  It is -- the question is
3  unclear as to what type of supervision that might be.  It's
4  general in nature.  Third, it's not relevant.
5        THE COURT:  Sustained.  It's not relevant.
6  Attorney Hamilton, I know you're in a sensitive portion of
7  your cross-examination.
8        MR. HAMILTON:  I absolutely don't want the break,
9  sir.  I don't know how much time I have.
10       THE COURT:  Go right ahead.  Continue.
11 Q.  From your administrative perspective, does a supervisor
12 have a responsibility to know what teachers are doing in the
13 classroom?
14       MR. MILLSTONE:  Objection as to relevance.
15       MR. HAMILTON:  Looking to see whether or not John
16 Freshwater had been provided any guidance.  I think it's
17 exceptionally important as to how much supervision he's been
18 given at any point in time.
19       THE COURT:  Overruled.
20 Q.  Does the supervisor, Mr. Short, have a responsibility to
21 know what teachers are doing in the classroom, sir?
22 A.  They have a responsibility to know what's in the
23 classroom, yes.
24 Q.  How do they exercise that responsibility and what are
25 the different ways?

Page 280

1  A.  They can meet with staff.  They can meet with a
2  teacher.  They can visit the classroom.  They can visit the
3  classroom when it's empty.  They can -- those are some ways.
4  Q.  Can they talk to the teacher, sir?
5  A.  Yes, sir.
6  Q.  Does the district at the middle school level require the
7  submission of lesson plans on any kind of regular basis?
8  A.  I don't believe so.
9  Q.  Has that always been the case?
10 A.  I don't know.  It wasn't when I taught there.
11 Q.  Under your current administration, is the submission of
12 lesson plans required on any type of regular basis?
13 A.  Not that I'm aware of.
14 Q.  Did you at any time, Mr. Short, have a concern about
15 making a false report to children's services as it relates to
16 this particular injury on Zachary Dennis's arm?
17 A.  No, sir.
18 Q.  Are you aware of any reporting of this alleged injury to
19 any other governmental service, such as children's services,
20 law enforcement, et cetera?
21 A.  I'm not aware of any.
22       MR. HAMILTON:  Can I have a brief two minutes?
23       THE COURT:  Certainly.
24       (Short break in proceedings.)
25       MR. HAMILTON:  Your Honor, I am done with that

Page 281

1  particular line of questioning. I am not done, however, with
2  this witness. I'll turn it to you, sir.
3        THE COURT: Do you have an estimate at this point
4  in time of whether another witness will be on today, or will
5  the rest of the day be taken with the remainder of your
6  questioning of Mr. Short?
7        MR. HAMILTON: I cannot accurately answer that.
8  All I can tell you, sir, is I definitely have more questions.
9        THE COURT: All right. It is almost ten till
10 1:00. I have been advised by the county authorities that we
11 need to be out of this building before 4:00 today. I would
12 like for us to reconvene no later than the stroke of the hour
13 at 2:00 so that we can at least try to get in the better part
14 of a couple hours after our lunch break. Be back here at
15 2:00. We'll start promptly at that time.
16                       - - -
17        The proceedings were in recess.
18                       - - -
19        THE COURT: Go ahead.
20 BY MR. HAMILTON:
21 Q. Mr. Short, are you aware of a grievance procedure
22 existing in the Mount Vernon Middle School System where if a
23 student has a grievance how they would process that
24 particular grievance?
25 A. No, sir.

Page 282

1  Q. Have you ever worked in the Mount Vernon Middle School?
2  A. Yes, sir.
3  Q. As a teacher?
4  A. Yes, sir.
5  Q. As an administrator?
6  A. No, sir.
7  Q. At any point in time did you discuss the grievance
8  procedure steps with the parents of Zachary Dennis?
9  A. No, sir.
10 Q. I earlier asked you about the letter of April 7th,
11 2008. Would you agree that the purpose of that letter was to
12 advise John Freshwater of two things, or did it have more
13 than two topics?
14 A. Two topics were FCA and religious materials in the
15 classroom.
16 Q. Okay. At the beginning of paragraph 1, line 1, of that
17 particular letter, it identifies the words several concerns.
18 How many is the number several, sir?
19 A. More than three.
20 Q. Okay. You agree that the letter only addresses two
21 issues, correct?
22 A. I believe it deals with several concerns -- yes, it
23 deals with two main issues.
24 Q. When it says past several weeks there on line 2, what
25 exactly is that time frame that is referenced?

Page 283

1  A. I would say the past three to four weeks, four weeks
2  before that.
3  Q. So the three to four weeks preceding the date of April
4  7, 2008?
5  A. I would say before that, yes.
6  Q. Between April 7, 2008 -- do you remember a press release
7  that came out April 22nd, 2008?
8  A. Yes, sir.
9  Q. Handing you what's going to be marked Employee Exhibit
10 Number 3, sir. Is that the press release that was -- is that
11 the press release we had just talked about from April 22nd,
12 2008?
13 A. Correct.
14 Q. Are you aware of any allegations or complaints between
15 April 7, 2008, and April 22nd, 2008, against John Freshwater
16 that were not previously addressed in your previous letters?
17 A. Can you say that one more time. I'm sorry.
18 Q. Are you aware of any allegations or complaints against
19 John Freshwater from April 7, 2008, until April 22nd, 2008,
20 that would not have been addressed either in this April 7th,
21 2008, letter, or otherwise?
22 A. I don't believe so.
23 Q. Okay. Monitor was placed in John Freshwater's classroom
24 on April 23rd, I believe your testimony was, correct?
25 A. I believe that's correct.

Page 284

1  Q. And you're asserting that nothing changed from the April
2  7th, 2008, letter causing you to put the monitor in his room
3  on April 23rd. There were no new allegations. Nothing new
4  had come up to cause that monitor to be placed at that time,
5  correct?
6  A. From April 7th to April 22nd?
7  Q. Yes, sir.
8  A. We received a letter April 14th from the Dennis family's
9  attorney and then I believe we received one April 23rd -- or
10 April 21st, excuse me. I believe those are in there.
11 Q. Why didn't you put a monitor in his room -- first of
12 all, who caused the monitor to be put in John Freshwater's
13 room? Was that you or Mr. White?
14 A. That would be myself with the board, yes, sir.
15 Q. Why didn't you put a monitor in his room sooner, prior
16 to April 7th?
17 A. We met April 22nd. We took all the things that we had
18 as a board and felt that that was the way to move at that
19 time.
20 Q. Do you know exactly which date John Freshwater was
21 removed as a monitor of FCA?
22 A. I would guess April 23rd should have been the day.
23 Q. So if John Freshwater -- from your understanding, he did
24 not remove his Bible from his desk by the April 16, 2008,
25 deadline, correct?

