Page 53

1  There's been -- as the gallery is well aware, there's been a
2  lengthy discussion, both this morning and now this afternoon,
3  concerning some matters that were associated with this
4  hearing but not directly concerning this hearing. We believe
5  that we have resolved those issues, and at this point in time
6  it's my understanding that one or more of the legal counsel
7  in the room would like to make a statement for the record to
8  resolve those issues.
9      MS. PHILEMOND: Thank you, Your Honor. Jessica
10 Philemond on behalf of the Doe family. Your Honor, we have
11 been fighting for some time now on behalf of the Doe family
12 and the children of Mount Vernon to protect their identities
13 in this matter, all of the children. The school district as
14 well. We have sought the agreement of John Freshwater and
15 his counsel in order to do that. They would not agree to the
16 protecting of the identities of the students of Mount
17 Vernon. Therefore, the Doe family has decided at this time
18 that they will come forward. They will no longer be a Doe
19 family. They are Jennifer and Stephen Dennis. Their son is
20 Zachary. You have our authority to share their names in this
21 hearing.
22     THE COURT: Thank you. That having been said, I
23 believe we can now return to the point of which we
24 discontinued the examination of your witness.
25 BY MR. MILLSTONE:

Page 54

1  Q. You have in front of you Board Exhibit Number 3?
2  A. Yes, I do.
3  Q. Having heard that stipulation, can you identify what
4  that document is.
5  A. It's a document I received from Jessica Philemond,
6  attorney for Dennis family.
7  Q. And it contains?
8  A. It contains ongoing complaints, allegations against
9  Mr. Freshwater.
10 Q. And I want to hand you what's been marked for
11 identification purposes as Board Exhibit Number 4. Can you
12 identify that, please. And for the record, let me indicate
13 there is a redaction on this. It isn't as apparent as it is
14 on the other -- on Exhibit 3. On Exhibit 3 Dennis's name had
15 been redacted, but here it is -- the CC was also to -- is
16 redacted. That had been to, I believe, Steve Dennis or
17 Mrs. Dennis. I'm not sure which it was.
18 A. I'm identifying this as a letter I received from Jessica
19 Philemond from the -- representing the Dennis family and,
20 again, contained in that alleged complaint against
21 Mr. Freshwater.
22 Q. I'm going to hand you what's been marked for
23 identification purposes as Board Exhibit Number 5. Would you
24 identify that for the record, please.
25 A. This is a civil suit brought against the school, myself,

Page 55

1  Mr. White, Mr. Freshwater, from the Dennis family.
2  Q. Now, you testified that you had an investigation done by
3  a third party.
4  A. Yes, sir.
5  Q. Do you recall the name of that third party?
6  A. HR On Call.
7  Q. And did you get a report?
8  A. Yes, sir, we did.
9  Q. I want to hand you what's been marked for identification
10 purposes as Board Exhibit Number 6. Ask you to review that
11 and tell me what it is, please, if you can.
12 A. This is a copy of the investigative report that the
13 school board received from HR On Call.
14 Q. Now, one of the areas that you indicated you received a
15 complaint about was a mark that was alleged to have been made
16 on a student's arm?
17 A. Yes, sir.
18 Q. Tell me when you first learned about that.
19 A. The parents set up a meeting with myself on December 7th
20 in the morning.
21 Q. Was that 2007?
22 A. 2007.
23 Q. Could you please describe what happened in that meeting.
24 A. During that meeting -- I'm sorry, I'm used to saying --
25 the Dennis family brought the pictures to me expressing

Page 56

1  concern that her child had spent time that night not sleeping
2  and showed marks on the arm and they said it took place in
3  Mr. Freshwater's class with a science device, a science
4  device of some kind. They described it as something that is
5  used to test acids and bases is what they expressed.
6  Q. And did they tell you what they wanted done or what the
7  concerns were?
8  A. Well, as we sat and discussed and took a look at the
9  pictures and sat together, they were very adamant that they
10 did not want to see Mr. Freshwater fired. They were adamant
11 that they did not want to see him go to jail. They didn't --
12 they did not believe that he did it with the intent to abuse
13 the child. They wanted to make sure that it didn't happen to
14 someone else. There was some talk about it being in the
15 shape of a cross, but it wasn't the main focus of that talk.
16 I concurred with them as far as that that I don't believe
17 Mr. Freshwater would intentionally hurt a child using that.
18 But that it did leave a mark and it was a concern and it
19 would be something that we, as a district, would try to make
20 sure it doesn't happen again to our students. May I say
21 also, we made sure we wanted to investigate it first before
22 we came to any conclusion as far as what actually took place.
23 Q. I'm going to hand you what's been marked for
24 identification purposes as Board Exhibit 7 and 8. Can you
25 identify those, please.

