**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**JOHN DOE, et al.,**

           **Plaintiffs,**                        **Case No. 2:08-cv-575**
                                                **JUDGE GREGORY L. FROST**
      **v.**                                  **Magistrate Judge Norah McCann King**

**MOUNT VERNON CITY SCHOOL**
**DISTRICT BOARD OF EDUCATION, et al.,**

           **Defendants.**

<u>**OPINION AND ORDER**</u>

This matter is before the Court on Plaintiffs' Motion for Partial Summary Judgment (Doc. # 60), Defendant John Freshwater's Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment (Doc. # 68), Counterclaimant John Freshwater's (in his Personal Capacity) Memorandum in Opposition to Plaintiffs' Motion for Partial Summary Judgment (Doc. # 70), Plaintiffs' Reply in Support of their Motion for Partial Summary Judgment (Doc. # 75), Defendant John Freshwater's Motion for Partial Summary Judgment (Doc. # 61), Plaintiffs' Memorandum in Opposition to Freshwater's Motion for Partial Summary Judgment (Doc. # 69), and Freshwater's Reply Memorandum in Support of his Motion for Partial Summary Judgment (Doc. # 74). For the reasons that follow, the Court **GRANTS in part and DENIES in part** Plaintiffs' Motion for Partial Summary Judgment and **GRANTS in part and DENIES in part** Freshwater's Motion for Partial Summary Judgment.

## I. Background

Defendant John Freshwater taught eighth grade science at Mount Vernon Middle School for approximately 22 years. Freshwater was terminated as a result of the incidents involved in

this lawsuit.  Plaintiff ZD[1] was a student in Freshwater's science class during the 2007-2008 school year.  Freshwater used a scientific device called a Tesla coil in his classroom to conduct experiments for over 20 years.  The Tesla coil is a device that creates an electrical charge between 20,000 and 45,000 volts, depending on how high or low the device is set.  The device has a metal tip, and when placed near an object, the electrical charge that it generates will arc from its tip to that object.

On December 6, 2007, during ZD's science class, Freshwater used the Tesla coil to apply electrical charges to sealed tubes of gas and, depending on the color the tube glowed when electrically charged, the students could identify what type of gas the tube contained.  Freshwater also showed the students how he could shock himself with the Tesla coil by running the charge across his arm.  Freshwater asked the students class whether any of them wanted to be shocked by the Tesla coil.  Several students, including ZD, volunteered.  Freshwater informed the students before applying the electrical shock that it would result in a temporary mark on their skin.

ZD testified Freshwater held ZD's arm down when he applied the electrical charge from the Tesla coil to it.  Freshwater denies that he did this.  Plaintiffs claim that the mark left on ZD's arm was in the shape of a Christian cross.  Freshwater avers that the mark was intended to be, and was, in the shape of an "X," not a cross.

The mark on ZD's arm was what he described as "red blotches" and "little welts."  (ZD

<hr>

[1]The Court uses the initials of the minor adolescent to protect his privacy in accordance with the Judicial Conference Policy on Privacy and the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002) and this Court's Local Rule 26.2(a).

Decl. ¶ 6.)  When ZD returned home from school that day he showed the mark to his mother. ZD described the mark as painful at that time, but not unbearably so.  That evening, ZD then went to Cleveland with his father to attend ice hockey practice.  ZD did not show his father the mark until after his ice hockey practice.  At that time, ZD's father took pictures of the mark on ZD's arm with his cell-phone camera.

After ZD and his father returned home, ZD's mother treated his arm with cold compresses and put him in bed.  ZD awoke a short time later crying from the pain of the mark, and his mother gave him Tylenol or some other pain killer to help him sleep.  The pain subsided over the next several days, and the mark on ZD's arm disappeared after several weeks.

On December 7, 2007, the day after the incident, ZD's parents met with the Superintendent of the Mount Vernon School District, Stephen Short.  They indicated to Superintendent Short that they wanted an investigation of the Tesla coil incident, but were adamant that they did not want Freshwater legally prosecuted or terminated.  ZD's parents stressed that their goal was to prevent Freshwater from demonstrating the effects of the Tesla coil on any other students.

Over the next few months, ZD's parents discovered that there were three copies of the Ten Commandments on the hall window in Freshwater's classroom and one copy on a bulletin board, a box of Bibles in the back corner of the classroom that was stored there for the student group the Fellowship of Christian Athletes ("FCA"), Freshwater's personal Bible on the corner of his desk, and other "religious materials."  (Freshwater Dep. 69-70, 89-93.)  Freshwater was the faculty advisor of the FCA for approximately 17 years.  The box of Bibles were utilized during the FCA meetings.

On April 7, 2008, Mount Vernon Middle School Principal, William White, asked Freshwater to remove the religious items from his classroom. Freshwater testified that he removed most of the religious materials from his classroom by April 16, 2008. Freshwater refused, however, to remove his personal Bible from his desk.

Freshwater was interviewed on several news shows regarding the dispute between he and the school relating to the religious items in his classroom. On April 16, 2008, Freshwater addressed a rally of supporters at Mount Vernon's Public Square, stating, among other things, that he "respectfully reject[ed] the request to remove the Bible." *Id.* at 51-53. On April 28, 2008, Freshwater was interviewed on *Bob Burney Live*, an AM radio talk show, and on July 5, 2008, Freshwater and one of his attorneys appeared on the Fox News television program, *Showdown*. Also, Freshwater was interviewed on the radio talk show, *Point of View* on August 1, 2008.

On June 13, 2008, ZD's parents, individually and as the natural parents and next friends of their minor child ZD, filed the complaint in this action against the Mount Vernon City School District Board of Education, Superintendent Short, Principal White, and Freshwater, and amended that complaint on August 11, 2008. (Docs. # 2, 11.) Plaintiffs alleged claims for relief for violations of the Establishment Clause of the First Amendment to the United States Constitution, retaliation for engaging in speech protected by the First Amendment, battery, and negligent supervision and retention. (Doc. # 11.)

On September 2, 2008, Freshwater filed the Counterclaim of Defendant John Freshwater to Plaintiffs' First Amended Complaint, in which he set forth two counterclaims: one for defamation and one for intentional infliction of emotional distress. (Doc. # 19.) Freshwater filed

his counterclaims shortly after the start of the administrative proceedings to terminate him from his Mount Vernon teaching position.

Upon the parties' request (Doc. # 51), this Court dismissed the claims against the School Board, Short, and White on October 1, 2009, which also disposed of the negligent supervision and retention claim for relief (Doc. # 52).

On November 16, 2009, Plaintiffs filed Plaintiffs' Motion for Partial Summary Judgment and Freshwater filed Freshwater's Motion for Partial Summary Judgment. Both of these motions are ripe for review.

## II. Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.*, 12 F.3d 1382, 1388-89 (6th Cir. 1993). To avoid summary judgment, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993). However, "summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970). "[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted).