Page 285

1  A.  That is correct.
2  Q.  So he didn't remove the Bible from his desk, then you
3  also removed him from the FCA monitor as a result, correct?
4  A.  Not just from that.  From the number of instances and
5  allegations that were there.
6  Q.  Do you ever do any inspections of classrooms?
7  A.  I have not inspected a classroom, no.
8  Q.  So during your entire time as -- let me narrow it down.
9  During your entire time as a superintendent, you've never
10  inspected any classroom, correct?
11  A.  I did -- no, I didn't inspect a classroom per se.
12  Q.  And Mr. -- in the letter that Bill White had signed on
13  April 7, 2008, uses the word collage on page 2.  Is it my
14  understanding or is it your understanding that collage only
15  involved the Ten Commandments?
16  A.  There was a collage on the window that included the Ten
17  Commandments.
18  Q.  Was there anything else in that collage that had a
19  religious nature to it?
20  A.  I can't -- I don't know.
21  Q.  In your opinion, should this particular letter have
22  referenced the 20 motivational sayings that were there on the
23  board or on the cupboard?
24  A.  I believe we covered that on the 14th letter, yes.
25  Q.  Okay.  But you didn't cover it in this April 7th letter,

Page 286

1  correct?
2  A.  No, sir.
3  Q.  In hindsight, should your -- should the letter of April
4  7th, 2008, by Mr. White have included the George Bush poster
5  that was in Mr. Freshwater's room?
6  A.  Again, I'll say that we refer to it April 14th, yes.  It
7  wasn't included April 7th.
8  Q.  Did you have discussion with Bill White after he had
9  visited John Freshwater's classroom and saw the poster on the
10  wall and the Bible still on the desk?  Do you remember having
11  any conversation with Mr. White after you had done so?
12  A.  In April, yes, early April he went through the room and
13  reported back to me the different things.
14  Q.  What did he report to you?
15  A.  The cross club, the Bible on the desk, the boxes of
16  Bibles in the back, the estimated 20 some motivational
17  sayings with Bible verses, the posters.  I believe there were
18  more than one Ten Commandments poster.  The George Bush
19  poster.
20  Q.  Are you stating -- I just want to make sure.  Where was
21  the other Ten Commandments poster at?  If it wasn't on his
22  door, where was it at?
23  A.  I believe Bill said it was on a wall.
24  Q.  Did you ever see any pictures of this?
25  A.  I can't remember seeing a picture of it, no.

Page 287

1  Q.  Take a look at the investigative report on page 14,
2  Exhibit Number 6, sir.
3  A.  Page 15?
4  Q.  In the investigative findings he states, The Ten
5  Commandments together with other posters of a religious
6  nature were posted in the room.  Most were removed after
7  Mr. White's letter of April 14th, but at least one poster
8  remained, which John Freshwater was instructed to remove
9  again on April 16th but he did not do so.  Do you have any
10  understanding of what those other posters or what that one
11  poster was that remained?
12  A.  My understanding of the one poster was the one you
13  referred to yesterday as James 5:16 with Bush in the cabinet
14  praying.
15  Q.  When did you first learn of a Bible on John Freshwater's
16  desk?
17  A.  When we did the -- when I instructed Mr. White to go
18  through the room early April.
19  Q.  That would be April, 2008, correct?
20  A.  Yes, sir.
21  Q.  How was it brought to your attention?  Was it brought to
22  your attention by Mr. White or by the Dennis family?
23  A.  Mr. White.
24  Q.  So the Dennis family didn't say anything about a Bible
25  being on Mr. Freshwater's desk, correct?

Page 288

1  A.  I don't remember that, no.  Correct.
2  Q.  Have you ever taken a look at the Bible that was on John
3  Freshwater's desk?
4  A.  I've seen it.
5  Q.  How did you see it?
6  A.  It was packed up and brought over to central office in
7  middle August.
8  Q.  That's the first time you saw it?
9  A.  Personally?  Yes.
10  Q.  What -- if you were to take a look at that particular
11  Bible, and I just want to go ahead and --
12        MR. HAMILTON:  This will be used as a point of
13  reference, Your Honor.  I'm certainly not going to enter it
14  into evidence at this point.
15  Q.  Would this be the particular Bible that you had seen on
16  that particular time sometime in mid August?
17  A.  It was a Living Bible with a forest green cover.
18  Q.  Okay.  I'm going to leave this here, but you may want to
19  refer to it here in a few moments.  Taking a look at that
20  particular Bible, recognizing you saw it after it was already
21  proclaimed to be a Bible, can you tell just by looking at
22  that book anywhere on it that it's a Christian Bible?  You're
23  more than welcome to touch it and look at it.
24  A.  I have a Living Bible of my own, so yes, I know it's a
25  living Bible.

Page 289

1 Q. My question to you is, can you tell that it is a
2 Christian Bible?
3 A. My Living Bible is a Christian Bible.
4 Q. Okay. I appreciate that your Living Bible is a
5 Christian Bible. As you take a look at this particular Bible
6 right here, can you tell that it is Christian in nature or
7 does it have any other religion attached to it? You can open
8 it up, but --
9 A. I did. I opened it up to see -- to make sure it was
10 Mr. Freshwater's and I saw that it looked like it was given
11 to him by his wife.
12 Q. I appreciate that. As it was sitting on that desk right
13 there, without opening it, without otherwise doing anything
14 to it, can you tell that it's a Christian Bible?
15 A. No, sir.
16 Q. The markings on the outside don't have any religious
17 significance, do they?
18 A. I've seen this before in churches and stained glass
19 windows.
20 Q. Okay. There's no mention of Christ anywhere on the
21 outside of the book, is there?
22 A. No, sir.
23 Q. No mention of any other religions on the outside of the
24 cover, is there?
25 A. No, sir.

Page 290

1 Q. How did you know it was a Christian Bible?
2 A. As I said before, I have a Living Bible.
3 Q. So you understand that it's a Christian Bible because of
4 your perspective and your experience, correct?
5 A. Yes.
6 Q. If you didn't know anything about Christianity, could
7 you take a look at that particular book and know that it
8 didn't have any kind of religious import?
9 A. No, sir.
10        MR. MILLSTONE: I'm going to object. How does he
11 know if -- he is a Christian. And the question is to ask him
12 to place himself in the position in which he is not.
13        THE COURT: He's already answered.
14 Q. The presence of that book there alone as it sits, be it
15 right here in front of you today or if you saw it at central
16 office or any other place, the presence of that book, does it
17 promote or denigrate religion in any form?
18 A. Individually, no. When it's a collection or group of
19 things in a room, then yes.
20 Q. Did you ever come to a conclusion that a Bible could not
21 sit on John Freshwater's desk?
22 A. That was part of the religious items that he was
23 requested to remove.
24 Q. Why was he specifically requested to remove that
25 particular book from his desk?