Page 3114

1  were fearful that something might happen to John Freshwater.
2  Are you aware of that?
3  A. Yes.
4  Q. What makes you think that John Freshwater would have
5  gone to jail?
6      MR. MANSFIELD: Objection, Your Honor.
7  Foundation. He's asking Zach for a legal conclusion about
8  whether John Freshwater would or would not go to jail.
9      MR. HAMILTON: Your Honor, with all due respect,
10 we've tried to give Mr. Mansfield a lot of latitude because
11 he just came on board in the last day or two. This is a
12 forum where there's no Fifth Amendment concerns. This is not
13 a deposition. This is a public tribunal where we're trying
14 to determine the merits of the case.
15     I've been very courteous, I think, speaking to
16 Mr. Mansfield yesterday. I've been exceptionally courteous
17 with him today. These objections are really more for the
18 forum in the federal action, and I encourage him to make all
19 the objections he wants there.
20     As it relates to this particular forum, there's
21 been certain allegations, obviously, which he hasn't had a
22 chance to read yet. Perhaps he hasn't reviewed all the
23 materials. It's quite clear there's been an assertion that
24 John Freshwater -- or what concerned the parents of Zach
25 Dennis is Mr. Freshwater would somehow be in trouble if they

Page 3115

1  reported or made any bigger deal about this. I simply want
2  to know what this young man's impression of that is.
3      HEARING OFFICER: Let me ask you, Attorney
4  Hamilton, what was your question immediately preceding the
5  one that was objected to?
6      MR. HAMILTON: What makes you think John Freshwater
7  might have gone to jail? I think that's the question.
8      HEARING OFFICER: I think that's the one you
9  objected to.
10     MR. MANSFIELD: Right.
11     HEARING OFFICER: I'm wondering --
12     MR. HAMILTON: I asked him if it was true that he
13 and his parents had a concern that somehow John Freshwater
14 would be in trouble if they reported what had happened. So,
15 clearly, it established a foundation. It's clearly relevant.
16     HEARING OFFICER: Well, I will sustain the
17 objection. The word "jail" kind of came from nowhere. If
18 you could maybe lay a bit more foundation or establish the
19 basis for that particular question.
20     MR. HAMILTON: Okay.
21 BY MR. HAMILTON:
22 Q. Zach, are you familiar with any statement by yourself or
23 your parents that they had a concern that John Freshwater
24 might go to jail?
25 A. Yes -- or to jail?

Page 3116

1  Q. Yeah.
2  A. No, I don't.
3  Q. Did you ever read the investigator's report?
4  A. I didn't read that, no.
5  Q. You didn't take a look at it?
6  A. I've looked at it a little bit, but I've never read it.
7  Q. Directing your attention to Board Exhibit No. 6, it's
8  going to be page 9, the first full paragraph, last line in
9  that paragraph. And the words state, They didn't want him to
10 go to jail, period.
11     Are you aware of any concern that you and your family
12 had about John Freshwater going to jail?
13 A. I am aware of concern about him getting in trouble, that
14 we didn't want that.
15 Q. So let me ask you this: What made you think he'd get in
16 trouble?
17 A. We felt it was very wrong.
18 Q. You stated he didn't have any intent to hurt you.
19 Right?
20 A. I didn't believe he did.
21 Q. So if he didn't have any intent to hurt you and an
22 accident happened, how would you be concerned that he was
23 going to get in trouble?
24 A. He can still go to jail for accidents.
25 Q. Does it ever bother you that your parents never took you