### III. Analysis

In Plaintiffs' Motion for Partial Summary Judgment, Plaintiffs request summary judgment on their battery claim and on both of Freshwater's counterclaims, *i.e.*, defamation and intentional infliction of emotional distress. Plaintiffs have also moved for partial summary judgment on their Establishment Clause claims and have requested that this Court strike the exhibits attached to Freshwater's memorandum in opposition to their motion for partial summary judgment. In Freshwater's Motion for Partial Summary Judgment, Freshwater requests summary judgment on Plaintiffs' battery claim.

### A. Freshwater's Defamation Counterclaim

Plaintiffs request summary judgment on Freshwater's defamation counterclaim. Defamation is the unprivileged publication of a false and defamatory matter about another. *McCartney v. Oblates of St. Francis deSales*, 80 Ohio App.3d 345, 353 (Lucas Cty. 6th App. Dist. 1992) (citing *McCarthy v. Cincinnati Enquirer, Inc.*, 101 Ohio App. 297 (1956) (citing *Cleveland Leader Printing Co. v.. Nethersole*, 84 Ohio St. 118 (1911))). "A defamatory statement is one which tends to cause injury to a person's reputation or exposes him to public hatred, contempt, ridicule, shame or disgrace or affects him adversely in his trade or business."

*Id.* (citing *Matalka v. Lagemann*, 21 Ohio App.3d 134, 136 (1985)).  In the case *sub judice*, for

the purpose of determining Plaintiffs' Motion for Partial Summary Judgment, Plaintiffs do not

dispute that the alleged defamatory statements have the tendency to injure Freshwater in his

occupation.

Freshwater claims the following 42 statements are defamatory:

1.  "The cross burning happened during an 8th grade science class and it happened with a science machine that uses an electric shock to cause a burn. And, the teacher chose to burn the shape of a cross onto [ZD]'s forearm."

2.  "This teacher conducted a healing session at school where he asked that satan be removed from a man who was a visitor of the school."

3.  "[Freshwater] said out loud, 'satan be removed from this man.' "

4.  "[ZD] didn't know it would be a cross and he didn't know it was going to hurt."

5.  "We (Plaintiffs) are religious people, but we were offended when Mr. Freshwater burned a cross onto the arm of our child.  This was done in science class in December 2007, where an electric shock machine was used to burn our child."

6.  "It is about following rules.  We follow the rules and we expect our children to follow the rules.  Rules have been broken here."

7.  "When Mr. Freshwater disagrees with teaching material based upon his own religious beliefs, he advises the students that, although he is forced to teach from the textbooks, the teachings are wrong or not proven according to the Bible."

8.  "These concerns had been going on for at least 11 years, and the school had not done anything."

9.  "Mr. Freshwater burned a cross into their child's arm using a science machine that caused pain."

10.  "Several Bibles were kept in Mr. Freshwater's classroom displayed for the students, not his own personal use."

11.  "Mr. Freshwater engaged in religious teaching including his own beliefs from

7

the Bible."

12. "Mr. Freshwater engaged in prayer in FCA meetings contrary to the District's legal obligations for monitoring such organizations."

13. "Mr. Freshwater led a 'healing session' during an FCA meeting."

14. "Mr. Freshwater violated the school's permission slip policy."

15. "Mr. Freshwater made statements about FCA members 'being the saved ones' and gave them Bibles to distribute to other students."

16. "They stated the burn remained on their child's arm for three or four weeks."

17. "In the shape of a cross."

18. The statements and representations depicted in two pictures identified in the administrative hearing as Board Exhibits 7 and 8.

19. "Mr. Freshwater burned a cross into . . . [ZD's] arm using a science machine."

20. "Several Bibles are also kept in Mr. Freshwater's classroom and are there as a display to his students, not for his personal use."

21. "Mr. Freshwater teaches his own beliefs from the Bible in his eighth grade science class."

22. "Where Mr. Freshwater disagrees with teaching material based upon his own religious beliefs, he advises the students that, although he is forced to teach from the textbooks, the teachings are wrong or not proven according to the Bible."

23. "Mr. Freshwater engages in prayer in FCA. He conducts prayers and also asks students to lead prayer."

24. "Mr. Freshwater led a healing session."

25. "He held his hands above the non-school speaker's head, had students in attendance circle the man, holding hands and praying, and Mr. Freshwater removed satan from the man. Mr. Freshwater also conducted a prayer at this meeting."

26. "Mr. Freshwater violates Mount Vernon's permission slip policy."

27. "Mr. Freshwater told his students that the permission slips are stupid and that he is breaking God's law if he turns away children that do not have a permission slip."

28. "Students are given Bibles in these meetings, by Mr. Freshwater, to distribute to other students at the school."

29. "Mr. Freshwater has continued to teach religion in his classroom."

30. "Mr. Freshwater branded a religious symbol on the skin" of [ZD].

31. The mark lasted as long as 3-4 weeks on at least one student who described the area as very painful.

32. "Mr. Freshwater said that it should be called the greatest Friday or the best Friday ever. And then he asked what Easter was, and someone said when Jesus was resurrected."

33. "[Freshwater] said that it was a temporary tattoo and said that those crosses are going to be there for a while."

34. Freshwater held minor Plaintiff's arm on an overhead projector.

35. Freshwater showed a video called the Watchmaker.

36. Freshwater would relate to a higher being in class.

37. Freshwater had me get on Answers in Genesis and research something about dinosaurs.

38. Freshwater expressed his personal belief in the flood theory as it relates to Noah's Ark.

39. Freshwater showed movies during meetings of the Fellowship of Christian Athletes.

40. Freshwater told us to take a Bible and give it to someone who needs it.

41. Freshwater was responsible for bringing a placarded motor vehicle to school property that was adorned with posters protesting abortion.

42. Freshwater violated the permission slip policy.

(Doc. # 70 at 4-7 of 13) (internal citations omitted).

Plaintiffs argue that they are entitled to summary judgment on each of these allegedly defamatory statements because (1) many of the statements were not made by Plaintiffs, (2) some of the statements are entitled to an absolute privilege, (3) some of the statements are entitled to a qualified privilege, and (4) Freshwater has introduced no evidence that the remaining statements were made with actual malice, which is required because he is a limited purpose public figure. This Court agrees.

### 1. Statements Not Attributable to Plaintiffs

Plaintiffs have submitted evidence showing that statements 1, 3, 4, 7, 8, 19, 20, 21, 22, 23, 24, 25, 26, 27, and 28 were made by Plaintiffs' former counsel, either verbally or in writing in letters that Plaintiffs neither drafted nor signed.

Statements 30 and 31are statements taken directly from a document titled "Mount Vernon Board of Education's Resolution of Intent to Consider the Termination of the Teaching Contract(s) of John Freshwater."  (Doc. # 75, Ex. C.)  Neither ZD nor his parents are members of the Mount Vernon School Board and did not participate in any way in drafting the Board's resolution.