Page 291

1 A. Because it was hard to tell between that book and all
2 the other things that were in his room what was part of the
3 display and what wasn't.
4 Q. In the letter you mentioned -- or the letter Mr. White
5 mentions that he had to remove the Bible and other items by a
6 particular date, correct?
7 A. That's correct.
8 Q. Why not have him remove those items immediately instead
9 of waiting several days if John Freshwater was breaking the
10 law?
11 A. I believe Mr. Freshwater asked for time to get things
12 done -- down and then met with Mr. White to go over what
13 other things needed to be removed.
14 Q. What's your understanding of when Mr. Freshwater asked
15 for this time?
16 A. What was my understanding?
17 Q. No. What is your understanding of Mr. Freshwater asking
18 for time to consider the removal of these items? When did
19 this occur?
20 A. In the letter in December.
21 Q. A moment ago you just stated that John Freshwater asked
22 for some time to remove his items.
23 A. Correct. On the 9th when we met, we set up a time to go
24 up and I believe he met with Mr. White on the 11th, and on
25 the 11th they came up with a letter on the 14th that gave him

Page 292

1 the deadline of the 16th.
2 Q. If he was breaking the law, why not have him immediately
3 stop breaking the law and remove that item that was breaking
4 the law?
5 A. We were having him remove those items.
6 Q. Okay. But you were allowing him to continue to break
7 the law, is that what you're saying, until a certain date?
8 A. We were working on getting an understanding.
9 Q. And what were you trying to get this understanding to?
10 A. To get an understanding of what needed to be removed.
11 Q. Okay. And you told him certain items had to be removed,
12 correct?
13 A. Correct.
14 Q. And he removed all of them but one, correct?
15 A. No. Two.
16 Q. You're saying that the George Bush poster is number two,
17 correct?
18 A. Correct.
19 Q. Okay. Are you aware of any other teachers with Bibles
20 on their desks, sir?
21 A. I know of -- I know of one for sure.
22 Q. Who's that, sir?
23 A. Lori Miller.
24 Q. Have you seen it on her desk?
25 A. I saw it on -- I saw it on her desk, yes.

1  Q.  Did you tell her to remove it?
2  A.  We told her to remove all the other items that she had.
3  There were some items there.
4  Q.  What were those other items that were there?
5  A.  I believe there was a cross.  There was a rock or
6  something with a Biblical verse, a couple other books.
7  Q.  Do you know what those other couple of books were?
8  A.  No, sir.
9  Q.  Were they two books or more than two books?
10  A.  I'm guessing -- I'm recollecting that there were two.
11  Q.  So did she remove the cross?
12  A.  Mr. White said that she removed the items she was asked
13  to remove.
14  Q.  Okay.  You don't know anything further than that,
15  correct?
16  A.  She was asked -- the items that she was asked to remove,
17  she removed them that day.
18  Q.  Do you know any other teachers with a Bible on their
19  desk?
20  A.  Personally, no.
21  Q.  Do you have information that perhaps other teachers have
22  Bibles on their desk?
23  A.  I've been told perhaps other people have Bibles on their
24  desk, but I don't have names.
25  Q.  As superintendent, don't you think it's important to

1  find out whether or not these people are violating the
2  establishment clause?
3  A.  No, sir.
4  Q.  And why don't you think that's important to find out
5  whether or not they're violating the establishment clause?
6  A.  I didn't have any complaints or allegations made against
7  any of them, and you went to the room and there was a
8  multiple list of things around the room that went along with
9  the allegations and complaints.
10  Q.  So if you had never received a complaint about John
11  Freshwater having religious articles in his room, do you
12  believe that we would be here discussing those particular
13  religious articles in his room today?
14  A.  If we hadn't received any complaints of things that were
15  in his room, I believe there were also other pieces that went
16  along with that.  The use of the Tesla coil.  There's the
17  teaching curriculum that is not part of our curriculum,
18  outside the curriculum.  There is refusal to follow
19  directives from the principal, from the administration.
20  There is monitor, non-participatory things.
21  Q.  In the letter of April 7, 2008, do you have any
22  understanding as to whether or not that's the first time John
23  Freshwater had ever been provided any training related to the
24  Equal Access Act or the establishment clause?
25  A.  I believe the Equal Access Act was in the handout I gave

1  him in September with the FCA handbook.
2  Q.  Have you ever had a social relationship with John
3  Freshwater?
4  A.  Yes, I have.
5  Q.  And describe that for me, sir.
6  A.  His son was a pitcher.  My son was a catcher.
7  Q.  Anything else other than that?
8  A.  I consider John to be a friend.  His daughter has been
9  at my house.
10  Q.  It's fair to say that you've known about John's
11  religious position for some time?
12  A.  I know John as a religious person, yes.
13  Q.  How long have you known that he's been a religious
14  person?
15  A.  I know John's been a religious person when he came to
16  Mount Vernon.
17  Q.  Do you have any religious hostility towards John
18  Freshwater?
19  A.  No, sir.
20  Q.  Bill White tell you he had a conversation with John
21  Freshwater on April 11, 2008?
22  A.  Is that in reference to one of these -- yes, he did.
23  Q.  Yes, sir, it is in reference to Exhibit Number 13, which
24  would be the April 14, 2008, letter.
25  A.  Yes, sir, he did.

1  Q.  What did he tell you about that conversation he had with
2  John?
3  A.  He told me on the 14th that he had shared that -- that
4  he had shared this letter with him and that he had told him
5  he gave him a deadline, the end of the day on Wednesday,
6  April 16th.
7  Q.  Do you know if anybody else was present at that meeting
8  between John Freshwater and Bill White?
9  A.  I'm not aware.
10  Q.  Do you know where it took place?
11  A.  I believe it took place in Mr. White's office.
12  Q.  Who set the removal date of April 16?
13  A.  I believe we were at the -- I believe it was Mr. White
14  and myself.
15  Q.  Anybody else involved in that decision?
16  A.  No, sir.
17  Q.  On April 14, 2008, the letter that should be Exhibit
18  Number 13, paragraph 2, line 2, it states that, Bibles and
19  other religious DVDs, videos, et cetera, should be placed out
20  of sight.  Do you concur with that?
21  A.  Yes, sir.
22  Q.  Who made a complaint about DVDs and videos?
23  A.  Well, the DVDs that were there also dealt with -- may I
24  refer to the report?
25  Q.  Yes, sir.