Page 3117

1  for any kind of medical exam?
2  A. No.
3  Q. How many pictures did you show to the investigators? Do
4  you know?
5  A. I don't know.
6  Q. Did they make copies of the pictures?
7  A. I don't know. I assume.
8  Q. You told the investigator all your different allegations
9  as it relates to John Freshwater?
10 A. Yes.
11 Q. Okay. You allege being marked by a Tesla coil.
12 Correct?
13 A. Yes.
14 Q. You also allege that John Freshwater led a healing
15 session.
16 A. Yes.
17 Q. You also alleged that John Freshwater prayed to God
18 about the devil.
19 A. Yes.
20 Q. You made an allegation to the investigators that an FCA
21 speaker made reference to "saved ones."
22 A. Yes.
23 Q. Now, did John Freshwater actually speak those words or
24 somebody else?
25 A. Which words?

1  A.   Uh-huh.
2  Q.   And when you say not many people were around, did other
3  people hear you talking about these things?
4  A.   I would say no.  They go on late at night.  There's
5  probably only four or five of us that actually get on and
6  practice and play.
7  Q.   Now, I've read several different places the
8  investigative report states that you and your wife had a
9  concern that John Freshwater may go to jail.  Is that an
10 accurate concern at the time?
11 A.   I think we -- I don't know if I was concerned he'd go to
12 jail.  I think we expressed concern when we saw Steve Short,
13 and that was it.
14 Q.   Are you familiar with the investigative report?
15 A.   Yes.
16 Q.   Have you read it?
17 A.   Yes.
18 Q.   Here on page 9, second -- first full paragraph, last
19 line states, They didn't want him to go to jail.  Would you
20 take a look at that.
21 A.   Okay.
22 Q.   Let me know when you're done reviewing it.
23 A.   Okay.
24 Q.   Did HR On Call, the investigators, accurately capture
25 your concerns as expressed to them and as detailed that you

1  had a concern that you didn't want anybody to go to jail?
2  A.   I think that we were concerned that we said that, again,
3  we did not want to make the issue to the police or didn't
4  want to -- things like that.  Maybe we did say jail.  It's
5  been over a year ago.
6  Q.   So do you rely upon things that you read then in that
7  report as being accurate?
8  A.   I would say yes, it must be.
9  Q.   What made you think at that time that John Freshwater
10 may go to jail or get in any kind of trouble?
11 A.   I think it's abuse.
12 Q.   You do think what's abuse?
13 A.   It could be abuse.  My son came home with a burn on his
14 arm.
15 Q.   So you think your son was abused by John Freshwater?
16 A.   Could be possibly.
17 Q.   A few moments ago you said you think it's abuse.
18 A.   I said I think it could be abuse.
19 Q.   I just want to make sure we clarify.  First you said I
20 think it's abuse, and then you're not really quite certain
21 about it being abuse, you kind of have a feeling it might be
22 abuse.  Is that what you're saying?
23          MR. MILLSTONE:  Objection.  Asked and answered.  He
24 said what he said.
25          THE COURT:  Overruled.

```
 1            MR. MANSFIELD:  Your Honor, I'd enter an objection
 2   as well.  This calls for Mr. Dennis to make a legal
 3   conclusion about whether something is abuse or not.  He can't
 4   do that.
 5            THE COURT:  He's just giving his opinion.
 6   Overruled.
 7   A.   Again, I can't determine.  That's why I went to the
 8   school.  The school can make that decision.  I presented it
 9   to, I feel, John's boss.  The school can handle the situation
10   on whether -- how they felt it was appropriate.
11   Q.   So you relied upon Mr. Short to make a determination as
12   to whether or not that's abuse, correct?
13   A.   Yes.
14   Q.   I want you to give me your answer to this question.
15   Which were you more concerned about, your son's well-being or
16   John Freshwater not getting in trouble?
17   A.   I'm concerned about my son's well-being.
18   Q.   Do you remember the allegations that you told the
19   investigators?
20   A.   Yes.
21   Q.   Can you recite what those were?
22   A.   No.
23   Q.   Okay.  Did you -- obviously, you allege that your son
24   had been marked by a Tesla coil, correct?
25   A.   He was.
```