Statement 18, Freshwater claims, consists of "statements and representations depicted in two pictures identified in the administrative hearing as Board Exhibits 7 and 8." (Doc. # 70 at 5.)  It is unclear exactly what Freshwater means by "statements and representations depicted in two pictures," and Freshwater fails to identify these alleged "statements and representations" with any specificity.  The two photographs are of ZD's arm after Freshwater had applied the Tesla coil to it and were first identified during Superintendent Stephen Short's testimony at Freshwater's termination hearing.  Plaintiffs cannot be held liable for any

statements that Short or others made about these exhibits. To the extent that it was Plaintiffs who published these photographs at the termination hearing, they are entitled to an absolute privilege as explained in the next section.

### 2. Absolute Privilege

A statement made in a judicial or quasi-judicial proceeding enjoys an absolute privilege against a defamation action as long as the allegedly defamatory statement is reasonably related to the proceeding in which it appears. *Hecht v. Levin*, 66 Ohio St.3d 458, 460, 462 (Ohio 1993) (citing *Surace v. Wuliger*, 25 Ohio St.3d 229 (1986)). Statements 17, 32, 33, 34, 35, 36, 37, 38, 39, and 40, are quotes or paraphrases from ZD's testimony during Freshwater's termination hearing. Plaintiffs correctly contend that the termination hearing was a quasi-judicial proceeding and, therefore, ZD's statements made during the termination hearing are absolutely privileged as a matter of law. *Id.* at 462 (extending absolute privilege to statements made in a complaint filed with the grievance committee of a local bar association); *see also Barilla v. Patella*, 144 Ohio App.3d 524, 534 (Cuyahoga Cty. 8th Dist. App. 2001) ("Communications made during unemployment proceedings, which are quasi-judicial in nature, are subject to an absolute privilege.") (citations omitted).

For an administrative proceeding to be deemed "quasi-judicial" under Ohio law, the proceeding must include notice, a hearing, and the opportunity for the "introduction of evidence by way of exhibits and/or testimony." *Nuspl v. Akron*, 61 Ohio St.3d 511, 516 (Ohio 1991). The evidence before the Court indicates that Freshwater's termination hearing meets all three of these requirements: The Mount Vernon School Board provided Freshwater with the proper notice, the proceedings consisted of a hearing before a referee who made a recommendation to the School

Board regarding Freshwater's employment, and both Freshwater and the School Board called numerous witnesses and introduced hundreds of exhibits. *See also* Ohio Rev. Code § 3319.16 (setting forth procedures for terminating Ohio public school teachers and requiring "the employing board [to] furnish the teacher with a written notice signed by its treasurer of its intention to consider the termination of the teacher's contract with full specification of the grounds for such consideration").

Because Freshwater's termination hearing qualifies as a quasi-judicial proceeding, Plaintiffs are required to show that the portions of ZD's testimony that Freshwater claims are defamatory "bear[] some reasonable relation" to the proceeding in which they were published. *Surace*, 25 Ohio St.3d at 233. The termination hearing transcript unequivocally demonstrates that ZD's allegedly defamatory statements bore a reasonable relation to the termination hearing. ZD testified about Freshwater's behavior during his science classes and Freshwater's termination hearing was to determine whether Freshwater's behavior during his classes provided reason to terminate his employment. Thus, ZD's testimony is absolutely privileged and cannot serve as the basis for Freshwater's defamation counterclaim.

### 3. Qualified Privilege

Statements 9, 10, 11, 12, 13, 14, and 15, are contained in an investigative report drafted by HR On Call, Inc., the company commissioned by the Mount Vernon School Board to conduct an independent investigation of the complaints against Freshwater. Plaintiffs argue that these statements are entitled to a qualified privilege. "[I]n order to establish a qualified privilege," a party "must show that (1) the publication was made in good faith, (2) there was an interest to be upheld, (3) the publication was limited in scope to that interest, (4) the publication was made on

a proper occasion, and (5) the publication was done in a proper manner and to the proper parties." *Thompson v. Webb*, 136 Ohio App.3d 79, 84 (Hamilton Cty. 1st. App. Dist. 1999) (citing *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Const. Trades Council*, 73 Ohio St. 3d 1, 8 (Ohio 1995)).

> The defense of qualified privilege is deeply rooted in public policy. It applies in a variety of situations where society's interest in compensating a person for loss of reputation is outweighed by a competing interest that demands protection. Accordingly, the privilege does not attach to the communication, but to the occasion on which it is made. It does not change the actionable quality of the publication, but heightens the required degree of fault. This affords some latitude for error, thereby promoting the free flow of information on an occasion worthy of protection.

*A & B-Abell Elevator Co.*, 73 Ohio St.3d at 8-9 (citations omitted).

In the instant action, the Court agrees with Plaintiffs that the statements at issue satisfy the five qualified privilege requirements. Initially, Plaintiffs testified that the statements were made in good faith, with only the intention of preventing future potential harm to any of Freshwater's students. "Once [Plaintiffs] asserted that [their] statements were made in good faith, [Freshwater] had the burden of showing that [Plaintiffs] acted with actual malice." *Id.* at 10. Freshwater has failed to submit any evidence of actual malice, as the Court explains in more detail below in the next section.

Next, as to the interest to be upheld, the Ohio Supreme Court has explained:

> One type of interest protected by a qualified privilege is the public interest. The "public interest" privilege "involves communications made to those who may be expected to take official action of some kind for the protection of some interest of the public."

*Id.* at 9 (citation omitted). Plaintiffs made communications to those charged with the investigation of a public school teacher accused of committing battery against their minor child.

Certainly, there is a public interest in school officials taking official action for the protection of school children. This is an interest that is protected by a qualified privilege.

Finally, the statements were made discretely to and at the request of investigators tasked by Mount Vernon school officials with investigating allegations of Freshwater's conduct, meaning that the statements were properly limited in scope, were made on the proper occasion, and were supplied to the proper parties. Thus, the final three prongs of the qualified privilege test are met. Accordingly, the statements at issue here are entitled to a qualified privilege.

### 4. Limited Purpose Public Figure Defamation

There are five remaining statements on Freshwater's list, two of which consist of Plaintiffs' statements contained in a facsimile that their former counsel sent to media outlets (statements 5 and 6) and three of which consist of statements for which the speaker and context could not be identified (statements 4, 41, and 42). For the purpose of their summary judgment motion, Plaintiffs do not contest that the statements can be attributed to them. Plaintiffs argue that, as a limited purpose public figure, Freshwater must show "actual malice" on the part of Plaintiffs in publishing the allegedly false statements, which Freshwater has failed to do. This Court agrees.

"There are four classifications for a plaintiff who alleges defamation: '(1) a private person; (2) a public official; (3) a public figure; and (4) a limited purpose public figure.' " *Kassouf v. Cleveland Magazine City Magazines*, 142 Ohio App.3d 413, 421 (Trumball Cty. 11th App. Dist. 2001) (citing *Talley v. WHIO TV-7 & WDTN TV-2*, 131 Ohio App. 3d 164, 169 (Montgomery Cty. 2d App. Dist. 1998)). The determination of whether or not a party is a public figure is a matter of law. *Id.* (citing *Milkovich v. News Herald*, 15 Ohio St. 3d 292, 294 (Ohio

1984)). A public figure is a person whose position or activities thrust them into the center of an important public controversy. *Id.* (citing *Curtis Publ'g Co. v. Butts*, 388 U.S. 130, 155 (1967)). A limited purpose public figure is one who becomes a public figure for a specific range of issues by being drawn into or voluntarily injecting himself into a specific public controversy. *Id.* (citing *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351 (1974)). Here, the parties agree, and the Court determines, that Freshwater is a limited purpose public figure.