Page 297

1  A.  The report shared -- the report shared that there's a
2  videotape titled Lies In The Textbooks, Part A 4 of 7, 10
3  Lies of Evolution, and we wanted to make sure that any tapes
4  or DVDs or anything along those lines were gone and out of
5  sight.
6  Q.  Now, you just mentioned a couple of titles that you read
7  from the investigative report, correct?
8  A.  Yes, sir.
9  Q.  Any of those titles mentioned in the April 7th or April
10 14th letter to Mr. Freshwater?
11 A.  I believe we covered them with the word videos.
12 Q.  Didn't list anything specific, correct?
13 A.  No, sir.
14 Q.  In the last line of the April 14, 2008, letter, it's a
15 directive that Mr. Freshwater should remove his Bible, those
16 other items, and they should be placed out of sight and
17 access of the students by this date.  What were you concerned
18 about with the access as it's written there?
19 A.  Well, because we talked previously, Mr. Freshwater and I
20 on the 9th, and he had possibly given out one or
21 two Bibles.  So they needed to be out of sight and away from
22 the students.  Then the other religious DVDs or videos or
23 anything else there would be included in that too.
24 Q.  You specifically spoke to John Freshwater about him
25 handing out a Bible?

Page 298

1  A.  Yes, sir.  That was your question?  Yeah.
2  Q.  What's your understanding of how he handed out a Bible?
3  A.  Well, he had Bibles accessible there.  I asked him if he
4  had handed out Bibles and he said he possibly might have
5  given out some Bibles to some of the FCA students, and that's
6  when I talked about the Gideons, and he said that they're not
7  allowed on school property to give out Bibles and I told him
8  neither was he.
9  Q.  Did he specifically state that he gave out a Bible or
10 did he say it was possible?
11 A.  He said it's possible that he gave some out.
12 Q.  Did he say whether or not he gave a Bible out during
13 school hours on duty time or was it some other time?
14 A.  Time was not discussed.
15 Q.  Other than Zachary Dennis, are you aware of any other
16 student filing a grievance against John Freshwater?
17 A.  No, sir.
18 Q.  Are you aware of the code of regulations for conduct of
19 pupils as detailed in the Mount Vernon Middle School teacher
20 handbook?
21 A.  Do you have a copy of that?
22 Q.  I do have a copy, but I'm curious if you're familiar
23 with it first.
24 A.  I'd have to take a look at it.
25 Q.  Do you have items of inspiration in your personal work

Page 299

1  space there at Mount Vernon?
2  A.  Not anymore.
3  Q.  When you say that, you smile, as if you're getting ready
4  to know exactly what I'm going to say.  Do you think you know
5  what I'm going to say or going to ask you about?
6  A.  I'm not sure what you're going to say today.
7  Q.  Did you previously have any Bible verses displayed in
8  your own office?
9  A.  I did.  I don't now.
10 Q.  And when did you take that out?
11 A.  After you left.
12 Q.  Do you remember what date that I left?
13 A.  I don't remember the date.
14 Q.  Okay.  Just for purposes of the record, we need to be as
15 clear as possible.  Did I meet you sometime after June 1,
16 2008?
17 A.  Yes.
18 Q.  Did I meet you sometime before school started for the
19 2008/2009 school year?
20 A.  Yes.
21 Q.  So we're talking about the summertime, correct?
22 A.  Yes.
23 Q.  Specifically my purpose for being there that day was to
24 allow for -- for you to allow the administrative process of
25 John Freshwater having a meeting with you related to the

Page 300

1  suspension that you recommended, correct?
2  A.  That is correct.
3  Q.  And would you tell me for the record what it is you
4  removed from your office after I left that day.
5  A.  I removed a painting that my son had done for me that
6  called me the world's greatest dad.
7  Q.  Congratulations.  Tell me a little bit more about that
8  particular document.
9  A.  It was a painting he had done for me where part of it
10 was painted and part of it wasn't finished.  That would be
11 part of the decor to it.  There was a Romans 13:8 verse down
12 in the left-hand corner.
13 Q.  Romans 13:8 or was it Romans 12:6?
14 A.  I thought it was 13:8, but I'm guessing you wrote it
15 down.
16 Q.  I never wrote it down.  I just remember.
17 A.  I don't remember the exact Bible verse.
18 Q.  If that's something I asked you later, would you be able
19 to tell me accurately which verse from Romans it was?
20 A.  Not right now, no.
21 Q.  Why did you have that particular, I'm going to call it a
22 document, why did you have that particular -- let's call it a
23 painting.  It's a painting, correct?
24 A.  (Nods head.)
25 Q.  You had that particular painting in your work space for

1  what reason?
2  A. My son did it for me.
3  Q. Gave you a sense of inspiration?
4  A. My son gives me a sense of inspiration, yes.
5  Q. Did the words on it give you any kind of inspiration?
6  A. It was done in love from my son, yes, sir.
7  Q. Do I have your commitment here today that, and I don't
8  want to be disrespectful to that particular painting, do I
9  have your commitment that you'll take a look at it the next
10 time we speak, because I will be calling you back during my
11 case in chief, and you'll note precisely what that verse is?
12 A. Sure.
13         MR. MILLSTONE: Objection.
14         THE COURT: You can answer.
15         MR. MILLSTONE: He's already answered.
16 Q. Do you have any other motivational posters in your area,
17 sir? In your work area?
18 A. There are motivational posters there, yes.
19 Q. Describe them for me, please.
20 A. There was one about attitude. There's one about focus.
21 Q. Any others?
22 A. Nope.
23 Q. Do you have any patriotic posters in your work area?
24 A. Not familiar with any, no, sir.
25 Q. Do you have a picture of the American flag with the

1  pledge of allegiance on it in your office space?
2  A. I believe there's a flag in my office.
3  Q. Does it have the pledge of allegiance written on that
4  particular --
5  A. I don't remember seeing it.
6  Q. I read the investigative report that Bill White was
7  present when the Tesla coil was tried upon somebody in the
8  investigation. I think it was specifically the
9  investigator. Are you aware of that?
10 A. I read the report, yes, sir.
11 Q. What did you think about that, the investigator in the
12 presence of one of our subordinates trying to test the coil
13 upon themselves?
14 A. I thought he was doing it as part of his investigation.
15 Q. Earlier you stated that you had not reviewed the
16 entirety of John Freshwater's personnel file. When I
17 reviewed it, I didn't see any mention about those particular
18 awards of distinction that John had received. Where would we
19 find any paperwork related to those awards of distinction?
20 A. Those were submitted to the Wiggin Street principal who
21 would in turn order the flags.
22 Q. The Wiggin Street principal, is that a supervisor of
23 John Freshwater?
24 A. No.
25 Q. How does someone come to be awarded one of these