Because Freshwater is a limited purpose public figure, he must show "actual malice" on the part of Plaintiffs in publishing the allegedly false statements. *Id.* (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-280 (1964), *Milkovich*, 15 Ohio St.3d at 294, and *Mohan v. Fetterolf*, 107 Ohio App.3d 167, 170 (Trumball Cty. 11th App. Dist 1995)). " 'Actual malice' is demonstrated by evidence that shows the defendant published the statement with knowledge that it was false or that the defendant published the statement with reckless disregard as to whether it was false or not." *Id.* (citing *New York Times Co.*, 376 U.S. at 280-281). " 'There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.' " *Id.* (citing *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)). Freshwater "bears the burden of producing clear and convincing evidence of 'actual malice.' " *Id.* (citing *Gertz*, 418 U.S. at 342 and *New York Times Co.*, 376 U.S. at 285-286.) Plaintiffs posit that Freshwater has introduced no evidence that the allegedly defamatory statements were made with actual malice.

Freshwater, however, argues that Plaintiffs' actual malice is shown by the fact that, "despite their claimed medical concern for their minor son, Plaintiff parents assert they did not take their eighth grade student to a doctor for fear the physician may have to report the injury to

authorities as the alleged injury may be a sign of abuse by Freshwater." (Doc. # 70 at 9.) Freshwater asserts that "[r]easonable jurors could find an inconsistent response by Plaintiffs in relation to the harm they subsequently complained about and the reality of whether such complaint was well founded." *Id.* at 9-10. Further, Freshwater claims that the timing and factual surroundings of some of Plaintiffs' statements reflect on Plaintiffs' credibility.

The Court finds that Freshwater's arguments reflect a misunderstanding of the nature of the showing that must be made to raise an issue of material fact as to whether Plaintiffs acted with actual malice. That is, "[a]ctual malice cannot 'be implied from the character and content of a publication. . . . It is not sufficient for a [defamation] plaintiff to show that an interpretation of facts is false; rather, he must prove with convincing clarity that defendant was aware of the high probability of falsity.' " *A & B-Abell Elevator Co.*, 73 Ohio St.3d at 13 (citations omitted). Furthermore, "[m]ere negligence is not enough to establish actual malice." *Id.* (citation omitted). "Thus, reckless conduct is not measured by whether a reasonably prudent man . . . would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." *A & B-Abell Elevator Co.*, 73 Ohio St.3d at 13 (citing *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)). There is simply no such evidence in this case. The Court, therefore, cannot conclude that Plaintiffs "in fact entertained serious doubts as to the truth of [their] publication." *Kassouf*, 142 Ohio App.3d at 421.

### 5. Conclusion of Defamation

Viewing the evidence in the light most favorable to Freshwater, the Court concludes that there are no genuine issues of material fact as to whether Plaintiffs defamed Freshwater, and that

Plaintiffs are entitled to summary judgment on each of the 42 statements Freshwater alleges were defamatory. Accordingly, the Court **GRANTS** Plaintiffs' Motion for Partial Summary Judgment as it relates to Freshwater's defamation counterclaim.

**B. Freshwater's Intentional Infliction of Emotional Distress[2] Counterclaim**

Plaintiffs move for summary judgment on Freshwater's intentional infliction of emotional distress counterclaim, arguing first, that because Freshwater's defamation claim cannot survive summary judgment neither can his derivative intentional infliction of emotional distress claim. Second, Plaintiffs posit that, even if the claim were not dependent upon the defamation claim it still cannot survive Plaintiffs' request for summary judgment. Plaintiffs' arguments are well taken.

First, because Freshwater's defamation counterclaim fails, then so too, does his counterclaim for intentional infliction of emotional distress, as the allegedly slanderous statements that comprise the defamation counterclaim were the purported cause of Freshwater's emotional distress. *See, e.g., Vail v. The Plain Dealer Publ'g Co.*, 72 Ohio St.3d 279, 283 (Ohio 1995) ("Since we have concluded that the [allegedly defamatory] statements at issue are constitutionally protected speech, [appellant's] claims for intentional infliction of emotional distress must also fail."); *see also A & B-Abell Elevator Co.*, 73 Ohio St.3d at 15 ("[W]here claims . . . are based on statements that are qualifiedly privileged under defamation law, the protection afforded those statements . . . must also apply in the derivative claims.").

---

[2] The Court notes that Plaintiffs move for summary judgment on a claim for negligent infliction of emotional distress. Freshwater does not respond in any way to Plaintiffs' request. In reviewing Freshwater's counterclaims, it is clear to the Court that Freshwater did not plead a claim for negligent infliction of emotional distress.

Second, even if Freshwater's defamation claim had survived summary judgment, his intentional infliction of emotional distress claim cannot. In Ohio, a party claiming intentional infliction of emotional distress must show:

> 1) [T]hat the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff; 2) that the actor's conduct was so extreme and outrageous as to go "beyond all possible bounds of decency" and was such that it can be considered as "utterly intolerable in a civilized community," 3) that the actor's actions were the proximate cause of plaintiff's psychic injury; and 4) that the mental anguish suffered by plaintiff is serious and of a nature that "no reasonable man could be expected to endure it[.]"

*Pyle v. Pyle*, 11 Ohio App.3d 31, 34 (Cuyahoga Cty. 8th Dist. 1983) (internal quotation marks and citations omitted); *see also Talley v. Family Dollar Stores of Ohio, Inc.*, 542 F.3d 1099, 2008 U.S. App. LEXIS 19342, *25-26 (6th Cir. 2008) (setting forth same elements).

Freshwater's argument in opposition to Plaintiffs' request for summary judgment in its entirety is as follows:

> Plaintiff parents never attended any session of Freshwater's class or any session of the Fellowship of Christian Athletes. It appears Plaintiff parents relied exclusively upon the representations made by their minor son without verification or consultation with Freshwater as was required by the school systems public complaint process (Administrative Hearing Transcript pages 3254-3255 and Employee Exhibit No. 118). The nature and seriousness of the allegations made by Plaintiffs against Freshwater were of the type of conduct an accuser should know would result in serious ramifications. Reasonable jurors could find Plaintiffs accusations related to the alleged "healing" session alone would subject Freshwater to public outrage. Freshwater testified about the difficulty he has had finding employment and the challenges he has faced as a result of Plaintiffs conduct (Administrative Hearing Transcript pages 4191-4194, and 4677).