1  particular distinctions?
2         MR. MILLSTONE: You want to -- for the record,
3  you're pointing at it. Just so that we have it in the
4  record, you want to describe what they are just to have a
5  complete record.
6         MR. HAMILTON: There are two plaques that we talked
7  about in the opening. They're both marks of distinction.
8  One, sir, is for calendar year 2000/2001. We'll call that
9  the first award. The second one is from calendar year
10 2006/2007. We'll call that the second award.
11 Q. My question to you is, how does somebody come to be
12 honored with such an award?
13 A. Usually a principal or an administrator of some kind
14 will nominate a person.
15 Q. You say usually. Are there other ways that people could
16 be nominated for such a distinction?
17 A. It would come from a principal or administrator.
18 Q. When you say administrator, I need to narrow down what
19 capacities those are. We've got a principal. We've got an
20 assistant principal. Anybody else?
21 A. Central office staff.
22 Q. Are you aware of who nominated John Freshwater for award
23 number one?
24 A. No, sir.
25 Q. Are you aware of who nominated John Freshwater for award

1  number two?
2  A. Yes, sir.
3  Q. Who did?
4  A. Tim Keib.
5  Q. Now, once a teacher is nominated for an award by an
6  administrator, is it automatic that they would get it?
7  A. Yes.
8  Q. How many people are selected for these types of awards
9  on an annual basis?
10 A. It depends. There may be 58, I think, one year. There
11 may be 48 to 50 another.
12 Q. How are the categories broken down? Is it one per
13 grade?
14 A. There's no category.
15 Q. There's no category at all?
16 A. No.
17 Q. So anybody could receive one at any time so long as
18 their performance achieved a mark of distinction; is that
19 correct?
20 A. Not necessarily.
21 Q. Okay.
22 A. You could receive one if -- let's say you're on the math
23 committee and the person on the math committee felt like you
24 did a nice job, so you could get one for being on the math
25 committee.

Page 305

1  Q. So now we've enlarged the number of people -- can the
2  committee person nominate somebody for an award?
3  A. The committee person is usually an administrator or
4  central office.
5  Q. How many people that you know of, how many people in the
6  Mount Vernon City School System have achieved two marks of
7  distinction such as John Freshwater has?
8      MR. MILLSTONE: I'm going to object to the
9  characterization mark of distinction. Is that what they're
10  called? Is that the name of them? I thought you called them
11  something else during your opening remarks. Perhaps we could
12  get them Xeroxed.
13     MR. HAMILTON: We certainly can Xerox them. Put
14  them into the record.
15     MR. MILLSTONE: So it's clear what we're talking
16  about.
17     MR. HAMILTON: Let's call it distinguished service
18  awards. Is that more proper for you?
19     MR. MILLSTONE: Yes.
20     THE COURT: Same title on both?
21     MR. HAMILTON: Yes, sir. Different years.
22  Q. Distinguished service awards, what are some of the
23  qualifications that one must demonstrate in order to be
24  nominated? Do you know?
25  A. There's not criteria.

Page 306

1  Q. Are these at any time voted upon by somebody once they
2  are nominated?
3  A. No, sir.
4  Q. Coming back to my previous question, are there -- do you
5  have knowledge of anybody who's received two distinguished
6  service awards, any one teacher who's received two of those
7  awards?
8  A. I have no knowledge.
9  Q. Would you think that it's unusual that somebody would
10  receive two over a period of seven years?
11  A. Not necessarily.
12  Q. So long as that person was doing good work, they could
13  receive one every year, correct?
14  A. So long as an administrator or somebody nominated them
15  for something.
16  Q. Is there a particular policy or anything written that
17  lays out any information related to those particular awards?
18  A. No, sir.
19  Q. Is there a nomination form?
20  A. Yes, there is.
21  Q. What's the name of that nomination form?
22  A. I believe distinguished service award nomination form.
23  Q. Are there directions on it on how to fill it out?
24  A. I believe so.
25  Q. When I reviewed the file, I didn't see anything in John

Page 307

1  Freshwater's personnel file about those distinguished service
2  awards. Can you explain why?
3  A. Because I think because of the fact that there wasn't
4  criteria, it didn't get to the point where it was put in.
5  Q. Is there a plan to develop some criteria for the
6  distribution of these awards?
7  A. We're going to be in the process this year of coming up
8  with a comprehensive group that will set criteria instead of
9  a forum so that a person can understand why they got the
10  award. Many times the recipient did not know what they
11  received the award for.
12  Q. Really? Give me an example.
13  A. If somebody was on a math committee and the math
14  committee -- it was an anonymous process where the --
15     MR. HAMILTON: Can I ask for quiet in the gallery,
16  please.
17  Q. Sir, could you please explain to me.
18  A. It was an anonymous process where the administrator
19  turned it in to the principal of Wiggin Street and the
20  principal of Wiggin Street would order those awards. So
21  there was no -- there was no -- basically, you received it,
22  but you may not know why you got it.
23  Q. Did somebody show up one day and it was sitting on their
24  desk?
25  A. It was passed out, I believe, at the end of the year.

Page 308

1  The last set we did, I believe, was '06/'07 when Mr. Maley
2  retired. We did all those at his. Last year we did not do
3  them because I believed there needed to be some criteria
4  involved in passing out distinguished service awards.
5  Q. So you had an end of the year ceremony where these
6  plaques were distributed?
7  A. I believe the 2007 end of the year breakfast.
8  Q. So at the breakfast where all the teachers in the
9  district come together?
10  A. Teachers and classified staff.
11  Q. Is the person brought up on stage and handed the plaque
12  or is it sitting at their table when they get there?
13  A. Their name is called up and they come up and receive it.
14  Q. Okay. Is there anything read about why that person
15  received that particular mark of distinction?
16  A. Distinguished service award, no, sir.
17  Q. Should they just walk up, get the plaque, and then walk
18  off?
19  A. Basically.
20  Q. There's no statement uttered by whoever is handing out
21  the plaque as to why this person received an award?
22  A. No, sir.
23  Q. Okay. From your perspective as an administrator, what
24  were the possible findings, categories of findings, that the
25  investigator could have made as it relates to the allegations

1  made against John Freshwater?
2  A.  I'm sorry, I'm not sure if I understand.
3  Q.  If I may elaborate.  He could sustain them or not
4  sustain them.  Is that true?
5  A.  That's true.
6  Q.  Could he have exonerated John Freshwater?  If you're
7  familiar with that.
8  A.  Yes, he could have.
9  Q.  He could have said you know what, yes, what John
10  Freshwater did was, in fact, an act that he completed and it
11  was lawful in nature.  Could he have found that John
12  Freshwater did an act as alleged and then exonerated that
13  particular allegation?
14  A.  I think what he would do is look at the act and the
15  allegations and see if there was substance to it or not.
16  Q.  Could he have also unfounded the particular allegation
17  meaning that he didn't believe there was any shred of
18  credibility?
19  A.  He could state that he did not find evidence of that.
20  Q.  When it comes down to as an administrator trying to
21  evaluate this particular information, what burden of proof
22  would you put between sustaining an allegation and not
23  sustaining an allegation?  How would you do that particular
24  weighing?
25  A.  Did that person do it.