(Doc. # 70 at 11 of 13.) Leaving aside for the moment that the portions of the administrative transcript relied upon by Freshwater have not been authenticated and, are therefore, not appropriately before this Court, this evidence is simply not of the nature or severity sufficient to

18

raise a genuine issue of material fact as to whether Freshwater was subjected to the intentional infliction of emotional distress. Even accepting as true that it was foreseeable that Freshwater would be subjected to "public outrage" because of Plaintiffs' statements, that is not enough. Indeed, not even considering the elements of the claim regarding Plaintiffs' intent and proximate cause, stating that Freshwater engaged in a healing session, or that he engaged in any other the other conduct at issue here, is not so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community. *See Pyle*, 11 Ohio App.3d at 34. Thus, no reasonable jury could return a verdict in Freshwater's favor on this claim.

Accordingly, the Court **GRANTS** Plaintiffs' Motion for Partial Summary Judgment as it relates to Freshwater's intentional infliction of emotional distress counterclaim.

**C. Plaintiffs' Establishment Clause Claims**

Plaintiffs move for partial summary judgment on their Establishment Clause claims, indicating that because Freshwater disputes some of the allegations regarding the Establishment Clause violations that are set forth in the amended complaint they have chosen to exclude them as bases for their instant motion. Instead, Plaintiffs move for summary judgment only on the alleged violations related to the postings of the Ten Commandments and the Bibles in Freshwater's classroom.

In his opposition memorandum, Freshwater argues that (1) violations based upon his personal Bible were not sufficiently pleaded, (2) Plaintiffs lack standing to bring an Establishment Clause claim, (3) the Establishment Clause claims are moot, and (4) there are genuine issue of material fact as to whether he violated the Establishment Clause.

19

### 1. Pleading the Establishment Clause Claims and Freshwater's Personal Bible

Freshwater argues that Plaintiffs cannot rely upon the fact that he kept his personal Bible on his desk to support their Establishment Clause claims because they did not raise it as an issue with the school district and because they did not specifically mention it in the amended complaint. In their reply memorandum, Plaintiffs argue that Freshwater cannot disclaim discussion of this evidence under these arguments. This Court agrees.

First, as Plaintiffs correctly argue, they are not foreclosed from raising claims against Freshwater merely because they did not present them in a complaint to the school district. See *Doe v. Wilson County Sch. Sys.*, 564 F. Supp.2d 766, 787 (M.D. Tenn. 2008) (permitting federal claims when not originally raised with school officials). Second, again as Plaintiffs accurately contend, reference to religious material in Freshwater's classroom as violative of the Establishment Clause sufficiently encompasses the Bible on Freshwater's desk. *See* Fed. R. Civ. P. 8(a)(2) (complaint need only set forth "a short and plain statement of the claim showing that the pleader is entitled to relief"). The Bible on Freshwater's desk was discussed at length in the evidence presented to this Court, both before and with the filing of Plaintiffs' Motion for Partial Summary Judgment. (*See e.g.* Docs. # 39, 60-3 through 60-8.) Thus, Freshwater can claim no surprise at Plaintiffs' request for summary judgment on their Establishment Clause claims based upon the Bible on Freshwater's desk.

Consequently, the Court concludes that Plaintiffs' violation of the Establishment Clause claims were pleaded in such a way that they include ZD's exposure to Freshwater's Bible on his desk, the box of Bibles in the back of Freshwater's classroom, and the four copies of the Ten Commandments posted in his classroom.

## 2. Standing

The burden is on the party invoking federal jurisdiction to demonstrate Article III standing. *Stalley v. Methodist Healthcare*, 517 F.3d 911, 916 (6th Cir. 2008). "In order to meet Article III standing requirements, a party must show (1) actual or threatened injury which is (2) fairly traceable to the challenged action and (3) a substantial likelihood the relief requested will redress or prevent the plaintiff's injury." *Adland v. Russ*, 307 F.3d 471, 477-78 (6th Cir. 2002) (citing *Deja Vu v. Metro. Gov't of Nashville*, 274 F.3d 377, 384 (6th Cir. 2001)). Freshwater argues that Plaintiffs lack standing because they have not alleged a concrete and particularized injury sufficient to meet this "injury in fact" requirement.

Specifically, Freshwater argues first that Plaintiffs lack standing because ZD did not endure direct and unwelcome exposure to the Ten Commandments and box of Bibles because he only noticed them toward the end of the year. Second, Freshwater argues that the injury alleged by ZD must be "more than the psychological consequence of observing conduct with which one disagrees." (Doc. # 68 at 20 of 36.) Freshwater's arguments are not well taken.

With regard to the first argument, Plaintiffs correctly explain that they possess standing based upon the uncontroverted fact that ZD was exposed to Freshwater's Bible, the box of Bibles, and the Ten Commandments postings, something he could not avoid, and Plaintiffs claim offense at such exposure. In *Washegesic v. Bloomingdale Pub. Sch.*, 33 F.3d 679, 681 (6th Cir. 1994), the Sixth Circuit "held that a high school graduate had standing to challenge his high school alma mater's display of a portrait of Jesus Christ because he continued to visit the school and encounter the portrait." *Adland*, 307 F.3d at 478. The *Washegesic* court noted that "the use of governmental authority to encourage a sectarian religious view is a sufficient injury if directed

toward the plaintiff. " *Washegesic*, 33 F.3d at 682. *See also Suhre v. Haywood County*, 131 F.3d 1083, 1088 (4th Cir. 1997) ("The cognizable injury caused by personal contact with a public religious display may thus satisfy the injury-in-fact requirement for standing to bring an Establishment Clause case."); *Murray v. City of Austin*, 947 F.2d 147, 151 (5th Cir. 1991) (ruling that the plaintiff had standing to challenge the City's inclusion of a cross in municipal logo); *Saladin v. City of Milledgeville*, 812 F.2d 687, 691-93 (11th Cir. 1987) (holding that the plaintiffs had standing because plaintiffs were directly confronted by the presence of the word "Christianity" on the city seal); *Doe v. Wilson Co. Sch. Sys.*, 564 F. Supp.2d at (M.D. Tenn. 2008) (the plaintiffs possessed standing when the minor child had observed religious "flyers, posters, signs, and 'I Prayed' stickers" and "could not avoid the religious posters and signs in the hallways" and the plaintiffs claimed offense at such exposure). Because ZD was only aware of the alleged offensive items part of the year does nothing to change this analysis.

As to the second argument, Freshwater contends that ZD's exposure to the box of Bibles and Ten Commandment postings "led to only, at most, a psychological consequence of observing conduct that [ZD] disagreed with and such an exposure is not enough to be considered an injury in fact." (Doc. # 68 at 22 of 36) (citing *Valley Forge Christian Coll. v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 485 (1982)). Freshwater concludes that this type of psychological injury is insufficient to confer standing upon Plaintiffs. However, as Plaintiffs correctly argue, Freshwater's reliance on the broad "psychological consequence" language from *Valley Forge*, is misguided. In construing the "psychological consequence" language, the Sixth Circuit clarified that the *Valley Forge* plaintiffs' "grievance had a vicarious quality" because they "were members of an organization challenging a

government action they learned about through a news release." *Washegesic Pub. Sch.*, 33 F.3d at 682 (criticizing the school district's heavy reliance on the *Valley Forge* language). In *Valley Forge* there was no "direct" contact with the offending conduct or item, unlike *Washegesic* or here, where a student had "continuing direct contact with the object at issue" and "[h]is grievance [was] not remote, vicarious or generalized as in *Valley Forge*." *Id.* at 683 (finding the student had continuing contact with the portrait of Jesus Christ).