1  Q.  Well, ultimately that is the answer that you have to
2  come up with.  My question specifically to you is, what level
3  of weight do you put on any of the evidence that you would
4  have to evaluate?  Can you give me an answer?
5  A.  I'd have to take each piece of information I would get
6  and evaluate it.
7  Q.  How do you yourself assess a person's credibility?
8  A.  Try to determine if they're telling me the truth.
9  Q.  What kind of indicators do you use to determine that?
10  A.  Could involve questions.  Could involve personal contact
11  in organizations.  Could involve --
12  Q.  Anything else?
13  A.  No, sir.
14  Q.  How do you determine the reliability or the accuracy of
15  a piece of information?
16  A.  Evaluate it.
17  Q.  Do you know who Linda Weston is?
18  A.  Yes, sir, I do.
19  Q.  Tell me her position, sir.
20  A.  Director of teaching and learning.
21  Q.  Are you familiar with a statement she made that she's
22  been having problems or complaints about John Freshwater for
23  11 years?
24  A.  I read it in the report.
25  Q.  Had you ever heard about problems with John Freshwater

1  over the past 11 years?
2  A.  I wasn't in that capacity.
3  Q.  Do you know of any documentation that Linda Weston did
4  related to those problems that she's had with John Freshwater
5  over the past 11 years?
6  A.  Not aware of any.
7  Q.  Have you spoke to Linda Weston about her statement?
8  A.  No, I haven't.
9  Q.  You haven't asked Linda Weston to identify the problems
10  that she's perceived over the last 11 years as stated in the
11  investigative report?
12  A.  No.  Because in reading the report, it was evident some
13  of the things she was talking about.
14  Q.  Is it your understanding that those things listed in the
15  investigative report are the complete and total sum of all of
16  the problems Linda Weston has experienced with John
17  Freshwater over the last 11 years?
18  A.  I have no way of knowing.
19  Q.  Have you asked her?
20  A.  No, sir.
21  Q.  Do you think it would be appropriate to ask her as the
22  leader of this organization?
23  A.  When we did the report, we talked through the report.
24  We haven't talked through anything since then because that's
25  when the board did some action.

1  Q.  You talked to the report.  What do you mean?
2  A.  I read through the report.  Excuse me.
3  Q.  Just a moment ago you said you talked through the
4  report.  Did you talk to --
5  A.  I misspoke.
6  Q.  Did you at any time talk to Linda Weston about this
7  particular investigative report?
8       MR. MILLSTONE:  Objection.  Asked and answered.
9       THE COURT:  Sustained.
10  Q.  Linda Weston stated she had a concern -- first of all,
11  are you aware that Linda Weston stated she had a concern of
12  the influence that John Freshwater had with his students?
13  A.  No, sir.
14  Q.  Are you aware of any problems that came up during the
15  2008 OAT testing for John Freshwater's class?
16  A.  Yes, sir.
17  Q.  What are you aware of?
18  A.  Special education tests did not arrive.  The state had
19  not made enough for students on IEPs, so from what I
20  understand, many schools received those OAT tests at a later
21  date.
22  Q.  So it's your understanding the problem's with the state
23  distribution system?
24  A.  Yes, sir.
25  Q.  Do you have any information or belief that the problem

1  was actually with Linda Weston?
2  A.  In conversation about it I believe she ordered some, but
3  I believe one of the problems was that there wasn't enough
4  out there to get to the schools on time.
5  Q.  Those students eventually, though, did get their test
6  and they did take the test, correct?
7  A.  That is correct.
8  Q.  Do you have any information or knowledge about how the
9  students in John Freshwater's class performed on that
10  particular test?
11  A.  Yes, I do.
12  Q.  How did they perform?
13  A.  Well.
14  Q.  Do you know the percentage of pass rate?
15  A.  I believe it was 77 percent.
16  Q.  How was the score John Freshwater's class achieved
17  compared to the other classes of his peer group?
18  A.  The other classes were lower, I believe.  I want to say
19  69 and 65, 67, something like that.
20  Q.  The purpose of the Ohio Achievement Tests are what?
21  A.  To test the student's knowledge from grades three
22  through eight in a sequential basis trying to take as they go
23  accumulation of their past grades.  So when they take an
24  eighth grade test, there may be sixth or seventh grade pieces
25  to that.  So it's a snapshot of that student and that one day

1  taking that one test to accumulate it over five years of
2  study in the science curriculum.
3  Q.  So are you saying, then, that it's an accumulated
4  knowledge base that is eventually tested and not just a
5  knowledge base from John Freshwater's teaching?
6  A.  It's an accumulated knowledge base.
7  Q.  John Freshwater's class did the best and the others did
8  not do as well, correct?
9  A.  When you take that percentage from that snapshot, from
10  that day, and with the other -- yes, sir.
11  Q.  Do you have any knowledge of how students that have
12  attended John Freshwater's science class have performed in
13  the ninth and tenth grade?
14  A.  No, sir, I don't.
15  Q.  Is there anywhere where that information is kept?
16  A.  There's not.  No, sir, I don't believe so.
17  Q.  So it's not broken down specifically by previous years
18  teachers so that we can gauge whether or not a particular
19  teacher had effectively taught for the next level?
20  A.  No, sir.
21      MR. HAMILTON:  Mr. Short, I thank you for your
22  time.  As I stated earlier, you are -- I know you're going to
23  be here anyway, but during our case in chief I anticipate
24  having some additional questions for you.  Thank you, sir.
25      MR. MILLSTONE:  I'm going to object to his

1  recalling him in the case in chief inasmuch as he's gone well
2  beyond the scope of direct throughout his examination.  He's
3  had an opportunity and been permitted to do so.
4      THE COURT:  I'll take that objection under
5  advisement.  Do you have any redirect questions?
6      MR. MILLSTONE:  Yes, I do.
7      THE COURT:  Could we take five minutes?
8      MR. MILLSTONE:  Yes.
9      THE COURT:  Start at 3:00.
10      (Short break in proceedings.)
11      THE COURT:  Attorney Millstone, if you want to
12  begin your redirect examination.
13      MR. MILLSTONE:  Thank you.
14          - - -
15          REDIRECT EXAMINATION
16  BY MR. MILLSTONE:
17  Q.  Mr. Short, Mr. Hamilton asked you on cross-examination
18  about students and how students might have bias and when they
19  might have bias.  Do you recall that?
20  A.  Yes, sir.
21  Q.  And he also asked you about students that you had talked
22  to about any of the allegations against Mr. Freshwater.  Do
23  you recall that?
24  A.  Yes, sir.
25  Q.  I believe that you indicated there was one student with