Accordingly, the Court concludes that Plaintiffs possess standing to file their claims based upon alleged Establishment Clause violations.

### 3. Mootness

Freshwater argues that Plaintiffs' violation of the Establishment Clause claims have been rendered moot because ZD is no longer a student at Mount Vernon Middle School and because Freshwater has been terminated from his teaching position there. Plaintiffs agree that their requests for injunctive and declaratory relief are moot; however, they assert that their request for damages saves their claim from mootness. This Court agrees.

In general, a claim for injunctive or declaratory relief is mooted in cases like this one when the student matriculates out of the school in which the alleged violation occurred. *See, e.g., Bd. of Sch. Comm'rs of Indianapolis v. Jacobs*, 420 U.S. 128, 129-30 (1975) (per curiam) (finding moot a suit for injunctive relief where all plaintiffs had graduated); *Curry v. Sch. Dist. of the City of Saginaw*, 452 F. Supp. 2d 723, 743 (E.D. Mich. 2006) *aff'd sub nom. Curry v. Hensiner*, 513 F.3d 570 (6th Cir. 2008) ("The Court finds, however, that the request for declaratory and injunctive relief is moot because Joel matriculated out of the Hadley Middle School in 2004 (he was a fifth grader in December 2003 when he participated in the Classroom

City project) and the injunction he seeks could provide no meaningful relief.").  However, the

Sixth Circuit has made clear that a damages claim will save an Establishment Clause claim from

a mootness challenge.  *See Blau v. Fort Thomas Pub. Sch. Dist.*, 401 F.3d 381, 387 (6th Cir.

2005) ("Thus, even if Amanda's matriculation from middle school to high school mooted the

claim for injunctive and declaratory relief (a point we need not decide), the existence of a

damages claim ensures that this dispute is a live one and one over which Article III gives us

continuing authority.") (citations omitted).

Here, Plaintiffs have requested damages, and therefore, this action has not been rendered

moot by Freshwater's termination or by ZD's matriculation from Mount Vernon Middle School.

### 4. Establishment Clause

Freshwater contends that there are genuine issues of material fact as to whether he

violated the Establishment Clause, and therefore, Plaintiffs' request for partial summary

judgment on these claims should be denied.  This Court agrees.

The First Amendment declares: "Congress shall make no law respecting an establishment

of religion, or prohibiting the free exercise thereof[.]"  U.S. Const., amend. I.  "The defining

principle of Establishment Clause jurisprudence is that the 'First Amendment mandates

government neutrality between religion and religion, and between religion and nonreligion.' "

*ACLU v. Grayson County*, 591 F.3d 837, 844 (6th Cir. 2010) (citing *McCreary County v. ACLU*,

545 U.S. 844, 860 (2005) (quoting *Epperson v. Arkansas*, 393 U.S. 97, 104 (1968))).  The

Supreme Court has stated that it "has come to understand the Establishment Clause to mean that

government may not promote or affiliate itself with any religious doctrine or organization, may

not discriminate among persons on the basis of their religious beliefs and practices, may not

delegate a governmental power to a religious institution, and may not involve itself too deeply in such an institution's affairs." *Allegheny County v. ACLU*, 492 U.S. 573, 590-91 (1989). Both the Establishment Clause and the Free Exercise Clause of the First Amendment operate against the states and their political subdivisions by virtue of the Fourteenth Amendment. *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 301 (2000); *School Dist. of Abington Township v. Schempp*, 374 U.S. 203, 215 (1963).

There are heightened concerns about protecting freedom of conscience from subtle coercive pressure in the elementary and secondary schools. *Lee v. Weisman*, 505 U.S. 577, 592 (1992). "School sponsorship of a religious message is impermissible because it sends the ancillary message to members of the audience who are nonadherants 'that they are outsiders, not full members of the political community, and an accompanying message to adherants that they are insiders, favored members of the political community.' " *Santa Fe Indep. Sch. Dist.*, 530 U.S. at 309 (quoting *Lynch*, 465 U.S. at 688 (O'Connor, J., concurring)). "The long-standing (but not always applied) test for determining whether government action violates the Establishment Clause was first articulated in *Lemon v. Kurtzman*,[3] 403 U.S. 602 (1971)."

---

[3]With regard to the *Lemon* test, the Sixth Circuit explains:

> While sitting *en banc*, this Court recently observed that although individual Supreme Court justices have expressed reservations regarding the test set forth in *Lemon v. Kurtzman*, 403 U.S. 602 (1971) for determining whether a particular government action violates the Establishment Clause, *see Am. Civil Liberties Union of Ohio v. Capital Square Review & Advisory Bd.*, 243 F.3d 289, 306 & n.15 (6th Cir. 2001) (*en banc*) (collecting cases), this Court, as an intermediate federal court, is bound to follow the *Lemon* test until the Supreme Court explicitly overrules or abandons it. *Adland v. Russ*, 307 F.3d 471, 479 (6th Cir. 2002) (citing *Grutter v. Bollinger*, 288 F.3d 732, 743 (6th Cir. 2002)).

*ACLU v. McCreary County*, 354 F.3d 438, 445 (6th Cir. 2003). Two years after the Sixth Circuit

*Grayson County*, 591 F.3d at 844. Under the *Lemon* test, for a governmental practice or display to satisfy the Establishment Clause, the action or display must (1) reflect a secular purpose; (2) have a primary effect that neither advances nor inhibits religion; and (3) avoid excessive government entanglement with religion. *See Lemon,* 403 U.S. at 612-613. If a plaintiff establishes a violation of any prong of the *Lemon* test, then the government action is unconstitutional. *McCreary County*, 354 F.3d at 447 (citing *Edwards v. Aguillard*, 482 U.S. 578, 583 (1987)).

After consideration of the evidence properly before it, the Court determines that there are genuine issues of material fact as to whether the box of Bibles in the corner of Freshwater's classroom, the Bible on his desk, the inclusion of the Ten Commandments in the classroom window, and the inclusion of the Ten Commandments on a classroom bulletin board fail any prong of the *Lemon* test.

### a. The "Secular Purpose" Prong of the *Lemon* Test

"Although a government's stated purposes for a challenged action are to be given some deference, it remains the task of the reviewing court to 'distinguish a sham secular purpose from a sincere one.' " *Id.* (quoting *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 308 (2000)).