1  whom you'd have had substantive discussion.
2  A.  Yes, sir.
3  Q.  Is that correct?
4  A.  Yes.
5  Q.  Who was that student?
6  A.  [Student #7]
7  Q.  And, again, what was the substance of the discussion
8  there?
9  A.  Substantive discussion was basically, as [Student #7] called
10  it, getting zapped by Mr. Freshwater from behind as he bent
11  down to get a test tube.
12  Q.  And [Student #7] volunteered to get zapped?
13  A.  No, sir.
14  Q.  Was this inconsistent with what you had understood
15  through the investigation to find and what you had found
16  through the earlier investigation into Mr. Freshwater's
17  actions with respect to the students and the Tesla coil?
18  A.  Yes, sir.
19  Q.  And how was that inconsistent?
20  A.  [Student #7] wasn't a volunteer.
21  Q.  Now, did [Student #7] display any bias toward Mr. Freshwater?
22  A.  Yes, he did.
23  Q.  He did.
24  A.  Yes, he did.
25  Q.  What was the bias he displayed?

Page 317

1  A. He said Mr. Freshwater was his buddy. He said me and
2  Mr. Freshwater are buds.
3  Q. When you say it was a bias, it was a favorable bias.
4  A. Yes. He liked Mr. Freshwater.
5  Q. There was also on cross-examination some substantial
6  time spent by Mr. Hamilton talking about different people
7  with whom you may or may not have had substantive discussions
8  or contact regarding the situation with Mr. Freshwater.
9  A. Yes, sir.
10 Q. Do you recall some of those questions?
11 A. Yes, sir.
12 Q. Can we put that into a little bit of context here? Do
13 people talk to you about the case?
14 A. People talk to me about this case every day.
15 Q. And do you -- what do you respond when they talk to you?
16 A. I just thank them for their prayers or I thank them for
17 their encouragement and I thank them for their thoughts and
18 they share concerns whichever way they feel.
19 Q. Do you discuss the substance of the case with them?
20 A. No, sir.
21 Q. And so I take it when you listen to people that you have
22 spoken with, you didn't list everyone who has spoken to you
23 or in that context.
24 A. No, sir.
25 Q. There's -- there was some testimony both yesterday and

Page 318

1  today concerning the collection of the Tesla coils, when they
2  were collected, who collected them, when you instructed
3  Mr. White to do that. Do you recall that various testimony?
4  A. Yes, sir.
5  Q. After going through everything and over the two days
6  here, do you recall how you instructed Mr. White to collect
7  the Tesla coils?
8  A. I told Mr. White to collect them. May I refer to the --
9  Q. Yeah. Please do. Just tell us what you're referring
10 to.
11 A. January 2nd. January 22nd note.
12 Q. Okay.
13 A. Refresh my conversation. Further direct --
14 Q. What Exhibit is that?
15 A. Exhibit -- Board Exhibit 9.
16 Q. Thank you.
17 A. It was further directed that the machines should be
18 removed from the classroom or locked up so students don't
19 have access to those machines. What I was telling Mr. --
20 what I was telling Mr. White to do in the previous was to
21 collect the machines and lock them up. What I think he
22 understood them to be would be to have them -- the teachers
23 collect them and lock them up. Subsequently, I wanted him to
24 get those and send them over --
25 Q. So did you have a subsequent --

Page 319

1  A. -- himself.
2  Q. I'm sorry. Did you have a subsequent conversation after
3  you saw the letter?
4  A. Yes, we did.
5  Q. So it was sometime, I take it, after January 22nd when
6  you would have collected?
7  A. Yes, sir.
8  Q. But you don't know when they actually were collected?
9  A. I don't know the date, no, sir.
10 Q. And you don't know whether he personally collected them
11 or whether Mr. Oxenford collected them or whether both of
12 them collected some. There was testimony, and I was a little
13 confused.
14 A. Correct. No. I am not sure as to the method in which
15 they were obtained.
16 Q. Okay. Now, there were a number of questions about the
17 grievance procedure -- I'm sorry, about the evaluation
18 procedure and the investigation procedure and the contract.
19 Do you have a copy of the collective bargaining agreement
20 there?
21 A. Yes, sir, I do.
22 Q. What -- could you turn to Article 2 and tell us what
23 Article 2 is about.
24 A. Grievance procedure?
25 Q. Uh-huh.

Page 320

1  A. Yes, sir.
2  Q. What's the purpose of the grievance procedure?
3  A. Purpose of this procedure is to resolve the grievance at
4  the lowest level. Both the board and MVEA agree that
5  grievances will be processed as expeditiously as possible.
6  Q. And is there a definition of a grievance?
7  A. A grievance is a disagreement involving a work situation
8  in which a teacher or group of teachers and/or the MVEA
9  believe there's been a violation, misinterpretation, or
10 misapplication of the written master contract entered into
11 between the board and MVEA, or rules, regulations, and
12 procedures of the administration and the board.
13 Q. And is there an opportunity to go to binding arbitration
14 if there is a grievance involving an alleged violation or
15 misinterpretation in this application of this collective
16 bargaining agreement?
17 A. Yes, sir.
18 Q. And is this the procedure for resolving disputes under
19 the contract, under the collective bargaining agreement?
20 A. Yes, sir.
21 Q. Did you ever receive any grievance from Mr. Freshwater?
22 A. No, sir.
23 Q. Either concerning evaluation or observations or
24 concerning the investigation?
25 A. No, sir.

1  Q. Did you ever receive any grievance during your
2  superintendency?
3  A. No, sir.
4  Q. From Mr. Freshwater?
5  A. No, sir.
6  Q. Are copies of grievances retained in employees personnel
7  files, or are they retained separately?  Do you know?
8  A. Should be in the employee files.
9  Q. And when you reviewed Mr. Freshwater's personnel file,
10  was there any record of any grievance ever filed by him?
11  A. No, sir.
12  Q. Now, since we're talking about personnel files, there
13  was some testimony that you had reviewed the personnel file
14  but you had not scrupulously read every piece that was in
15  there.
16  A. Yes, sir.
17  Q. Could you please explain what you did look through, what
18  you may not have looked at carefully, and what is in the
19  contents of the personnel file.
20  A. The contents of the personnel file is licensure
21  information, is copies of contracts, evaluations as far as
22  into the time coaching.  You sign a slip at the end that
23  deals with coaching.  And then you have a teaching side or a
24  reporting side, so you kind of have two sides to the file.  I
25  spent most of my time looking at the substantive positions,