Here, Freshwater claims that the Bibles were is his classroom for the secular purpose of fulfilling his role as the faculty advisor of a student group, the FCA, and for the secular purpose

---

made this observation, the Supreme Court decided two Establishment Clause cases, one was its review of *McCreary*, in which it applied the *Lemon* test and a second case in which it did not. *See McCreary County v. ACLU*, 545 U.S. 844 (2005) (applying the *Lemon* test in evaluating a county courthouse display that included the Ten Commandments) and *Van Perry v. Orden*, 545 U.S. 677 (2005) (holding the display of a Ten Commandments monument on state grounds constitutional without applying the *Lemon* test).

of storing items for that same group. The same holds true, he avers, for the Ten Commandments posted on a bulletin board. That is, that they were posted on the bulletin board by the FCA, a club that was given access to the classroom for their meetings and to the bulletin board to post FCA materials. As to the Ten Commandments posted in the window, Freshwater claims that he covered the windows for the secular purpose of fulfilling the school district's mandate that all windows between the classrooms and the hallway be covered for security reasons. Further, Freshwater points out that the window was covered with three book covers that each contained the Ten Commandments and several secular inspirational quotes from well-known people.

The Court finds that, when viewing the evidence in the light most favorable to Freshwater, drawing all reasonable inferences in his favor, and making no credibility determinations, the Court cannot say that no reasonable jury could return a verdict in his favor. The Court, therefore, will allow a jury to determine whether Freshwater's stated secular purposes are a sham or are sincere.

### b. The "Endorsement" and "Entanglement" Prongs of the *Lemon* Test

Freshwater and Plaintiffs address the second and third prongs of the *Lemon* test together, and there seems to be some support for this type of combination. *See Mitchell v. Helms*, 530 U.S. 793, 807 (2000) (combining these two prongs when considering whether a facially neutral statute violated the Establishment Clause); *see also Zelman v. Simmons-Harris*, 536 U.S. 639, 668-669 (2002) (O'Connor, J., concurring) (discussing the Supreme Court's "fold[ing of] the entanglement inquiry into the primary effect inquiry" because "both inquiries rely on the same evidence"). Further, the parties correctly contend that *Lemon* effectively includes an "endorsement" test, "which looks to whether a reasonable observer would believe that a

particular action constitutes an endorsement of religion by the government." *McCreary County*, 354 F.3d at 446. This "endorsement" consideration does not replace any of the *Lemon* factors, but "should be treated as a refinement of the second *Lemon* [advancement] prong." *Baker v. Adams County/Ohio Valley Sch. Bd.*, 310 F.3d 927, 929 (6th Cir. 2002) (internal quotation marks omitted). Therefore, the parties contend that the advancement, endorsement, and entanglement considerations may be addressed under a similar endorsement prong, by determining "whether an objective observer" would acquaint the display as "state endorsement" of religion. *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 308 (2000) (internal quotation marks omitted). For purposes of the instant analysis the Court agrees and shall address these two prongs together under these standards.

Thus, the Court must determine whether an objective observer would acquaint the Bibles and Ten Commandment postings in Freshwater's classroom as state endorsement of religion. Plaintiffs argue that any reasonable observer, including Freshwater's students, would undoubtedly find the displays to constitute an endorsement of religion by the government. In opposition, Freshwater argues that there are issues of fact as to whether a reasonable observer would have found these items to constitute state endorsement of religion. This Court agrees.

First, the Court is not sure that a box of Bible's in the corner of a room with many other boxes of stored items constitutes a "display." Second, with regard to all of the items at issue here, and viewing all of the evidence in the light most favorable to Freshwater, the Court simply cannot say that no reasonable jury could find that the "displays" do not constitute an endorsement of religion. These are issues appropriately left for a jury to decide.

28

### c. Summary of the *Lemon* test

Based on the foregoing analysis, the Court concludes that there are material issues of fact as to whether the Bibles and Ten Commandment postings reflect a secular purpose, have a primary effect that neither advances nor inhibits religion, and avoid excessive government entanglement with religion. Accordingly, the Court **DENIES** Plaintiffs' Motion for Summary Judgment on Plaintiffs' violation of the Establishment Clause claims for relief.

### D. Plaintiffs' Battery Claim

Plaintiffs move for summary judgment on their claim of battery, arguing that there is no issue of material fact as to whether a battery occurred. Freshwater requests summary judgment on Plaintiffs' battery claim, arguing that, even if a battery occurred, ZD's act in volunteering for the experiment constitutes legal consent, which would negate Freshwater's liability.

### 1. Plaintiffs' Request for Summary Judgment on their Battery Claim

Plaintiffs argue that the application of the Tesla coil to ZD's arm constitutes a battery. In Ohio, a "person is subject to liability for battery when he acts intending to cause a harmful or offensive contact, and when a harmful contact results." *Love v. City of Port Clinton*, 37 Ohio St.3d 98, 99 (Ohio 1988). *See also Harris v. United States*, 422 F.3d 322, 330 (6th Cir. 2005) (noting that the definition of battery in Ohio is "an intentional uninvited contact with another."). Plaintiffs argue that Freshwater possessed the requisite intent for battery because he "undoubtably should have known that his actions were substantially certain to cause harm." (Doc. # 60 at 37.) Plaintiffs point out that Freshwater testified that he knew the Tesla coil "put out a lot of volts," that students often pulled their arm away when it was applied to them, and that Freshwater knew electrical shocks could cause burns. *Id.* Therefore, Plaintiffs assert that

there are no genuine issues of material fact as to whether a battery occurred. Plaintiffs' argument is not well taken.

The Court easily concludes that there are genuine issues of material fact as to whether Freshwater's application of the Telsa coil to ZD's arm constitutes a battery. Freshwater had been applying the Tesla coil to his student's arms for approximately 21 years, with not one reported injury. Over 600 students, in Freshwater's classes alone, had the Tesla coil applied to their arms without incident. Moreover, two other science teachers engaged in the same Tesla coil experiment with their students, one for over 20 years. These teachers too never had a reported injury resulting from the experiment.

Accordingly, the Court **DENIES** Plaintiffs' Motion for Summary Judgment as it relates to their claim for battery.

### 2. Freshwater's Request for Summary Judgment on Plaintiffs' Battery Claim

Freshwater contends that, even if the application of the Tesla coil is considered a battery, he cannot be held liable because ZD consented to the application of the Tesla coil. Therefore, Freshwater requests summary judgment on Plaintiffs' battery claim. In their opposition memorandum, Plaintiffs argue that volunteering for the Tesla coil experiment does not equate to legal consent.

For ZD's consent to constitute legal consent, he must have possessed the capacity to consent, have consented, the actions consented to must not have exceeded the scope of the consent, and the consent must not have been negated.

### a. Did ZD possess the capacity to consent?

Plaintiffs argue that, because ZD is a minor he "cannot legally consent to this type of

battery[,]" for two reasons.  (Doc. # 69 at 9.)  First, because ZD was not "capable of appreciating . . . the conduct consented to," and, second because "as impressionable minor, Ohio law prevents [ZD] from consenting to such actions."  *Id.* at 10 (citing Restatement (Second) Torts § 892A cmt. b.)