1  the reports, the observations, evaluations.  I didn't spend a
2  lot of time on the contracts or licenses.
3  Q. So when you responded to Mr. Hamilton that you had
4  not -- he said that you looked at the entire file.  Again,
5  what other portion of that didn't you look at?
6  A. I didn't review the licensure.  I didn't review the
7  contracts.  There might have been -- what the contract is is
8  a list of teachers' names.  They sign it.  It tells what
9  they're going to be paid for that year.  You have those for
10  coaching.  You have those for teaching.  Mr. Freshwater
11  coached as coach for a long time, so there's quite a few of
12  those in there too.
13  Q. Okay.  Now, I want to make sure that I understand your
14  testimony.  You became superintendent in 2007/2008, during
15  that school year.
16  A. Yes.
17  Q. Do you remember at the beginning of the school year and
18  you became the interim or the superintendent on January 1,
19  2008.
20  A. That's correct.
21  Q. What did you do with respect to the distinguished
22  service award for 2007/2008?
23  A. We didn't have them.
24  Q. So under your watch, you've eliminated them
25  permanently?  Temporarily?  What --

1  A. I believe that there should be some reasoning and some
2  explanation and some criteria for giving a person a
3  distinguished service award.  I believe that there should be
4  a nomination process.  I believe it should go to a committee
5  of peers to decide what people should receive an award and
6  then to share with individuals what they received it for.
7  Q. You also -- there were some questions about
8  Mr. Freshwater's character and whether knowing his character
9  you believe that he would have intentionally burned a cross
10  into a student's arm, or something to that effect.  Could you
11  tell us what you meant by -- and I believe you indicated that
12  you thought that it was within his character to have made a
13  cross.
14  A. What I'm trying to say is that I believe that the
15  students said that Mr. Freshwater told them it would be a
16  cross.  I believe if Mr. Freshwater told that person
17  something, I believe Mr. Freshwater's character that he would
18  tell the truth and that that's what it would be.
19  Q. With respect to the FCA, what are the -- what are the
20  duties of a monitor?
21  A. The duties of a monitor are to insure that students
22  behave, to make sure the students are safe, to make sure that
23  it's student led.  They're not to facilitate, not to
24  participate, not to lead.
25  Q. And there was some discussion about the role of the

1  parent and the role of a monitor with respect to FCA.  I
2  wonder if you can expound a little bit on where you see
3  outside of school the limitations and where there aren't
4  limitations with respect to a monitor and why those
5  limitations are there or not there.
6  A. In relationship to Mr. Freshwater and his daughter?
7  Q. Yes.  I'm sorry.  In relationship to Mr. Freshwater and
8  his daughter.  There was a number of questions about that.
9  A. I believe if his daughter comes up to him and says dad,
10  I'd like to pray at FCA, that's great.  I believe that if
11  John says I need you to pray to start off FCA and that's what
12  I want you to do, then that's different in that role,
13  especially if -- in that particular situation -- I don't
14  think as a family you can't have a discussion on prayer or
15  religion.
16  Q. Now, you've heard Mr. Hamilton say this case is about
17  Mr. Freshwater's Bible on his desk.  Is that the reason you
18  recommended the termination of Mr. Freshwater, because he had
19  his personal Bible on his desk?
20  A. No, sir.
21  Q. Why did you recommend the termination of Mr. Freshwater?
22  A. I recommended termination of Mr. Freshwater because of,
23  one, Mr. Freshwater used the Tesla coil to make marks on
24  students.  Two, I used -- I advised it because Mr. Freshwater
25  taught beyond the curriculum, failed to teach some parts of

1 the curriculum, and brought religion into the science
2 classroom.  Three, because he was instructed to be a
3 non-participatory monitor of FCA and it appears that at times
4 he might have led, participated, even facilitated the FCA
5 meetings.  And four, when Mr. Freshwater was directed to
6 remove the religious items that were in his classroom, he
7 gave a statement denying, defying the request, stating that
8 he would not and he left a Bible and a poster in his
9 classroom.  Then on top of that, he brought in two other
10 Christian books, a Bible and Jesus of Nazareth, that he
11 brought in as quoted in the report to make a statement and I
12 believe that is gross insubordination.
13 Q.  Has this been easy for you?
14 A.  No, sir.
15        MR. MILLSTONE:  That's all.
16        THE COURT:  Thank you.  Any recross, Attorney
17 Hamilton?
18        MR. HAMILTON:  No, thank you, Your Honor.
19        THE COURT:  Thank you.  Well, by my calculation and
20 looking at the clock, we have about 29 more minutes in this
21 chamber before the county commissioners are asking that we
22 leave.  Also by my calculation the next witness could not
23 testify within 29 minutes, possibly not even twice or thrice
24 that amount of time.  There's very little point in starting a
25 witness now and then not returning to that witness until

1 later this month.  I think we'd all like to have the
2 testimony in one block and fresh so that we can evaluate it.
3 That all having been said, unless there's other comments from
4 either counsel table, we'll adjourn the hearing for the
5 remainder of the day and resume it at the days that have been
6 marked on the calendar later this month.
7        MR. MILLSTONE:  Starting at 9:00 a.m. on the 28th,
8 I believe.
9        THE COURT:  Yes.
10        MR. MILLSTONE:  Before we depart, we subpoenaed
11 Mr. Freshwater and some documents.  Does he have those
12 documents?
13        MR. HAMILTON:  No, he doesn't.  We'll get them to
14 you.
15        THE COURT:  Anything further?
16        MR. HAMILTON:  I might share for the record I'll
17 respond to the subpoena.  I don't remember what was asked, so
18 I want to make sure I clarify my answer.  I'll get
19 whatever -- I'll address the subpoena.
20        THE COURT:  I understand.
21        MR. MILLSTONE:  We have nothing further.
22        THE COURT:  All right.  Hearings's adjourned for
23 the day.
24
25

1              CERTIFICATE OF REPORTER
2
3        I, Tammy K. McGhee, Registered Merit Reporter, do
4 hereby certify that the foregoing is a true and complete
5 transcript of the proceedings conducted on the 2nd and 3rd
6 days of October, 2008.  And I further certify that I was
7 personally present during all of the said proceedings.
8        Subscribed this 15hth day of October, 2008.
9
10                          _____
11                          Tammy K. McGhee, RMR
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 327

```
 1                    CERTIFICATE OF REPORTER

 2

 3          I, Tammy K. McGhee, Registered Merit Reporter, do

 4   hereby certify that the foregoing is a true and complete

 5   transcript of the proceedings conducted on the 2nd and 3rd

 6   days of October, 2008.  And I further certify that I was

 7   personally present during all of the said proceedings.

 8          Subscribed this 15hth day of October, 2008.

 9

10          Tammy K. McGhee, RMR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```