With regard to Plaintiffs first argument, Plaintiffs contend that Freshwater held a position of authority over ZD and that he used the position to lure unwitting ZD into volunteering to consent.  Plaintiffs argue that ZD, as a 13 year old adolescent, could not appreciate the nature, extent, and consequences of the Telsa coil experiment.

Freshwater, however, argues that, although ZD is a minor, he is not a child nor is he one of deficient mental capacity.  ZD received A's and B's in Freshwater's class and scored "accelerated" on the Ohio Achievement Tests as it relates to science in eighth grade.  Plaintiffs allowed their son to play the video games that are designated "mature," for individuals over the age of seventeen, and ZD testified that he was involved in relationships with the opposite sex and played full contact sports.  Freshwater concludes that this evidence shows that ZD possessed the capacity to consent.

Viewing the evidence in the in the light most favorable to Plaintiffs, the Court concludes that there are material issues of fact as to whether ZD had the capacity to consent.

### b.  Did ZD consent?  Did Freshwater exceed the scope of ZD's consent?

Informed consent requires "full disclosure of the implications and probable consequences of the proposed conduct to which such consent applies [when] given in such terms as may be fully comprehended by the person giving the consent."  *Lacey v. Laird*, 166 Ohio St. 12, 17 (Ohio 1956) (Hart, J., concurring).  "If the actor exceeds the consent, the consent is not

effective for the excess and he is not protected from liability for harm attributable to the excess."

*McIntyre v. Thriftco, Inc.*, No. 77767, 2001 Ohio App. LEXIS 2182, 2001 WL 534158, at *4

(Cuyahoga Cty. 8th App. Dist. May 17, 2001) (citing Restatement (Second) of Torts § 892A(4)

and cmt. h).

Freshwater argues that ZD was given full disclosure about the experiment and the

possibility that it would leave a mark on his arm, and that Freshwater did not exceed the

boundaries of that consent. Freshwater contends also that ZD was informed by his observation

of the several students that had the Tesla coil's electric volt touch them before ZD participated in

the experiment.

Plaintiffs, however, argue that Freshwater's actions and ZD's observations were not

sufficient to constitute "full disclosure" from Freshwater and therefore ZD could not consent to

the conduct that occurred. Plaintiffs also posit that, while ZD "arguably consented to a shock or

minor type of touching from the Tesla coil, Freshwater exceeded the scope of that consent

because his actions caused burning, blistering, and prolonged discomfort." (Doc. # 69 at 9.)

The Court concludes that these issues are ones of material fact that are appropriate for a

jury to decide.

### c. Was ZD's consent negated?

Plaintiffs argue that, "even if [ZD] did and could consent, this alleged consent was

negated by mistake, misrepresentation, and duress." (Doc. # 69 at 2 of 19.) The parties point the

Court to the Restatement (Second) of Torts, which explains that consent is negated by

"substantial mistake concerning the nature of the invasion of [] interests or the extent of harm to

be expected from [the conduct]" and by duress. §§ 892B(2), § 892B(3).

With regard to mistake or misrepresentation, Plaintiffs argue that Freshwater chose only to disclose part of the information he possessed about the Tesla coil experiment and not the information he "knew" from using the device for over 20 years, *i.e.*, "the burning and pain." (Doc. # 69 at 16.)  Freshwater, therefore misrepresented what would happen when he applied the Tesla coil to students' arms, and ZD consented based exclusively on Freshwater's misrepresentation of what could transpire.  This unilateral mistake, Plaintiffs contend, negates Freshwater's consent defense.

However, as Freshwater correctly argues, he testified that he had no knowledge that the experiment would cause ZD, or any other student, burning and pain.  Further, the evidence before the Court indicates that the Tesla coil experiment was conducted on hundreds of students with no injury.  Plaintiffs have failed to bring forth any evidence that would tend to show that Freshwater knew that the Tesla coil experiment could cause the burning and pain to which Plaintiffs refer.

With regard to duress, ZD testified that Freshwater held ZD's arm down while the Tesla coil was applied.  Plaintiffs argue that, "[a]t the very least, this actual physical duress negates any purported consent."  (Doc. # 69 at 17) (citing Restatement (Second) of Torts § 892B(3): "Consent is not effective if it is given under duress").  Freshwater denies that he held ZD's arm down while applying the Tesla coil.  The determination of whether Freshwater held down ZD's arm causing him duress is a factual determination dependent upon the credibility to be given to the testimony of Freshwater and ZD.  Therefore, this is a determination that is properly left for the jury.

Consequently, the Court concludes that Plaintiff's have raised a genuine issue of material

fact as to whether ZD's consent, if indeed there was such consent, was negated by duress. However, Plaintiffs have failed to raise a genuine issue of material fact as to whether the alleged consent was negated by mistake or misrepresentation.

### d. Conclusion of Freshwater's request for summary judgment on plaintiffs' battery claim

Viewing the evidence in the light most favorable to Plaintiffs, and making all reasonable inferences in their favor, the Court concludes that there are genuine issues of material fact as to whether ZD possessed the capacity to consent, whether he did consent, whether Freshwater exceeded the scope of any given consent, and whether the consent (if given) was negated by duress; therefore, the Court **DENIES** Freshwater's Motion for Partial Summary Judgment in this regard. The Court, however, **GRANTS** Freshwater's motion as it relates to Plaintiffs' defense of negation of ZD's consent because of mistake or misrepresentation.

## E. Plaintiffs' Request to Strike Exhibits

Plaintiffs request that the Court strike the exhibits attached to Freshwater's Memorandum in Opposition for several reasons. The Court, however, finds it unnecessary to address any of the reasons because it was unnecessary for the Court to rely on any of the exhibits. The Court notes that there is currently pending a motion to compel that apparently addresses some of the exhibits that, Plaintiffs argue, have not been properly produced. It appears that that motion may dispose of some of the issues Plaintiffs have with Freshwater's exhibits.

Accordingly, the Court **DENIES as MOOT** Plaintiffs request to strike Freshwater's exhibits.

## IV. Conclusion

Based on the foregoing, the Court **GRANTS in part and DENIES in part** Freshwater's

Motion for Partial Summary Judgment. (Doc. # 61.) Specifically, the Court **GRANTS** Freshwater's motion as it relates to Plaintiffs' defense of negation of ZD's consent because of mistake or misrepresentation and **DENIES** the remainder of the motion. The Court also **GRANTS in part and DENIES in part** Plaintiffs' Motion for Partial Summary Judgment. (Doc. # 60.) Specifically:

    1. The Court **GRANTS** Plaintiffs' motion as it relates to Freshwater's counterclaims for defamation and intentional infliction of emotional distress.

    2. The Court **DENIES** Plaintiffs' motion as it relates to their claim for battery and for violations of the Establishment Clause.

    3. The Court **DENIES as MOOT** Plaintiffs' motion as it relates to their request to strike the exhibits attached to Freshwater's memorandum in opposition to Plaintiffs' motion.

    **IT IS SO ORDERED.**

/s/ Gregory L. Frost
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE